No. 25-50246

# In the United States Court of Appeals for the Fifth Circuit

LA UNIÓN DEL PUEBLO ENTERO; SOUTHWEST VOTER REGISTRATION EDUCATION PROJECT; MEXICAN AMERICAN BAR ASSOCIATION OF TEXAS; TEXAS HISPANICS ORGANIZED FOR POLITICAL EDUCATION; JOLT ACTION; WILLIAM C. VELASQUEZ INSTITUTE; FIEL HOUSTON, INCORPORATED; FRIENDSHIP-WEST BAPTIST CHURCH; TEXAS IMPACT; JAMES LEWIN; MI FAMILIA VOTA,

*Plaintiffs-Appellees,*

*v.*

GREGORY W. ABBOTT, IN HIS OFFICIAL CAPACITY AS GOVERNOR OF TEXAS; JANE NELSON, IN HER OFFICIAL CAPACITY AS TEXAS SECRETARY OF STATE; STATE OF TEXAS; WARREN K. PAXTON, IN HIS OFFICIAL CAPACITY AS ATTORNEY GENERAL OF TEXAS; HARRIS COUNTY REPUBLICAN PARTY; DALLAS COUNTY REPUBLICAN PARTY; NATIONAL REPUBLICAN SENATORIAL COMMITTEE,

*Defendants-Appellants,*

REPUBLICAN NATIONAL COMMITTEE,

*Movant-Appellant.*

———————————

OCA-GREATER HOUSTON; LEAGUE OF WOMEN VOTERS OF TEXAS; REVUP-TEXAS,

*Plaintiffs-Appellees,*

*v.*

KEN PAXTON, TEXAS ATTORNEY GENERAL,

*Defendant-Appellant.*

———————————

LULAC TEXAS; TEXAS ALLIANCE FOR RETIRED AMERICANS; TEXAS AFT; VOTO LATINO,

*Plaintiffs-Appellees,*

*v.*

KEN PAXTON, IN HIS OFFICIAL CAPACITY AS THE TEXAS ATTORNEY GENERAL,

*Defendant-Appellant.*

_____

DELTA SIGMA THETA SORORITY, INCORPORATED; THE ARC OF TEXAS,

*Plaintiffs-Appellees,*

*v.*

GREGORY WAYNE ABBOTT, IN HIS OFFICIAL CAPACITY AS THE GOVERNOR OF TEXAS; WARREN KENNETH PAXTON, JR., IN HIS OFFICIAL CAPACITY AS THE ATTORNEY GENERAL OF TEXAS,

*Defendants-Appellants,*

————

On Appeal from the United States District Court
for the Western District of Texas, San Antonio Division

————

**INTERVENOR-DEFENDANTS-APPELLANTS' BRIEF**

————

John M. Gore
E. Stewart Crosland
Nathaniel C. Sutton
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
Phone: (202) 879-3939
Fax: (202) 626-1700
jmgore@jonesday.com
scrosland@jonesday.com
nsutton@jonesday.com

Counsel for Intervenor-Appellants

## CERTIFICATE OF INTERESTED PERSONS

No. 25-50246

LA UNIÓN DEL PUEBLO ENTERO ET AL.,
*Plaintiffs-Appellees,*

*v.*

GREGORY W. ABBOTT ET AL.,
*Defendants-Appellants.*

The undersigned counsel of record certifies that the following listed persons and entities (other than governmental parties) as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

La Unión del Pueblo Entero

Southwest Voter Registration Education Project

Mexican American Bar Association of Texas

Texas Hispanics Organized for Political Education

JOLT Action

William C. Velasquez Institute

Fiel Houston, Incorporated

Friendship-West Baptist Church

Texas Impact

James Lewin

OCA-Greater Houston

League of Women Voters of Texas

LULAC Texas

Texas Alliance for Retired Americans

Texas AFT

Voto Latino

Delta Sigma Theta Sorority, Incorporated

The Arc of Texas

Republican National Committee

Harris County Republican Party

Dallas County Republican Party

National Republican Senatorial Committee

National Republican Congressional Committee

Kim Ogg

Houston Area Urban League

Mi Familia Vota

Marla Lopez

Marlon Lopez

Paul Rutledge

REVUP-Texas

Michael Courtney Keats
Direct: 212-859-8914
Email: michael.keats@friedfrank.com
Fried, Frank, Harris, Shriver & Jacobson LLP
1 New York Plaza

New York, NY 10004

Rebecca L. Martin
Direct: 212-859-8305
Email: rebecca.martin@friedfrank.com
Fried, Frank, Harris, Shriver & Jacobson LLP
1 New York Plaza
New York, NY 10004

Elizabeth Ryan
Direct: 214-746-8158
Email: liz.ryan@weil.com
Fax: 214-746-7777
Weil, Gotshal & Manges, L.L.P.
200 Crescent Court, Suite 300
Dallas, TX 75201

Zachary Tripp
Direct: 202-682-7000
Email: zack.tripp@weil.com
Fax: 202-857-0940
Weil, Gotshal & Manges, L.L.P.
2001 M Street, N.W., Suite 600
Washington, DC 20036

Aaron J. Curtis
Direct: 212-310-8901
Email: aaron.curtis@weil.com
Weil, Gotshal & Manges, L.L.P.
767 Fifth Avenue
New York, NY 10153-0119

Charles K. Gehnrich
Direct: 212-310-8391
Email: charles.gehnrich@weil.com
Weil, Gotshal & Manges, L.L.P.
767 Fifth Avenue
New York, NY 10153-0119

Sean Morales-Doyle

Direct: 646-292-8363
Email: morales-doyles@brennan.law.nyu.edu
Brennan Center for Justice
120 Broadway, Suite 1750
New York, NY 10271

Patrick Berry
Direct: 646-925-8754
Email: berryp@brennan.law.nyu.edu
Brennan Center for Justice
120 Broadway
New York, NY 10271

Jasleen Kaur Singh
Direct: 646-292-8389
Email: singhj@brennan.law.nyu.edu
Brennan Center for Justice
120 Broadway
New York, NY 10271

Jessica Ring Amunson
Direct: 202-639-6023
Email: jamunson@jenner.com
Fax: 202-661-4993
Jenner & Block, L.L.P.
1099 New York Avenue, N.W., Suite 900
Washington, DC 20001-4412

Thomas Paul Buser-Clancy
Direct: 713-942-8146
Email: tbuser-clancy@aclutx.org
American Civil Liberties Union of Texas
P.O. Box 8306
Houston, TX 77288

Dayton Campbell-Harris
Direct: 425-516-8400
Email: dcampbell-harris@aclu.org
American Civil Liberties Union Foundation
Voting Rights Project

125 Broad Street
New York, NY 10004

Adriel I. Cepeda Derieux
Direct: 212-284-7334
Email: acepedaderieux@aclu.org
Fax: 212-549-2654
American Civil Liberties Union Foundation
915 15th Street, N.W.
Washington, DC 20005

Sarah Xiyi Chen
Direct: 512-474-5073
Email: schen@texascivilrightsproject.org
Texas Civil Rights Project
1405 Montopolis Drive
Austin, TX 78741-3438

Zachary Dolling
Direct: 512-474-5073
Email: zachary@texascivilrightsproject.org
Texas Civil Rights Project
1405 Montopolis Drive
Austin, TX 78741-3438

Ashley Alcantara Harris
Direct: 713-942-8146
Email: aharris@aclutx.org
American Civil Liberties Union of Texas
P.O. Box 8306
Houston, TX 77288

Savannah Kumar
Direct: 713-942-8146
Email: skumar@aclutx.org
American Civil Liberties Union of Texas
Suite 350
5225 Katy Freeway
Houston, TX 77007

Peter Hofer
Direct: 512-454-4816
Email: phofer@disabilityrightstx.org
Fax: 512-454-3999
Disability Rights Texas
2222 W. Braker Lane
Austin, TX 78758

Sophia Lin Lakin
Direct: 212-519-7836
Email: slakin@aclu.org
Fax: 212-549-2654
American Civil Liberties Union Foundation
Voting Rights Project
125 Broad Street, 18th Floor
New York, NY 10004

Christopher McGreal
Direct: 214-630-0916
Email: cmcgreal@disabilityrightstx.org
Disability Rights Texas, North Texas Regional Office
1420 W. Mockingbird Lane, Suite 450
Dallas, TX 75247-4932

Adriana Cecilia Pinon
Direct: 713-942-8146
Email: apinon@aclutx.org
American Civil Liberties Union of Texas
P.O. Box 8306
Houston, TX 77288

Lucia Romano
Direct: 713-974-7691
Email: lromano@drtx.org
Fax: 713-974-7695
Disability Rights Texas
1500 McGowen Street, Suite 100
Houston, TX 77004

Edgar Saldivar

Direct: 713-942-8146
Email: esaldivar@aclutx.org
American Civil Liberties Union of Texas
5225 Katy Freeway, Suite 350
Houston, TX 77007

Ari J. Savitzky
Direct: 212-549-2681
Email: asavitzky@aclu.org
American Civil Liberties Union Foundation
125 Broad Street
New York, NY 10004-2400

Christopher D. Dodge
Direct: 202-987-4928
Email: cdodge@elias.law
Elias Law Group, L.L.P.
250 Massachusetts Avenue, N.W., Suite 400
Washington, DC 20001

Marcos Mocine-McQueen
Direct: 202-968-4492
Email: mmcqueen@elias.law
Elias Law Group, L.L.P.
250 Massachusetts Avenue, N.W., Suite 400
Washington, DC 20001

Uzoma Nkem Nkwonta
Direct: 202-968-4490
Email: unkwonta@elias.law
Elias Law Group, L.L.P.
250 Massachusetts Avenue, N.W., Suite 400
Washington, DC 20001

Julie Zuckerbrod
Direct: 202-987-5680
Email: jzuckerbrod@elias.law
Elias Law Group, L.L.P.
250 Massachusetts Avenue, N.W., Suite 400
Washington, DC 20001

Jennifer A. Holmes
Direct: 202-682-1300
Email: jholmes@naacpldf.org
NAACP Legal Defense & Educational Fund, Incorporated
700 14th Street, N.W., Suite 600
Washington, DC 20005

J. Michael Showalter
Direct: 312-258-5561
Email: j.michael.showalter@afslaw.com
ArentFox Schiff LLP
233 S. Wacker Drive, Suite 7100
Chicago, IL 60606

Mohammed A. Badat
Direct: 212-965-2200
Email: abadat@naacpldf.org
Fax: 212-226-7592
NAACP Legal Defense & Educational Fund, Inc.
40 Rector Street, 5th Floor
New York, NY 10006

Eitan G. Berkowitz
Direct: 408-334-8775
Email: eitan.berkowitz@afslaw.com
ArentFox Schiff LLP
44 Montgomery Street, 38th Floor
San Francisco, CA 94104

Kenneth E. Broughton, Jr.
Direct: 713-469-3819
Email: kbroughton@reedsmith.com
Fax: 713-469-3899
Reed Smith LLP
2850 N. Harwood St., Suite 1500
Dallas, TX 75201

James David Cromley
Direct: 312-258-5616
Email: james.cromley@afslaw.com
Fax: 312-258-5600
ArentFox Schiff LLP
233 S. Wacker Drive, Suite 7100
Chicago, IL 60606

William D'Angelo, III
Direct: 949-633-0879
Email: william.dangelo@afslaw.com
ArentFox Schiff LLP
555 W. Fifth Street, 48th Floor
Los Angeles, CA 90013

Victor Genecin
Direct: 212-965-2200
Email: vgenecin@naacpldf.org
Fax: 212-226-7592
NAACP Legal Defense & Educational Fund, Inc.
40 Rector Street, 5th Floor
New York, NY 10006

Derek H. Ha
Direct: 415-757-5897
Email: derek.ha@afslaw.com
ArentFox Schiff LLP
44 Montgomery Street, 38th Floor
San Francisco, CA 94104

Ann Helen MacDonald
Direct: 312-258-5548
Email: ann.macdonald@afslaw.com
ArentFox Schiff LLP
233 S. Wacker Drive, Suite 7100
Chicago, IL 60606

Roswill Mejia
Direct: 512-409-2718
Email: rmejia@reedsmith.com
Fax: 512-623-1802
Reed Smith LLP
401 Congress Avenue, Suite 1800
Austin, TX 78701

Keely Dulaney Pippin
Direct: 713-469-3888
Email: kpippin@reedsmith.com
Fax: 713-469-3899
Reed Smith
1221 McKinney Street, Suite 2100
Houston, TX 77010

Kathryn Sadasivan
Direct: 212-965-2200
Email: ksadasivan@naacpldf.org
Fax: 212-226-7592
NAACP Legal Defense & Educational Fund, Inc.
40 Rector Street, 5th Floor
New York, NY 10006

Uruj Sheikh
Direct: 212-965-2275
Email: usheikh@naacpldf.org
NAACP Legal Defense and Educational Fund, Inc.
40 Rector Street, 5th Floor
New York, NY 10006

Ciara A. Sisco
Direct: 212-965-2200
Email: csisco@naacpldf.org
Fax: 212-226-7592
NAACP Legal Defense & Educational Fund, Inc.
40 Rector Street, 5th Floor
New York, NY 10006

