No. 25-50246

# In the United States Court of Appeals for the Fifth Circuit

La Unión del Pueblo Entero, Southwest Voter Registration Education Project; Mexican American Bar Association of Texas; Texas Hispanics Organized for Political Education; JOLT Action; William C. Velasquez Institute; Fiel Houston, Incorporated; Friendship-West Baptist Church; Texas Impact; James Lewin; Mi Familia Vota,

*Plaintiffs-Appellees,*

*v.*

Gregory W. Abbott, in his official capacity as Governor of Texas; Jane Nelson, in her official capacity as Texas Secretary of State; State of Texas; Warren K. Paxton, in his official capacity as Attorney General of Texas; Harris County Republican Party; Dallas County Republican Party; National Republican Senatorial Committee,

*Defendants-Appellants,*

Republican National Committee

*Movant-Appellant,*

OCA-Greater Houston; League of Women Voters of Texas; REVUP-Texas,

*Plaintiffs-Appellees,*

*v.*

Ken Paxton, Texas Attorney General,

*Defendant-Appellant,*

LULAC Texas; Texas Alliance for Retired Americans; Texas AFT; Voto Latino,

*Plaintiffs-Appellees,*

*v.*

Ken Paxton, in his official capacity as the Texas Attorney General,

*Defendant-Appellant,*

Delta Sigma Theta Sorority, Incorporated; The Arc of Texas,

*Plaintiffs-Appellees,*

v.

Gregory Wayne Abbott, in his official capacity as Governor of Texas; Warren Kenneth Paxton, Jr., in his official capacity as the Attorney General of Texas,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the Western District of Texas, San Antonio Division

## OPENING BRIEF FOR STATE DEFENDANTS-APPELLANTS

Ken Paxton
Attorney General of Texas

Brent Webster
First Assistant Attorney General

Office of the Attorney General

William R. Peterson
Solicitor General

William F. Cole
Principal Deputy Solicitor General

Daniel Ortner
Assistant Solicitor General

P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

Daniel.Ortner@oag.texas.gov

*Counsel for State Defendants-Appellants*

## CERTIFICATE OF INTERESTED PERSONS

No. 25-50246

LA UNIÓN DEL PUEBLO ENTERO, SOUTHWEST VOTER REGISTRATION EDUCATION PROJECT; MEXICAN AMERICAN BAR ASSOCIATION OF TEXAS; TEXAS HISPANICS ORGANIZED FOR POLITICAL EDUCATION; JOLT ACTION; WILLIAM C. VELASQUEZ INSTITUTE; FIEL HOUSTON, INCORPORATED; FRIENDSHIP-WEST BAPTIST CHURCH; TEXAS IMPACT; JAMES LEWIN; MI FAMILIA VOTA,

*Plaintiffs-Appellees,*

*v.*

GREGORY W. ABBOTT, IN HIS OFFICIAL CAPACITY AS GOVERNOR OF TEXAS; JANE NELSON, IN HER OFFICIAL CAPACITY AS TEXAS SECRETARY OF STATE; STATE OF TEXAS; WARREN K. PAXTON, IN HIS OFFICIAL CAPACITY AS ATTORNEY GENERAL OF TEXAS; HARRIS COUNTY REPUBLICAN PARTY; DALLAS COUNTY REPUBLICAN PARTY; NATIONAL REPUBLICAN SENATORIAL COMMITTEE,

*Defendants-Appellants,*

REPUBLICAN NATIONAL COMMITTEE

*Movant-Appellant,*

---

OCA-GREATER HOUSTON; LEAGUE OF WOMEN VOTERS OF TEXAS; REVUP-TEXAS,

*Plaintiffs-Appellees,*

*v.*

KEN PAXTON, TEXAS ATTORNEY GENERAL,

*Defendant-Appellant,*

---

LULAC TEXAS; TEXAS ALLIANCE FOR RETIRED AMERICANS; TEXAS AFT; VOTO LATINO,

*Plaintiffs-Appellees,*

*v.*

KEN PAXTON, IN HIS OFFICIAL CAPACITY AS THE TEXAS AT-
TORNEY GENERAL,

*Defendant-Appellant,*

---

DELTA SIGMA THETA SORORITY, INCORPORATED; THE ARC OF
TEXAS,

*Plaintiffs-Appellees,*

*v.*

GREGORY WAYNE ABBOTT, IN HIS OFFICIAL CAPACITY AS GOV-
ERNOR OF TEXAS; WARREN KENNETH PAXTON, JR., IN HIS OFFI-
CIAL CAPACITY AS THE ATTORNEY GENERAL OF TEXAS,

*Defendants-Appellants.*

Under the fourth sentence of Fifth Circuit Rule 28.2.1, the State Defendants-Appellants, as governmental parties, need not furnish a certificate of interested persons.

/s/ Daniel M. Ortner

DANIEL M. ORTNER
*Counsel of Record for State Defendants-Appellants*

## Statement Regarding Oral Argument

On March 13, 2025, the United States Court for the Western District of Texas permanently enjoined the enforcement of all or part of nine provisions of the Texas Election Integrity Protection Act, 87th Leg., 2d C.S., ch. 1, 2021 Tex. Gen. Laws 3873[1] (commonly known as "S.B.1"). The court based its ruling on the erroneous theory that by requiring voters seeking to vote by mail to provide identification numbers to show that they are who they say they are, Texas violated Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act—two laws designed to combat discrimination against disabled individuals. But the district court's overly broad application of federal disability law would turn the ADA into a weapon that would demolish state election security measures. Given these serious consequences, Secretary Nelson believes oral argument is appropriate.

---

[1] As codified in various sections of the Texas Election Code including sections 64.034, 64.0322, 84.002, 84.011, 84.0111, 86.001, 86.002, 86.010, and 86.011.

# TABLE OF CONTENTS

Page

Certificate of Interested Persons ................................................................. i

Statement Regarding Oral Argument ....................................................... iii

Table of Authorities ................................................................................. vi

Introduction ............................................................................................. 1

Statement of Jurisdiction ......................................................................... 4

Issues Presented ...................................................................................... 4

Statement of the Case .............................................................................. 4

    I.   The Administration of Elections in Texas .................................... 4

    II.  Options for Voters with Disabilities in Texas ............................. 5

        A.  In-person voting .................................................................... 5

        B.  Curbside voting ..................................................................... 6

        C.  Voting by mail ....................................................................... 6

        D.  Requesting additional accommodations ................................ 8

    III. S.B.1's Protections for Voters with Disabilities .......................... 8

        A.  Voter Identification Provisions (Sections 5.02, 5.03, and 5.07) ........... 9

        B.  Cure Provisions (Sections 5.12, 5.13, and 5.14) .................... 11

        C.  Voter Assistance Provisions (Sections 6.03, 6.04, 6.05, and 6.07) ........ 12

        D.  Paid-Assistance Provision (Section 6.06) ............................. 12

        E.  Vote Harvesting Provision (Section 7.04) ............................ 13

    IV. Texas's Implementation of S.B.1 ............................................. 13

    V.  Requesting and Receiving Accommodations under S.B.1 .......... 16

    VI. Procedural History .................................................................. 17

Summary of the Argument ...................................................................... 20

Standard of Review ................................................................................ 22

Argument .............................................................................................. 22

    I.   The District Court Did Not Have Jurisdiction over Plaintiffs' Claims ............................................................................... 22

A.  Plaintiffs lack standing because they have not suffered a
    cognizable ADA injury..................................................................... 23

    1.  Plaintiffs' do not suffer a cognizable injury from the voter
        identification provisions ................................................... 24

        a.  Plaintiffs are not directly injured by the voter
            identification provisions ........................................ 24

        b.  Plaintiffs' members are not injured by the voter
            identification provisions ........................................ 26

    2.  Plaintiffs' organizational injuries are not ADA injuries............... 28

B.  The Secretary does not enforce S.B.1 or the ADA and is
    therefore not a proper defendant. ..................................................... 29

II.  Plaintiffs Failed to Prove Their Title II and Section 504 Claims. ............. 32

A.  Texas provides disabled voters with meaningful access to
    voting. ............................................................................................. 32

B.  This Court has never recognized disparate-impact claims
    under Title II or Section 504 and should refuse to do so here............ 34

C.  Plaintiffs' failure-to-accommodate claim fails.................................... 37

    1.  Plaintiffs failed to request an accommodation. ............................ 37

    2.  Any limitations that Plaintiffs' members experience are not
        open and obvious.................................................................... 38

    3.  Requesting an accommodation was not futile.............................. 40

    4.  Plaintiffs' proposed modifications are unreasonable. .................. 42

    5.  The district court's order fundamentally alters S.B.1. ................ 45

III.  The District Court Exceeded Its Equitable Authority by Issuing
     an Overly Broad Injunction........................................................................ 47

Conclusion ...................................................................................................... 47

Certificate of Service......................................................................................... 48

Certificate of Compliance ................................................................................ 49

# Table of Authorities

Page(s)

**Cases:**

*Alexander v. Choate,*
469 U.S. 287 (1985)...................................................................... 2, 33, 36

*Alexander v. Sandoval,*
532 U.S. 275 (2001)...................................................................... 35, 36, 37

*Ayotte v. Planned Parenthood of N. New Eng.,*
546 U.S. 320 (2006) ........................................................................ 43

*Bennett v. Spear,*
520 U.S. 154 (1997) ........................................................................ 28

*Biden v. Nebraska,*
600 U.S. 477 (2023) ........................................................................ 42

*Block v. Tex. Bd. of Law Exam'rs,*
952 F.3d 613 (5th Cir. 2020) .......................................................37, 46

*City of Dallas v. TCI W. End, Inc.,*
463 S.W.3d 53 (Tex. 2015) ............................................................31

*City of Los Angeles v. Lyons,*
461 U.S. 95 (1983) .......................................................................... 27

*Crawford v. Marion County Election Board,*
553 U.S. 181 (2008).................................................................26-27, 43, 45

*Danos v. Jones,*
652 F.3d 577 (5th Cir. 2011) .......................................................... 29

*Doe v. BCBS of Tenn., Inc.,*
926 F.3d 235 (6th Cir. 2019) .......................................................... 35

*E.T. v. Paxton,*
41 F.4th 709 (5th Cir. 2022) .......................................................... 42

*FDA v. All. for Hippocratic Med.,*
602 U.S. 367 (2024) ....................................................................... 24, 25

*Frame v. City of Arlington,*
616 F.3d 476 (5th Cir. 2010)........................................................... 34

*Frame v. City of Arlington,*
657 F.3d 215 (5th Cir. 2011) ......................................................... 34, 40

*In re Gee,*
941 F.3d 153 (5th Cir. 2019) .......................................................... 22

*Gladstone Realtors v. Village of Bellwood,*
   441 U.S. 91 (1979) .......................................................... 22

*Gonzales v. City of New Braunfels,*
   176 F.3d 834 (5th Cir. 1999) ......................................... 35

*Green Valley Special Util. Dist. v. City of Schertz,*
   969 F.3d 460 (5th Cir. 2020)........................................ 43

*Griffin v. United Parcel Serv., Inc.,*
   661 F.3d 216 (5th Cir. 2011) ........................................ 42

*Gustafson v. Bi-State Dev. Agency of Mo.-Ill. Metro. Dist.,*
   29 F.4th 406 (8th Cir. 2022) .................................... 33-34

*Havens Realty Corp. v Coleman,*
   455 U.S. 363 (1982) ..................................................... 25

*Hous. Area Urb. League v. Abbott,*
   No. 5:21-cv-848 (W.D. Tex. 2021) ...............................17

*Johnson v. Gambrinus Co. Spoetzl Brewery,*
   116 F.3d 1052 (5th Cir. 1997).................................... 42