Sarah C. Stewart
Direct: 469-680-4228
Email: sarah.stewart@reedsmith.com
Fax: 469-680-4299
Reed Smith, LLP
2850 N. Harwood Street, Suite 1500
Dallas, TX 75201

Shira Wakschlag
Direct: 202-534-3708
Email: wakschlag@thearc.org
Fax: 202-534-3731
The Arc of the United States
1825 K Street, N.W., Suite 1200
Washington, DC 20006

Evan Monod
Direct: 202-534-3710
Email: monod@thearc.org
The Arc of the United States
2000 Pennsylvania Avenue, N.W., Suite 500
Washington, DC 20006

Breanna Della Williams
Direct: 405-602-4779
Email: bwilliams@naacpldf.org
NAACP Legal Defense & Educational Fund, Inc.
40 Rector Street, 5th Floor
New York, NY 10006

Mark L. Bieter
Phone: 208-389-9000
Email: mark.bieter@stoel.com
Fax: 208-389-9040
Stoel Rives LLP
101 S. Capitol Boulevard, Suite 1900
Boise, ID 83702

John Bonifaz
Phone: 617-244-0234
Email: jbonifaz@freespeechforpeople.org
Fax: 512-628-0142
Free Speech For People
1320 Centre Street, Suite 405
Newton, MA 02459

Ben Clements
Phone: 617-244-0234
Email: bclements@freespeechforpeople.org
Fax: 512-628-0142
Free Speech For People
1320 Centre Street, Suite 405
Newton, MA 02459

Courtney M. Hostetler
Phone: 617-249-3015
Email: chostetler@freespeechforpeople.org
Fax: 512-628-0142
Free Speech For People
1320 Centre Street #405
Newton, MA 02459

Sean Michael Lyons
Direct: 210-225-5251
Email: sean@lyonsandlyons.com
Fax: 210-225-6545
Lyons & Lyons, PC
237 W. Travis Street, Suite 100
San Antonio, TX 78205

Amira Marcella Mattar
Phone: 617-564-0464
Email: amira@freespeechforpeople.org
Free Speech For People
48 N. Pleasant Street, Suite 304
Amherst, MA 01002

Wendy J. Olson
Phone: 208-389-9000
Email: wendy.olson@stoel.com
Fax: 208-389-9040
Stoel Rives LLP
101 S. Capitol Boulevard, Suite 1900
Boise, ID 83702

Bradley R. Prowant
Phone: 612-373-8800
Email: bradley.prowant@stoel.com
Fax: 612-373-8881
Stoel Rives LLP
33 S. Sixth Street, Suite 4200
Minneapolis, MN 55402-3722

Laura E. Rosenbaum
Phone: 503-294-9642
Email: laura.rosenbaum@stoel.com
Fax: 503-220-2480
Stoel Rives LLP
760 S.W. 9th Avenue, Suite 3000
Portland, OR 97205

Cory R. Liu
Phone: 737-802-1800
Email: cory.liu@butlersnow.com
Butler Snow LLP
1400 Lavaca Street, Suite 1000
Austin, TX 78702

Eric J.R. Nichols
Phone: 737-802-1800
Email: eric.nichols@butlersnow.com
Butler Snow LLP
1400 Lavaca Street, Suite 1000
Austin, TX 78702

Daniel Ortner
Direct: 512-936-1896
Email: daniel.ortner@oag.texas.gov
Office of the Texas Attorney General
Office of the Solicitor General
P.O. Box 12548 (MC-059)
Austin, TX 78711-2548

Ryan Glen Kercher
Direct: 512-463-2100
Email: ryan.kercher@oag.texas.gov
Texas Attorney General's Office
Special Litigation Division
P.O. Box 12548 (MC-009)
Austin, TX 78711-2548

John Matthew Gore
Direct: 202-879-3930
Email: jmgore@jonesday.com
Jones Day
51 Louisiana Avenue, N.W.
Washington, DC 20001

E. Stewart Crosland
Direct: 202-879-3951
Email: scrosland@jonesday.com
Jones Day
51 Louisiana Avenue, N.W.
Washington, DC 20001

Benjamin P. Daus
Direct: 202-879-3643
Email: bdaus@jonesday.com
Jones Day
51 Louisiana Avenue, N.W.
Washington, DC 20001

Nathaniel C. Sutton
Direct: 202-879-3645
Email: nsutton@jonesday.com
Jones Day
51 Louisiana Avenue, N.W.
Washington, DC 20001

/s/ John M. Gore
JOHN M. GORE
*Counsel for Intervenor-Appellants*

## STATEMENT REGARDING ORAL ARGUMENT

Intervenor-Appellants respectfully request oral argument.  *See* Fed. R. App. P. 34; 5th Cir. R. 28.2.3.  The order under review raises legally and practically significant questions regarding the legality of the Texas Election Code.  Oral argument will assist this Court in answering those questions.

## TABLE OF CONTENTS

**PAGE**

CERTIFICATE OF INTERESTED PERSONS .................................................. i

STATEMENT REGARDING ORAL ARGUMENT..................................... xvi

INTRODUCTION ............................................................................1

JURISDICTIONAL STATEMENT................................................... 5

STATEMENT OF ISSUES ............................................................. 6

STATEMENT OF THE CASE .......................................................... 6

    A.    Disabled Voters Have Many Opportunities To Vote In
Texas. ...................................................................................... 6

    B.    Texas's Election Code Has Long Regulated Assistance Of
Disabled Voters.................................................................. 8

    C.    Texas Enacts S.B. 1. ................................................... 11

    D.    Plaintiffs Sue To Enjoin S.B. 1. ...................................17

    E.    The District Court Permanently Enjoins Several
Provisions Of S.B. 1.........................................................19

SUMMARY OF ARGUMENT ....................................................... 23

STANDARD OF REVIEW ............................................................ 28

ARGUMENT................................................................................ 28

I.    PLAINTIFFS LACK STANDING TO CHALLENGE THE IDENTIFICATION
REQUIREMENT, THE OATH PROVISION, AND THE ASSISTOR
DISCLOSURE PROVISIONS OF S.B. 1. ...................................... 29

    A.    Plaintiffs Lack Associational Standing. .................................30

    B.    Plaintiffs Lack Organizational Standing................................. 39

II.    PLAINTIFFS' ADA AND SECTION 504 CLAIMS FAIL ON THE MERITS. .......41

    A.    S.B. 1 Does Not Meaningfully Exclude Disabled
Individuals From Voting. ....................................................... 42

    B.    Plaintiffs Failed To Request An Accommodation.................... 49

    C.    Enjoining S.B. 1 Statewide Fundamentally Alters Texas's
Voting Program. .................................................................... 56

# TABLE OF CONTENTS
(continued)

**Page**

CONCLUSION............................................................................. 62

CERTIFICATES OF COMPLIANCE AND SERVICE.................................. 64

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Abbott v. Perez,*
    585 U.S. 579 (2018) ........................................................... 27, 58

*Alexander v. Choate,*
    469 U.S. 287 (1985) ................................................. 4, 28, 42, 43

*Ball v. LeBlanc,*
    792 F.3d 584 (5th Cir. 2015) ............................................... 50

*Cadena v. El Paso Cnty.,*
    946 F.3d 717 (5th Cir. 2020) .......................................43, 47, 53

*California v. Texas,*
    593 U.S. 659 (2021) ............................................................. 35

*Clapper v. Amnesty Int'l USA,*
    568 U.S. 398 (2013) .............................................................31

*Crown Castle Fiber, L.L.C. v. City of Pasadena,*
    76 F.4th 425 (5th Cir. 2023) ................................................ 28

*Doe v. BlueCross BlueShield of Tennessee, Inc.,*
    926 F.3d 235 (6th Cir. 2019) ............................................... 56

*E.T. v. Paxton,*
    41 F.4th 709 (5th Cir. 2022) ............................................... 53

*Eu v. San Francisco Cty. Democratic Cent. Comm.,*
    489 U.S. 214 (1989) ........................................................ 27, 58

*FDA v. All. for Hippocratic Med.,*
    602 U.S. 367 (2024) ....................................................*passim*

*Frame v. City of Arlington,*
616 F.3d 476 (5th Cir. 2010) .................................................. 43

*Funeral Consumers All., Inc. v. Service Corp. Int'l,*
695 F.3d 330 (5th Cir. 2012) .................................................. 32

*Gonzalez v. Blue Cross Blue Shield Ass'n,*
62 F.4th 891 (5th Cir. 2023) .................................................. 34

*Gustafson v. Bi-State Dev. Agency of Missouri-Illinois Metro.*
*Dist.,*
29 F.4th 406 (8th Cir. 2022) .................................................. 48

*Hohider v. United Parcel Serv.,*
574 F.3d 169 (3d Cir. 2009) ............................................. 50, 53

*In re Cleveland Imaging & Surgical Hosp., LLC,*
26 F.4th 285 (5th Cir. 2022) .................................................. 29

*In re Gee,*
941 F.3d 153 (5th Cir. 2019) (per curiam) ............................. 29

*Johnson v. Gambrinus Co./Spoetzl Brewery,*
116 F.3d 1052 (5th Cir. 1997) ........................................... 56, 57

*Kamps v. Baylor Univ.,*
592 F. App'x 282 (5th Cir. 2014) ........................................... 56

*La. Fair Hous. Action Ctr., Inc. v. Azalea Garden Props.,*
*L.L.C.,*
82 F.4th 345 (5th Cir. 2023) ................................................. 41

*La Unión Del Pueblo Entero v. Abbott,*
119 F.4th 404 (5th Cir. 2024) ................................................ 17

*La Unión Del Pueblo Entero v. Abbott,*
2025 WL 2489464 (5th Cir. Aug. 29, 2025) ..................... *passim*

*La Unión Del Pueblo Entero v. Abbott,*
  29 F.4th 299 (5th Cir. 2022) ................................................... 18

*La Unión Del Pueblo Entero v. Abbott,*
  68 F.4th 228 (5th Cir. 2024) ................................................... 18

*League of Women Voters of Fla., Inc. v. Lee,*
  595 F. Supp. 3d 1042 (N.D. Fla. 2022) .................................... 59

*Lightbourn v. City of El Paso,*
  118 F.3d 421 (5th Cir. 1997) ..................................................... 8

*Lujan v. Defenders of Wildlife,*
  504 U.S. 555 (1992) ................................................................ 24

*Luke v. Texas,*
  46 F.4th 301 (5th Cir. 2022) .................................... 46, 47, 48

*Mi Familia Vota v. Ogg,*
  105 F.4th 313 (5th Cir. 2024) ................................................. 18

*Payan v. Los Angeles Community College District,*
  11 F.4th 729 (9th Cir. 2021) ............................................ 54, 55

*PGA Tour, Inc. v. Martin,*
  532 U.S. 661 (2001) ................................................................ 57

*Purcell v. Gonzalez,*
  549 U.S. 1 (2006) .................................................................... 19

*Reule v. Jackson,*
  114 F.4th 360 (5th Cir. 2024) ................................................. 35

*Sch. Bd. of Nassau Cnty. v. Arline,*
  480 U.S. 273 (1987) .......................................................... 57, 58

*Servicios Azucareros De Venezuela C.A. v. John Deere
   Thibodeaux, Inc.,*
  702 F.3d 794 (5th Cir. 2012) .................................................. 38

*Shrimpers & Fishermen of the RGV v. Tex. Comm'n on Envtl. Quality,*
   968 F.3d 419 (5th Cir. 2020) ........................................................... 33, 34

*Smith v. Harris Cnty.,*
   956 F.3d 311 (5th Cir. 2020) .......................................................... 43, 50

*State v. Hollins,*
   620 S.W.3d 400 (Tex. 2020) ............................................................ 1

*Storer v. Brown,*
   415 U.S. 724 (1974) ...................................................................... 1

*Sutton v. United Air Lines, Inc.,*
   527 U.S. 471 (1999) ..................................................................... 54

*Tennessee v. Lane,*
   541 U.S. 509 (2004) .............................................................. *passim*

*Tex. State LULAC v. Elfant,*
   52 F.4th 248 (5th Cir. 2022) ..................................................... 24, 36, 37

*TransUnion LLC v. Ramirez,*
   594 U.S. 413 (2021) ............................................................. 23, 29, 33

*Trump v. CASA, Inc.,*
   606 U.S. 831 (2025) ............................................................. 27, 61, 62

*United States v. Paxton,*
   148 F.4th 335 (5th Cir. 2025) ................................................. *passim*

*Veasey v. Abbott,*
   830 F.3d 216 (5th Cir. 2016) .......................................................... 2

*Windham v. Harris Cnty.,*
   875 F.3d 229 (5th Cir. 2017) ................................................. *passim*

*Zimmerman v. Austin,*
   881 F.3d 378 (5th Cir. 2018) ......................................................... 36

**STATUTES**

28 U.S.C. § 1292 ....................................................................... 6

28 U.S.C. § 1331 ....................................................................... 5

42 U.S.C. § 12132 .................................................................... 42

Act of 1985, S.B. 616 ............................................................... 9

Help America Vote Act,
    52 U.S.C. § 21083 ........................................................ 13, 14