*LA All. For Hum. Rts. v. Cnty. Of Los Angeles,*
   14 F.4th 947 (9th Cir. 2021) ........................................ 43

*La Union Del Pueblo Entero v. Abbott,*
   119 F.4th 404 (5th Cir. 2024)........................... 19, 21, 29

*La Union del Pueblo Entero v. Abbott,*
   618 F. Supp. 3d 388 (W.D. Tex. 2022) ......................... 30

*La Union Del Pueblo Entero v. Abbott,*
   No. 24-50826, 2025 WL 2489464
   (5th Cir. Aug. 29, 2025) .......................................*passim*

*La Union del Pueblo Entero v. Abbott,*
   No. 5:21-cv-844 (W.D. Tex.) ........................................17

*La Union del Pueblo Entero v. Scott,*
   No. 22-50775 (5th Cir. Dec. 9, 2022) ........................... 30

*League of Women Voters of Fla., Inc. v. Lee,*
   595 F. Supp. 3d 1042 (N.D. Fla. 2022) ........................ 43

*Lexmark Int'l, Inc. v. Static Control Components, Inc.,*
   572 U.S. 118 (2014) ................................................ 28, 29

*Lightbourn v. County of El Paso,*
   118 F.3d 421 (5th Cir. 1997) .................................. 22, 30

*Lujan v. Defenders of Wildlife,*
  504 U.S. 555 (1992) ................................................................. 22

*Luke v. Texas,*
  46 F.4th 301 (5th Cir. 2022) ........................................... 26, 32

*LULAC Tex. v. Esparza,*
  No. 1:21-cv-786 (W.D. Tex. 2021) ..................................... 17

*Mi Familia Vota v. Abbott,*
  No. 5:21-cv-920 (W.D. Tex. 2021) ..................................... 17

*Mi Familia Vota v. Ogg,*
  105 F.4th 313 (5th Cir. 2024) ............................................. 18

*Murthy v. Missouri,*
  603 U.S. 43 (2024) ....................................................... 22, 30

*NAACP v. City of Kyle,*
  626 F.3d 233 (5th Cir. 2010) ........................................24, 25, 26

*National Federation of the Blind v. Lamone,*
  813 F.3d 494 (4th Cir. 2016) ............................................. 44

*OCA-Greater Hous. v. Esparza,*
  No. 1:21-cv-780 (W.D. Tex. 2021) ..................................... 17

*Payan v. Los Angeles Community College District,*
  11 F.4th 729 (9th Cir. 2021) ............................................. 37

*People First of Ala. v. Merrill,*
  491 F. Supp. 3d 1076 (N.D. Ala. 2020) ............................. 33

*Richardson v. Flores,*
  28 F.4th 649 (2022) .......................................................... 31

*Richardson v. Tex. Sec'y of State,*
  978 F.3d 220 (5th Cir. 2020) ......................................... 7, 26

*Riel v. Elec. Data Sys. Corp.,*
  99 F.3d 678 (5th Cir. 1996) ............................................... 37

*Russello v. United States,*
  464 U.S. 16 (1983) ........................................................... 40

*Smith v. Harris County,*
  956 F.3d 311 (5th Cir. 2020) ............................................. 37

*Soledad v. U.S. Dep't of Treasury,*
  304 F.3d 500 (5th Cir. 2002) ............................................. 38

*Stanley v. City of Sanford,*
  145 S. Ct. 2058 (2025) ...................................................... 29

*Taylor v. Principal Fin. Grp., Inc.*,
  93 F.3d 155 (5th Cir. 1996) .................................................. 38

*Tennessee v. Lane*,
  541 U.S. 509 (2004) ........................................................... 36

*Tenth St. Residential Ass'n v. City of Dallas*,
  968 F.3d 492 (5th Cir. 2020) ............................................... 25

*Tex. All. For Retired Ams. v. Scott (TARA)*,
  28 F.4th 669 (5th Cir. 2022) ............................................... 22

*Tex. Democratic Party v. Benkiser*,
  459 F.3d 582 (5th Cir. 2006) ............................................... 24

*Tex. LULAC v. Huges*,
  978 F.3d 136 (5th Cir. 2020) ............................................... 26

*Texas Democratic Party v. Hughs*,
  860 F. App'x 874 (5th Cir. 2021) ......................................... 31

*TransUnion LLC v. Ramirez*,
  594 U.S. 413 (2021) ........................................................... 28

*Trump v. CASA, Inc.*,
  145 S. Ct. 2540 (2025) .................................................. 45, 47

*United States v. Alcantar*,
  733 F.3d 143 (5th Cir. 2013) ............................................... 23

*United States v. Mississippi*,
  82 F.4th 387 (5th Cir. 2023) ..................................... 34, 44, 45

*United States v. Paxton*,
  No. 23-50885, 2025 WL 2205864 (5th Cir. Aug. 4, 2025) .......... *passim*

*Veasey v. Abbott*,
  830 F.3d 216 (5th Cir. 2016) ........................... 1, 26, 44, 46

*Voting for Am., Inc. v. Steen*,
  732 F.3d 382 (5th Cir. 2013) ............................................... 43

*Voting Integrity Project, Inc. v. Bomer*,
  199 F.3d 773 (5th Cir. 2000) ............................................... 43

*Windham v. Harris County*,
  875 F.3d 229 (5th Cir. 2017) ........................................ 38, 39

**Constitutional Provisions, Statutes, and Rules:**

U.S. Const. amend. XIV, § 5 ................................................................ 36

Tex. Const. art. III .................................................................... 22, 28

28 U.S.C. § 1292 ............................................................................ 4

28 U.S.C. § 1331 ............................................................................ 4

29 U.S.C. § 794 (Section 504 of the Rehabilitation Act) ...................... *passim*

42 U.S.C § 12131 *et seq.* (Tit. II of the ADA) .............................. *passim*

42 U.S.C § 12132 ....................................................................... 29, 35

42 U.S.C § 12133 ......................................................................... 29

42 U.S.C § 12188(a)(1) ................................................................... 40

42 U.S.C § 2000d *et seq.* ............................................................... 35

52 U.S.C. § 20901 *et seq.* ............................................................... 10

52 U.S.C. § 21083(d) ...................................................................... 10

Texas Election Integrity Protection Act, 87th Leg., 2d C.S., ch. 1,
  2021 Tex. Gen. Laws 3873 (S.B.1) ........................................... *passim*

Tex. Elec. Code § 1.011(a) ................................................................ 7

Tex. Elec. Code § 1.011(c)-(d) ........................................................... 7

Tex. Elec. Code §  1.011(e) ............................................................... 7

Tex. Elec. Code § 1.022 ............................................................... 8, 41

Tex. Elec. Code § 13.002(c)(8)(A) ...................................................... 10

Tex. Elec. Code § 13.047 ................................................................. 5

Tex. Elec. Code § 13.071-.073 ........................................................... 5

Tex. Elec. Code § 31.001(a) .............................................................. 4

Tex. Elec. Code § 31.002 ................................................................. 5

Tex. Elec. Code § 31.003 ............................................................... 4, 5

Tex. Elec. Code § 31.004 ................................................................. 5

Tex. Elec. Code § 32.002 ................................................................. 5

Tex. Elec. Code § 32.071 ................................................................. 5

Tex. Elec. Code § 32.115 ................................................................. 5

Tex. Elec. Code § 33.008 ................................................................. 5

Tex. Elec. Code § 43.002 ................................................................. 5

Tex. Elec. Code § 43.034(a) .............................................................. 5

Tex. Elec. Code § 61.006(a) .............................................................. 6

Tex. Elec. Code § 61.012 ................................................................ 31

Tex. Elec. Code § 61.013(b)-(c) ...................................................31

Tex. Elec. Code § 63.0015 ...........................................................15

Tex. Elec. Code § 64.009 .............................................................6

Tex. Elec. Code § 64.009(a) .........................................................6

Tex. Elec. Code § 64.031 .............................................................5

Tex. Elec. Code § 64.032(c). .......................................................5

Tex. Elec. Code § 64.0322 ..........................................................iii

Tex. Elec. Code § 64.034 ...................................................iii, 6, 12

Tex. Elec. Code § 64.036(a)(d) ....................................................6

Tex. Elec. Code § 64.037 .............................................................5

Tex. Elec. Code § 82.002-.004 .....................................................6

Tex. Elec. Code § 83.001 .............................................................5

Tex. Elec. Code § 84.002 ............................................................iii

Tex. Elec. Code § 84.003(a) .........................................................7

Tex. Elec. Code § 84.004(a) .........................................................7

Tex. Elec. Code § 84.011 ............................................................iii

Tex. Elec. Code § 84.0111 ..........................................................iii

Tex. Elec. Code § 84.035 ...........................................................11

Tex. Elec. Code § 84.0041(a)-(b) .................................................7

Tex. Elec. Code § 86.001 ......................................................iii, 7

Tex. Elec. Code § 86.002 .............................................................7

Tex. Elec. Code § 86.010 ............................................................iii

Tex. Elec. Code § 86.010(a) .........................................................7

Tex. Elec. Code § 86.010(c) .........................................................7

Tex. Elec. Code § 86.010(d)-(g) ...................................................7

Tex. Elec. Code § 86.010(h)(1) ...................................................12

Tex. Elec. Code § 86.011 ............................................................iii

Tex. Elec. Code § 86.0052 ...........................................................7

Tex. Elec. Code § 86.0105 .........................................................12

Tex. Elec. Code § 87.0271(b) .....................................................11

Tex. Elec. Code § 276.015 .........................................................13

Tex. Elec. Code § 276.015(e) .....................................................13

Tex. Penal Code § 37.02 ......................................................6, 12

**Other Authorities:**

Texas Secretary of State, *Texas Has 18.6 Million Registered Voters*
(Oct. 19, 2024),
https://www.sos.state.tx.us/about/newsreleases/2024/101924.sht
ml ................................................................................................................... 42

# Introduction

Texas provides voters with disabilities a wide array of options for voting, including voting by mail, early voting, curbside voting, and voting in person with assistance. It also offers numerous accommodations to ensure that these voters can vote successfully. But the 2020 election, held in the middle of the COVID-19 pandemic, revealed significant vulnerabilities including "the scourge of mail-in-ballot fraud," *United States v. Paxton*, No. 23-50885, 2025 WL 2205864, at *4 (5th Cir. Aug. 4, 2025), and the potential for disabled voters to be coerced or intimidated by those claiming to assist them.

In response in 2021, Texas enacted S.B.1, a voting rights and security law that simultaneously expanded access to methods of voting for disabled voters and created new election-security measures to eliminate the "significant threat" of mail-in-ballot fraud, *Veasey v. Abbott*, 830 F.3d 216, 256 (5th Cir. 2016), and other types of election fraud. One security measure requires voters who vote by mail to provide an ID number or social security number that matches the State's records, closing a loophole that "trigger[ed] significant election security concerns." *Paxton*, 2025 WL 2205864, at *2. Another measure requires those assisting voters to sign an oath that they did not coerce or intimidate the voters they assisted.

Before any of these commonsense security measures went into effect, Plaintiffs, several voting rights and disability rights non-profits, sued the State of Texas, the Governor, the Secretary of State, and the Attorney General (the "State

Defendants"),[2] and numerous county election officials, challenging altogether more than three dozen provisions under an assortment of claims. One of their many theories—and the one at issue in this appeal—is that S.B.1 discriminates against disabled voters under Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act.

The ADA ensures that disabled individuals are given "meaningful access" to public programs through "reasonable accommodations" or "modifications." *Alexander v. Choate*, 469 U.S. 287, 304 (1985).[3] But Title II was not designed to undermine the States' interest "in preserving the integrity" of its programs, *id.* at 300—least of all to undermine the integrity of state elections by allowing the federal courts to tear down election security measures.