Rehabilitation Act
    § 504 .................................................................... *passim*

Tex. Elec. Code Article 8.13 (1957) ........................................ 9

Tex. Elec. Code § 1.022 ................................... 44, 48, 51, 52

Tex. Elec. Code § 13.002 ....................................................... 13

Tex. Elec. Code § 41.001 ................................................. 6, 44

Tex. Elec. Code § 43.034 ................................................. 7, 44

Tex. Elec. Code § 61.012 ................................................. 7, 44

Tex. Elec. Code § 64.009 ....................................... 6, 7, 12, 44

Tex. Elec. Code § 64.031 ............................................... 7, 8, 9

Tex. Elec. Code § 64.032 .............................................. *passim*

Tex. Elec. Code § 64.034 .............................................. 10, 16

Tex. Elec. Code § 64.036 .............................................. 10, 38

Tex. Elec. Code § 81.001 ................................................. 6, 44

Tex. Elec. Code § 82.001 ....................................................... 6

Tex. Elec. Code § 82.002 ........................................................... 6, 44

Tex. Elec. Code § 82.003 ................................................................ 6

Tex. Elec. Code § 82.004 ................................................................ 6

Tex. Elec. Code § 82.005 ........................................................... 6, 44

Tex. Elec. Code § 82.007 ................................................................ 6

Tex. Elec. Code § 82.008 ................................................................ 6

Tex. Elec. Code § 84.001 ...............................................................12

Tex. Elec. Code § 84.002 .........................................................*passim*

Tex. Elec. Code § 84.035 ...............................................................15

Tex. Elec. Code § 84.011 .........................................................*passim*

Tex. Elec. Code § 86.001 ...............................................................11

Tex. Elec. Code § 86.002 ......................................................... 14, 15

Tex. Elec. Code § 86.013 ...............................................................14

Tex. Elec. Code § 86.010 ...............................................................44

Tex. Elec. Code § 86.015 .........................................................*passim*

Tex. Elec. Code § 87.041 .............................................. 12, 15, 45, 48

Tex. Elec. Code § 87.0271 ......................................................15, 45, 48

Tex. Elec. Code § 276.013 (1985) ................................................ 10

Tex. Elec. Code § 276.015 ......................................................16, 17, 21

Tex. Penal Code Article 258 (1911) ............................................... 9

Tex. Penal Code § 37.02 (1985) ..............................................11, 38

Title 36, Ch. 6, Art. 1790 (1893) ..................................................... 8

Title 49, Ch. 7, Art. 3003 (1911) ..................................................... 9

Voting Rights Act
    § 208 ...............................................................................17, 23

**OTHER AUTHORITIES**

MIT Election Data + Science Lab, Spotlight on Texas: Record
    Breaking Early Vote Turnout ..................................................61

National Conf. of State Legislatures, *Voter ID Laws*
    (Feb. 2, 2024) ......................................................................... 2

A. Samuels, *Carrollton mayoral candidate arrested on
    suspicion of fraudulently obtaining mail-in ballots*,
    Tex. Tribune (Oct. 8, 2020) ......................................................1

S.B. 1
    § 1.03 ................................................................................... 11
    § 1.04 ................................................................................1, 11
    § 1.08 ................................................................................... 11

University of Texas/Texas Tribune Poll (2021) .............................1

## INTRODUCTION

"[A]s a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." *Storer v. Brown*, 415 U.S. 724, 730 (1974). The 2020 election underscored this point. In response to the COVID-19 pandemic, some Texas counties deviated from standard protocols and pushed the boundaries of what State law permits. *See, e.g.*, *State v. Hollins*, 620 S.W.3d 400, 410 (Tex. 2020) (per curiam) (holding that Harris County unlawfully sent unsolicited mail-ballot applications). Simultaneously, many Texans were concerned about the risk of fraud in Texas's elections. *See, e.g.*, University of Texas/Texas Tribune Poll, at 20 (2021), https://perma.cc/H9QP-UWCK. Those fears were well founded. *See, e.g.*, A. Samuels, *Carrollton mayoral candidate arrested on suspicion of fraudulently obtaining mail-in ballots*, Tex. Tribune (Oct. 8, 2020), https://perma.cc/S6PG-Y438.

After the 2020 election, the Texas Legislature enacted S.B. 1 to "reduce the likelihood of fraud in the conduct of elections, protect the secrecy of the ballot, promote voter access, and ensure that all legally cast ballots are counted." S.B. 1 § 1.04. As relevant here, the Legislature addressed two areas where Texas elections are particularly susceptible to fraud. For one, it

1

enacted additional safeguards around mail ballots, where "the potential and reality of fraud [are] much greater . . . than with in-person voting." *Veasey v. Abbott*, 830 F.3d 216, 239 (5th Cir. 2016) (en banc).  For the other, it identified and specifically addressed fraudulent schemes designed to secure votes in the guise of providing assistance to voters.

The Legislature addressed mail voting across the board by strengthening the identification requirements for voting by mail.  Most States, including Texas, require in-person voters to show identification.  *See, e.g.*, National Conf. of State Legislatures, *Voter ID Laws* (Feb. 2, 2024), https://perma.cc/4HGH-7NS6.  The Legislature adopted similar requirements for mail ballots in S.B. 1.  Under S.B. 1, voters applying for or casting a mail ballot must provide a unique personal identifying number not available to the public—their Texas driver's license or identification number, or the last four digits of their Social Security number.  Election officials verify that number against the voter's registration record before sending the voter a blank mail ballot and again before counting a returned mail ballot.

S.B. 1 also added three sets of modest requirements to Texas's preexisting rules for voter assistance.  *First*, S.B. 1 adds language to Texas's longstanding voter-assistor oath confirming that (1) the oath is made under penalty of perjury, (2) the assistor did not coerce or pressure the voter into

selecting him as an assistor, and (3) the voter represented to his assistor that he is eligible for assistance. *Second*, S.B. 1 requires assistors to disclose to election officials their name, address, and relationship with the voter. *Third*, S.B. 1 builds on Texas's preexisting ban on schemes in which strangers accept compensation for seeking out voters to "assist."

The District Court enjoined enforcement of *all* these commonsense requirements statewide under the banner of Title II of the Americans with Disabilities Act (ADA) and Section 504 of the Rehabilitation Act. That holding is wrong on every level.

To start, Plaintiffs lack standing to challenge S.B. 1's identification requirement, revisions to the voter-assistance oath, and amended disclosure requirement. Indeed, this Court recently held in another appeal in this case that Plaintiffs lack standing to challenge revisions to the voter-assistance oath and the amended disclosure requirement. *See La Unión Del Pueblo Entero v. Abbott*, 2025 WL 2489464, at *4-*7 (5th Cir. Aug. 29, 2025) ("*LUPE*"). Plaintiffs advance exactly the same untenable standing theories in this appeal. Their alleged harms—such as inconvenience, a speculative risk of ballot rejection, or a hypothetical "chill" on would-be assistors—are not cognizable under Article III. Plaintiffs likewise cannot proceed under a

diversion of resources theory because their expenditures fall squarely within their wheelhouse of voter education.

The District Court's holding is also profoundly wrong on the merits. In its telling, the ADA and Section 504 give Plaintiffs a roving power to eliminate any voting law that "may dissuade" a disabled individual from voting. That holding is incompatible with the ADA: The ADA does not guarantee elimination of all inconveniences or override the State's interest in secure elections. Instead, it guarantees disabled individuals "meaningful access" to voting. *Alexander v. Choate*, 469 U.S. 287, 301 (1985).

Texas law already provided individuals with disabilities meaningful access to voting—and S.B. 1 *expanded* that access. Indeed, Texas law long has provided ample opportunities and accommodations for disabled individuals to vote, ranging from voting in person with an assistor, voting curbside, and voting by mail. S.B. 1 only expanded those opportunities by enacting a statutory cure process for mail ballots returned with errors, reducing reliance on signature matching as a method for verifying voters' identities, and codifying an express anti-discrimination mandate that ensures election officials stand ready to respond to every disabled voter's accommodation request.

The District Court's conclusion that Texas has somehow failed to provide meaningful access to voting was not its only error on the merits. It also misapplied the ADA when it excused Plaintiffs and their members from their burden of requesting an accommodation before filing suit. And it erred when it adopted a *statewide* injunction against S.B. 1—which enjoins enforcement of the challenged provisions for *all* Texas voters, not only voters with disabilities who suffered actionable discrimination under the ADA or Section 504—as a "reasonable" accommodation. There is simply nothing reasonable about wielding the ADA and Section 504 to order a statewide judicial roll-back of election integrity measures that the Legislature has deemed vital to protecting all Texans' right to vote. The District Court's injunction far exceeded its remedial authority under the ADA and Article III.

This Court should reverse, uphold the properly calibrated scope of the ADA and Section 504, and reaffirm the authority of States to ensure electoral security through commonsense election laws.

## JURISDICTIONAL STATEMENT

The District Court had jurisdiction under 28 U.S.C. § 1331 because Plaintiffs' claims arise under federal law. The District Court entered its finding of facts and conclusions of law on March 14, 2025, following a bench trial. ROA.40864–40975. On March 26, 2025, State Defendants and

Intervenor-Defendants each timely filed notices of appeal, which were docketed on April 2, 2025. ROA.41034, 41036; ECF Nos. 1, 6. This Court has jurisdiction under 28 U.S.C. § 1292(a)(1) because the District Court permanently enjoined Sections 5.02, 5.03, 5.07, 6.03-6.07, and 7.04 of S.B. 1.

## STATEMENT OF ISSUES

**1.**   Do Appellees have Article III standing?

**2.**   Do the challenged S.B. 1 provisions violate the ADA and Section 504?

## STATEMENT OF THE CASE

### A.   Disabled Voters Have Many Opportunities To Vote In Texas.

Texas law has long provided voters with disabilities multiple options to vote, and structured each option so that the voter can obtain necessary accommodations. Specifically, disabled voters may vote (1) in a polling place during early voting; (2) curbside during early voting; (3) in a polling place on Election Day; (4) curbside on Election Day; and (5) by mail. *See* Tex. Elec. Code §§ 41.001, 64.009, 81.001, 82.005. These options go beyond those available to non-disabled voters, who are generally ineligible for curbside voting and may vote by mail only if they are at least sixty-five years of age or satisfy other specific criteria. *See id.* §§ 64.009, 82.001-.004, 82.007-.008.

Texas law also guarantees a range of accommodations for disabled voters. For example, Texas law guarantees such voters a robust right to

assistance with every method of voting. *See* Tex. Elec. Code §§ 64.031, 64.032. Voters with disabilities have a right to receive that assistance from a person of their choice (with limited exceptions) or from election officials. *See id.* § 64.032(c).

When it comes to in-person voting, each polling place must "be accessible to and usable by . . . persons with physical disabilities." *Id.* § 43.034. Accordingly, each location must have "at least one voting station" that "provides a practical and effective means for voters with physical disabilities to cast a secret ballot." *Id.* § 61.012. Likewise, every polling place must comply with rigorous accessibility requirements, including features such as curb cuts or temporary nonslip ramps, entry at ground level, sufficiently wide doorways, handrails, and the elimination of any obstacles that could hinder a voter's access to the voting area. *Id.* § 43.034.

For voters who are physically unable to enter a polling location, election officials must provide alternative voting methods, such as curbside voting, which permits individuals to cast their ballots from their vehicles. *Id.* § 64.009. Each polling place must "reserve[]" for curbside voting a parking space that displays "in large font that is clearly readable from a vehicle, a telephone number that a voter may call or text to request assistance from an election officer at the polling place." *Id.* "[O]n the voter's request, an election

officer shall deliver a ballot to the voter" at the voter's vehicle or the polling place entrance. *Id.*

Individual county boards of elections have also implemented a range of additional measures to enhance accessibility for disabled voters. *See Lightbourn v. City of El Paso*, <u>118 F.3d 421, 428</u> n.7 (5th Ci<u>r. 1997</u>). For instance, counties staff every polling location with trained election workers to assist voters requiring help. *See* <u>ROA.35426</u>. Furthermore, counties will not select any polling location that is not compliant with the ADA. <u>ROA.35425</u>. And they have established procedures for receiving and considering requests for accommodations from voters. *See, e.g.*, <u>ROA.35434</u>.

The practical impact of these layered protections is that an individual with a disability can expect concrete, on-the-ground assistance throughout the voting process. And if any unforeseen barrier arises, county officials are available to field and to act upon requests for additional accommodations.

## B. Texas's Election Code Has Long Regulated Assistance Of Disabled Voters.

For over a century, Texas has provided avenues for individuals with disabilities to receive assistance while voting. The general rule has always been that voters must vote alone. Title 36, Ch. 6, Art. 1790 (1893). But since as early as 1893, Texas has provided exceptions "when an elector is unable to prepare his ballot." *Id.* In that circumstance, the voter could "declare[] to

8

the presiding officer that he can not read or write, or that by blindness or other physical disability he is unable to prepare his ballot." *Id.* Art. 1791. The voter then would "upon request receive the assistance of two of the [election] judges in the preparation [of his ballot]." *Id.*

Soon thereafter, Texas added a requirement that election judges providing assistance must "first sw[ear] that they will not suggest, by word or sign or gesture, how the voter shall vote," and instead "will confine their assistance to answering his questions, to naming candidates, and the political parties to which they belong, and . . . will prepare his ballot as the voter himself shall direct." Title 49, Ch. 7, Art. 3003 (1911). Any election judge who prepared a ballot "otherwise than the way the voter himself . . . direct[ed]" was "guilty of a misdemeanor." Tex. Penal Code Art. 258 (1911).