But the district court nevertheless used Title II and Section 504 to invalidate nine provisions of S.B.1 (Sections 5.d02, 5.03, 5.07, 6.03, 6.04, 6.05, 6.06, 6.07, and 7.04), not merely as applied to disabled individuals, but for more than 18 million registered Texas voters. And it did so even though Plaintiffs could not show (1) that any of their members had been denied the right to vote as a result of the challenged

---

[2] Plaintiffs Title II and Section 504 claims were brought solely against the Secretary and the Attorney General, not the State of Texas or the Governor. ROA.35389. The district court also dismissed these claims against the Attorney General for lack of standing. ROA.40972. Therefore, although all of these parties remain listed in the case caption and are nominally parties to this appeal, the district court's injunction binds only the Secretary.

[3] Although there may be some differences between accommodations and modifications under the ADA, these differences are not relevant here and the terms are used interchangeably.

provisions; (2) that they or their members suffered any other Constitutionally cognizable injury; or (3) that the Secretary enforces the challenged provisions or is responsible for granting or denying ADA accommodations regarding the challenged provisions.

In doing so, the district court drastically exceeded the scope of Title II and Section 504. It embraced a disparate-impact theory of liability that is contrary to the plain text those sections and that this Court has never endorsed. It improperly excused Plaintiffs' failure to request *any* accommodations from local election officials. And it concluded that the demand to completely invalidate election-security measures for all voters, regardless of disability, was a reasonable accommodation. Absent action by this Court, the ADA will be transformed from a law that ensures reasonable accommodations into a weapon for dissatisfied political advocacy groups to second guess and overturn legislatively enacted election-security measures.

The Court should reverse the district court's injunction and render judgment dismissing Plaintiffs' claims for a want of jurisdiction. Alternatively, if the Court determines the district court properly exercised jurisdiction over Plaintiffs' claims and reaches the merits of those claims, the Court should reverse and render judgment for the Secretary because S.B.1 violates neither Title II nor Section 504. But, if the Court determines that Plaintiffs should prevail on any of their claims, the Court should still narrow the scope of the district court's injunction because it exceeds the district court's equitable authority.

## STATEMENT OF JURISDICTION

Plaintiffs invoked the court's original jurisdiction pursuant to 28 U.S.C. section 1331. But the district court lacked jurisdiction because Plaintiffs failed to establish Article III standing—both generally and as to Secretary Nelson in particular.

This Court has appellate jurisdiction under 28 U.S.C. section 1292 because State Defendants-Appellants timely appealed both the district court's order granting a permanent injunction and the district court's order clarifying its injunction. ROA.40219, 41078.

## ISSUES PRESENTED

The issues presented are:

1.  Whether the district court had jurisdiction over Plaintiffs' Title II and Section 504 claims against the Secretary of State.

2.  Whether the district court erred in ruling for Plaintiffs on the basis of a disparate-impact theory of liability under Title II and Section 504.

3.  Whether the district court erred in excusing Plaintiffs from requesting an accommodation and by completely enjoining the enforcement of state election law for *all* voters.

## STATEMENT OF THE CASE

## I.   The Administration of Elections in Texas

The Texas Secretary of State is Texas's "chief election officer," charged with maintaining "uniformity in the application, operation, and interpretation" of the Texas Election Code. §§ 31.001(a),.003. The Secretary discharges this obligation primarily by issuing "written directives and instructions," training local election

officials, and developing official forms that are used by local officials. *Id.* §§ 13.047, 31.002, 31.003, 31.004, 32.115, 33.008. The Secretary does not have the statutory authority to approve or deny requests for accommodations from voters On-the-ground administration of elections in Texas is instead carried out by county and local officials, including county clerks, voter registrars, and election judges. This includes designating polling places, registering voters, administering early voting, and ensuring order at the polling place. *Id.* §§ 13.071-.073, 32.002, 32.071, 43.002, 83.001.

## II.  Options for Voters with Disabilities in Texas

Texas provides voters with disabilities a wide array of options for voting and numerous accommodations to ensure that they can vote successfully.

### A.  In-person voting

To begin, Texas voters may vote in person on Election Day or during the early-voting period. ROA.43082. Texas requires that all polling places must be "accessible to and usable by the elderly and persons with physical disabilities." Tex. Elec. Code § 43.034(a); ROA.79969-70.

Disabled voters may receive voting assistance at the polls from an election worker or "by any person selected by the voter" other than their employer or an agent of their labor union.  Tex. Elec. Code §§ 64.031, .032(c). If assistance is provided to a voter who is not eligible for assistance, that voter's ballot may not be counted. *Id.* § 64.037. However, if a voter states that he is eligible for assistance, the Secretary advises counties to accept the voter's representation and not question the voter's eligibility or the nature of his disability. ROA.46416-17.

Assistors are prohibited from offering "unlawful assistance" that can harm a voter's rights, such as suggesting how the voter should vote or filling out the ballot differently than the voter directs. Tex. Elec. Code §§ 61.006(a), 64.036(a)(d); ROA.46426. To prevent undue influence, an assistor must take an oath made under penalty of perjury before assisting a voter. Tex. Elec. Code § 64.034; Tex. Penal Code § 37.02. This oath requirement predates S.B.1. ROA.45972. *See also La Union Del Pueblo Entero v. Abbott*, No. 24-50826, 2025 WL 2489464, at *6 (5th Cir. Aug. 29, 2025) (LUPE III) (noting the pre-SB1 oath "was *already* taken under penalty of perjury") (emphasis in original). It applies only to voting assistance (i.e., assistance interacting with the ballot itself), not to general assistance, like opening a door for a voter or releasing the straps on a wheelchair. ROA.46417-18.

## B.  Curbside voting

Voters who are "physically unable to enter the polling place without personal assistance or likelihood of injuring the voter's health" may also utilize curbside voting at all polling locations. Tex. Elec. Code § 64.009(a); ROA.42343-45. With curbside voting, an election officer delivers a ballot to the voter at their vehicle. Tex. Elec. Code § 64.009. Each polling place must have at least one clearly marked parking spot for curbside voting. ROA.42344.

## C.  Voting by mail

Voters with disabilities and voters over 65 can also vote by mail. *See* Tex. Elec. Code §§ 82.002-.004. To receive a mail-in ballot, a voter must submit an Application

for Ballot by Mail (ABBM). An early voting clerk reviews each ABBM and mails an official ballot to applicants who satisfy all of the requirements. *Id.* §§ 86.001,.002.

As this Court has recognized, "[t]he potential and reality of fraud is much greater in the mail-in ballot context than with in-person voting," *Richardson v. Tex. Sec'y of State*, 978 F.3d 220, 239 (5th Cir. 2020). Accordingly, Texas has enacted several security measures regarding the process of requesting a ballot and voting by mail. In addition, submitting false information on an ABBM, submitting an ABBM without the consent of the voter, and altering the information on an ABBM are all felonies. Tex. Elec. Code § 84.0041(a)-(b).

If a voter is disabled or illiterate, their ABBM may be signed by a witness in the presence of the voter. *Id.* § 1.011(a), (e). To prevent intimidation or fraud, a witness must include identifying information on the application including the witness's name, signature, address, and relationship to the voter, *id.* §§ 1.011(c)-(d), 84.003(a), and can only sign one application for one voter per calendar year, *id.* § 84.004(a).

Voters eligible for assistance may be assisted with their official mail-in ballot. *Id.* § 86.010(a). The assistor must sign a written oath and provide the required information. *Id.* § 86.010(c). Knowingly failing to sign the oath or enter the required information is a state jail felony, and "the voter's ballot may not be counted." *Id.* § 86.010(d)-(g). Assistors also cannot be compensated for depositing ballots in the mail. *Id.* § 86.0052.

### D. Requesting additional accommodations

Voters with disabilities may request additional accommodations from their local election officials. ROA.43097. Texas law specifically forbids election officials from interpreting the Texas Election Code so as "to prohibit or limit the right of a qualified individual with a disability from requesting a reasonable accommodation or modification to any election standard, practice, or procedure mandated by law or rule that the individual is entitled to request under federal or state law." Tex. Elec. Code § 1.022. Even if a county is unable to grant a request, the county election officials would still work with the voter to help them vote. ROA.44348. The record shows that, in some counties, voters can request an accommodation using a complaint form that is available either at the polling place or online. ROA.42505. Other counties follow different procedures.

## III. S.B.1's Protections for Voters with Disabilities

The 2020 Election offered unprecedented challenges for Texas's voting system. To address the COVID-19 pandemic, local officials altered voting rules and experimented with unauthorized approaches, including extending hours, allowing drive-thru voting, creating multiple ballot drop-off locations, and sending out mass mailings of unsolicited ABBMs. ROA.37267-37303. The Legislature responded by enacting S.B.1, which set out "to prevent fraud in the electoral process," promote "voter access," "increas[e] the stability of [] constitutional democracy," and make "the conduct of elections . . . uniform and consistent throughout [Texas]." SB 1 §§ 1.03, 1.04, 4.02. The provisions relevant to this appeal are described below.

## A. Voter Identification Provisions (Sections 5.02, 5.03, and 5.07)

Before S.B.1, ABBMs required only publicly accessible information about voters, making it possible for individuals to fraudulently submit an ABBM without consent. ROA.45832. This "trigger[ed] significant election security concerns." *Paxton*, 2025 WL 2205864, at *2. Frank Phillips, the Voting Administrator for Denton County, testified that, in 2020, he discovered a Mayoral candidate who committed voter-impersonation fraud by submitting ABBMs on behalf of 84 individuals without their knowledge or permission. ROA.45821, 45827-28. Phillips detected this fraud because the candidate requested that all the ballots be sent to the same address. ROA.45827-28. Had the candidate used different addresses, however, it is unlikely that the fraud would have been detected. ROA.45830-32. As this Court recently recognized, such methods of engaging in voter fraud ordinarily have "minimal risk of detection." *Paxton*, 2025 WL 2205864, at *2. Jonathan White, formerly of the Texas Attorney General's Election Integrity Division, likewise testified about "frequent flyer assistance," where a single assistor—often a paid operative—submitted dozens or even hundreds of ballots, which may have led to voter disenfranchisement or fraud if the assistor did not faithfully fill out the ballot. ROA.45913-17. *Accord* ROA.42242 (El Paso Elections Administrator testifying she was aware of one incident where a fraudster impersonated a voter on an ABBM or mail-in ballot)

To combat this type of fraud, Section 5.02 of S.B.1 requires that an individual filling out an ABBM or mail-in ballot include: (A) their most recent driver's license number, election ID number, or personal ID number (DPS number); (B) if the applicant "has not been issued" a DPS number, then "the last four digits of the

applicant's social security number" (SSN4); or (C) "a statement by the applicant that the applicant has not been issued a" DPS number or SSN4. Local officials are instructed to approve an ABBM and ballot if a voter puts *either* the matching DPS number *or* a valid SSN4.[4] ROA.43528. Accordingly, the Secretary and many counties recommend that voters put down both numbers to maximize the odds of approval. ROA.43529, 43842, 45843, 46584. If a voter's ABBM does not contain this personal identifying information, then the clerk is instructed to reject it. S.B.1 § 5.07. This new information is not publicly accessible, so requiring it reduces the likelihood of assistance fraud. ROA.42481.