In 1957, the Texas Legislature provided that, instead of being assisted by election judges, a voter "may select any qualified voter residing in the precinct to assist him." Tex. Elec. Code Art. 8.13 (1957). Any such assistor was required to take a similar oath. *See id.*

Texas reorganized its Election Code in 1985. *See* Act of 1985, S.B. 616. Under the 1985 Act, a voter "eligible to receive assistance in marking" the ballot had two options for assistance. Tex. Elec. Code §§ 64.031, 64.032 (1985). *First*, on the "voter's request," "two election officers shall provide the

assistance," with each official from different political parties if possible. *Id.* § 64.032(b) (1985). *Second*, "[o]n the voter's request, the voter may be assisted by any person selected by the voter other than the voter's employer, an agent of the voter's employer, or an officer or agent of a labor union to which the voter belongs." *Id.* § 64.032(c).

The Election Code provided that, when the voter used the second option and chose his own assistor, "an election officer shall enter the [assistor's] name and address on the poll list beside the voter's name." *Id.* § 64.032(d). It also required the assistor to take this oath:

> I swear (or affirm) that I will not suggest, by word, sign, or gesture, how the voter should vote; I will confine my assistance to answering the voter's questions, to stating propositions on the ballot, and to naming candidates and, if listed, their political parties; I will prepare the voter's ballot as the voter directs; and I am not the voter's employer, an agent of the voter's employer, or an officer or agent of a labor union to which the voter belongs.

*Id.* § 64.034 (as amended in 2013).

As with previous versions, the 1985 Election Code prescribed penalties for assistors who violated it. An assistor was guilty of a misdemeanor if he knowingly provided assistance to an ineligible voter, prepared the ballot in a way other than the voter directed, or suggested how the voter should vote while assisting. *Id.* § 64.036. Additionally, violating the oath rendered the assistor guilty of election fraud and perjury. *See id.* § 276.013 (1985) (offense

to "knowingly or intentionally . . . cause any false or intentionally misleading statement, representation, or information to be provided[] to an election official"); Tex. Penal Code § 37.02 (1985) (person commits perjury if he "makes a false statement under oath").

### C.    Texas Enacts S.B. 1.

In response to difficulties faced by election officials in the 2020 election, the Texas Legislature enacted S.B. 1 "to prevent fraud in the electoral process," promote "voter access," "increase[e] the stability of [] constitutional democracy," and make "the conduct of elections . . . uniform and consistent throughout [Texas]."  S.B. 1 §§ 1.03, 1.04.  S.B. 1 did not eliminate any preexisting protections for voters with disabilities.  To the contrary, it strengthened the guardrails that ensure voters with disabilities have meaningful access to the franchise.  S.B. 1 expressly bars election officials from interpreting the Election Code "to prohibit or limit the right of a qualified individual with a disability from requesting a reasonable accommodation or modification to any election standard, practice, or procedure mandated by law or rule that the individual is entitled to request under federal or state law."  *Id.* § 1.08.

Disabled voters have benefited from additional protections in S.B. 1. For example, S.B. 1 reduces the State's reliance on signature matching for

verifying the voter's identity. This change alleviated concerns that physical impairments could prevent some voters from creating consistent signatures. Tex. Elec. Code § 87.041. Moreover, multiple S.B. 1 provisions help guarantee that voters' choices remain private when obtaining assistance. *Id.* §§ 64.009; 64.034.

As relevant to this appeal, S.B. 1 also enacted several provisions to advance Texas's interests in preventing fraud and undue influence over vulnerable voters: the "Identification Requirement," "Curative Provisions," and "Voter-Assistance Amendments."

### 1. Identification Requirement for Voting by Mail

To vote by mail in a given year, an individual must submit a signed application to the county early-voting clerk. Tex. Elec. Code §§ 84.001, .007. Applicants must provide their "name and the address at which [they are] registered to vote," the reason they are eligible to vote by mail, and a mailing address, if different from their registration address. *Id.* § 84.002(a)(1). Once the application is approved, the voter can vote by mail for the rest of the year. *Id.* § 86.0015(b).

But "merely requiring mail-in ballot applications to list the voter's name and registration address triggers significant election security concerns." *United States v. Paxton*, 148 F.4th 335, 339 (5th Cir. 2025). "That

information is easily available to anyone who simply requests it from Texas
election officials—who readily provide copies of voter files with such
information upon request." *Id*. S.B. 1 addressed this insecurity by amending
the mail-voting process to require voters applying for—and, later casting—a
mail ballot to provide one of two unique identification numbers not available
to the public. Specifically, the applicant or voter must provide:

> (A) the number of the applicant's [or voter's] driver's license,
> election identification certificate, or personal identification card
> issued by the Department of Public Safety;
>
> (B) if the applicant [or voter] has not been issued a number
> described by Paragraph (A), the last four digits of the applicant's
> [or voter's] social security number; or
>
> (C) a statement by the applicant [or voter] that the applicant [or
> voter] has not been issued a number described by Paragraph (A)
> or (B).

S.B. 1, § 5.02 (codified at Tex. Elec. Code § 84.002(1-a)) (hereinafter "the
Identification Requirement"). Notably, this is the same identification
information Texans must provide when registering to vote, *see* Tex. Elec.
Code § 13.002(c)(8), in line with federal requirements in the Help America
Vote Act ("HAVA"), 52 U.S.C. § 21083(a)(5)(A).

S.B. 1 thus establishes an apparent hierarchy among acceptable
identification numbers. A Department of Public Safety number is required
for individuals who have been issued one, and the last four digits of a Social

Security number may be provided by individuals who have not. Nonetheless, to ease the burden of complying with S.B. 1, the Secretary of State has advised that voters may provide either number, and election officials have encouraged voters to provide both numbers. ROA.35031. Election officials have accepted applications with either (or both) numbers, so long as a provided number matches a number recorded for the voter in the State's voter-registration database, Texas Election Administration Management ("TEAM"). *Id.*

Section 5.03 implements this mandate by adding a dedicated space on the application form for the voter to supply the chosen identifier. Tex. Elec. Code § 84.011(a). Section 5.07 requires election officials to deny a mail-ballot application if the applicant provides no number or a number that does not match a number associated with the individual in TEAM. *Id.* § 86.001(f).

Once a mail-ballot application is approved, election officials mail the voter a ballot, an envelope in which to place the ballot, and a carrier envelope in which to place the ballot envelope and ballot. *Id.* § 86.002(a). Even before S.B. 1, voters were required to provide certain information on the carrier envelope, such as a name, address, and signature. *Id.* § 86.013. S.B. 1 adds a new requirement: Voters also must record the same number they

14

successfully used to *apply* for the mail ballot, *id.* § 86.002(g)-(h), or their ballot will be rejected, *id.* § 87.041(b), (d-1), (e).

## 2. Curative Provisions for Mail-In Ballots

Prior to S.B. 1, the Election Code lacked an effective method for voters to fix errors on their applications or mail-ballot return envelopes, such as missing information or a mismatched signature. S.B. 1's "Curative Provisions" addressed the gap by establishing procedures that allow all voters to correct issues with their applications and ballots and ensure they can vote and have their votes counted. Tex. Elec. Code §§ 87.0271; 87.0411.

Section 5.06 allows voters who request a mail ballot but later choose to vote in person to cancel their mail ballot and cast a provisional ballot. *See id.* § 84.035. Section 5.10 permits voters to supply or correct a missing or incorrect numeric identifier on their mail-ballot application after submission, and provides various methods to do so. *See id.* § 86.015(c). And Section 5.12 establishes a "ballot-cure" process for defects election officials identify on the carrier envelope of the voter's returned ballot. *See id.* § 87.0271.

## 3. Voter-Assistance Amendments

The "Voter-Assistance Amendments" aim to "provid[e] for appropriate voting assistance to elderly and disabled voters" and "ban[] 'vote harvesting.'" Bill Analysis, House Committee Report. As relevant here, S.B. 1 updates the

requirements for assistors in three ways. *First*, Section 6.04 (the "Oath Provision") adds the underlined language to the assistor's oath:

> I swear (or affirm) <u>under penalty of perjury</u> that <u>the voter I am assisting represented to me they are eligible to receive assistance;</u> I will not suggest, by word, sign, or gesture, how the voter should vote; I will confine my assistance to reading the ballot to the voter, directing the voter to read the ballot, or directing the voter to mark the ballot; <u>I will prepare the voter's ballot as the voter directs; I did not pressure or coerce the voter into choosing me to provide assistance;</u> ~~and~~ I am not the voter's employer, an agent of the voter's employer, or an officer or agent of a labor union to which the voter belongs<u>; I will not communicate information about how the voter has voted to another person; and I understand that if assistance is provided to a voter who is not eligible for assistance, the voter's ballot may not be counted</u>.

<u>Tex. Elec. Code § 64.034</u>.

*Second*, Sections 6.03, 6.05, and 6.07 (the "Assistor Disclosure Provisions") require the assistor to complete a form designed by the Secretary of State listing (1) "the name and address of the [assistor]," (2) "the relationship to the voter of the [assistor]," and (3) "whether the [assistor] received or accepted any form of compensation or other benefit from a candidate, campaign, or political committee" in exchange for providing assistance. *Id.* §§ 64.0322, 86.010; *see also id.* § 86.013(b) (requiring this form's inclusion on the carrier envelope).

*Third*, Sections 6.06 and 7.04 (the "Offense Provisions") ban compensated voter assistance and compensated vote harvesting. Section

6.06 criminalizes "offers to compensate another person for assisting voters," as well as soliciting or accepting such offers. *Id.* § 86.015. Section 7.04 criminalizes giving, offering, or receiving "compensation or other benefit" for "vote harvesting services," which are defined as any "in-person interaction with one or more voters, in the physical presence of an official ballot or a ballot voted by mail, intended to deliver votes for a specific candidate or measure." *Id.* § 276.015.

### D.    Plaintiffs Sue To Enjoin S.B. 1.

Before S.B. 1 was even signed into law, a host of advocacy groups sued to enjoin almost every provision in the bill. The District Court consolidated those suits. This Court has already heard several appeals arising from the District Court's decisions on various aspects of the plaintiffs' broad-ranging suits. In each of those appeals, it has stayed or reversed (or both) the District Court's decision. *See LUPE*, 2025 WL 2489464, at *4-*13 (reversing District Court's holdings that Plaintiffs had standing to challenge the Oath Provision and Assistor Disclosure Provisions and that Section 208 of the Voting Rights Act preempts the Offense Provisions); *Paxton*, 148 F.4th at 338 (reversing District Court's holding that S.B. 1's Identification Requirement violates the federal Materiality Provision); *La Unión Del Pueblo Entero v. Abbott*, 119 F.4th 404, 409 (5th Cir. 2024) (staying pending appeal District Court's

invalidation of S.B. 1's vote-harvesting ban); *Mi Familia Vota v. Ogg*, 105 F.4th 313, 333 (5th Cir. 2024) (reversing District Court's holding that District Attorney Ogg was a proper defendant); *La Unión Del Pueblo Entero v. Abbott*, 68 F.4th 228, 231 (5th Cir. 2024) (reversing District Court's rejection of non-party state legislators' legislative-privilege assertion); *United States v. Paxton*, No. 23-50885, ECF 80-1 at 5 (5th Cir. Dec. 15, 2023) (staying District Court's invalidation of voter-identification requirement for mail ballots); *La Unión Del Pueblo Entero v. Abbott*, 29 F.4th 299, 304 (5th Cir. 2022) (reversing District Court's denial of intervention to Intervenor-Appellants).

This appeal concerns Plaintiffs' challenges under Title II of the ADA and Section 504 of the Rehabilitation Act to S.B. 1's Identification Requirement, Curative Provisions, and Voter-Assistance Amendments. Plaintiffs—various organizations providing voter education and other services—alleged associational or organizational standing to invoke the District Court's jurisdiction. For associational standing, Plaintiffs have argued that their members have had mail-ballot applications rejected for failure to comply with the Identification Requirement and that members have been deterred from seeking, and assistors deterred from providing, assistance because of fears of prosecution under the Voter-Assistance

Amendments.  For organizational standing, Plaintiffs claimed that S.B. 1 has deterred them from providing voter assistance and forced them to divert resources.  The case proceeded to a bench trial.

### E.   The District Court Permanently Enjoins Several Provisions Of S.B. 1.

On March 14, 2025, the District Court declared that the Identification Requirement and the Voter-Assistance Amendments violate the ADA and Section 504.  ROA. 40864-40975.  It also entered a permanent injunction against enforcement of those provisions, but stayed that injunction through the May 2025 election due to the potential for voter confusion under the *Purcell* principle, *see Purcell v. Gonzalez,* 549 U.S. 1, 2-6 (2006). ROA.40968-40974.  After the State moved for clarification of the scope and duration of the stay, the District Court modified the stay to cover "all injunctive relief" and to extend through any appeal.  ROA.41039.