Evidence at trial showed that the Voter Identification Provisions made the mail-in ballot process *more* accessible for certain disabled voters. ROA.44360. Before S.B.1, a mail-in ballot could not be counted without an affirmative signature match. ROA.44360. The signature-match process arguably stood as a barrier for individuals with a disability who had difficulty consistently signing documents; Amy Litzinger, one of the members of ARC/REV UP who testified at trial, noted that this concern was one of the key reasons that she voted in person rather than by mail. ROA.45278, 45280. But under S.B.1, if an individual satisfies the Voter Identification Provisions, then that voter is entitled to a rebuttable presumption of a matching signature,

---

[4] Under federal law, a voter must put either a DPS number or their SSN4 on their voter application in order to register to vote. *See* Help America Vote Act, 52 U.S.C. § 20901 *et seq.*; *id.* § 21083(d). The instruction that a voter *first* put a DPS number parallels these requirements for registering to vote. *See* Tex. Elec. Code § 13.002(c)(8)(A).

reducing the likelihood that their ballot will be rejected. ROA.45831. S.B.1 also provided signature matching committees with the opportunity to review additional signatures to determine that the signatures on the ABBM and ballot match. *See* ROA.42741-42 (testifying that after S.B.1 was enacted, county officials went to a document storage faculty to look for old physical documents in order to find a signature match), ROA.45838-39.

### B. Cure Provisions (Sections 5.12, 5.13, and 5.14)

Sections 5.12, 5.13, and 5.14 introduced (for the first time) a cure process for defective ABBMs and mail-in ballots. ROA.42325. Under S.B.1, Texas offers voters at least five ways to correct defects on their ABBMs or mail-in ballots:

1. Using an online ballot tracker. ROA.43839. Voters with both a DPS number and a SSN4 can use the online tracker to correct their ID number or fix other defects. ROA.42325-27.

2. Filing a new voter application that will update voter information in the system and ensure a match. ROA.43565.

3. Mailing a corrected ballot or ballot correction form. Tex. Elec Code § 87.0271(b).

4. Visiting the election office in person. *Id.* If a defect is not identified in time for a voter to cure it before an election, the voter may come and make corrections up to six days after the election. ROA.46571.

5. Cancelling the mail-in ballot and voting in person with a provisional ballot. Tex. Elec. Code § 84.035.

### C.  Voter Assistance Provisions (Sections 6.03, 6.04, 6.05, and 6.07)

S.B.1 contains several provisions designed to protect vulnerable voters from undue pressure from voting assistors.

First, Section 6.04 revises the assistor's oath to include affirmations about voting assistors' preexisting obligations, such as a promise not to pressure or coerce the voter, a commitment to preserve ballot secrecy, and an acknowledgment that assisting an ineligible voter may invalidate that person's ballot. *Id.* § 64.034. Section 6.04 also informs assistors that the oath is made under penalty of perjury—a requirement dating back to 1974. *See* Tex. Penal Code § 37.02. Close relatives of or individuals living with the voter do not have to sign this oath. *See* Tex. Elec. Code § 86.010(h)(1).

Second, Section 6.03 requires individuals who assist voters to provide additional identifying information and to disclose any compensation received from a campaign or candidate. This same information must also be included on a space on the official carrier envelope by those who assist with either completing or delivering a mail-in ballot. *See* Sections 6.05, 6.07.

### D.  Paid-Assistance Provision (Section 6.06)

Section 6.06 bans individuals from being compensated—or soliciting compensation—to assist with mail-in ballots. Tex. Elec. Code § 86.0105. The provision does not apply if the assistor is an "attendant" or "caregiver" that is "previously known to the voter." *Id.* Nor does it prevent individuals from being reimbursed for their expenses. ROA.43901-02. Instead, it only applies to those paid specifically for

assisting voters, not to individuals with paid jobs, such as canvassers who may assist voters in the due course of their job. ROA.45992.

### E.  Vote Harvesting Provision (Section 7.04)

Section 7.04 criminalizes paid vote harvesting, defined as "in-person interaction with one or more voters, in the physical presence of an official ballot or a ballot voted by mail, intended to deliver votes for a specific candidate or measure." Tex. Elec. Code § 276.015. This provision applies only if the activity (a) is compensated, (b) conducted in person with a voter, (c) directly involves an official ballot, (d) is done while the ballot is actually present or while a voter is voting, and (e) is designed to deliver votes for or against a specific candidate or measure. Tex. Elec. Code § 276.015(e). Vote harvesting is one of the most common types of election crime in Texas. ROA.45913, 45917.

## IV. Texas's Implementation of S.B.1

S.B.1 was enacted in a special session in September 2021. ROA.46546. As a result, both state and county officials were pressed for time to implement all its requirements for the March 2022 primary election. ROA.46547. In addition, primary elections are the most difficult elections for Texas to administer because many components are party-led rather than county-led. ROA.60415. Due to this truncated schedule, there were some issues with the rollout of the Voter Identification Provisions and the ballot tracker. For instance, some counties were not able to access all of the voter information from the State's electronic voter database, making it more difficult to match identifying information. ROA.43535, 46402. Voters unfamiliar

with the new requirements also frequently failed to include their identifying information, a learning-curve problem that arises naturally whenever there is a change to voting rules. ROA.14592. These issues led to rejection rates of mail-in ballots between 11-12% for the first election under S.B.1. ROA.46411.

However, after the March 2022 primary, both state and county officials invested significant resources to improve the implementation of the Voter Identification Provisions. For instance, counties developed inserts informing voters of the identification requirements and encouraging them to list both their DPS number and SSN4. ROA.43111. The Secretary knew of and supported these efforts. ROA.46412. And the Secretary's office invested millions of dollars into a media campaign to raise awareness and increase compliance with these requirements. ROA.46611-13, 46618-20. It also updated its electronic database with additional ID numbers to try ensure that updated with ID numbers for as many Texas voters as possible. ROA.42322-23.

In addition, the Texas Legislature passed a law that improved the implementation of the Voter Identification Provisions in several ways: (1) Replacing the requirement to list the voter's address with a requirement to list the voter's date of birth (a simpler and less error-prone requirement), ROA.46570; (2) allowing counties to immediately review ballots to verify information, which cuts down delays and helps voters to cure defects in a timelier manner, ROA.46571; and (3) allowing counties to send a correction form to voters rather than the actual ballot (addressing some security and privacy concerns), ROA.46573.

These combined efforts were remarkably successful. Rejection rates of mail-in ballots plummeted in the November 2022 election to just 2.7%, which is comparable

to rejection rates from past elections. ROA.46412. And in some counties, the rates were even lower. *See* ROA.42815 (Cameron County 1.7%); ROA.43523 (Travis County 2.16%). In Bexar County, the rejection rate even dipped below the average for past elections. ROA.43036, 43104-05 (rejection rate of 1.7% compared to 3-4% in a typical past election). Out of more than 8.1 million votes cast in November 2022, only 6,355 mail-in ballots were rejected due to an ID-number mismatch. *See* ROA.14592. County and state officials expect these numbers to decline even further as voters become more familiar with these requirements. ROA.46413.

The implementation of S.B.1 did not result in a large number of voters being unable to vote or forced to vote without needed assistance during the November 2022 election. ROA.42303-04, 43100-03. Nor were election officials aware of individuals who refused to assist voters as a result of S.B.1's requirements. ROA.42304. The Secretary's office received only a few phone calls related to concerns over the Voter Assistance Provisions. ROA.46430

S.B.1 has also not had a significant impact on wait times. For instance, in the November 2022 General Election, the average wait time in El Paso County was 10 to 15 minutes, which is typical for a midterm election. ROA.42283-84. And in Dallas County the average was only 1.2 minutes during early voting and 3.7 minutes on Election Day. ROA.42467. Meanwhile, in Harris County, curbside voters were typically assisted within 5 or 10 minutes. ROA.42703-04. Despite these low wait times, some counties like El Paso and Dallas further accommodated voters with mobility impairments by moving them to the front of the line at the polling place, as authorized by Texas law. ROA.42267, 42444; Tex. Elec. Code § 63.0015.

## V.  Requesting and Receiving Accommodations under S.B.1

S.B.1 did not restrict election officials' ability to make ADA accommodations. To the contrary, Section 1.08 reiterates that no provision of the Election Code may be "interpreted to prohibit or limit the right of a qualified individual with a disability from requesting a reasonable accommodation or modification to any election standard practice or procedure" under either federal or state law. S.B. 1 § 1.08.

Indeed, local election officials have offered accommodations to voters—particularly with the requirements of the Voter Identification Provisions. For instance, one county sent election officials to the homes of disabled and immobile individuals who requested assistance to correct ballot deficiencies. ROA.42746-47. The Secretary advised counties that they could hand-deliver carrier envelopes to allow voters to immediately correct defects such as a missing a signature, missing information about witnesses or assistors, or an incorrect ID number. ROA.43363-64. Even election officials who did not offer specific accommodations to homebound voters recognized that they were authorized to do so as long as they offered the same accommodations to other similarly situated voters. ROA.43482.

Election officials also offered accommodations at the polling place. For instance, the El Paso Elections Administrator testified that election judges were trained to provide accommodations to disabled voters at the polls such as moving them up "to the front of the line" and could grant other requests for an accommodation or modification. ROA.42267, 42276. However, elections officials were unable to accommodate some requests that were directly contrary to the design of Texas's election laws. For example, the Secretary's office advised Harris County election officials that they

could not permit disabled voters to vote or cure defective mail-in ballots by email. ROA.43299.

The record similarly reflects that when Plaintiffs' members have asked for clarifications or accommodations these requests have regularly been granted. For instance, Nunez Landry was concerned that her assistors could be prosecuted for providing her with assistance with remembering who she planned to vote for. But when she reached out to the ADA administrator at the Harris County Elections Office, she was told that she was permitted to receive the assistance that she needed. ROA.45262-64.

## VI. Procedural History

Lawsuits seeking to enjoin the enforcement of dozens of provisions of S.B.1 were filed even *before* the bill was signed into law or took effect. *See* ROA.238, 86853. These lawsuits were consolidated into the present action.[5] ROA.87673-75, 87106, 87399. Altogether, five separate sets of private plaintiffs, made up of voting rights and disability rights organizations, initiated a facial challenge against more than three dozen provisions of S.B.1 under an assortment of legal theories. The United States also challenged several provisions of S.B.1 including the Voter Identification Provisions. *See Paxton*, 2025 WL 2205864, at *2.

---

[5] *See* ROA.87080, 87372, 87656, 87723 (consolidating *OCA-Greater Hous. v. Esparza*, No. 1:21-cv-780 (W.D. Tex. 2021); *Hous. Area Urb. League v. Abbott*, No. 5:21-cv-848 (W.D. Tex. 2021); *LULAC Tex. v. Esparza*, No. 1:21-cv-786 (W.D. Tex. 2021); and *Mi Familia Vota v. Abbott*, No. 5:21-cv-920 (W.D. Tex. 2021) under the lead case *La Union del Pueblo Entero v. Abbott*, No. 5:21-cv-844 (W.D. Tex.)).

This appeal, however, concerns only the private plaintiffs' assertion that S.B.1's Voter Identification Provisions (Sections 5.02, 5.03, 5.07, 5.10, 5.12), Voter Assistance Provisions (Sections 6.03, 6.04, 6.05, 6.07), Paid Compensation Provision (Section 6.06), and Vote Harvesting Provision (Section 7.04)— violate Title II of the ADA (42 U.S.C. § 12131 *et seq.*) and Section 504 of the Rehabilitation Act (29 U.S.C. § 794). Only three of the Plaintiff groups (that the district court referred to as the HAUL Plaintiffs, the OCA Plaintiffs, and the LUPE Plaintiffs) brought ADA and Section 504 claims. These claims remain live against only the Secretary from among the State Defendants-Appellants.[6]

State Defendants-Appellants moved to dismiss Plaintiffs' operative second amended complaints on the grounds of sovereign immunity, lack of standing, and lack of a private right of action. ROA.7801, 7834, 7943, 8245. Those motions to dismiss were granted in part and denied in part. ROA.11427, 11629, 11673, 11747, 11808. State Defendants-Appellants' appeals about these denials remain pending before this Court, having been fully briefed and argued in July 2023.[7]

---

[6] Plaintiffs' Title II and Section 504 claims were brought solely against the Secretary and the Attorney General, not the State of Texas or the Governor, ROA.35389, and the claims against the Attorney General were dismissed for lack of standing without a cross appeal, ROA.40972.