The District Court began by determining that Plaintiffs had standing to challenge the Identification Requirement and the Voter-Assistance Amendments, but not the Curative Provisions.  As to the Identification Requirement, the District Court held that two of the Plaintiff Organizations, The Arc of Texas and REV UP Texas, had associational standing through one member—Ms. Yvonne Yvette Iglesias—whose application to vote by mail was allegedly rejected due to her failure to list an identification number.

ROA.40940-40941. Taking Ms. Iglesias's experience as typical of millions of disabled Texans, the District Court accepted that the entire organizational membership faced a "substantial risk" of similar rejections. ROA.40940. The District Court concluded that this risk was traceable to local election officials, who review mail-ballot requests, and the Secretary of State, who creates the forms and instructions for mail-ballot requests. ROA.40941.

The court next held that Plaintiffs lack standing to challenge the Curative Provisions, reasoning that an order setting those sections aside would not redress Plaintiffs' asserted harms. ROA.40942. As the District Court explained, the Curative Provisions impose no obligations on voters but instead *help* voters fix errors that otherwise prevent them from casting ballots or having their ballots counted. *Id.*

The District Court also held that The Arc of Texas and REV UP Texas had associational standing to challenge the Oath Provision. The District Court identified four members of those Plaintiffs who forwent assistance in voting, either because their assistants "w[ere] uncomfortable taking the Oath of Assistance" or because they "did not want to expose [their assistors] to criminal liability." ROA.40943 n.51. Those injuries, said the District Court, were "fairly traceable" to "the credible threat of criminal enforcement of the Oath against the[] assistors"—a conclusion based largely on testimony that

"attendants specifically cited the 'penalty of perjury' and 'eligibility' language in the Oath as their reasons for declining to provide assistance." ROA.40944-40945.

The District Court concluded that some Plaintiffs also had organizational standing to challenge the Oath Provision and the Assistor Disclosure Provisions. ROA.40947. It maintained that these "requirements are burdensome to assistors," have "caused delays at polling places that have interfered with voting assistance," and have caused Plaintiffs "difficulty recruiting members to provide voting assistance." *Id.* In the District Court's view, "[t]he chilling effect that the Assistor Disclosure and Oath requirements would have on individuals' willingness to provide voting assistance—and the downstream effects on organizations' ability to perform voter[-]assistance services—was 'sufficiently predictable' to establish causation for standing purposes." *Id.* (quotations omitted).

The District Court also found that the LUPE Plaintiffs had standing to challenge the Offense Provisions. ROA.40949-40951. It explained that these provisions "directly regulate[]" those Plaintiffs by barring conduct they engage in—namely, providing compensation to their staff members for assisting voters or harvesting votes. *Id.*

Turning to the merits, the District Court ruled that the Identification Requirement and the Voter-Assistance Amendments violate the ADA and Section 504. ROA.40952-40965. The District Court determined that Plaintiffs and their members suffered discrimination because the challenged provisions "may dissuade" individuals with disabilities from voting. ROA.40955.

The District Court next ruled that the ADA did not require Plaintiffs' members to request an accommodation because it would be "impractical" for "each voter with a disability [to] request a separate accommodation" and Defendants were "aware of the large-scale harm that . . . the Challenged Provisions would impose on voters with disabilities" due to Plaintiffs' testimony before the State Legislature. ROA.40960-40961.

Finally, concluding that the requested modification—a statewide injunction against S.B. 1 reverting Texas to pre-S.B. 1 law—was reasonable, the District Court rejected Defendants' argument that such an injunction would fundamentally alter the nature of Texas's voting program. ROA.40963. It therefore permanently enjoined enforcement of the challenged provisions in all of their applications. ROA.40970-40974.

Defendants timely appealed. ROA.41034, 41036; ECF Nos. 1, 6.

## SUMMARY OF ARGUMENT

**I.**    The District Court lacked jurisdiction over Plaintiffs' challenges to S.B. 1's Identification Requirement, Oath Provision, and Assistor Disclosure Provisions.  In fact, this Court recently held that these same Plaintiffs do not have standing to challenge the Oath Provision and Assistor Disclosure Provisions under Section 208 of the Voting Rights Act.  *LUPE*, 2025 WL 2489464, at *4-*7.  That decision squarely controls, given that Plaintiffs press the same standing theories here.

**A.**    Plaintiffs lack associational standing to challenge S.B. 1's Identification Requirement, Oath Provision, and Assistor Disclosure Provisions because none of their members has identified a cognizable injury traceable to S.B. 1.

To start, standing requires a harm bearing a "close relationship" to one "traditionally recognized as providing a basis for a lawsuit in American courts."  *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424 (2021).  As such, the burden associated with completing a form is not the kind of injury that opens federal courthouse doors.  *LUPE*, 2025 WL 2489464, at *5.  Nor is the supposed "injury" of waiting in a line, as all voters must inevitably do.  *Id.* Neither can Plaintiffs gesture at an undefined increased risk that their members' ballots might be rejected for clerical errors.  Injury-in-fact must be

"actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (cleaned up).

Plaintiffs also cannot use a purported fear of prosecution to secure standing. Plaintiffs fantasize about ways in which an unreasonable prosecutor might bring unreasonable charges under S.B. 1, but they presented no evidence of any investigations or prosecutions *anywhere in Texas* under the challenged provisions. All they offer is speculation that requires several assumptions about how third parties not before the Court will react, which cannot establish standing. *See Tex. State LULAC v. Elfant*, 52 F.4th 248, 256 (5th Cir. 2022). Moreover, the District Court's injunction did not even redress Plaintiffs' fears of prosecution under the Oath Provision because the Oath Provision does not change assistors' legal obligations; it merely communicates to would-be assistors their preexisting, unchallenged obligations.

**B.**    Plaintiffs also lack organizational standing. Plaintiffs rest their claim of organizational injury-in-fact on their mere use of their resources to counteract S.B. 1. But the Supreme Court has recently—and roundly—rejected the notion that "standing exists when an organization diverts its resources in response to a defendant's actions." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024). Were the rule otherwise, any plaintiff could

simply spend its way into standing.  Because Plaintiffs here have alleged only that they continued to engage in their usual activities in response to S.B. 1, they have not *diverted* any resources in a manner that can establish standing.

**II.**     S.B. 1 does not violate either the ADA or the Rehabilitation Act.

**A.**     Plaintiffs failed to make a prima facie case because Texas does not meaningfully exclude disabled voters from voting.  To the contrary, Texas ensures that disabled individuals have various options to exercise their right to vote—and S.B. 1 only expanded these protections.  Unsurprisingly, Plaintiffs have identified no instance in which *any* of their members testified they were unable to vote, by reason of their disability, because of any challenged S.B. 1 provision.

**B.**     Even if Plaintiffs had made out a prima facie case, their claims remain deficient.  To succeed on a failure-to-accommodate theory, a plaintiff must "specifically identify the disability and resulting limitations, and [] request an accommodation in direct and specific terms" unless those facts are "open, obvious, and apparent to the entity's relevant agents."  *Windham v. Harris Cnty.*, 875 F.3d 229, 236-37 (5th Cir. 2017).  The trial record contains no evidence that any Plaintiff or member of a Plaintiff requested from an election official any accommodation for any challenged S.B. 1

provision or that election officials knew about their members' limitations. That dooms their claims.

The District Court mistakenly ruled that it would have been "futile" for Plaintiffs to request an accommodation because it read the Election Code to prohibit election officials from granting accommodations. ROA.40959-40960. The opposite is true. S.B. 1 expressly bars election officials from interpreting the Election Code to prohibit an individual from requesting an accommodation, and federal law guarantees a right to a reasonable accommodation.

The District Court also erred in concluding that the members' disabilities were "open and obvious" because Plaintiffs testified in opposition to S.B. 1 before it was enacted. ROA.40961. An individual's disability must be "open and obvious" to "the entity's relevant agents," not the State Legislature. *Windham*, 875 F.3d at 237. Plaintiffs' testimony did not put local election officials on notice of their limitations or purported need for accommodations.

**C.** At any rate, the relief Plaintiffs seek exceeds the bounds of what the ADA and Rehabilitation Act permit. Those statutes only require that entities provide "reasonable modifications" to their policies, practices, or procedures. *Tennessee v. Lane*, 541 U.S. 509, 532 (2004) (quoting 42 U.S.C.

§ 12131(2)).  Plaintiffs failed to meet their burden to identify a reasonable modification.  Instead, they requested a statewide injunction against nine provisions of S.B. 1 that does not distinguish between voters who actually have qualifying disabilities and those who do not, or between those who were denied meaningful access to voting due to their disabilities and those who were not.

For similar reasons, the statewide injunction constitutes an impermissible "fundamental alteration" to Texas's voting process.  *Id.*  The "inability [of a State] to enforce its duly enacted [laws] clearly inflicts irreparable harm on the State."  *Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018).  The harm here is even graver, where the District Court's blanket injunction thwarts the State's compelling interest "in preserving the integrity of its election process."  *Eu v. San Francisco Cty. Democratic Cent. Comm.*, 489 U.S. 214, 231 (1989).

The proposed relief also flouts fundamental remedial rules.  An injunction must be no broader than necessary to provide the parties complete relief.  *See Trump v. CASA, Inc.*, 606 U.S. 831, 851-52 (2025).  The District Court's order, however, enjoins the challenged provisions as to all Texas voters, not only those shown to have suffered actionable discrimination.  The District Court's injunction thus strays far beyond the

circumspect scope of federal remedial authority and must be vacated for that reason alone.

## STANDARD OF REVIEW

This Court "reviews a permanent injunction for abuse of discretion," which "occurs where the trial court (1) relies on clearly erroneous factual findings, (2) relies on erroneous conclusions of law, or (3) misapplies the factual or legal conclusions when fashioning its injunctive relief." *Crown Castle Fiber, L.L.C. v. City of Pasadena*, 76 F.4th 425, 433 (5th Cir. 2023) (internal punctuation omitted). "[I]ssues of Article III standing" are questions of law reviewed *de novo*. *Id.* at 432.

## ARGUMENT

The District Court erred in several respects. To start, Plaintiffs lack standing to challenge S.B. 1's Identification Requirement, Oath Provision, and Assistor Disclosure Provisions because their theories of injury are either not cognizable or not traceable to those provisions.

The District Court's merits ruling is equally flawed. The ADA and Section 504 guarantee disabled voters the opportunity to seek a "reasonable accommodation," *Windham*, 875 F.3d at 236-37, when they lack "meaningful access" to voting, *Alexander*, 469 U.S. at 301. Texas law, however, provides ample access to voting for disabled individuals. Plaintiffs, moreover, did not pursue a reasonable accommodation before seeking to

enjoin the challenged provisions. And the modification they proposed and the District Court adopted—a statewide injunction—violates fundamental remedial rules and the ADA's prohibition on modifications that "fundamentally alter" the nature of the program at issue. *Lane*, 541 U.S. at 532.

The Court should reverse.

## I.    PLAINTIFFS LACK STANDING TO CHALLENGE THE IDENTIFICATION REQUIREMENT, THE OATH PROVISION, AND THE ASSISTOR DISCLOSURE PROVISIONS OF S.B. 1.

Because it implicates subject-matter jurisdiction, this Court has an obligation to confirm that Plaintiffs possess standing to bring their claims before proceeding to the merits. *In re Cleveland Imaging & Surgical Hosp., LLC*, 26 F.4th 285, 294 (5th Cir. 2022). As the parties invoking federal jurisdiction, Plaintiffs must show (1) "that [they] suffered an injury in fact that is concrete, particularized, and actual or imminent," (2) "that the injury was likely caused by the defendant," and (3) "that the injury would likely be redressed by judicial relief." *TransUnion*, 594 U.S. at 423. These requirements must be met as to each claim, and Plaintiffs must establish standing "to challenge each provision of law at issue." *In re Gee*, 941 F.3d 153, 161-62 (5th Cir. 2019) (per curiam).

Plaintiffs lack standing to challenge the Identification Requirement, the Oath Provision, and the Assistor Disclosure Provisions. As this Court recently explained in an appeal concerning these same litigants, presenting the same standing theories as grounds to challenge several of the same provisions, the inconvenience of filling out a form is not a cognizable Article III injury, and any cognizable harm Plaintiffs can identify is either not traceable to S.B. 1 or based on features of the Election Code that, in substance, long predate S.B. 1. *See LUPE*, 2025 WL 2489464, at *4-*7. This Court should dismiss Plaintiffs' challenges to Sections 5.02, 5.03, 5.07, 6.03, 6.04, 6.05, and 6.07.

## A. Plaintiffs Lack Associational Standing.

Organizations can establish an injury-in-fact for jurisdictional purposes through either associational standing or organizational standing. Associational standing "is derivative of the standing of the association's members," and requires that those members themselves have standing. *Id.* at *4 (quotations omitted). Plaintiffs cannot show associational standing to challenge the Identification Requirement, the Oath Provision, or the Assistor Disclosure Provisions because they cannot identify an individual member with standing to challenge any of those provisions.