[7] The Harris County District Attorney also appealed the district court's partial denial of her sovereign immunity and standing arguments. Since then, this Court has ordered Plaintiffs' claims against her to be dismissed on sovereign-immunity grounds because she did not possess any demonstrated willingness to enforce S.B.1 while this litigation was pending, and her mere theoretical ability to prosecute or investigate violations of the Election Code did not demonstrate the requisite compulsion or constraint. *Mi Familia Vota v. Ogg*, 105 F.4th 313, 329-33 (5th Cir. 2024).

On September 11, 2023, the district court commenced a six-week bench trial on Plaintiffs' claims against State Defendants-Appellants. ROA.41999-46934. The parties submitted hundreds of pages of findings of facts and conclusions of law in January 2024. ROA.35326, 35382, 35472, 35548, 35664, 35755, 36017, 36217, 36575, 36767, 37149, 37455.

In November 2023, the district court held that the Voter Identification Provisions of S.B.1 violated the Materiality Provisions of the Civil Rights Act of 1964 and granted summary judgment on those claims. ROA.35075. On August 4, 2025, a panel of this court reversed, holding that the district court lacked jurisdiction to resolve Plaintiffs' claims due to the pending sovereign immunity appeal. *Paxton*, 2025 WL 2205864, at *3. It also ruled that the "ID number requirement is obviously designed to confirm that each mail-in ballot voter is precisely who he claims he is" and therefore plainly satisfies the materiality requirement. *Id.* at *1.

In September 2024, just a few weeks before voting would begin for the November 2024 General Election, the district court enjoined enforcement of the Vote Harvesting Provision on First Amendment grounds. ROA.39901. On October 15, 2024, this Court granted a stay of that injunction pending appeal. *La Union Del Pueblo Entero v. Abbott*, 119 F.4th 404, 407 (5th Cir. 2024) (LUPE I). This Court also noted the State's compelling interest in addressing "voter privacy and security protections at the voting booth" also applies to the Vote Harvesting Provision. *Id.* at 409.

On October 11, 2024, the district court ruled that the Voter Assistance Provisions violate and are preempted by Section 208 of the Voting Rights Act. ROA.40063. On appeal, this Court granted State Defendants-Appellants' motion for

a stay pending appeal. *La Union Del Pueblo Entero v. Abbott*, No. 24-50826. at Doc. No. 246-2 (LUPE II). On August 29, 2025, this Court reversed. It found that Plaintiffs lacked standing to challenge the Voter Assistance Provisions (Sections 6.03, 6.04, 6.05 and 6.07), and that the Paid Assistance Ban and Vote Harvesting Ban did not violate Section 208. *LUPE III*, 2025 WL 2489464.

On March 14, 2025, the district court ruled that the Voter Identification Provisions, Voter Assistance Provisions, Paid Assistance Provision, and Vote Harvesting Provision violated Title II and Section 504. ROA.40864. However, the court held that Plaintiffs lacked standing to challenge the Cure Provisions. ROA.40942. The court also held that the Attorney General was not a proper defendant because he did not "provide the services and benefits at issue in this case." ROA.40972. The court granted State Defendants-Appellants' motion for a stay pending appeal, ROA.41039, and subsequently clarified that the stay remains in effect for the duration of this appeal. ROA.41100. State Defendants-Appellants filed a timely notice of appeal as well as a supplemental notice of appeal after the court subsequently clarified aspects of its order. ROA.41034, 41078.

## Summary of the Argument

**I.**  Plaintiffs' claims are jurisdictionally defective. For starters, Plaintiffs have not suffered a cognizable Article III injury. The record shows that Plaintiffs' members have learned to comply with the Voter Identification Provisions and that these provisions will pose, at most, only a minor inconvenience in the future. Plaintiffs also do not suffer any concrete injuries other than being required to divert resources to educate voters, a harm that is inadequate for standing. This Court recently held that

neither Plaintiffs nor their members are injured by the Voter Assistance Provisions. *LUPE III*, 2025 WL 2489464 at *5-6. And although some of the Plaintiffs are impacted by the Paid Compensation and Vote Harvesting Provisions, these injuries are not within the zone of interest of either Title II or Section 504, as these laws are designed to protect qualified individuals with disabilities, not advocacy organizations. The district court also erred by enjoining the Secretary because "Secretary of State" does not "enforce[] S.B.1." *LUPE I*, 119 F.4th at 409. The Court should therefore reverse the district court's order and dismiss Plaintiffs' claims against the Secretary.

**II.**   Alternatively, on the merits, this Court has never recognized a disparate-impact theory of liability under Title II or Section 504, and such a claim runs counter to both the text and congressional design of these laws. Moreover, Plaintiffs' failure-to-accommodate claim is a nonstarter because Plaintiffs' members failed to request *any* accommodation or modification whatsoever. The district court erroneously found that the disabilities of Plaintiffs' members were open and obvious, and therefore, they were entitled to the accommodations they sought without having to ask for them specifically. But election officials should not be required to anticipate the disparate needs of disabled Texas voters in advance, and the record showed that Texans who *did* request accommodations were frequently granted those accommodations—there was nothing futile about asking. Furthermore, Title II and Section 504 require only *reasonable* modifications. But there is nothing reasonable about a permanent injunction that prevents vital security measures from being applied to any Texas voter with or without a disability. The ADA is meant to be ensure meaningful

access to voting, not to be wielded as a sword to strike down democratically enacted election-security measures.

S T A N D A R D   O F   R E V I E W

This Court reviews the "district court's conclusions of law *de novo*, and the district court's factual findings for clear error." *Lightbourn v. County of El Paso*, 118 F.3d 421, 427 (5th Cir. 1997) (citation omitted). Because it is a jurisdictional requirement, the Court also views questions of standing *de novo. Tex. All. for Retired Ams. v. Scott* (*TARA*), 28 F.4th 669, 671 (5th Cir. 2022).

A R G U M E N T

## I.   The District Court Did Not Have Jurisdiction over Plaintiffs' Claims.

The district court lacked jurisdiction over Plaintiffs' claims both generally and specifically regarding Secretary Nelson. To establish standing under Article III, Plaintiffs must prove that (1) they have suffered an "injury in fact," that is (2) fairly traceable to the enforcement of the specific challenged provision, and (3) likely to be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). And because standing "is not dispensed in gross," Plaintiffs must prove "standing to challenge *each provision* of law at issue." *In re Gee*, 941 F.3d 153, 161-62 (5th Cir. 2019) (per curiam) (emphasis added). Plaintiffs must also show that their injury for "each claim" is traceable to "each defendant" for "each form of relief that they seek." *Murthy v. Missouri*, 603 U.S. 43, 61 (2024). Each Plaintiff must establish its standing with evidence "adduced at trial." *Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 115 n.31 (1979).

Plaintiffs failed to show that they suffered a cognizable ADA injury or that any of their alleged injuries are traceable to the Secretary. The district court therefore erred in granting an injunction in their favor.

## A. Plaintiffs lack standing because they have not suffered a cognizable ADA injury.

In *LUPE III*, 2025 WL 2489464, at *3, this Court ruled that Plaintiffs lack standing to challenge S.B.1's Voter Assistance Provisions (Sections 6.03, 6.04, 6.05 and 6.07). Any injury to Plaintiffs or their members is either rooted in "baseless speculation about future prosecutions," merely clarifies existing law, or causes only a de minimus injury like an incidental increase in waiting time at the polls that does not cause a cognizable injury. *Id.* at *5-*6. Under the rule of orderliness, the Court's decision is binding on these claims, and the Court should reverse the district court's decision and order judgment in the Secretary's favor on them. *See United States v. Alcantar*, 733 F.3d 143, 145 (5th Cir. 2013). The principles articulated in the Court's decision there should lead to the same outcome for Plaintiffs' challenge to the Voter Identification Provisions here.

This Court's recent decision also established that OCA and LUPE had standing to challenge the Paid Assistance Provision, and that the OCA and LUPE Plaintiffs had standing to Vote Harvesting Ban.[8] But the Court should still rule that Plaintiffs cannot challenge these provisions under Title II and Section 504 because Plaintiffs

---

[8] OCA does not challenge Section 6.06 under the ADA or the Rehabilitation Act. ROA.29604 n.5.

are not within the zone of interest of the ADA—a discrete question that was not before the Court in the Voting Rights Act appeal. *See Infra* Sec. I.A.2.[9]

### 1. Plaintiffs' do not suffer a cognizable injury from the voter identification provisions

Plaintiffs allege two theories of standing to challenge the Voter Identification Provisions. First, they claim direct organizational standing on the basis of their own organizational injuries. *NAACP v. City of Kyle*, 626 F.3d 233, 237-38 (5th Cir. 2010). Second, they assert associational standing because their members are allegedly injured by the provisions. *Tex. Democratic Party v. Benkiser*, 459 F.3d 582, 587-88 (5th Cir. 2006). Neither theory gives them standing to challenge these provisions.

### a. Plaintiffs are not directly injured by the voter identification provisions

To have standing, "organizations must satisfy the usual standards for injury in fact, causation, and redressability that apply to individuals." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 393-94 (2024). This requirement ensures that organizations do not possess merely "a general legal, moral, ideological, or policy objection to a particular government action." *Id.* at 381. Plaintiffs lack organizational standing because they have only that kind of "general" objection to the Voter Identification Provisions.

---

[9] The Court's decision in *LUPE III*, 2025 WL 2489464, at *6, does not specify whether the basis for Plaintiffs' standing to challenge the Paid-Assistance Ban and Vote-Harvesting Ban is associational or organizational standing. However, the Court's decision focuses on the impact that these provisions would have on "conduct the organization engages in" rather than on any injury they cause to voters with disabilities. *Id.* at *7-8.

Plaintiffs' argument for organizational standing to challenge the voter identification provisions focuses on their need to divert resources in response to S.B.1 and to spend additional time and effort assisting voters with these provisions. This argument relies heavily on *Havens Realty Corp. v Coleman*, 455 U.S. 363 (1982). But in *Alliance for Hippocratic Medicine*, the Supreme Court clarified that "*Havens* was an unusual case, and this Court has been careful not to extend the *Havens* holding beyond its context." *All. for Hippocratic Med.*, 602 U.S. at 396. The Supreme Court emphasized that it was *not* enough for an organization to show that it "diverts its resources in response to a defendant's actions." *Id.* at 395. Indeed, such a broad theory of standing "would mean that all the organizations in America would have standing to challenge almost every . . . policy that they dislike, provided they spend a single dollar opposing those policies." *Id.*

In *Havens*, the illegal redlining policies that were challenged "directly affected and interfered with [the plaintiffs'] core business activities—not dissimilar to a retailer who sues a manufacturer for selling defective goods to the retailer." *Id.* Here, by contrast, the challenged provisions of S.B.1 do not directly affect and interfere with Plaintiffs' "core business activities" and instead merely impact them as "issue-advocacy organization[s]." *Id.* Plaintiffs have also failed to provide the degree of specificity that this Court has required, failing to point to specific "projects or causes" that they were required to forego because of the alleged diversion. *Tenth St. Residential Ass'n v. City of Dallas*, 968 F.3d 492, 500 (5th Cir. 2020); *see also City of Kyle*, 626 F.3d at 238-39 (holding that an organizational plaintiff lacked standing in

an FHA suit even though it spent $15,000 in response to ordinances). Plaintiffs therefore lack organizational standing.