Plaintiffs do not have associational standing to challenge the Identification Requirement because they cannot establish an imminent injury that would justify prospective relief. Plaintiffs allege that they have standing on the assertion that Texas officials might reject a disabled voter's ballot because "she was unable to comply with S.B. 1's number-matching requirements." ROA.40940. But the record belies any notion that this harm is "certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013).

To the contrary, Plaintiffs have struggled to identify any individuals who suffered this harm. After the extensive discovery in this case, the District Court enjoined the Identification Requirement statewide on the basis that a *single* individual—Yvonne Yvette Iglesias—allegedly had her application to vote by mail rejected "because she failed to include an ID number." ROA.40905. The State provided her the opportunity to cure her application, *see* ROA.33535-33538, but she still failed to provide an ID number, *see* ROA.33540. The District Court thought that this anecdotal allegation established a "substantial risk" of future injury. ROA.40940-40941.

That is incorrect. An isolated, bygone episode cannot supply the "real and immediate threat of repeated injury" that is indispensable to prospective

relief.  *See Funeral Consumers All., Inc. v. Service Corp. Int'l*, 695 F.3d 330, 342 (5th Cir. 2012).  At any rate, the cure procedures that S.B. 1 put in place make the threat of repeated injury implausible.  Because those procedures permit voters to supply the required identification number after notice, any future harm rests on speculation voters will fail to submit the required information after multiple opportunities to do so.  Such claims that fail to rise "above the speculative level" do not suffice to establish imminent injury.  *Id.* at 343.

Plaintiffs likewise cannot establish standing to challenge the Oath Provision and the Assistor Disclosure Provisions.  They propose several theories for how these provisions harm their members.  They say these provisions have "caused delays at polling places that have interfered with voting assistance."  ROA.40947.  They say the disclosure requirements "increase the risk that the ballot will be rejected because the assistor made a clerical error."  ROA.7240.  And they say that the modified oath and disclosure requirements will deter people from serving as assistors "out of fear of prosecution," meaning some voters will be unable to use their assistors of choice.  ROA.40923.

This Court has already held that none of these theories satisfies the requirements for standing.  *See LUPE*, 2025 WL 2489464, at *4-*7.

**1.**   To begin, Plaintiffs' complaint that it will take additional time to vote because of these provisions cannot support standing.  To be an injury-in-fact, the alleged harm must bear a "close relationship" to "a harm traditionally recognized as providing a basis for a lawsuit in American courts." *TransUnion*, 594 U.S. at 424 (cleaned up).  The supposed difficulty of attesting to an oath or "[w]aiting a few minutes while an assistor completes a simple form" bears no resemblance to any traditionally cognizable harm. *LUPE,* 2025 WL 2489464, at *5.  If it did, then *any* voter would have standing to challenge *any* election rule, which could theoretically add *de minimis* time costs to voting.  Such a theory would violate fundamental standing principles, which are designed to ensure that "only those most immediately affected by a government policy" can bring lawsuits.  R. Fallon et al., The Federal Courts and the Federal System 117 (7th ed. 2015).

**2.**   Next, consider Plaintiffs' concern about "increased risk" that a ballot will be rejected for a "clerical error" on the disclosure form.  This theory fails for the same reason Plaintiffs lack standing to challenge the Identification Requirement:  Injury-in-fact must be "actual or imminent, not conjectural or hypothetical." *Shrimpers & Fishermen of the RGV v. Tex. Comm'n on Envtl. Quality*, 968 F.3d 419, 424 (5th Cir. 2020) (per curiam).  "Increased-risk claims—even when they are particularized—often cannot satisfy" that

requirement. *Id.*

Just so here. Plaintiffs have not identified a single instance of a ballot being rejected for that reason. *See id.* at 425 (refusing to "wade into the morass of [] empirical questions" about increased risk "[w]ithout actual evidence" (cleaned up)). Even if they did, Plaintiffs must demonstrate "either continuing harm or a real and immediate threat of repeated injury in the future" to have standing to receive injunctive relief. *Gonzalez v. Blue Cross Blue Shield Ass'n*, 62 F.4th 891, 902 (5th Cir. 2023) (citation omitted). A few isolated incidents of assistors making paperwork errors—and Plaintiffs have not even shown that—could not indicate any likelihood of repetition in the future.

**3.** Finally, Plaintiffs' contention that some voters did not receive the assistance they preferred following S.B. 1's passage fares no better. Plaintiffs do not identify even a single instance of anyone being prosecuted under the Oath Provision or Assistor Disclosure Provision in the more than three years S.B. 1 has been on the books. *See LUPE,* 2025 WL 2489464, at *4-5. They nonetheless allege that their voter members had to vote without assistance either because their preferred assistors refused out of fear of prosecution under S.B. 1, or because the voters themselves refrained from seeking assistance to protect their would-be assistors from prosecution. *See*

ROA.40943-40946.  According to the District Court, that lack of assistance is the injury sufficient to ground standing.  *See* ROA.40946.

The District Court erred.  These "injuries" are not "fairly traceable to the challenged action of the defendant."  *Reule v. Jackson*, 114 F.4th 360, 366-67 (5th Cir. 2024).  That element is "substantially more difficult to establish" when the "causal relation between injury and challenged action depends upon the decision of an independent third party."  *California v. Texas*, 593 U.S. 659, 675 (2021).  To "thread the causation needle" in such circumstances, a plaintiff "must show that the third parties will likely react in predictable ways that in turn will likely injure the plaintiffs."  *All. for Hippocratic Med.*, 602 U.S. at 383.

Here, Plaintiffs' members claim that their usual assistors might be unwilling to assist them in the future out of fear of prosecution under S.B. 1.  ROA.40944.  In other words, Plaintiffs' theory of causation is that unwillingness to provide assistance is caused by fears of prosecution, and those fears are caused by the challenged provisions.  Take, for instance, Amy Litzinger's attendant, who Litzinger testified was concerned about facing liability for attesting to the modified oath.  ROA.40913.  In order for that fear to become reality, the following would have to happen:



That is not a credible fear of prosecution. The chain of speculation is impermissibly "depend[ent] . . . on the actions of third part[ies]" not before the Court. *Zimmerman v. Austin*, 881 F.3d 378, 390 (5th Cir. 2018). Because it is far from "predictable" that any relevant prosecutions will occur, *All. for Hippocratic Med.*, 602 U.S. at 383, a refusal to provide assistance because of such fears is not fairly traceable to S.B. 1.

This Court held as much in *Texas State LULAC*. There, two organizations challenged an election law which prohibited voters from establishing or maintaining a residence "for the purpose of influencing the outcome of a certain election." *Tex. State LULAC*, 52 F.4th at 251 (quoting S.B. 1111). The organizations claimed that they feared prosecution if they mistakenly advised ineligible voters to register. *Id.* at 256.

This Court held that the organizations lacked standing because "there is no credible threat that they will be prosecuted." *Id.* at 257. In particular, "[t]he fanciful notion that Plaintiffs will be charged . . . depends on a highly attenuated chain of possibilities," including (a) the organizations committing an actual violation of the law, (b) the violation being discovered by the voter registrar, (c) the registrar referring the violation to a prosecutor, (d) the prosecutor determining that the organizations actually violated the law, and (e) the prosecutor "exercis[ing] his discretion to bring charges against" the organizations. *Id.*

The same analysis applies here, almost to the letter. There is no credible threat of prosecution for any assistor attempting to comply with S.B. 1. Plaintiffs produced *zero* evidence at trial of anyone being investigated, prosecuted, or threatened with prosecution for violating the challenged provisions. *LUPE*, 2025 WL 2489464, at *4-*6. And crediting fears of prosecution requires indulging several layers of "pure speculation." *Id.* at *6.

*First*, the Court must assume that would-be assistors for Plaintiffs' members will violate the voter-assistance laws—even though Plaintiffs adduced *zero* evidence at trial that any organizational member or witness was likely to do so. *Second*, the Court must assume that someone would discover the hypothetical violation. *Third*, the Court must assume someone

would report any violation.  And *fourth*, the Court must assume a prosecutor will exercise his discretion to bring charges.  The Court would have to indulge all of these "fanciful" assumptions even though there is no evidence in the record of *any* of these four events happening *anywhere* in Texas since S.B. 1's enactment, let alone to any of Plaintiffs' witnesses or members.  *Id.* Plaintiffs' theory of injury based upon fear of prosecution fails.

**4.** Finally, Plaintiffs' alleged injury from the Oath Provision cannot be redressed.  Plaintiffs must show "a likelihood that the requested relief"—here, a permanent injunction of S.B. 1—"will redress the alleged injury." *Servicios Azucareros De Venezuela C.A. v. John Deere Thibodeaux, Inc.*, 702 F.3d 794, 799-800 (5th Cir. 2012).

Plaintiffs claim, and the District Court agreed, that Section 6.04's additions to the oath have deterred assistors.  In particular, the District Court found it significant that Section 6.04 has added to the oath that it is taken "under penalty of perjury" and that the voter must have "represented to [the assistor] they are eligible to receive assistance."  ROA.40914-40919, 40945. But the oath has *always* been under penalty of perjury, and it has *always* been an offense to "knowingly . . . provide[] assistance to a voter who is not eligible for assistance" or to "provide[] assistance to a voter who has not requested assistance." Tex. Elec. Code. § 64.036 (2020); *see also* Tex. Penal

Code § 37.02 (2020) (defining perjury as making a false statement under oath "with intent to deceive and with knowledge of the statement's meaning"). If assistors are truly worried about being prosecuted for perjury or for assisting an ineligible voter, permanently enjoining S.B. 1 would do nothing to allay their concerns. *Accord LUPE*, 2025 WL 2489464, at *6 ("We cannot fathom how the Oath Provision harmed [P]laintiffs' members by making the existing consequences of the law more explicit.").

In short, no individual member has standing to challenge the Identification Requirement, the Oath Provision, and the Assistor Disclosure Provisions. Plaintiffs therefore lack associational standing to challenge those provisions.

### B.  Plaintiffs Lack Organizational Standing.

Plaintiffs also claim that they have standing in their own right as voting advocacy organizations. The District Court did not find that Plaintiffs established organizational standing to challenge the Identification Requirement, but it did find organizational standing to challenge the Oath Requirement and Assistor Disclosure Requirement. ROA.40947-40949. Plaintiffs' primary theory—which the District Court accepted—rests on their claimed inability to assist voters due to fear of prosecution under S.B. 1. ROA.40947. Plaintiffs have also claimed injury from having to "divert time,

money, and resources from other activities" to educate voters about S.B. 1. *See, e.g.*, ROA.6270 ¶ 48.

Plaintiffs lack organizational standing. As with associational standing, Plaintiffs cannot show that their purported difficulty in providing assistance to voters is fairly traceable to the Oath or Assistor Disclosure Provisions. Once again, Plaintiffs presented "no evidence that any assistor has violated" these provisions or that *anyone* in all of Texas has been investigated or prosecuted under them. *LUPE*, 2025 WL 2489464, at *4. And crediting claimed fears of prosecution—and any corresponding "chill"—requires indulging too much speculation to confer standing. *See* Part I.A.1, *supra*.

Plaintiffs' attempts to ground standing in a diversion-of-resources theory are similarly unavailing. *LUPE*, 2025 WL 2489464, at *5. The Supreme Court has recently rejected the notion that "standing exists when an organization diverts its resources in response to a defendant's actions." *All. for Hippocratic Med.*, 602 U.S. at 395. That conclusion flowed from the well-settled principle that an organization "cannot spend its way into standing simply by expending money" to "advocate against [a] defendant's action." *Id.* at 394. The question is thus not whether the organization spent money to counteract a challenged action, but rather whether the challenged

action "perceptibly impaired" its "core" mission. *Id.* at 395 (quotations omitted).

Plaintiffs cannot show any "perceptible impair[ment]" of their mission. *Id.* In fact, the expenditures Plaintiffs complain of *are* their mission—voter education. *See La. Fair Hous. Action Ctr., Inc. v. Azalea Garden Props., L.L.C.*, 82 F.4th 345, 354 (5th Cir. 2023) (organization lacks standing when it simply undertakes "efforts" that "likely fall within the ambit of [its] routine activities") (cleaned up). It is hard to see how "preparing new educational materials" on S.B. 1 "divert[s] resources" from "community education activities." ROA.7255-7256 ¶¶ 162, 165. If that were enough, *every* voting advocacy organization would have standing to challenge any voting policy it dislikes, "provided [it] spend[s] a single dollar" doing exactly what it was created to do—educating voters about election law. *All. for Hippocratic Med.*, 602 U.S. at 395.

This Court should dismiss all challenges to Sections 5.02, 5.03, 5.07, 6.03, 6.04, 6.05, and 6.07 for lack of subject-matter jurisdiction.

## II.    PLAINTIFFS' ADA AND SECTION 504 CLAIMS FAIL ON THE MERITS.

Even if this Court has jurisdiction to reach them, Plaintiffs' claims fail on the merits. Plaintiffs allege that the ADA and Section 504 override broad swaths of state voting laws, but they are wrong. The ADA and Section 504

simply guarantee disabled voters the opportunity to seek a "reasonable accommodation," *Windham*, 875 F.3d at 236-37, when they lack "meaningful access" to voting, *Alexander*, 469 U.S. at 301. Texas law, however, provides ample access to voting for disabled individuals. And Plaintiffs did not even attempt to seek a reasonable accommodation before seeking to enjoin the challenged provisions statewide. Because the District Court disregarded these principles and imposed a sweeping injunction untethered to any individualized showing of a legal violation, this Court should reverse.