### b. Plaintiffs' members are not injured by the voter identification provisions

To establish a cognizable injury under their theory of associational standing, Plaintiffs must show that at least one of their members (1) is a qualified individual with a disability; (2) who was excluded from participation in, or denied the benefits of, services, programs, or activities for which the public entity is responsible, or was otherwise being discriminated against; and (3) that such discrimination is because of the disability. *Luke v. Texas*, 46 F.4th 301, 305 (5th Cir. 2022). There must be "evidence in the record showing that a *specific member*" has suffered a concrete and cognizable injury traceable to the challenged provision. *City of Kyle*, 626 F.3d at 237 (emphasis added).

Individuals have no "right to be free from the usual burdens of voting." *Richardson v. Tex. Sec'y of State*, 978 F.3d 220, 237 (5th Cir. 2020) (quoting *Veasey*, 830 F.3d at 316 (Jones, J., concurring)); *LUPE III*, 2025 WL 2489464, at *5. Accordingly, Plaintiffs must show that Voter Identification Provisions do more than merely "make casting a ballot more inconvenient for some voters." *Richardson*, 978 F.3d at 237 (citing *Tex. LULAC v. Huges*, 978 F.3d 136, 146 (5th Cir. 2020)). None of Plaintiffs members can satisfy this standard for the Voter Identification Provisions.

In *Crawford v. Marion County Election Board*, the Supreme Court already held that requiring voters to provide identification represents nothing more than the "usual burdens of voting," and is amply justified by the States' "interest in deterring

and detecting voter fraud." 553 U.S. 181, 191, 198 (2008). Accordingly, just as this Court dismissed Plaintiffs' challenge to the Voter Assistance Provisions for failing to impose anything that went beyond the "usual burdens of voting," it should do the same here for the Voter Identification Provisions.

Plaintiffs could not identify members who were likely to be prevented from voting because of the Voter Identification Provisions. Plaintiffs could point to only a single member who had her mail-in ballot rejected in the November 2022 election due to the ballot-identification requirements. Ms. Iglesias, a member of the ARC and REV UP, testified during her deposition that her mail-in ballot in November 2022 was rejected because the numbers she listed did not match the numbers on file. ROA.33557. However, she expressed her conviction that in future elections she would have the knowledge and ability to correct any future errors and vote by mail successfully. ROA.33558. Therefore, she is unlikely to be harmed by identification requirements in the future. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983) ("[S]tanding to seek the injunction requested depended on whether" a plaintiff "was likely to suffer *future* injury." (emphasis added)).

None of the other organizations identified even a single member who will be unable to vote. Plaintiffs initially identified Teri Saltzman, but she later acknowledged that election officials were able to help her cure her ballot in the March 2022 primary, ROA.45356, and that her ballot was accepted in the November 2022 election without incident, ROA.45360. Another voter's mail-in ballot was rejected because she forgot to include her identifying information on the carrier envelope, but she had

successfully put that information on her ABBM, ROA.42967-69, which shows that there is no reason that she could not successfully vote by mail in the future.

Apart from these individual anecdotes, the evidence at trial showed that the identification requirement provided, at most, a minor and temporary inconvenience for voters—as shown by the rapid decline of ballot rejections in the November 2022 election. *See supra* Statement of the Case Sec. IV. Even Ms. Iglesias recognized that voters would increasingly be able to submit compliant ballots as they become more familiar with S.B.1's requirements. ROA.33558. The high compliance rate in the November 2022 election demonstrates that Plaintiffs' members are not likely injured by the ID-match requirement. And any inconvenience that comes from listing these numbers is just one of the "usual burdens of voting," lacks a "'close relationship to a harm traditionally recognized as providing a basis for a lawsuit in American courts,'" and "falls far short of establishing a cognizable Article III injury." *LUPE III*, 2025 WL 2489464, at *5 & n. 6 (5th Cir. Aug. 29, 2025) (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424 (2021)) (cleaned up).

### 2.  Plaintiffs' organizational injuries are not ADA injuries.

Plaintiffs also lack standing to bring any of their claims because their alleged injuries are not within the zone of interest of Title II or Section 504. To have standing to sue, a plaintiff must show that it has "a right to sue under th[e] substantive statute" and its interests "fall within the zone of interests protected by the law invoked." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126-127 (2014). This is determined "by reference to the particular provision of law." *Bennett v. Spear*, 520 U.S. 154, 175-76 (1997). Title II seeks to avoid discrimination against

"qualified individual[s] with a disability," 42 U.S.C. § 12132, and it creates a cause of action for a "person alleging discrimination on the basis of disability," *id.* § 12133. Nothing in Title II or Section 504 contemplates protection for organizations—entities that cannot, as a matter of reality, have a disability. *See Stanley v. City of Sanford,* 145 S. Ct. 2058, 2066 (2025) (emphasizing that, in the Title I context, only qualified individuals can bring suit because "the statute protects people, not benefits, from discrimination"). This defect applies even to the Paid Assistance and Vote Harvesting Provisions. LUPE's employment practices may be impacted by their inability to compensate employees for assisting voters in filling out mail-in-ballots, but this does not mean that LUPE—an organization that cannot be denied equal treatment or a reasonable accommodation due to a non-existent disability—has suffered an injury covered by the ADA. Nor can Plaintiffs raise the third-party rights of their members as a basis for their organizational standing. *Danos v. Jones*, 652 F.3d 577, 582 (5th Cir. 2011); *Lexmark,* 572 U.S. at 127-28 nn.3-4. Plaintiffs therefore lack standing.

## B.   The Secretary does not enforce S.B.1 or the ADA and is therefore not a proper defendant.

"[T]he Secretary of State" does not "enforce[] S.B. 1," *LUPE I*, 119 F.4th at 409. Thus, any injury that Plaintiffs suffer is not traceable to the Secretary's actions, and an injunction running against the Secretary would not remedy any injury Plaintiffs suffer. The Secretary is therefore not a proper defendant in this case.[10] The

---

[10] This argument is already fully briefed in State Defendants-Appellants' appeal of the district court's partial denial of their motion to dismiss. In that brief, State Defendants-Appellants provide a detailed provision-by-provision breakdown of the

district court correctly dismissed the Attorney General because he "does not provide the service or benefit at issue," *La Union del Pueblo Entero v. Abbott*, 618 F. Supp. 3d 388, 420 (W.D. Tex. 2022), ROA.40972, but the court erred in refusing to dismiss the Secretary because the same reasoning that applies to the Attorney General applies equally to the Secretary.

The Secretary acknowledges that a panel of this Court recently rejected the argument that Plaintiffs lack standing to sue the Secretary over the Voter Identification Provision of S.B.1. *Paxton*, 2025 WL 2205864, at *3. However, standing must be assessed on a claim-by-claim basis, *Murthy*, 603 U.S. at 61, and the Secretary lacks the necessary enforcement connection to Title II or Section 504.[11] Indeed, the Secretary "has no duty under either Texas law or the ADA to take steps to ensure that local election officials comply with the ADA." *Lightbourn*, 118 F.3d at 432 (holding that the Secretary was not responsible for a county's failure to employ equipment that was accessible to blind voters). As this Court has explained, the "ADA is not an election law" because it "does not include even a single provision specifically governing elections" and "never refers to elections." *Id.* at 430.[12]

---

flaws in the district court's analysis. *See* Opening Brief for State Defendants-Appellants 27-35, *La Union del Pueblo Entero v. Scott*, No. 22-50775 (5th Cir. Dec. 9, 2022).

[11] To the extent that Secretary's argument is foreclosed by the recent panel decision, she preserves the right to request en banc review.

[12] However, the district court's conclusion that the Secretary had a "know-nothing, do-nothing policy of non-administration" with regard to the ADA, ROA.40870, is contradicted by the record which shows the Secretary working closely with disability rights groups to make voting more accessible in Texas, ROA.43924-25.

While the Secretary provides advice and guidance to local election officials regarding their duties under the Election Code, this does not extend to offering advice about providing ADA accommodations.[13] *See supra* Statement of the Case Sec. I. In any event, merely "[o]ffering advice, guidance, or interpretive assistance does not compel or constrain local officials." *Richardson v. Flores*, 28 F.4th 649, 655 (2022). Hence in *Texas Democratic Party v. Hughs*, this Court held that the Secretary did not have a "sufficient connection to enforce" the wet signature requirement for voter registration applications because "county registrars are the ones who review voter registration applications." 860 F. App'x 874, 878 (5th Cir. 2021) (per curiam). That same conclusion is even stronger here given the Secretary's lack of any enforcement connection to the ADA.

---

[13] The district court erroneously read two sections of the Texas Election Code as if they gave the Secretary authority to grant or deny accommodations to disabled voters. ROA.40871. In reality these sections concern the ability of sparsely populated counties (with between 10,000 and 20,000 residents) to declare that they are unable to meet polling place accessibility requirement of having one accessible voting machine in each polling place because of an undue burden. *See* Tex. Elec. Code §§ 61.012, 61.013(b)-(c). *If* a county attempts to opt out in this manner, *then* the Secretary reviews their request. *Id.* These sections have nothing to do with the Secretary considering, granting, or denying requests from individual voters for accommodations. Furthermore, the fact that the Texas Legislature specifically carved out a role for the Secretary under these specific subsections stands in stark contrast with the absence of any role for the Secretary in administering the provisions of S.B.1. *See City of Dallas v. TCI W. End, Inc.*, 463 S.W.3d 53, 55 (Tex. 2015) (noting that when interpreting Texas statutes courts must "presume the Legislature selected the statute's language with care, choosing each word for a purpose and purposefully omitting words not chosen").

## II.  Plaintiffs Failed to Prove Their Title II and Section 504 Claims.

Plaintiffs failed to show that S.B.1 violates Title II or Section 504. Most fundamentally, their claims fail because Texas provides disabled voters with meaningful access to vote—which is all that Title II and Section 504 require.

Plaintiffs did not allege or show that S.B.1 intentionally discriminates against disabled voters. And even though Plaintiffs did not bring disparate-impact claims, the district court nevertheless invalidated S.B.1 under this theory. ROA.40907 ¶ 161. This Court has never recognized disparate-impact liability under Title II and this dramatic expansion of Title II will subject state election laws to never-ending scrutiny, contrary to both the text and purpose of Title II.

Regarding Plaintiffs' failure-to-accommodate theory, Plaintiffs' claims fail because they did not request accommodations from anyone. The requests were necessary because Plaintiffs' needs for accommodations were not open and obvious and making a request would not have been futile. Additionally, Plaintiffs' proposed "accommodation" was the complete invalidation of state election law for *all* voters—this is per se an unreasonable accommodation. By granting Plaintiffs' request, the district court exceeded its equitable authority and fundamentally altered Texas election laws.

### A.  Texas provides disabled voters with meaningful access to voting.

Plaintiffs' Title II and Section 504 claims fail because Texas provides disabled voters with "meaningful access" to voting, and S.B.1 does not change that. *See Luke*, 46 F.4th at 305. Meaningful access does not mean completely identical access. All that is required is "evenhanded treatment and the opportunity for handicapped

individuals to participate in and benefit from programs," not "equal results." *Alexander v. Choate*, 469 U.S. 287, 304 (1985).