## A. S.B. 1 Does Not Meaningfully Exclude Disabled Individuals From Voting.

Plaintiffs cannot make out a prima facie case because they can point to no record evidence showing disabled individuals are meaningfully excluded from voting. To the contrary, Texas offers a whole host of ways for disabled individuals to vote.

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. To make "a prima facie case of discrimination under the ADA," a plaintiff must demonstrate: "(1) that he is a qualified individual within the

meaning of the ADA; (2) that he is being excluded from participation in, or being denied benefits of, services, programs, or activities for which the public entity is responsible, or is otherwise being discriminated against by the public entity; and (3) that such exclusion, denial of benefits, or discrimination is by reason of his disability." *Smith v. Harris Cnty.*, 956 F.3d 311, 317 (5th Cir. 2020) (quotations omitted). The Rehabilitation Act has the same requirements, except the causation requirement is more demanding: The exclusion, denial, or discrimination must be "solely by reason" of the plaintiff's disability. *Cadena v. El Paso Cnty.*, 946 F.3d 717, 723 n.1 (5th Cir. 2020).

To establish discrimination under the ADA, "a plaintiff must show that a benefit is being administered in a way that 'effectively denies' individuals with qualifying disabilities 'meaningful access' to the benefits for which they are qualified." *Frame v. City of Arlington*, 616 F.3d 476, 484 (5th Cir. 2010), *on reh'g en banc*, 657 F.3d 215 (5th Cir. 2011). This "does not require [the State] to employ any and all means to make [voting] services accessible." *Lane*, 541 U.S. at 531-32. And it does not "guarantee [disabled individuals] equal results." *Alexander*, 469 U.S. at 304. Rather, it "require[s] the States to take reasonable measures to remove . . . barriers to accessibility." *Lane*, 541 U.S. at 531.

Texas easily meets that standard.  Its voting laws—including S.B. 1—
ensure that voters with disabilities have meaningful access to the ballot
through various voting options.  In fact, Texas provides disabled voters
numerous accommodations—including *more* options for casting ballots than
those provided the general electorate.  In particular, a voter with a qualifying
disability may:

- Vote in person during the State's lengthy period of no-excuse
  early voting.  Tex. Elec. Code §§ 41.001, 81.001, 82.005.

- Vote in person on Election Day at ADA-compliant polling places.
  *Id.* §§ 43.034, 61.012.

- Vote curbside, where an election worker brings the ballot (or an
  accessible ballot-marking device) to the voter's vehicle and
  deposits the completed ballot in the box.  *Id.* § 64.009.

- Vote by mail on account of disability and obtain assistance both
  in completing the application and marking the ballot.  *Id.*
  §§ 82.002(a), 86.010(a)-(g).

Far from restricting these avenues, S.B. 1 preserved every one of them
and *expanded* protections for disabled voters.  Most notably, S.B. 1 codified
an express anti-discrimination mandate, barring officials from interpreting
any provision of the Election Code "to prohibit or limit the right of a qualified
individual with a disability from requesting a reasonable accommodation."
*Id.* § 1.022.  S.B. 1 also addressed prior barriers that had disproportionately
affected disabled voters.  It created a statutory cure process that allows all

mail voters to correct any defect in either the application or the carrier envelope through an online portal, telephone hotline, in-person visit, or (at the voter's request) a home visit by county staff. *Id.* §§ 86.015(c), 87.0271, 87.0411. S.B. 1 also deemphasized signature comparison as a means of verifying voters' identities, addressing concerns that physical impairments could prevent some voters from creating consistent signatures. *Id.* § 87.041. The county election administrators that conduct Texas elections testified that they honor these statutory obligations, train poll workers on disability etiquette, and routinely grant accommodation requests.

Plaintiffs have identified no instance in which any disabled Texan could not cast a ballot because of S.B. 1. Plaintiffs' own witnesses confirm the point. No Plaintiff or Plaintiff group member testified they were unable to vote, by reason of their disability, because of any challenged S.B. 1 provision. Several did so curbside. *See, e.g.*, ROA.35415, 35422, 35454. Others used accessible machines or voted with assistance. *See, e.g.*, ROA.35412-13, 35420. And still others voted by mail and successfully tracked or cured their ballots. *See, e.g.*, ROA.35416. The ease with which disabled individuals have voted after S.B. 1 belies any suggestion that S.B. 1 *discriminates* against those voters.

The District Court's contrary conclusion misstates the law and is incompatible with the record. The District Court seemed to think that any restriction that "may dissuade" a disabled individual from voting would violate the ADA. *See* ROA.40955 (quotations omitted). But *every* election regulation—whether it concerns voter identification, ballot handling, or polling place restrictions—could be said to "dissuade" some subset of voters, including those with disabilities, from voting. If that is enough to run afoul of the ADA, no state election regulation is safe: Any such law would be at the mercy of a plaintiff who can find someone—anyone—who is put off by even the most minor inconvenience. The ADA's "limited . . . remedy" of meaningful access does not require the State to "compromise" its compelling interest in secure and orderly elections based on what may dissuade an idiosyncratic voter. *Lane*, 541 U.S. at 531-32; *Paxton*, 148 F.4th at 339. And it does not give plaintiffs a veto over State election regulations merely because they prefer not to comply with those regulations.

The District Court also erred in finding it legally irrelevant to the question of meaningful access that "[all] of Plaintiffs' disabled members . . . were ultimately able to cast a ballot." ROA.40954. The District Court appeared to think that *Luke v. Texas*, 46 F.4th 301 (5th Cir. 2022) required it to ignore this evidence. Not so. In *Luke*, State officials denied the plaintiff,

who was deaf, a sign language interpreter during his arrest, court proceedings, and interactions with probation officers. *Id.* at 303. It also provided the plaintiff no other way to participate in and "understand" his legal proceedings. *See id.* at 306.

The State nonetheless argued that the plaintiff's ADA claim failed because his probation hearing had ended favorably, even if he could not understand or participate in it. *See id.* This Court reversed the district court's grant of a motion to dismiss on this theory. *See id.* Indeed, as this Court reasoned, "[l]ack of meaningful access is *itself* the harm under Title II, regardless of whether any additional injury follows." *Id.*

*Luke* therefore establishes only that a State cannot defeat an ADA claim for lack of *access* merely by showing that the State program granted the plaintiff a favorable *outcome*. But *Luke* nowhere suggests, much less establishes, that courts must ignore evidence that plaintiffs alleging a lack of meaningful access actually *did* access the challenged program or service. *See id.* To the contrary, in determining whether a plaintiff was denied meaningful access, courts routinely consider whether the plaintiff actually accessed the program or service in question. *See, e.g.*, *Cadena*, 946 F.3d at 725 (crutches did not provide the plaintiff with meaningful access because "she could not safely ambulate within the facility on crutches"); *see also*

*Gustafson v. Bi-State Dev. Agency of Missouri-Illinois Metro. Dist.*, 29 F.4th 406, 412 (8th Cir. 2022) (considering plaintiff's use of bus and rail service "between 50 to 100 times each year" with only three "isolated" incidents as evidence of meaningful access).

*Luke* therefore has nothing to do with this case:  Unlike the *Luke* plaintiff, who was denied all participation and accommodation in his legal proceedings, the evidence that Plaintiffs' members successfully voted shows they *did* have access to and participate in voting.  The District Court erred in concluding that it was required to bury its head in the sand at this *evidence of access* as part of its *lack-of-access* analysis.

Moreover, even when the District Court correctly stated the law, its conclusions were incompatible with the factual record.  For example, the District Court stated that "Title II is not targeted at merely guaranteeing minimally adequate services to disabled people."  ROA.40954 (quotations omitted).  That is of course true.  But the record establishes that Texas provides far more than "minimally adequate services."  Indeed, Texas offers disabled voters various options to access the vote, including several options unavailable to the general electorate.  S.B. 1 only builds on that comprehensive scheme with protections tailored to voters with disabilities. Tex. Elec. Code § 1.022; *see also id.* §§ 86.015(c), 87.0271, 87.041, 87.0411.

The District Court thus erred in determining that Texas's voting laws provide only "minimally adequate services" for voters with disabilities. ROA.40954.

The District Court also erred in determining that "the Challenged provisions of S.B. 1 have harmed . . . voters with disabilities[] by denying them an equal opportunity to participate in and benefit from Defendants' voting programs." ROA.40956. Even before S.B. 1, the State provided voters with disabilities *more* opportunities than the general electorate to cast a ballot. *See supra* at 6-8. S.B. 1 *expanded* those options. There is simply no basis to conclude that Texas does not provide disabled individuals a meaningful opportunity to vote.

### B.  Plaintiffs Failed To Request An Accommodation.

Even if Plaintiffs made out a prima facie case, their claims remain fatally deficient. The ADA and Rehabilitation Act do not give Plaintiffs the power to decommission laws that they disfavor. Instead, they must engage with State officials by identifying and requesting a reasonable accommodation that would grant their members meaningful access to the voting process. Plaintiffs and their members, however, have done no such thing.

"To succeed on a failure-to-accommodate claim, a plaintiff must prove: (1) he is a qualified individual with a disability; (2) the disability and its

consequential limitations were known by the covered entity; and (3) the entity failed to make reasonable accommodations." *Ball v. LeBlanc*, 792 F.3d 584, 596 n.9 (5th Cir. 2015). In order to satisfy the knowledge element, a disabled plaintiff must "ordinarily" engage in an interactive process with the entity he or she sought a benefit from. *Smith*, 956 F.3d at 317; *see also Hohider v. United Parcel Serv.*, 574 F.3d 169, 187 (3d Cir. 2009) (describing required "interactive process"). Because "the ADA does not require clairvoyance, the burden falls on the plaintiff to specifically identify the disability and resulting limitations, and to request an accommodation in direct and specific terms." *Windham*, 875 F.3d at 236-37 (quotations omitted). "When a plaintiff fails to request an accommodation in this manner, he can prevail only by showing that 'the disability, resulting limitation, and necessary reasonable accommodation' were 'open, obvious, and apparent' to the entity's relevant agents." *Id.* at 237 (citation omitted).

Plaintiffs' claims flunk these standards. The trial record contains no evidence that any Plaintiff or member of a Plaintiff group has requested any accommodation to enable them to vote since the effective date of S.B. 1. Likewise, the trial record contains no evidence that any Defendant has failed or refused to provide any accommodation. Nor is there any evidence Defendants directed a local official to deny an accommodation.

Because Plaintiffs and their members did not request an accommodation, they can prevail only by establishing that the members' disabilities, limitations, and necessary accommodations were "open, obvious, and apparent" to local election officials. *Id.* Plaintiffs, however, produced no such evidence.

The District Court did not dispute any of this. Instead, it ruled that Plaintiffs and their members did not need to request an accommodation because any request would be "futile." ROA.40959. According to the District Court, county election officials "testified . . . they believed they were prohibited from granting such requests." ROA.40959-40960. And the District Court read the Election Code to "confirm[] their understanding." *Id.*

Nothing could be further from the truth. S.B. 1 expressly bars election officials from interpreting the Election Code as "to prohibit or limit the right of a qualified individual with a disability from requesting a reasonable accommodation." Tex. Elec. Code § 1.022. In other words, an election official would violate the law if he or she refused to consider a request for a reasonable accommodation from a qualified individual with a disability. The plain terms of S.B. 1 therefore directly contradict the District Court's reasoning.

Unsurprisingly, no election official testified that they were *prohibited* from granting a request for a reasonable accommodation.  In the testimony cited by the District Court, Plaintiffs' counsel repeatedly asked officials if they could "waive" the Identification Requirement or Oath Requirement for a disabled voter.  *See, e.g.*, ROA.43310:12-14 ("[W]ould you be able to . . . waive completion of the form?"); ROA.42769:16-25 (similar); ROA.43043:3-7 (similar); ROA.43303:21-43304:1 (similar).  That is an absurd question; S.B. 1 sets forth mandatory requirements to vote.  But just because election officials cannot *eliminate* those requirements, does not mean they cannot *accommodate* disabled voters.  In fact, when asked whether they "trie[d] to make modifications or accommodations for voters with disabilities," those same officials answered: "Absolutely." ROA.43042:20-23.  That is the correct answer, based on the express anti-discrimination mandate in S.B. 1.  *See* Tex. Elec. Code § 1.022.

Still not convinced? Take the District Court at its word.  As it explained, voters who need assistance voting "could ask the presiding judge for a reasonable accommodation."  ROA.40917.  The District Court then cited section 1.022 and explained that it "recogniz[es] qualified individuals' 'right to *request*[] a reasonable accommodation.'"  *Id.* n.34.  The District Court

seemed to think that any request would be futile because S.B. 1 does not grant individuals the "right to *receive* any such accommodation[]." *Id.*

Of course it does not. The ADA and the Rehabilitation Act grant that right—and preempt any contrary state laws. Moreover, "[an ADA defendant] is not required to acquiesce to [a plaintiff's] choice of accommodations." *Cadena*, 946 F.3d at 725. "It's well settled that *defendants*—not plaintiffs—get to choose between reasonable accommodation(s), and plaintiffs' preferences between reasonable accommodation(s) are irrelevant" to the calculus. *E.T. v. Paxton*, 41 F.4th 709, 717 (5th Cir. 2022).