The record does not show that disabled individuals in Texas "will be unable to benefit meaningfully from the" opportunity to vote as a result of S.B.1. *See id.* at 302. To the contrary, voting in Texas is widely accessible and accommodating of voters with disabilities. Texas offers disabled individuals many different avenues for voting, including several that are specifically tailored to disabled voters, and S.B.1 enhanced or expanded many of those options. *See supra* Statement of the Case Secs. II, III, V.

Policies that merely "dissuade" or discourage voters from voting in a particular way do not deprive disabled voters of a meaningful opportunity to vote. *People First of Ala. v. Merrill*, 491 F. Supp. 3d 1076, 1160 (N.D. Ala. 2020). Hence, even if Plaintiffs are right that a small number of disabled voters each year (approximately 0.1% of potential disabled voters in Texas in November 2022)[14] are unable to vote by mail because of the Identification Match Provisions, or that some voters will need to rely on an election official rather than an assistor of their choosing, that would not deprive disabled voters in Texas of meaningful access to voting as a class. These are merely "frustrating, but isolated, instances," *Gustafson v. Bi-State Dev. Agency of Mo.-Ill.*

---

[14] There are approximately 3 million voting-eligible Texans with disabilities. ROA 40869 ¶ 2. But no more than 6,355 mail-in-ballots were rejected in November 2022 due to S.B.1's requirements. *See* ROA.14592.

*Metro. Dist.*, 29 F.4th 406, 412 (8th Cir. 2022), that do not violate Title II or Section 504.[15]

Additionally, this Court has emphasized that claims of discrimination under Title II cannot be based "on hypothetical future event[s]," but must be based on an actual a denial of public services based on the "the actual, not hypothetical administration of public programs." *United States v. Mississippi*, 82 F.4th 387, 394 (5th Cir. 2023). But as already discussed, Plaintiffs have not shown that any of their disabled members will be denied access to voting as a result of any of the challenged provisions. *See Supra* Section I.A.1.b. Plaintiffs' failure to show anything more than a "hypothetical future" injury to their disabled members is not just fatal to Plaintiffs' standing, but also to the merits of their claims. Plaintiffs' Title II and Section 504 claims should have therefore been rejected at the outset.

## B. This Court has never recognized disparate-impact claims under Title II or Section 504 and should refuse to do so here.

The district court did not find that S.B.1 discriminated expressly on the basis of disabilities, instead it held that its provisions were unlawful under a disparate-impact theory. ROA.40907 ¶ 161. But this was improper for two reasons. First, Plaintiffs did

---

[15] The district court stated that Plaintiffs merely needed to show "an unreasonable level of difficulty in accessing the benefits." ROA.40955. But this language came from a decision of a panel of this Court that was vacated when the case was reheard en banc. *Frame v. City of Arlington*, 616 F.3d 476, 483 (5th Cir. 2010), *on reh'g en banc*, 657 F.3d 215 (5th Cir. 2011). The en banc Court did not adopt this language and instead emphasized that the ADA imposes only an obligation to "take reasonable measures" to make facilities and services accessible to individuals with disabilities. *Frame v. City of Arlington*, 657 F.3d 215, 232 (5th Cir. 2011).

not plead a disparate-impact claim.[16] *See Gonzales v. City of New Braunfels*, 176 F.3d 834, 839 (5th Cir. 1999) (rejecting a Title I disparate impact claim because the plaintiff "failed even to plead a disparate impact claim"). Second, disparate-impact liability under Title II and Section 504 has never been recognized by this Court and is contrary to the statutes' plain language and congressional design.

The plain language of both Title II and Section 504 does not allow for disparate-impact liability. Title II forbids exclusion "by reason of such disability" which encompasses only intentional discrimination. 42 U.S.C. § 12132. Section 504 is even narrower, prohibiting only discrimination that is done "solely by reason" of a disability. 29 U.S.C. § 794. In addition, both Title II and Section 504 depend on Title VI of the Civil Rights Act, 42 U.S.C. § 2000d *et seq.*, to establish "remedies, procedures, and rights" and disparate-impact liability is unavailable under Title VI. *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). They therefore "pick[] up the type of discrimination—the standard for determining discrimination" that Congress set out in Title VI, and do not "change the nature of those grounds" or "add[] a new form of discrimination." *Doe v. BCBS of Tenn., Inc.*, 926 F.3d 235, 238-39 (6th Cir. 2019) (rejecting a disparate-impact theory for discrimination under the Affordable Care Act, a law that similarly relies on Title VI).

---

[16] HAUL's second amended complaint briefly alleges that S.B.1 disproportionately impacts voters with disabilities, but their ADA claim speaks merely of "discrimination" on the basis of disability without discussing disparate impact. ROA.6299 ¶ 121. Neither LUPE's nor OCA's second amended complaints mention disparate impact even once. ROA.6431, 7283.

Disparate-impact claims are also incompatible with the congressional purpose of Title II and Section 504. Congress did not require government agencies to "evaluate the effect on the handicapped of every proposed action that might touch the interests of the handicapped, and then to consider alternatives for achieving the same objectives with less severe disadvantage to the handicapped." *Alexander*, 469 U.S. at 298. Instead, Title II and Section 504 are designed to keep the burden on states "within manageable bounds" and strike a balance "between the statutory rights of the handicapped to be integrated into society and the legitimate interests" states have "in preserving the integrity of their programs." *Id.* at 298, 300. Limiting Title II claims to intentional discrimination or failures to grant reasonable accommodations strikes that balance.

Any disparate-impact claims should also be rejected on the basis of constitutional avoidance. If Title II is interpreted as a freewheeling requirement that state election-security laws be intensively scrutinized for their impact on disabled individuals, then it is not "congruent and proportional" to the scope of the Fourteenth Amendment. *Tennessee v. Lane*, 541 U.S. 509, 531-32 (2004) (upholding Title II because it requires only "reasonable modifications that would not fundamentally alter the nature of the service provided, and only *when the individual seeking modification* is otherwise eligible for the service" (internal quotation marks omitted) (emphasis added)). Without the requirement that individuals seek an accommodation, Title II would cease to be a proportional prophylactic measure and would exceed Congress's power under Section 5 of the Fourteenth Amendment.

The district court relied on the Ninth Circuit's erroneous decision in *Payan v. Los Angeles Community College District*, which recognized a Title II disparate-impact claim. 11 F.4th 729, 739 (9th Cir. 2021). But as Judge Lee's dissenting opinion persuasively demonstrated the majority opinion failed to grapple with the text of Title II or the impact of *Sandoval*. *Id.* at 740 (Lee, J., dissenting). Judge Lee also presciently warned that disparate-impact claims could "lead to a wholly unwieldy administrative and adjudicative burden." *Id.* This case demonstrates the wisdom of his warning. Indeed, it is hard to imagine *any* regulation of voting by mail or voting assistance that will be safe from scrutiny if disparate-impact claims are recognized. This Court should avoid this "breathtakingly broad" reading of Title II and Section 504, *see LUPE III*, 2025 WL 2489464, at *9 (internal quotation marks omitted), and reject disparate-impact liability under Title II and Section 504.

## C. Plaintiffs' failure-to-accommodate claim fails.

### 1. Plaintiffs failed to request an accommodation.

With failure-to-accommodate claims, this Court has repeatedly required that plaintiffs show that they requested a reasonable accommodation or modification. Because Plaintiffs failed to do so, their claims fail. A plaintiff "bears the burden of showing that he requested a modification and that it was reasonable." *Block v. Tex. Bd. of Law Exam'rs*, 952 F.3d 613, 618 (5th Cir. 2020). This request must be made in "direct and specific terms." *Smith v. Harris County*, 956 F.3d 311, 317, 319 (5th Cir. 2020). "This places the burdens where they comfortably fit[.]" *Riel v. Elec. Data Sys. Corp.*, 99 F.3d 678, 682 (5th Cir. 1996). Plaintiffs must show that any of the Defendants knew "that further accommodation was necessary." *Smith*, 956 F.3d at 319.

In light of the many accommodations that Texas already offers—for instance, at least *five* different options for voters to cure defects on their mail-in ballot, *supra* Statement of the Case Sec. III.B.—the "ADA does not require clairvoyance" from election officials. *Windham v. Harris County,* 875 F.3d 229, 237 (5th Cir. 2017) (citations omitted).[17] Plaintiffs did not meet their burden here.

### 2. Any limitations that Plaintiffs' members experience are not open and obvious.

Because Plaintiffs' members did not request an accommodation, they must prove that they qualify for a "narrow exception" by showing that their need for an accommodation was "open, obvious, and apparent." *Windham,* 875 F.3d at 237-39. It wasn't.

A limitation and necessary accommodation are obvious if the public entity "knew or should have known" both the extent of the disability *and* what accommodation the plaintiff needed. *Id.* at 237-38. Unless *both* the "resulting limitations[] *and* necessary reasonable accommodations" are open and obvious, the burden remains on disabled individuals "to specifically identify the disability and resulting limitations, and to suggest the reasonable accommodations." *Taylor v. Principal Fin. Grp., Inc.*, 93 F.3d 155, 165 (5th Cir. 1996) (emphasis added). In *Windham*, this Court held that a plaintiff's limitation and necessary accommodation were *not* obvious even

---

[17] The failure to request an accommodation is particularly fatal to Plaintiffs' Section 504 claim since it makes no sense to say that an entity discriminated "solely by reason of a disability" when it was not even made aware of the disability in the first place. 29 U.S.C. § 794(a); *Soledad v. U.S. Dep't of Treasury*, 304 F.3d 500, 504 (5th Cir. 2002).

when the disabled plaintiff told officers that he had a neck injury and showed them a doctor's note explaining the injury. 875 F.3d at 233, 238. The Court held that it was not enough that the officers knew of the existence of a disability because "knowledge of a disability is different from knowledge of the resulting limitation. And it certainly is different from knowledge of the necessary accommodation." *Id.* at 238.

Plaintiffs' claims rely on the conclusion that the many, varied, and often undisclosed disabilities that their members face have created a need so "open and obvious" that the Secretary and election officials had to know what further accommodations they needed to provide. Not so. Plaintiffs' own witnesses acknowledged at trial that voters with disabilities are a disparate group with a wide variety of different needs, limitations, and preferred accommodations. ROA.45575 (recognizing that while there are "certain commonalities," accommodations need to be individualized to a person's disability and needs); ROA.45787 (acknowledging that "the majority of voters with disabilities who do vote do not have significant difficulties in voting"). For instance, one voter may ask to cure a ballot curbside while another may want election officials to come to his home. Election officials cannot be expected to guess what limitations disabled voters will have and what accommodations they will request. That's precisely why Title II places the burden on disabled individuals to request accommodations in the first place.

The district court found that the Secretary was expected to offer accommodations based on the testimony that disability-rights activists gave at "the Texas legislature before S.B. 1 was enacted." ROA.40961. But the Secretary is not aware of any case (and Plaintiffs did not cite one below) that suggests an election official's general

"awareness" that people with disabilities may need voting accommodations obliges that official to offer a voting accommodation to a specific disabled individual without that person requesting such an accommodation. To the contrary, this Court has applied this "narrow exception" only where an individual's *own* disabilities, limitations, and needed accommodations were open and apparent. Plaintiffs therefore do not meet this exception and their failure to request an accommodation is fatal to their claims.

### 3.   Requesting an accommodation was not futile.

The district court accepted Plaintiffs' contention that asking for an accommodation would have been a futile gesture because the Secretary and local election officials are unable to make such accommodations. *See* 42 U.S.C. § 12188(a)(1). But this conclusion was both wrong as a matter of law and incompatible with the factual record at trial.