But here, neither Plaintiffs nor their members began the "interactive process," *Hohider*, 574 F.3d at 187, by requesting any accommodation. They simply rushed to court. The District Court erred in deeming all requests for accommodations futile before giving State officials the chance to consider such requests.

The District Court also suggested that the Plaintiffs' members' disabilities were "open and obvious" because Plaintiffs and their members testified in opposition to S.B. 1 before it was enacted. ROA.40961. Not so. To excuse the failure to request an accommodation, the individual's "disability, resulting limitation, and necessary reasonable accommodation" must be "open and obvious" to "*the entity's relevant agents.*" *Windham*, 875

F.3d at 237 (emphasis added).  The Legislature, in enacting laws of general applicability, does not serve as the covered entity responsible for responding to individualized requests for reasonable accommodation in voting or State programs generally.  Instead, S.B. 1 tasks election officials with considering and responding to such requests.  So merely voicing opposition to proposed legislation, even if based on disability-related concerns, does not put the State's "relevant agents" on notice of an individual's specific need for an accommodation.  *Id.*

Charging on, the District Court maintained it would be "impractical and contravene the ADA" for "each voter with a disability" to "request a separate accommodation."  ROA.40960.  To the contrary, requesting an accommodation is fully consistent with the ADA.  After all, the ADA mandates "an individualized approach."  *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 483-84 (1999).  Requesting an accommodation puts the relevant officials on notice of each individual's limitations and the modifications he or she requires.  *See Windham*, 875 F.3d at 236 (explaining that "the service provider must [] have understood 'the limitations [the plaintiff] experienced . . . *as a result* of that disability" (citation omitted)).

As its only authority to the contrary, the District Court cited the Ninth Circuit's decision in *Payan v. Los Angeles Community College District*, 11

F.4th 729, 738-39 (9th Cir. 2021). ROA.40960. But *Payan* itself explained that "a reasonable accommodation claim is focused on an accommodation based on an *individualized* request or need." 11 F.4th at 738 (emphasis added). The Ninth Circuit further clarified that when a plaintiff seeks a specific accommodation, the relevant inquiry is whether the public entity had notice of the individual's limitations and failed to provide the necessary modification. *Id.* at 739-40.

The Ninth Circuit distinguished a reasonable accommodation claim from a disparate impact claim, explaining that the latter "is focused on modifying a policy or practice to improve systemic accessibility." *Id.* at 738. But this is not a disparate impact case. The District Court expressly characterized Plaintiffs' claims as asserting a "Failure to Accommodate," ROA.40958, and analyzed those claims under a failure-to-accommodate rubric, *see id.* (citing *Cadena*, 946 F.3d at 724 (explaining that under a failure-to-accommodate theory, "a plaintiff must show that the entity knew of the disability and its consequential limitations")). Plaintiffs, for their part, have never pressed a disparate impact theory. *See, e.g.*, ROA.6370 (alleging "Failure to Provide Reasonable Accommodations").

This should come as no surprise because this Court, unlike the Ninth Circuit, has *rejected* disparate impact liability in this area, expressly holding

that "[t]he ADA does not prohibit policies that have a disparate impact." *Kamps v. Baylor Univ.*, 592 F. App'x 282, 285 (5th Cir. 2014). Plaintiffs could have argued that *Kamps* got it wrong. *But see Doe v. BlueCross BlueShield of Tennessee, Inc.*, 926 F.3d 235, 241 (6th Cir. 2019) (explaining that Section 504 "does not prohibit disparate-impact discrimination"). But they never did so and have forfeited any disparate impact challenge.

### C. Enjoining S.B. 1 Statewide Fundamentally Alters Texas's Voting Program.

At any rate, the relief Plaintiffs seek exceeds the bounds of what the ADA and Rehabilitation Act permit and what Article III authorizes federal courts to order. Those statutes require only that public entities provide "reasonable modifications" to their policies, practices, or procedures. *Lane*, 541 U.S. at 532. They do not permit changes that would "fundamentally alter" the nature of the program at issue. *Id.* Ignoring these standards altogether, Plaintiffs moved to enjoin S.B. 1 statewide with respect to all voters. It is difficult to conceive of a more fundamental alteration to state law. The District Court erred in concluding otherwise.

This Court applies a burden-shifting framework to assess whether a plaintiff's proposed modification is consistent with the ADA. Under this framework, the plaintiff bears the initial burden of "proving" "that the requested modification is reasonable" "in the run of cases." *Johnson v.*

*Gambrinus Co./Spoetzl Brewery*, 116 F.3d 1052, 1059-60 (5th Cir. 1997). A modification "is not reasonable if it either imposes undue financial and administrative burdens . . . or requires a fundamental alteration in the nature of the program." *Sch. Bd. of Nassau Cnty. v. Arline*, 480 U.S. 273, 287 n.17 (1987). If the plaintiff meets its burden, the defendant can still prevail if it "prov[es] that the requested modification would fundamentally alter the nature of the public accommodation." *Johnson*, 116 F.3d at 1059.

Plaintiffs failed to meet their initial burden to identify a reasonable modification. Instead of proposing a *modification* tailored to disabled voters, Plaintiffs sought to *eliminate* nine separate provisions of S.B. 1 in their entirety—and the District Court gave them that. If upheld, this injunction would exempt *every* voter in Texas from those provisions, not only those voters with valid ADA or Section 504 claims. The injunction does not differentiate between voters who actually have qualifying disabilities and those who do not, or between those who were genuinely prevented from voting due to their disabilities and those who were not.

This does not constitute a modification that is reasonable "in the run of cases." *Id.* Plaintiffs do not even attempt to tailor their remedy to the alleged injuries their members have suffered. *See PGA Tour, Inc. v. Martin*, 532 U.S. 661, 683 n.38 (2001) (requiring that a modification be "reasonable"

and "necessary" to address the alleged injury). As a result, the District Court's injunction imposes "undue financial and administrative burdens" on Texas. *Nassau Cnty.*, <u>480 U.S. at 287</u> n.17. Rather than adjusting its voting process to accommodate disabled voters—the "limited . . . remedy" the ADA requires, *Lane*, <u>541 U.S. at 531-32</u>—the State must change essential aspects of its voting process for the entire electorate. Those changes will require significant expense and risk confusing Texas voters who have cast ballots under S.B. 1. Unsurprisingly, Plaintiffs point to no evidence of this Court upholding any modification of similar breathtaking scope.

For similar reasons, the requested relief constitutes a fundamental alteration to Texas's voting process. The Supreme Court has repeatedly held that the "inability [of a State] to enforce its duly enacted [laws] clearly inflicts irreparable harm on the State." *Abbott*, <u>585 U.S. at 602</u> n.17. The harm here is even graver, where Texas passed S.B. 1 to advance its compelling interest in ensuring election security. *Eu*, <u>489 U.S. at 231</u> (explaining that a State "indisputably has a compelling interest in preserving the integrity of its election process"). Plaintiffs' requested relief would undermine that interest, foreclosing enforcement of the challenged provisions without exception. "The expansive scope of the proposed modification, both in applying to all voters and in seeking to enjoin the entire provision, has the effect of

58

fundamentally altering the law." *League of Women Voters of Fla., Inc. v. Lee*, 595 F. Supp. 3d 1042, 1158 (N.D. Fla. 2022), *aff'd in part and rev'd in part by* 66 F.4th 905 (11th Cir. 2023).

The District Court's dismissal of these substantial concerns was alarmingly flip. *First*, it maintained that Plaintiffs met their burden to identify a reasonable modification because their proposed relief "is simply a return to pre-S.B. 1 law and practice, which the State has already shown is feasible." ROA.40962. But feasible is different than reasonable or not fundamentally altering. Eliminating the challenged provisions is hardly reasonable or not fundamentally altering because it requires Texas to revert to an electoral process that contained fundamental insecurities. *See Paxton*, 2025 WL 2205864, at *2. Doing so will impose obvious "financial and administrative burdens" on the State: the hallmark of an *unreasonable* modification.

*Second*, the District Court faulted Defendants for "not offer[ing] any evidence that enjoining the Challenged Provisions would 'fundamentally alter' voting in Texas." ROA.40963. That conclusion is wholly incompatible with the record. As to the Identification Requirement, this Court has already explained (in this same litigation) that the State *has* established that S.B. 1 serves its weighty interest in "combating voter fraud." *Paxton*, 148 F.4th at

338.  The Assistor Disclosure Provisions similarly enhance electoral security and protect vulnerable voters from undue partisan pressure and fraudulent schemes designed to secure votes in the guise of providing assistance.  *See, e.g.*, ROA.45930-45938 (describing various unlawful assistance schemes, which S.B. 1 was designed to prevent).  The District Court did not need to look much further than the Title or text of S.B. 1 to grasp these points.  *See* S.B. 1, An Act Relating to Election Integrity and Security; *id.* at 1.0015 (explaining that S.B. 1 will "reduce the likelihood of fraud in the conduct of elections, protect the secrecy of the ballot, promote voter access, and ensure that all legally cast ballots are counted").  It nevertheless dismissed these concerns without serious consideration and required the State to return to an electoral process it deemed insecure.

*Third*, the District Court minimized Defendants' opposition to a statewide injunction "as hand wringing over the scope of the injunctive relief" because "both voting by mail and voting with assistance are available only to limited categories of voters in Texas."  ROA.40964.  That reasoning is erroneous.  To begin, it ignores the fact that Texas specifically identified these categories of voting as susceptible to abuse.  *See* ROA.45913 (testimony from Texas's former top voter-fraud prosecutor that "vote harvesting, assistance fraud, and illegal voting" are "the three main categories" of

election crimes); *Paxton*, 148 F.4th at 338 (recognizing that the Identification Requirement combats ballot fraud). The District Court's injunction would expose the State to the very forms of fraud that it enacted S.B. 1 to prevent.

Furthermore, the District Court itself acknowledged that its injunction would affect more than "limited categories" of voters. ROA.40964. It found that "[t]here are at least 3 million voting-eligible Texans with disabilities." ROA.40869. And it explained that those voters are more likely to vote by mail or vote with assistance. *Id.* Nevertheless, disabled voters "represented [only] 32% of all voters who voted by mail in 2020." ROA.40876. In the 2020 election alone, Texans cast roughly a million mail-in votes. *See* MIT Election Data + Science Lab, Spotlight on Texas: Record Breaking Early Vote Turnout, https://electionlab.mit.edu/articles/spotlight-texas-record-breaking-early-vote-turnout. The District Court's injunction thus has sweeping implications, extending well beyond the Plaintiffs or a narrow subset of voters.

Finally, in all events, the District Court's injunction violates fundamental remedial rules. As the Supreme Court recently explained, "[t]he equitable tradition has long embraced the rule that courts generally 'may administer complete relief *between the parties*.'" *Trump*, 606 U.S. at

851.  In fact, complete relief "is not a guarantee—it is the maximum a court can provide." *Id.* at 854.  "[T]he broader and deeper the remedy the plaintiff wants, the stronger the plaintiff's story needs to be." *Id.* (quotations omitted).  Plaintiffs went for broke and sought a statewide injunction.  But that injunction provides far more than complete relief to any injured party.  It eliminates the challenged provisions as to *all* Texas voters, not just Plaintiffs' members with disabilities who face imminent harm actionable under the ADA and Rehabilitation Act.  The injunction thus sweeps far too broadly.

## CONCLUSION

This Court should reverse the District Court's order permanently enjoining Sections 5.02, 5.03, 5.07, 6.03-6.07, and 7.04 of S.B. 1 and dismiss Plaintiffs' ADA and Rehabilitation Act challenges to those provisions.

September 19, 2025                    Respectfully submitted,


                                      *s/John M. Gore*

                                      John M. Gore
                                        *Counsel of Record*
                                      E. Stewart Crosland
                                      Nathaniel C. Sutton
                                      JONES DAY
                                      51 Louisiana Ave., N.W.
                                      Washington, DC 20001
                                      (202) 879-3939
                                      jmgore@jonesday.com
                                      scrosland@jonesday.com
                                      nsutton@jonesday.com


                                      *Counsel for Intervenor-Appellants*

**CERTIFICATES OF COMPLIANCE AND SERVICE**

I certify that this brief complies with Federal Rule of Appellate Procedure 32(a)(5)-(a)(6), (a)(7)(B), (c)(1), and Fifth Circuit Rule 32.1-32.2. Excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Fifth Circuit Rule 32.2, the brief contains 12,987 words and has been prepared using Microsoft Word in Georgia 14-point font.

I certify that on September 19, 2025, I caused a copy of the foregoing to be served on all counsel of record via CM/ECF.

September 19, 2025

*s/John M. Gore*
John Gore
*Counsel for Intervenor-Appellants*