The futile-gestures exception is found only in Title III of the ADA, not Title II. *See Russello v. United States*, 464 U.S. 16, 23 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."). The exception therefore does not apply to Plaintiffs' claims. Nor is Title III's exception as broad as the district court suggested: It states only that disabled individuals do not need to actually *use* services like an inaccessible sidewalk before seeking relief. *Frame v. City of Arlington*, 657 F.3d 215, 235 (5th Cir. 2011). It does not excuse a disabled person from *asking* for an *accommodation* before suing.

There was also nothing futile about making a request for accommodation here. Local election officials have the power and are required to make reasonable accommodations for the laws they administer. *See supra* Statement of the Case Sec. V. And the Secretary is authorized to give guidance to election officials regarding whether their proposed actions are in compliance with Texas election law—just as she did when she advised them that they could go to voters' homes to cure defects. ROA.43363-64..

Texas law, including one of the provisions enacted by S.B.1, specifically prohibits election officials from interpreting the Texas Election Code so as "to prohibit or limit the right of a qualified individual with a disability from requesting a reasonable accommodation or modification to any election standard, practice, or procedure mandated by law or rule that the individual is entitled to request under federal or state law." Tex. Elec. Code § 1.022. The district court acknowledged this but held that this provision merely authorized individuals to request an accommodation, not for local officials to actually *grant* a request. ROA.40917 n.34. This was an inexplicable and erroneous conclusion. Local officials are *required* to make reasonable accommodations under the ADA, and Texas law expressly safeguards their authority to do so.[18] *See supra* Statement of the Case Sec. V.

Furthermore, the factual record shows that when disabled voters *did* inform election officials that they needed an accommodation, these accommodations were

---

[18] To the extent that there is confusion on this point, the district court could have clarified for the sake of local election officials that they are authorized and indeed required to grant reasonable requests for modification or accommodation.

frequently provided. Indeed, officials from some counties went so far as to meet voters curbside or in their homes to help them cure ballot defects. ROA.42746-47. "There is simply no evidence that [election officials are] unwilling to engage in a good-faith, interactive process [with Plaintiffs] regarding [their potential] request[s] for a reasonable accommodation." *Griffin v. United Parcel Serv., Inc.*, 661 F.3d 216, 225 (5th Cir. 2011). Therefore, requesting an accommodation was far from futile.

### 4.   Plaintiffs' proposed modifications are unreasonable.

Even if Plaintiffs' failure to request a modification is excused, their proposed relief is not a reasonable modification to the challenged provisions. Plaintiffs are required to prove their proposed modification is reasonable. *Johnson v. Gambrinus Co. Spoetzl Brewery*, 116 F.3d 1052, 1059 (5th Cir. 1997) (noting that the "plaintiff bears the ultimate burden of proof on the issue"). "[D]efendants—not plaintiffs—get to choose between reasonable accommodation(s)" regardless of plaintiffs' preferences. *E.T. v. Paxton*, 41 F.4th 709, 717 (5th Cir. 2022). If Plaintiffs propose a reasonable modification, then the Secretary may show that the proposed modification would constitute a fundamental alteration of the law or impose an undue burden.

Plaintiffs only proposed "modification" is the total elimination of the challenged provisions of S.B.1 *for all voters*— all 8.1 million who voted in November 2022, ROA.14592, and the more than 18 million registered voters.[19] This is not a "modification" at all. *See Biden v. Nebraska*, 600 U.S. 477, 494-95 (2023) (explaining that

---

[19] Texas Secretary of State, Texas Has 18.6 Million Registered Voters (Oct. 19, 2024), https://www.sos.state.tx.us/about/newsreleases/2024/101924.shtml.

the ordinary and legal meaning of "modify" includes only "modest adjustments and additions" and not "basic and fundamental changes"). Plaintiffs' requested relief is therefore facially unreasonable, and the district court erred in granting it.

Title II and Section 504 do not give Plaintiffs and federal judges the power to rewrite and decommission laws and policies that they disfavor. Such a power would "frustrate[] the intent of the elected representatives of the people." *Crawford*, 553 U.S. at 203 (quoting *Ayotte v. Planned Parenthood of N. New Eng.*, 546 U.S. 320, 329 (2006)). The district court's invalidation of Texas election law is particularly disturbing in light of the vital role of the States in "regulating the conduct of their elections," *Voting for Am., Inc. v. Steen*, 732 F.3d 382, 387 (5th Cir. 2013), including "the responsibility for establishing the time, place, and manner of holding" elections, *Voting Integrity Project, Inc. v. Bomer*, 199 F.3d 773, 775 (5th Cir. 2000).

The district court also failed to consider whether voters could have had their alleged exclusion cured with a more modest adjustment to Defendants' practices, policies, and procedures. A poorly tailored remedy like the one the district court adopted here is unreasonable. *See Green Valley Special Util. Dist. v. City of Schertz*, 969 F.3d 460, 478 n.39 (5th Cir. 2020) (explaining that a "court must narrowly tailor an injunction to remedy the specific action which gives rise to the order."). Indeed, such a broad injunction "undermines the basic purpose of the law, no matter what that purpose is." *League of Women Voters of Fla., Inc. v. Lee*, 595 F. Supp. 3d 1042, 1158 (N.D. Fla. 2022); *see also LA All. for Hum. Rts. v. Cnty. of Los Angeles*, 14 F.4th 947, 960-61 (9th Cir. 2021) (reversing an overly broad Title II injunction because the

plaintiffs were "unable to support the sweeping relief ordered" and the relief had not been "tailored to their injuries").

The district court's injunction also ignores this Court's instruction in *Veasey* that an injunction of election-security measures "should respect a legislature's policy objectives when crafting a remedy." *Veasey*, 830 F.3d at 269. For instance, in *Veasey*, a race-discrimination case, this Court enjoined a voter ID requirement only for those who did not have or were not able to reasonably obtain compliant identification. *Id.* at 271. But the Court did "not disturb" the laws' effect on "the vast majority of eligible voters" who possessed the proper identification and "must show it to vote." *Id.* Here on the other hand, the district court enjoined enforcement of the identification requirements of S.B.1. wholesale, even for those who have that information and can include it on their ABBM or mail-in ballot without any substantial burdens. This was an unreasonable modification.

Similarly, in *National Federation of the Blind v. Lamone*, the Fourth Circuit found that an injunction that required a state to make an existing but not yet fully implemented online ballot marking tool "available *to plaintiffs* for the 2014 general election" was a reasonable modification. 813 F.3d 494, 502 (4th Cir. 2016) (emphasis added). The key difference was that the requested relief in *Lamone* was provided specifically to disabled voters rather than enjoining *all* enforcement of a generally applicable law.

The district court's injunction also resembles the overly broad injunction that this Court recently invalidated in *Mississippi*, 82 F.4th at389. There, the Court warned that even if there is proof of discrimination against those with disabilities,

"[s]weeping institution-wide directives … are *never* 'narrowly tailored' to remedy individual instances of discrimination." *Id.* at 400 (emphasis added). Like that injunction, the district court's sweeping injunction invalidating numerous provisions of Texas law is not tailored "to remedy individual instances of discrimination" and is "overly broad." *Id.*

The Supreme Court's recent decision in *Trump v. CASA, Inc.*, further demonstrates the impropriety of the district court's order. There, the Supreme Court invalidated the practice of issuing universal injunctions and reemphasized that injunctions must be limited to "the parties named as plaintiff and defendants" in the lawsuit. 145 S. Ct. 2540, 2552 (2025). The district court's sweeping injunction that invalidates Texas law with regard to millions of Texas voters "falls outside the bounds of a federal court's equitable authority," *id.* at 2554. It therefore cannot be a reasonable modification under Title II. Because Plaintiffs failed to propose modifications tailored to accommodating disabled voters, their claims must be rejected.

### 5. The district court's order fundamentally alters S.B.1.

Finally, the district court's order was unreasonable because it fundamentally alters S.B.1 by disregarding Texas's compelling interest in enforcing election-security laws. The Supreme Court has held that a state's identification and voter-security requirements are justified by the states' "interest in deterring and detecting voter fraud." *Crawford*, 553 U.S. at 191. These types of provisions also generate "public confidence in the integrity of the electoral process" and therefore "encourage[] citizen participation in the democratic process." *Id.* at 197.

Title II "does not require States to compromise their essential eligibility criteria for public programs." *Block*, 952 F.3d at 618. But that is exactly what the district court's decision did. Texas is no longer able to require that voters provide their DPS number or SSN4 before being able to vote by mail, to require assistors to qualify by taking an oath of assistance, or to prevent vote harvesting practices that it has deemed particularly susceptible to fraud. That "compromise[s]" the "essential eligibility" criterion that the Texas Legislature has established for voting, *id.*, and undermines the Legislature's goal of ensuring that disabled voters are able to vote without "fear of intimidation or manipulation" or the "likelihood of fraud," S. Rep. No. 97-417, at 241 (1982); ROA.51997.

The district court dismissed the impact its decision would have with a conclusory assertion that "the State Defendants have not offered any evidence that enjoining the Challenged Provisions would 'fundamentally alter' voting in Texas." ROA.40963. But this assertion is contradicted by the mountain of evidence that State Defendants-Appellants presented at trial showing that the provisions of S.B.1 addressed ways that Texas voters (especially disabled voters) were vulnerable to fraud. *See supra* Statement of the Case Sec. III.A. Indeed, this Court has already recognized that "mail-in ballot fraud is a significant threat," *Veasey*, 830 F.3d at 256, and that the voter ID requirements of S.B.1 "meaningfully correspond[] to the State's legitimate interests in preventing the scourge of mail-in-ballot fraud." *Paxton*, 2025 WL 2205864, at *4. The district court's disregard for Texas's vital interest was clearly erroneous.

In any event, the district court misses the point. Texas's democratically elected branches enacted election-security measures that they deemed necessary. States are given "considerable discretion in deciding" how to secure their "important interests in voter integrity." *Id.* And a judicial order completely eradicating those measures improperly intrudes on "a coordinate branch of the Government," *CASA*, 145 S. Ct. at 2561, and fundamentally alters that law even if it doesn't fundamentally alter voting writ large.

## III. The District Court Exceeded Its Equitable Authority by Issuing an Overly Broad Injunction.

As already mentioned, the Supreme Court recently ruled that injunctions must be limited to "the parties named as plaintiff and defendants" in the lawsuit. *Id.* at 2552. The district court's injunction which impacts millions of voters across the whole state of Texas is plainly improper and "falls outside the bounds of a federal court's equitable authority." *Id.* at 2554. So even if Plaintiffs otherwise prevail, this Court should direct the district court to narrow the scope of the injunction to Plaintiffs and their members.

## Conclusion

The Court should reverse the district court's decision and direct the court to dismiss Plaintiffs' Title II and Section 504 claims against the State Defendants-Appellants for lack of jurisdiction or in the alternative rule in favor of the State Defendants-Appellants on the merits.

Respectfully submitted.

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General


Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

WILLIAM R. PETERSON Solicitor
General

WILLIAM F. COLE
Principal Deputy Solicitor General

/s/ DANIEL M. ORTNER
DANIEL M. ORTNER
Assistant Solicitor General
Daniel.Ortner@oag.texas.gov

*Counsel for State Defendants-Appel-lants*

## CERTIFICATE OF SERVICE

On September 15, 2025, this brief was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and (3) the document has been scanned with the most recent version of Symantec Endpoint Protection and is free of viruses.

/s/ Daniel M. Ortner
DANIEL M. ORTNER

## CERTIFICATE OF COMPLIANCE

This brief complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,547 words, excluding the parts of the brief exempted by Rule 32(f); and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Equity) using Microsoft Word (the same program used to calculate the word count).

/s/ Daniel M. Ortner
DANIEL M. ORTNER