# In The United States Court of Appeals
# For the Fifth Circuit

LA UNIÓN DEL PUEBLO ENTERO; SOUTHWEST VOTER
REGISTRATION EDUCATION PROJECT; MEXICAN
AMERICAN BAR ASSOCIATION OF TEXAS; TEXAS HISPANICS
ORGANIZED FOR POLITICAL EDUCATION; JOLT ACTION;
WILLIAM C. VELASQUEZ INSTITUTE; FIEL HOUSTON,
INCORPORATED; FRIENDSHIP-WEST BAPTIST CHURCH;
TEXAS IMPACT; JAMES LEWIN,

*Plaintiffs–Appellees,*

*v.*

GREGORY W. ABBOTT, IN HIS OFFICIAL CAPACITY AS
GOVERNOR OF TEXAS; JANE NELSON, IN HER OFFICIAL
CAPACITY AS TEXAS SECRETARY OF STATE; STATE OF
TEXAS; WARREN K. PAXTON, IN HIS OFFICIAL CAPACITY AS
ATTORNEY GENERAL OF TEXAS; HARRIS COUNTY
REPUBLICAN PARTY; DALLAS COUNTY REPUBLICAN
PARTY; NATIONAL REPUBLICAN SENATORIAL COMMITTEE,

*Defendants–Appellants,*

REPUBLICAN NATIONAL COMMITTEE

*Movant-Appellant.*

---

REVUP-TEXAS,

*Plaintiffs–Appellees,*

*v.*

KEN PAXTON, ATTORNEY GENERAL OF TEXAS,

*Defendant–Appellant.*

---

DELTA SIGMA THETA SORORITY, INCORPORATED; THE ARC OF TEXAS,

*Plaintiffs–Appellees*,

*v.*

GREGORY W. ABBOTT, IN HIS OFFICIAL CAPACITY AS GOVERNOR OF TEXAS; AND WARREN KENNETH PAXTON, ATTORNEY GENERAL OF TEXAS,

*Defendants–Appellants*.

---

On Appeal from the United States District Court
for the Western District of Texas
San Antonio Division – No. 5:21-cv-00844

## COMBINED BRIEF OF PLAINTIFFS–APPELLEES

Victor Genecin
Kathryn Sadasivan
Breanna Williams
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
40 Rector Street, 5th Floor
New York, NY 10006
(212) 965-2200
vgenecin@naacpldf.org
ksadasivan@naacpldf.org
bwilliams@naacpldf.org

Kelly Gardner
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
260 Peachtree Street NW, Suite 2300
Atlanta, GA 30303
(404) 590-0885
kgardner@naacpldf.org

Brian Dimmick
Adriel I. Cepeda Derieux
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
915 15th Street NW
Washington, DC 20005
(202) 457-0800
bdimmick@aclu.org
acepedaderieux@aclu.org

Ari Savitzky
Dayton Campbell-Harris
Sophia Lin Lakin
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 284-7334
asavitzky@aclu.org
dcampbell-harris@aclu.org
slakin@aclu.org

Shira Wakschlag
Evan Monod
THE ARC OF THE UNITED
STATES, INC.
2000 Pennsylvania Ave NW,
Suite 500
Washington, DC 20006
(202) 534-3708
wakschlag@thearc.org
monod@thearc.org

J. Michael Showalter
Duncan Weinstein
ARENTFOX SCHIFF LLP
233 South Wacker Drive, Suite 7100
Chicago, IL 60606
(312) 258-5561
j.michael.showalter@afslaw.com
duncan.weinstein@afslaw.com

Derek Ha
ARENTFOX SCHIFF LLP
44 Montgomery Street, 38th Floor
San Francisco, CA 94104
(415) 757-5500
derek.ha@afslaw.com

Elissa Gershon
Megan A. Rusciano
CENTER FOR PUBLIC
REPRESENTATION
5 Ferry Street #314
Easthampton, MA 01027
(413) 586-6024
egershon@cpr-ma.org
mrusciano@cpr-ma.org

Thomas Paul Buser-Clancy
Ashley Alcantara Harris
AMERICAN CIVIL LIBERTIES
UNION OF TEXAS
P.O. Box 8306
Houston, TX 77288
(713) 942-8146
tbuser-clancy@aclutx.org
aharris@aclutx.org

Zachary Dolling
TEXAS CIVIL RIGHTS PROJECT
1405 Montopolis Drive
Austin, Texas 78741
(512) 474-5073
zachary@texascivilrightsproject.org

Peter Thomas Hofer
Christopher McGreal
DISABILITY RIGHTS TEXAS
2222 W. Braker Lane
Austin, TX 78758
(512) 454-4816
phofer@drtx.org
cmcgreal@drtx.org

Nina Perales
MEXICAN AMERICAN LEGAL
DEFENSE AND EDUCATION
FUND
110 Broadway, Suite 300
San Antonio, Texas 78205
(210) 224-5476
nperales@maldef.org

Leah J. Tulin
BRENNAN CENTER FOR JUSTICE
AT NYU SCHOOL OF LAW
777 6th Street NW, Suite 1100
Washington, DC 20001
(202) 650-6397
tulinl@brennan.law.nyu.edu

Sean Morales-Doyle
Jasleen K. Singh
Patrick A. Berry
BRENNAN CENTER FOR JUSTICE
AT NYU SCHOOL OF LAW
120 Broadway, Suite 1750
New York, NY 10271
(646) 292-8310
morales-doyles@brennan.law.nyu.edu
singhj@brennan.law.nyu.edu
berryp@brennan.law.nyu.edu

Zachary Tripp
Aaron J. Curtis
WEIL, GOTSHAL &
MANGES, L.L.P.
767 5th Avenue
New York, NY 10153
(212) 310-8901
zack.tripp@weil.com
aaron.curtis@weil.com

*Counsel for Plaintiffs-Appellees*

# CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of 5th Cir. R. 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

**Plaintiffs-Appellees**

- La Unión del Pueblo Entero
- Southwest Voter Registration Education Project
- Mexican American Bar Association of Texas
- Texas Hispanics Organized for Political Education
- JOLT Action
- William C. Velasquez Institute
- FIEL Houston, Inc.
- Friendship-West Baptist Church
- Texas Impact
- James Lewin
- REVUP–Texas

**Counsel**

- American Civil Liberties Union Foundation
- American Civil Liberties Union of Texas
- Lawyers' Committee for Civil Rights Under Law
- Brennan Center for Justice at NYU School of Law
- Mexican American Legal Defense and Education Fund
- The Arc of the United States
- NAACP Legal Defense and Educational Fund, Inc.
- Center for Public Representation
- ArentFox Schiff LLP

- Delta Sigma Theta Sorority, Inc.

- The Arc of Texas

**Defendants-Appellants and Intervenors-Appellants**

- Gregory W. Abbott, Governor of Texas

- Jane Nelson, Secretary of State of Texas

- State of Texas

- Warren K. Paxton, Attorney General of Texas

- Harris County Republican Party

- Dallas County Republican Party

- National Republican Senatorial Committee

- Republican National Committee

**Counsel**

- Office of the Texas Attorney General, Solicitor General's Office

- Jones Day

**Other Non-Party Interested Persons or Groups**

- Mi Familia Vota

- OCA–Greater Houston

- LULAC Texas

**Counsel**

- N/A

- Texas Alliance for Retired Americans

- Texas AFT

- Voto Latino

- League of Women Voters of Texas


Dated: November 21, 2025

*/s/ Brian Dimmick*
Brian Dimmick

*/s/ Victor Genecin*
Victor Genecin

*/s/ Leah Tulin*
Leah Tulin

*/s/ Nina Perales*
Nina Perales

Counsel of Record for Plaintiffs-Appellees

## STATEMENT REGARDING ORAL ARGUMENT

The District Court's fact-bound liability determination in this case is based on an extensive trial record. Oral argument may assist this Court in answering any questions regarding the record and any related legal issues. Plaintiffs-Appellees accordingly request oral argument.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ......................................... i

STATEMENT REGARDING ORAL ARGUMENT ................................ iv

TABLE OF CONTENTS ......................................................................... v

TABLE OF AUTHORITIES ................................................................. viii

INTRODUCTION ................................................................................... 1

JURISDICTIONAL STATEMENT ......................................................... 5

ISSUES PRESENTED ............................................................................ 5

STATEMENT OF THE CASE ................................................................. 5

I.  STATUTORY BACKGROUND .................................................. 5

II.  FACTUAL BACKGROUND ........................................................ 7

    A. Texans with disabilities face challenges in voting ...................... 7

    B. Before S.B.1, disabled Texans voted securely. ........................... 8

    C. Texas imposes new restrictions on disabled voters. ................... 9

    D. The District Court finds after trial that the Challenged
       Provisions impede voting by Texans with disabilities,
       violating the ADA. .................................................................. 11

        1. The District Court finds that the Assistance
           Restrictions criminalize outreach to disabled voters ....... 12

        2. The District Court finds that the Oath-and-
           Assistance Provisions menace assistors and inhibit
           disabled voters from obtaining assistance. ..................... 14

        3. The District Court finds that the Number-Matching
           Requirement disenfranchises and erects barriers for
           voters with disabilities. .................................................. 19

SUMMARY OF ARGUMENT .................................................... 25

STANDARD OF REVIEW ..................................................... 30

ARGUMENT ..................................................................... 31

I.      PLAINTIFFS HAVE STANDING. ........................................ 31

    A. Plaintiffs have standing to challenge the Assistance
       Restrictions. .......................................................... 32

    B. Plaintiffs have standing to challenge the Oath-And-
       Assistance Provisions. ............................................. 34

    C. Plaintiffs have standing to challenge the Number-
       Matching Requirement. ............................................ 39

    D. Plaintiffs' injuries are traceable to the Secretary. ..................... 42

II.     DEFENDANTS VIOLATED THE ADA BY FAILING TO
      PROVIDE REASONABLE MODIFICATIONS TO
      TEXAS'S VOTING PROGRAMS FOR VOTERS WITH
      DISABILITIES. ........................................................ 45

    A. The Challenged Provisions deprive disabled voters of
       meaningful access to Texas's voting programs. ....................... 46

        1. Alternative voting options do not provide
          meaningful access. ............................................. 47

        2. Meaningful access does not depend on whether
          Texans with disabilities successfully voted. ................... 51

    B. Defendants cannot evade their duty to make reasonable
       modifications by claiming none were requested. ...................... 54

        1. Voters made requests that the State ignored. ................. 55

        2. The ADA required reasonable modifications here
          regardless of individual requests. .............................. 56

        3. Requests for modifications would have been futile. ........ 60

    C. Defendants' belated disparate-impact argument fails. ............ 65

III. ENJOINING S.B.1 DOES NOT FUNDAMENTALLY ALTER TEXAS'S VOTING PROGRAM .................................. 69

 A. Modifying State law to avoid discrimination is not a fundamental alteration to Texas's voting program. ................ 70

 B. Enjoining the Challenged Provisions would not fundamentally alter Texas's voting program. ........................... 76

IV. THE DISTRICT COURT'S REMEDY IS PROPER. ................ 78

 A. The District Court did not abuse its discretion in granting a statewide injunction. ........................................... 78

 B. The Court can remand for a narrower remedy. ........................ 80

CONCLUSION ...................................................................... 81

# TABLE OF AUTHORITIES

**Cases**

*A Helping Hand, LLC v. Baltimore County,*
515 F.3d 356 (4th Cir. 2008)................................................................33

*A.J.T. by & through A.T. v. Osseo Area Schools,*
605 U.S. 335 (2025)............................................................................6

*Addiction Specialists, Inc. v. Township of Hampton,*
411 F.3d 399 (3d Cir. 2005)...............................................................33

*Alexander v. Choate,*
469 U.S. 287 (1985)...............................................................6, 27, 45

*American Council of the Blind of New York, Inc. v. City of New York,*
495 F. Supp. 3d 211 (S.D.N.Y. 2020)................................................49

*American Council of the Blind v. Paulson,*
525 F.3d 1256 (D.C. Cir. 2008)..........................................................52

*Anderson v. City of Bessemer City, North Carolina,*
470 U.S. 564 (1985)............................................................................30

*Apter v. Department of Health & Human Services,*
80 F.4th 579 (5th Cir. 2023)...............................................................38

*Association of American Physicians & Surgeons, Inc. v. Texas Medical Board,*
627 F.3d 547 (5th Cir. 2010)...............................................................32

*Association of Community Organizations for Reform Now v. Fowler,*
178 F.3d 350 (5th Cir. 1999)...............................................................33

*Bailey v. Board of Commissioners of Louisiana Stadium & Exposition District,*
484 F. Supp. 3d 346 (E.D. La. 2020)..................................................47

*Bank of America v. City of Miami*,
    581 U.S. 189 (2017)................................................................34

*Barber ex rel. Barber v. Colorado Department of Revenue*,
    562 F.3d 1222 (10th Cir. 2009)...........................................71

*Beech v. Hercules Drilling Co., LLC*,
    691 F.3d 566 (5th Cir. 2012)...............................................31

*Bennett-Nelson v. Louisiana Board of Regents*,
    431 F.3d 448 (5th Cir. 2005)...................................6, 45, 57

*Block v. Texas Board of Law Examiners*,
    952 F.3d 613 (5th Cir. 2020).........................................70-71

*Brooks v. Colorado Department of Corrections*,
    12 F.4th 1160 (10th Cir. 2021)...........................................52

*Bultemeyer v. Fort Wayne Community Schools*,
    100 F.3d 1281 (7th Cir. 1996).............................................58

*Cadena v. El Paso County*,
    946 F.3d 717 (5th Cir. 2020)......................................passim

*Cascino v. Nelson*,
    No. 22-50748, 2023 WL 5769414 (5th Cir. Sept. 6, 2023).................39

*Colony Insurance Co. v. Wright*,
    16 F.4th 1186 (5th Cir. 2021)............................................30

*Consumer Data Industry Association v. Texas*,
    No. 21-51038, 2023 WL 4744918 (5th Cir. July 25, 2023).................32

*Crawford v. Hinds County Board of Supervisors*,
    1 F.4th 371 (5th Cir. 2021)..............................................39

*Crown Castle Fiber, L.L.C. v. City of Pasadena*,
    76 F.4th 425 (5th Cir. 2023).............................................31

*Davoll v. Webb*,
    194 F.3d 1116 (10th Cir. 1999)..........................................58

*Delano-Pyle v. Victoria County,*
   302 F.3d 567 (5th Cir. 2002)..............................7, 43, 45, 57

*Democracy North Carolina v. North Carolina State Board of Elections,*
   476 F. Supp. 3d 158 (M.D.N.C. 2020)..........................48, 75

*Disabled in Action v. Board of Elections,*
   752 F.3d 189 (2d Cir. 2014) ..................................49, 52, 67

*Doe v. Rowe,*
   156 F. Supp. 2d 35 (D. Me. 2001) ...............................60, 76

*Doe v. Trump,*
   142 F.4th 109 (1st Cir. 2025)........................................80

*Dudley v. Hannaford Brothers Co.,*
   333 F.3d 299 (1st Cir. 2003) ........................................63

*E.T. v. Paxton,*
   41 F.4th 709 (5th Cir. 2022) ........................................77

*Easyriders Freedom F.I.G.H.T. v. Hannigan,*
   92 F.3d 1486 (9th Cir. 1996)........................................79

*Equal Employment Opportunity Commission v. Chevron Phillips Chemical Co., LP,*
   570 F.3d 606 (5th Cir. 2009)........................................55

*Food and Drug Administration v. Alliance for Hippocratic Medicine,*
   602 U.S. 367 (2024)..............................................32, 37

*Food and Drug Administration v. R.J. Reynolds Vapor Co.,*
   145 S.Ct. 1984 (2025)...............................................34

*Frame v. City of Arlington,*
   657 F.3d 215 (5th Cir. 2011)...................................passim

*Fry v. Napoleon Community Schools,*
   580 U.S. 154 (2017)..................................................6

*Funeral Consumers Alliance, Inc. v. Service Corp. International*,
    695 F.3d 330 (5th Cir. 2012)................................................................ 40

*Griffin v. United Parcel Service, Inc.*,
    661 F.3d 216 (5th Cir. 2011)................................................................ 58

*Gustafson v. Bi-State Development Agency of Missouri-Illinois
    Metropolitan District*,
    29 F.4th 406 (8th Cir. 2022) ................................................ 47, 52, 54

*Havens Realty Corp. v. Coleman*,
    455 U.S. 363 (1982)............................................................................ 32

*Henrietta D. v. Bloomberg*,
    331 F.3d 261 (2d Cir. 2003) ........................................................ 67, 68

*Hindel v. Husted*,
    875 F.3d. 344 (6th Cir. 2017).......................................... 69, 70, 71, 75

*Hohider v. United Parcel Service, Inc.*,
    574 F.3d 169 (3d Cir. 2009) ................................................................ 58

*Hooker v. Dallas Independent School District*,
    No. 3:09-CV-1289-D, 2010 WL 4025877 (N.D. Tex. Oct. 13,
    2010)................................................................................................... 34

*In re Southern Recycling, L.L.C.*,
    982 F.3d 374 (5th Cir. 2020)................................................................ 30

*Innovative Health Systems, Inc. v. City of White Plains*,
    117 F.3d 37 (2d Cir. 1997) ................................................................ 33

*Janvey v. Alguire*,
    539 F. App'x 478 (5th Cir. 2013)........................................................ 38

*Johnson v. Callanen*,
    610 F. Supp. 3d 907 (W.D. Tex. 2022)................................................ 71

*Johnson v. Gambrinus Co. Spoetzl Brewery*,
    116 F.3d 1052 (5th Cir. 1997).............................................. 69, 70, 75

*Kamps v. Baylor University,*
592 F. App'x 282 (5th Cir. 2014).................................................67

*La Unión del Pueblo Entero v. Abbott,*
151 F.4th 273 (5th Cir. 2025) ..................................31, 32, 38

*Lartigue v. Northside Independent School District,*
100 F.4th 510 (5th Cir. 2024) .......................................6, 46

*Lightbourn v. County of El Paso,*
118 F.3d 421 (5th Cir. 1997)..............................................43

*Los Angeles Alliance for Human Rights v. County of Los Angeles,*
14 F.4th 947 (9th Cir. 2021) ...............................................78

*Luke v. Texas,*
46 F.4th 301 (5th Cir. 2022) ....................................... passim

*Mary Jo C. v. New York State & Local Retirement System,*
707 F.3d 144 (2d Cir. 2013) ...............................................71

*McCoy v. Texas Department of Criminal Justice,*
No. C.A.C 05 370, 2006 WL 2331055 (S.D. Tex. Aug. 9, 2006)..........34

*McCullum v. Orlando Regional Healthcare System, Inc.,*
768 F.3d 1135 (11th Cir. 2014)..........................................34

*McGary v. City of Portland,*
386 F.3d 1259 (9th Cir. 2004).............................................7

*MX Grp., Inc. v. City of Covington,*
293 F.3d 326 (6th Cir. 2002)..............................................33

*National Federation of the Blind v. Lamone,*
813 F.3d 494 (4th Cir. 2016)....................................... passim

*OCA-Greater Houston v. Texas,*
867 F.3d 604 (5th Cir. 2017)...................................31, 32, 43

*Oconomowoc Residential Programs v. City of Milwaukee,*
300 F.3d 775 (7th Cir. 2002)..............................................67

*Olmstead v. L.C.*,
   527 U.S. 581 (1999) ............................................................... 69

*Ortega v. Grisham*,
   148 F.4th 1134 (10th Cir. 2025) ........................................ 80

*Ostrewich v. Tatum*,
   72 F.4th 94 (5th Cir. 2023) ................................................ 43

*Oxford House, Inc. v. City of Baton Rouge, Louisiana*,
   932 F. Supp. 2d 683 (M.D. La. 2013) ................................ 60

*Payan v. Los Angeles Community College District*,
   11 F.4th 729 (9th Cir. 2021) .............................................. 58

*Pederson v. Louisiana State University*,
   213 F.3d 858 (5th Cir. 2000) .............................................. 30

*People First of Alabama v. Merrill*,
   491 F. Supp. 3d 1076 (N.D. Ala. 2020) ..................... passim

*PGA Tour, Inc. v. Martin*,
   532 U.S. 661 (2001) ................................................ 70, 71, 72

*Pierce v. District of Columbia*,
   128 F. Supp. 3d 250 (D.D.C. 2015) .................................... 55

*Reickenbacker v. Foster*,
   274 F.3d 974 (5th Cir. 2001) ........................................ 29, 69

*Reporters Committee for Freedom of the Press v. Rokita*,
   147 F.4th 720 (7th Cir. 2025) ............................................ 80

*Riel v. Electronic Data Systems Corp.*,
   99 F.3d 678 (5th Cir. 1996) ................................................ 58

*Rollins v. Home Depot U.S.A*,
   8 F.4th 393 (5th Cir. 2021) ................................................ 67

*Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*,
   547 U.S. 47 (2006) .............................................................. 31

*Scales v. Slater,*
　181 F.3d 703 (5th Cir. 1999)...............................................68

*Schwarz v. Villages Charter School, Inc.,*
　No. 5:12-CV-177-OC-34PRL, 2014 WL 12623013 (M.D. Fla.
　May 23, 2014)...............................................................60

*Shaw v. Hunt,*
　517 U. S. 899 (1996).......................................................79

*Shotz v. Cates,*
　256 F.3d 1077 (11th Cir. 2001)...........................................52

*Smith v. Dunn,*
　568 F. Supp. 3d 1244 (M.D. Ala. 2021)...................................62

*Smith v. Harris County,*
　956 F.3d 311 (5th Cir. 2020)..............................................59

*Soledad v. U.S. Department of Treasury,*
　304 F.3d 500 (5th Cir. 2002)..............................................58

*Speech First, Inc. v. Fenves,*
　979 F.3d 319 (5th Cir. 2020)..............................................36

*Spokeo v. Robins,*
　578 U.S. 330 (2016).......................................................31

*Steger v. Franco, Inc.,*
　228 F.3d 889 (8th Cir. 2000)..............................................63

*Stringer v. Whitley,*
　942 F.3d 715 (5th Cir. 2019)..............................................31

*Swanson v. City of Plano,*
　No. 4:19-CV-412, 2020 WL 6799173 (E.D. Tex. Nov. 19, 2020).........34

*Taylor v. Principal Financial Group, Inc.,*
　93 F.3d 155 (5th Cir. 1996)...............................................58

*Tennessee v. Lane,*
　541 U.S. 509 (2004).......................................................76

*Tokio Marine & Fire Insurance Co., Ltd. v. FLORA MV,*
    235 F.3d 963 (5th Cir. 2001) .............................................. 31

*Trump v. CASA, Inc.,*
    606 U.S. 831 (2025) ........................................................ 79

*U.S. Airways v. Barnett,*
    535 U.S. 391 (2002) ........................................................ 71

*United States v. Hialeah Housing Authority,*
    418 F. App'x 872 (11th Cir. 2011) ..................................... 55

*United States v. Lierman,*
    151 F.4th 530 (4th Cir. 2025) .......................................... 80

*United States v. Mississippi,*
    82 F.4th 387 (5th Cir. 2023) ...................................... 53, 78

*United States v. Paxton,*
    148 F.4th 335 (5th Cir. 2025) .......................................... 43

*Veasey v. Abbott,*
    830 F. 3d 216 (5th Cir. 2016) .......................................... 30

*Warth v. Seldin,*
    422 U.S. 490 (1975) ........................................................ 38

*Weber v. Cranston School Committee,*
    212 F.3d 41 (1st Cir. 2000) ............................................. 33

*Windham v. Harris County,*
    875 F.3d 229 (5th Cir. 2017) ........................................... 59

*Wisconsin Community Services, Inc. v. City of Milwaukee,*
    465 F.3d 737 (7th Cir. 2006) ........................................... 68

**Statutes**

28 C.F.R. §35.130 .................................................. 6, 7, 45, 46

28 C.F.R. §35.164 .............................................................. 69

29 U.S.C. §794 .................................................................. 6

42 U.S.C. §12101 ........................................................... 6, 7

42 U.S.C. §12132 ............................................................... 5

42 U.S.C. §12133 ......................................................... 26, 33

TEC §1.0015 ..................................................................... 75

TEC §1.003 ....................................................................... 75

TEC §276.015 ................................................................... 13

TEC §276.018 ................................................................... 15

TEC §276.019 .............................................................. 44, 63

TEC §31.002 ............................................................... 23, 43

TEC §31.006 ..................................................................... 44

TEC §31.129 ..................................................................... 63

TEC §64.0322 ............................................................. 15, 43

TEC §64.034 .......................................................... 15, 17, 18

TEC §82.001 ..................................................................... 19

TEC §82.002 ..................................................................... 19

TEC §82.003 ..................................................................... 19

TEC §82.004 ..................................................................... 19

TEC §82.007 ..................................................................... 19

TEC §82.008 ..................................................................... 19

TEC §84.002 ..................................................................... 20

TEC §84.011 ..................................................................... 23

TEC §86.001 ................................................................ 20, 23

TEC §86.002 .................................................................... 23

TEC §86.010 .................................................................... 15

TEC §86.0105 ....................................................... 12, 13, 73

TEC §86.012 .................................................................... 23

TEC §86.013 .................................................................... 15

TEC §87.041 .................................................................... 20

Tex. Local. Gov't Code §813 ................................................. 35

Tex. Penal Code §12.34 ....................................................... 13

Tex. Penal Code §12.35 ....................................................... 15

Tex. Penal Code §38.01 ....................................................... 13

## Other Authorities

Tex. S.B.1, 87th Leg., 2d C.S. (2021) ....................................... 9

## INTRODUCTION

If a wheelchair user encounters an inaccessible building but can, with great hardship, crawl up the stairs to enter, no one would suggest that she has received equal opportunity under the Americans with Disabilities Act. The same principle governs here. Voters with disabilities cannot be forced to figuratively crawl up the steps to exercise the franchise. This Court has recognized that the ADA requires public entities to take "reasonable measures" to ensure access when they design or implement public programs. *Frame v. City of Arlington*, 657 F.3d 215, 232 (5th Cir. 2011) (en banc). And just as a city constructing new sidewalks must ensure they are accessible, *id.*, Texas must ensure that new voting rules are accessible to voters with disabilities. This case arises out of Texas's failure to do that.

In 2021, Texas enacted S.B.1, imposing significant barriers, including criminal penalties, on voters with disabilities and those who assist them. After a six-week trial featuring testimony from roughly 80 witnesses and close to 1,000 admitted exhibits, the District Court found that the provisions of S.B.1 at issue in this appeal, as enforced by Defendants, caused voters with disabilities to experience repeated mail-ballot rejections, endure physical pain and loss of privacy when voting in person, and confront significant barriers to receiving the assistance they need to vote. ROA.40956 (D.Ct.Op.93).

The District Court held that Defendants' failure to make modifications to the provisions at issue denies voters with disabilities meaningful access to Texas's voting programs in violation of the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act ("Section 504"); that reverting to pre-S.B.1 rules is a reasonable modification; and that Defendants offered no evidence that such relief would fundamentally alter Texas's voting programs. Defendants identify no clear error in the District Court's extensive factual findings and cite no controlling law to the contrary. The Court should reject their appeal.

As a threshold matter, the District Court correctly found that Plaintiffs have standing to challenge the restrictions S.B.1 imposes on voters with disabilities, based on detailed findings of jurisdictional fact. Defendants cannot defeat standing for Plaintiffs' ADA claims by invoking a prior ruling addressing different claims under a different statute.

On the merits, the District Court's fact-bound liability determination must be affirmed. The challenged provisions criminalize providing or receiving "anything of value" for assisting disabled voters with mail ballots or canvassing at disabled voters' homes. They threaten criminal penalties for assisting disabled voters at the polls. And they make mail-ballot voting much more difficult for Texans with disabilities, requiring them to guess which ID number the State has in an error-riddled voter database and then accurately write it on an easy-to-miss,

small-print form, and making it difficult or impossible for them to correct any mistakes after the fact. The District Court credited abundant evidence, including testimony from disabled voters, assistors, experts, and election officials, that these provisions impose major barriers to voting for Texans with disabilities and thereby deny them meaningful access to those programs in violation of the ADA.

Defendants identify no clear error in the District Court's findings. It does not matter whether Texas has multiple voting methods or that some of disabled people were ultimately able to vote despite S.B.1. The ADA requires that the voting *process* be accessible to voters with disabilities regardless of the ultimate *results*. *See Luke v. Texas*, 46 F.4th 301, 305-07 (5th Cir. 2022). Here, it was not: The record amply supports the District Court's finding that the challenged S.B.1 provisions at issue deprive disabled Texans of an equal opportunity to access Texas's voting programs even if some voters are able to overcome those barriers with great difficulty to cast ballots anyway.

The District Court also correctly rejected Defendants' affirmative defense that the relief ordered—*i.e.*, enjoining the provisions at issue here—would fundamentally alter Texas's voting programs. Defendants mainly argued below that *any* modifications to their election rules would be unreasonable, citing unspecified voter-fraud concerns. Preventing voter fraud is surely important, but to prove their defense under the ADA's demanding fundamental alteration doctrine, Defendants were

required to adduce specific evidence regarding the essential nature of the challenged portions of S.B.1. The District Court found that they failed to do so, offering only "conclusory assertions," ROA.40963 (D.Ct.Op.100), while Plaintiffs offered concrete evidence of harm. Defendants cannot show that these findings constitute clear error.

Nor was there any abuse of discretion in the District Court's enjoining the challenged provisions, which apply only to a circumscribed set of voters, on a statewide basis—a simple and administrable remedy that provides complete relief to Plaintiffs' members across Texas. And if the injunction here somehow were overly broad, the right approach would be to affirm on the merits and then remand for narrower relief.

## JURISDICTIONAL STATEMENT

The District Court had jurisdiction pursuant to 28 U.S.C. §1331 because this case arises under federal law, specifically the ADA and Section 504. This Court has jurisdiction pursuant to 28 U.S.C. §1292 because the appeal is from the District Court's grant of a permanent injunction following trial.

## ISSUES PRESENTED

1.     Do Plaintiffs have standing to bring ADA claims against the challenged provisions of S.B.1?

2.     Was the District Court's conclusion, following a lengthy trial, that the challenged provisions of S.B.1 violated the ADA, based on clearly erroneous factfinding or mistakes in applying the law to the facts?

3.     Did the District Court abuse its discretion in enjoining the unlawful provisions?

## STATEMENT OF THE CASE

### I.   STATUTORY BACKGROUND

The ADA "is a 'broad mandate'" with a "'sweeping purpose'": to eliminate discrimination against people with disabilities and "integrate them into the economic and social mainstream of American life.'" *Frame v. City of Arlington*, 657 F.3d 215, 223 (5th Cir. 2011) (en banc) (internal citations omitted). Title II of the law provides that no qualified individual with a disability may be excluded from, or denied the benefits of, any public entity's "services, programs, or activities." 42 U.S.C. §12132; *see*

*also* 28 C.F.R. §35.130, including in "critical areas" such as "voting." 42 U.S.C. §12101(a)(3); *Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494, 507 (4th Cir. 2016) (voting is a "quintessential" covered program).[1]

To establish a *prima facie* Title II case, a plaintiff must show that she (1) is a qualified individual with a disability, (2) who was excluded from participation in, denied the benefits of, or otherwise discriminated against in a public entity's services, programs, or activities (3) by reason of that disability. *Luke v. Texas*, 46 F.4th 301, 305 (5th Cir. 2022); *Cadena v. El Paso Cnty.*, 946 F.3d 717, 723 (5th Cir. 2020). Intent is not required to establish an ADA violation. *Alexander v. Choate*, 469 U.S. 287, 295-96 (1985); *accord A.J.T. by & through A.T. v. Osseo Area Schs.*, 605 U.S. 335, 344-45 (2025).

Title II requires "public entities to provide equal opportunities to disabled and non-disabled individuals" to access their services, programs, or activities. *Lartigue v. Northside Indep. Sch. Dist.*, 100 F.4th 510, 520 (5th Cir. 2024); *see also* 28 C.F.R. §35.130(b)(1)(ii)-(iii); *Frame*, 657 F.3d at 232 ("DOJ's regulations … apply Title II's nondiscrimination mandate."). This affirmative duty requires governmental entities to

---

[1] Section 504 of the Rehabilitation Act likewise bars disability discrimination by entities that receive federal funds. 29 U.S.C. §794(a). Section 504 and the ADA impose nearly identical substantive requirements, and courts interpret the two in tandem. *E.g.*, *Fry v. Napoleon Cmty. Schs.*, 580 U.S. 154, 158 (2017); *Bennett-Nelson v. La. Bd. of Regents*, 431 F.3d 448, 454 (5th Cir. 2005); ROA.40870, 40932 (D.Ct.Op.7, 69). Accordingly, unless otherwise noted, Plaintiffs' arguments herein regarding "the ADA" apply equally to their Section 504 claims.

make reasonable modifications[2] to their programs when necessary, unless they can show that the modification would fundamentally alter the nature of the service, program, or activity. *See* 28 C.F.R. §35.130(b)(7)(i); *accord Cadena*, 946 F.3d at 724; *Delano-Pyle v. Victoria Cnty.*, 302 F.3d 567, 575 (5th Cir. 2002); *see also* 42 U.S.C. §12101(a)(5).

## II.    FACTUAL BACKGROUND[3]

### A.    Texans with disabilities face challenges in voting.

There are over three million voting-eligible Texans with disabilities, including older adults, such as voters who have mobility impairments, who are blind or have visual impairments, and/or who have cognitive disabilities that involve difficulty remembering, concentrating, or making decisions. ROA.40869, 40876, 40879, 40904, 40907, 40915 (D.Ct.Op.6, 13, 16 n.15, 41 n.25, 44, 52). Disabled Texans are more likely to live alone and often have difficulty going outside the home alone; many lack transportation or internet access, live in poverty, and face social isolation. ROA.40903-40904, 40922-40923 (D.Ct.Op.40-41, 40 n.24) (citing ROA.45745 (Kruse), ROA.65266). Because of these challenges,

---

[2] The terms "reasonable modification" and "reasonable accommodation" "create identical standards" and may be used interchangeably. *E.g.*, *McGary v. City of Portland*, 386 F.3d 1259, 1266 n.3 (9th Cir. 2004). Plaintiffs generally use "reasonable modification" to refer to Title II's affirmative duty to take steps to avoid discrimination, in contrast to individual requests for "reasonable accommodations."

[3] The facts set forth herein are as found by the District Court after trial or otherwise drawn from the record. "ROA." denotes the record, and a parallel citation to "D.Ct.Op." denotes the District Court's decision.

disabled voters in Texas need to be able to vote by mail and/or use assistance to vote.

**B.    Before S.B.1, disabled Texans voted securely.**

In the decades before S.B.1, Texans with disabilities voted without fraud.

Many voted with assistance, and numerous county officials testified at trial that they had never seen in-person assistance for disabled voters used to commit fraud. *See* ROA.42175 (El Paso County/Wise), 42431 (Dallas County/Scarpello), 43315 (Harris County/Longoria), 43545 (Hidalgo County/Escobedo), 42854 (Travis County/DeBeauvoir). Indeed, the District Court found that the Texas Office of the Attorney General (the "OAG") had identified *zero* resolved cases of voter-assistance fraud at a polling place. ROA.40922 (D.Ct.Op.59) (citing ROA.46032 (White), ROA.76481-76492).

Voter impersonation in Texas mail-ballot voting was also virtually nonexistent, as county officials testified. *See* ROA.42258 (Wise), 42853 (DeBeauvoir), 43004-43005 (Bexar County/Callanen), 43294 (Longoria), 43545 (Escobedo). One official testified that voter fraud is a "unicorn," explaining that she had investigated fraud allegations "many times" over decades, but had never seen a prosecution or conviction. ROA.42854-42855 (DeBeauvoir); *see also* ROA.45881 (Denton County/F. Phillips), ROA.43354-43355, 43357, 81756 (Longoria). And the former Director of

Elections for the Texas Secretary of State (the "Secretary") confirmed that there was no systemic statewide mail-ballot fraud problem in the 2020 general election and that Texans could have great confidence in the system in place in 2020. *See* ROA.24711, 43937-43938 (Ingram).

### C.    Texas imposes new restrictions on disabled voters.

In 2021, despite Texas's history of secure elections—including in 2020—the Legislature amended Texas's Election Code (the "TEC") by enacting S.B.1, a package of purported "election integrity" measures. *See* Tex. S.B.1, 87th Leg., 2d C.S. (2021).

During the legislative process, Texans with disabilities repeatedly emphasized in legislative testimony the large-scale harms and barriers that certain S.B.1 provisions would impose on voters who, because of their disabilities, vote by mail or with assistance. ROA.40874 (D.Ct.Op.11 & n.10) (citing ROA.60505-60506, ROA.60509-60510, ROA.60511, ROA.60516-60523, ROA.60524-60546, ROA.60555, ROA.61009-61015, ROA.61016-61017, ROA.61676-61693); *see also* ROA.40873, 40924 (D.Ct.Op.10, 61) (citing ROA.60509-60510, 81987 (Senate Session Tr.), ROA.43344-43345, 43351-43352 (Longoria), ROA.45237 (Nunez Landry)).

For Texans with disabilities, those dangers were especially acute: As the District Court found, the Secretary's Elections Division and other officials had long taken a "know-nothing, do-nothing policy of non-

administration" concerning their ADA obligations in administering elections. ROA.40870-40871 (D.Ct.Op.7-8) (citing ROA.35393, ROA.43925-43926, 43928-43929 (Ingram), ROA.46591-46592 (Adkins)). The Secretary's witnesses testified that their office has no familiarity with the ADA or how it applies to voting, no written policies on the State's ADA obligations, and that modification requests the State receives are redirected to the counties. ROA.40871 (D.Ct.Op.8) (citing ROA.43925-43926 (Ingram), ROA.46591-46592 (Adkins)). But the Secretary had not trained county officials on their obligations under the ADA, including the obligation to provide disabled voters reasonable modifications, apart from consulting with them on the physical accessibility of polling places. *See* ROA.40873 (D.Ct.Op.10 & n.9); ROA.43928-43929 (Ingram).

The provisions at issue in this appeal—S.B.1 §§6.06 & 7.04 (the "Assistance Restrictions"); §§6.03-6.05 & 6.07 (the "Oath-and-Assistance Provisions"); and §§5.02, 5.03, 5.07) (the "Number-Matching Requirement") (collectively, "the Challenged Provisions")—were enacted despite the opposition of Texans with disabilities. The first statewide election after they took effect was the March 2022 Primary. ROA.40899 (D.Ct.Op.36).

**D. The District Court finds after trial that the Challenged Provisions impede voting by Texans with disabilities, violating the ADA.**

Plaintiffs—including The Arc of Texas ("The Arc"), Delta Sigma Theta Sorority, Inc. ("DST"), La Unión De Pueblo Entero ("LUPE"), Mexican American Bar Association of Texas ("MABA"), FIEL Houston, Inc. ("FIEL"), and REVUP Texas ("REVUP")—are non-profit organizations whose members are directly affected by the Challenged Provisions. *See* ROA.40888-40893 (D.Ct.Op.25-30) (citing ROA.45614-45615, 45617, 45619, 45624 (REVUP), ROA.45490-45491, 45493-45494, 45497-45498 (The Arc), ROA.44079, 44081, 44084-44086, 44108, 44197 (DST), ROA.44531, 44533, 44540-44541) (MABA), ROA.44429, 44534 (FIEL)).

In 2021, Plaintiffs sued to enjoin the Challenged Provisions under the ADA and Section 504 (and brought other claims against S.B.1 not at issue here). Defendants are: (1) the Secretary, who maintains the electronic Texas Election Administration Management system voter database ("TEAM") used to administer the Number-Matching Requirement, designs the forms implementing the Challenged Provisions, advises local election officials on compliance with the Challenged Provisions, and refers information about potential election crimes to the OAG, ROA.40874, 40894-40897 (D.Ct.Op.11, 31-34); (2) local election officials who enforce the Number-Matching Requirement by rejecting voters' applications to vote by mail and mail ballots,

ROA.40880-40881, 40891, 40894, 40897-40898 (D.Ct.Op.17-18, 28, 31, 34-35); and (3) state and local law enforcement officials, who can prosecute purported violations of the Assistance Restrictions and the Oath-and-Assistance Provisions, ROA.40894-40898 (D.Ct.Op.31-35).

The case was tried over six weeks in 2023, producing more than 5,000 pages of trial transcripts. ROA.40868 (D.Ct.Op.5).

In March 2025, the District Court issued a 112-page decision, setting forth extensive factfinding, credibility determinations, and legal analysis and determining that the Challenged Provisions violate the ADA and Section 504. *See* ROA.40864-40975 (D.Ct.Op.1-112). The Court found that these provisions pose barriers to and disenfranchise disabled Texans, force them to undergo physical pain, indignity, and loss of privacy while voting without assistance, deter assistors from providing lawful help to disabled Texans, and threaten advocacy organizations with criminal sanctions. *E.g.*, ROA.40956 (D.Ct.Op.93).

## 1. The District Court finds that the Assistance Restrictions criminalize outreach to disabled voters.

S.B.1 imposes severe new limitations on those who assist voters with disabilities. It is now a state-jail felony for a person to compensate, or offer to compensate, another person—or to receive or accept compensation—for assisting a voter with a mail ballot. TEC §86.0105(a)-(c) (S.B.1 §6.06). "Compensation" is defined as "anything reasonably regarded as an economic gain or advantage, including … anything of

value." Tex. Penal Code §38.01(3). This prohibition does not apply to an "attendant" or "caregiver" "previously known to the voter," TEC §86.0105(f), but neither S.B.1 nor any other statute defines these terms. ROA.43905, 43907 (Ingram). Nor has the Secretary published any guidance interpreting these terms. ROA.43906 (Ingram).

S.B.1 §7.04 also establishes a new felony, punishable by up to ten-years' imprisonment, for giving, offering, or receiving "compensation or other benefit" for "vote harvesting services." TEC §276.015(b), (f); *see* Tex. Penal Code §12.34. "Vote harvesting" is defined as any "in-person interaction with one or more voters, in the physical presence of an official ballot or a ballot voted by mail, intended to deliver votes for a specific candidate or measure." TEC §276.015(a)(2). "Benefit" is defined as "anything reasonably regarded as a gain or advantage." *Id.* §276.015(a)(1). The law does not define any other terms or phrases.

The District Court found that the Assistance Restrictions' bans on compensated assistance and canvassing interfere with Plaintiffs' members' ability to obtain help with voting, and with Plaintiffs' organizational ability to provide assistance. ROA.40925-40927, 40929 (D.Ct.Op.62-64, 66). The former chief of OAG's Election Integrity Division confirmed that §6.06 "appear[s] to apply" to a paid canvasser for a non-profit get-out-the-vote organization who engages with voters and provides mail ballot assistance at the voter's request. ROA.40926 (D.Ct.Op.63) (citing ROA.45991-45993 (White)). Crediting testimony

from witnesses including state and local officials, the District Court also found that S.B.1 §6.06 makes it a felony to offer or accept any token of appreciation for mail-ballot assistance, such as buying lunch for a friend who helps with a mail ballot, "even if there is no fraud in the assistance and the assistor marks the ballot consistent with the [voter's] wishes." ROA.40926 (D.Ct.Op.63) (citing ROA.43902-43904 (Ingram)).

The Assistance Restrictions thus not only expose Plaintiffs and their members and volunteers to criminal prosecution but may also "be read to impose criminal liability on the very voters" they purport to protect: disabled Texans who need assistance to vote. ROA.40928 (D.Ct.Op.65); *see also* ROA.40887 (D.Ct.Op.24) (prohibitions "reach conduct well beyond any common understanding of 'vote harvesting'"). The District Court also found that, because of the Assistance Restrictions, Plaintiffs had in fact stopped helping disabled voters. *E.g.*, ROA.40927, 40929 (D.Ct.Op.64, 66).

## 2. The District Court finds that the Oath-and-Assistance Provisions menace assistors and inhibit disabled voters from obtaining assistance.

Pre-S.B.1, assistors were required to disclose only their names and addresses; S.B.1 §§6.03, 6.05, and 6.07 collectively mandate that those who help voters at the polls or with a mail ballot must now provide, in writing on an "Assistor Disclosure Form," that information plus their relationship to the voter and "any form of compensation or other benefit"

received. TEC §§64.0322(a)(3), 86.010(e), 86.013 (b); *see also* ROA.85354. Assisting without completing these written disclosures is a state-jail felony. *See* TEC §86.010 (d), (f)-(g); Tex. Penal Code §12.35(a)-(b).

S.B.1 §6.04 also adds confusing new language to the "Oath of Assistance" that assistors must sign at the polls or on the mail-ballot carrier envelope. An assistor now must swear "under penalty of perjury that the voter I am assisting represented to me they are eligible to receive assistance" and that "I did not pressure or coerce the voter into choosing me to provide assistance." TEC §64.034 (S.B.1 §6.04); *see* TEC §§86.010(c), 86.013(f); *see also* ROA.66977 (oath for polling places), ROA.65311 (oath on carrier envelope). Violation of any term of this oath is a state-jail felony, as is assisting a voter without completing the oath. ROA.40882 (D.Ct.Op.19) (citing TEC §276.018(a)(2)-(b); Tex. Penal Code §12.35(a)-(b)).

The District Court found that S.B.1's new written disclosures and revised oath language deter disabled voters from requesting assistance in the voting process and deter assistors from providing such assistance. ROA.40907-40908 (D.Ct.Op.44-45). As a result, some voters have forgone assistance altogether; others have sought assistance from election officials without receiving it; still others have sacrificed their privacy, dignity, and bodily autonomy to vote. ROA.40907-40908 (D.Ct.Op.44-45).

The District Court premised its findings on the testimony of voters with disabilities who require voting assistance, individuals who have

served as assistors, and election officials. ROA.40907-40908 (D.Ct.Op.44-45). In particular, the District Court credited the testimony of four members of The Arc who need help in every aspect of their lives but were forced to vote without caregivers' help in the 2022 elections, enduring significant physical pain, hardship, and losses of privacy. ROA.40908 (D.Ct.Op.45); *see also* ROA.40910, 40913-40914 (D.Ct.Op.47, 50-51) (loss of privacy); ROA.40908, 40913, 40917 (D.Ct.Op.45, 50, 54) (physical pain and discomfort); ROA.40911 (D.Ct.Op.48) (other hardships). The District Court found that the voters endured those harms because they could not risk exposing their daily caregivers to criminal liability and losing their caregivers' critical assistance. ROA.40908 (D.Ct.Op.45); *see also* ROA.40909 (D.Ct.Op.46) (Plaintiff-member Nunez Landry); ROA.40911 (D.Ct.Op.48) (Plaintiff-member Halvorson); ROA.40912-40913 (D.Ct.Op.49-50) (Plaintiff-member Litzinger); ROA.40914 (D.Ct.Op.51) (Plaintiff-member Crowther).

Jodi Lydia Nunez Landry, for example, has progressive muscular dystrophy and uses a power wheelchair. ROA.40908 (D.Ct.Op.45); *see* ROA.45231, 45233-45234. She prefers to vote in person assisted by her partner, because she "can trust him and there's a certain amount of privacy there[.]" ROA.40909 (D.Ct.Op.46); *see* ROA.45232. But she has not asked him for voting assistance since S.B.1 took effect because she does not "want to put him in jeopardy," or risk accusations that she is "being coerced." ROA.40909-10910 (D.Ct.Op.46-47) (citing ROA.45244-

45245, 45254-45255, 45258). In 2022, the device that allows Ms. Nunez Landry to vote independently malfunctioned while she was at the polls; poll workers were unable to assist her, and instead watched as Ms. Nunez Landry made her selections, preventing her from voting in privacy and depriving her of a secret ballot. ROA.40910 (D.Ct.Op.54) (citing ROA.45242-45244).

Crediting extensive testimony from disabled voters and others who characterized the amended oath as "intimidating," "scary," and "threatening," the District Court also found the new oath language deters assistors, and that assistors who had helped voters before S.B.1 are no longer willing to do so. ROA.40915 (D.Ct.Op.52).

The District Court also found, again based on extensive witness testimony, that fears regarding the Oath-and-Assistance Provisions were significantly exacerbated by the confusion around the meaning of the new terms added to the oath by S.B.1, especially in combination with the new "penalty of perjury" language. The assistor must swear, for example, that the voter has represented to the assistor that the voter is "eligible to receive assistance," and that the assistor understands that if the voter "is not eligible for assistance, the voter's ballot may not be counted." TEC §64.034. But the oath does not define who is "eligible," nor explain who determines eligibility, nor indicate what a voter or an assistor must do to demonstrate or to ascertain eligibility, leaving voters and assistors confused about how to comply and avoid prosecution. ROA.40917-40919

(D.Ct.Op.54-56) (citing TEC §64.034 and ROA.42147 (Hidalgo County/Rocha), ROA.45249-45250 (Nunez Landry), ROA.45559-45560, 45573 (Cranston)).

The District Court credited testimony from the former Chief of OAG's Election Integrity Division acknowledging that, whether an assistor would be prosecuted for failing to obtain a sufficient representation of eligibility from the voter depends upon "the interpretation of the D.A. in that county where [the potential] offense took place." ROA.40919 (D.Ct.Op.56) (citing ROA.46103 (White)). The District Court also credited testimony that election officials would and did scrutinize whether disabled voters needed assistance, standing over them as they marked their ballots, invading their privacy, and further heightening the fears of voters and assistors. ROA.40919 (D.Ct.Op.56) (citing ROA.45213-45214 (Miller), ROA.45243-45244 (Nunez Landry), ROA.45291 (Litzinger)).

Assistors, voters, and election officials all testified that the new language in the oath could be read to prohibit typical and lawful forms of assistance. The District Court credited testimony, for example, that assistors who encourage voters to seek assistance if they need it, or who call voters to offer help with their plans to vote, could be accused of "pressuring" the voter to choose the assistor. ROA.40920 (D.Ct.Op.57) (citing ROA.44538 (MABA)). As one election official testified: "The wording is vague enough" that a person who engaged in such standard

forms of assistance "might be concerned that they are going to violate the oath if they signed it." ROA.40920-40921 (D.Ct.Op.57-58) (citing ROA.42731-42732 (Cameron County/Garza)).

The District Court further found that voters and assistors are unable "to know what kind of assistance can be provided, if any, without triggering the Oath requirement," because this question presents, as the Secretary's former Director of Elections testified, "a very gray area." ROA.40917 (D.Ct.Op.54) (citing ROA.46418-46420 (Ingram)). Amy Litzinger, a member of The Arc, had a "quite painful" experience voting with her wheelchair's chest strap fastened because she did not know whether her attendant could unclip it without being required to take the oath. ROA.40913, 40917 (D.Ct.Op.50, 54) (citing ROA.45287-45288).

### 3. The District Court finds that the Number-Matching Requirement disenfranchises and erects barriers for voters with disabilities.

Texas's mail-ballot program is available to only limited categories of voters, the most common of which are voters with disabilities and voters over 65. Outside of these limited categories, voters in Texas are not eligible to vote by mail. ROA.40875-40876 (D.Ct.Op.12-13). *See* TEC §82.001-.004, §82.007-.008. Indeed, voters with disabilities comprise one-third or more of the hundreds of thousands of Texans who vote by mail, as the District Court found. ROA.40876 (D.Ct.Op.13).

Under S.B.1 §§5.02, 5.03, & 5.07, a mail-ballot voter now must write, on the mail-ballot application form and again on the ballot carrier envelope, an identification number that exactly matches a number recorded for the voter in the TEAM database. The voter must enter either: (1) a driver's license or other number issued by the Texas Department of Public Safety ("DPS Number") matching the one in TEAM; or, (2) if the applicant has "not been issued" a DPS number, the last four digits of the applicant's Social Security Number ("SSN4"); or (3) a statement asserting that the applicant does not have a DPS number or SSN4. TEC §84.002(a)(1-a) (S.B.1 §§5.02, 5.03). The mail-ballot application or mail ballot of a voter who does not provide a number that matches whatever is in TEAM will be rejected by county officials. *See* TEC §§86.001(f), 87.041(b)(8) (S.B.1 §§5.07, 5.13).

The District Court found, based on an extensive record including expert testimony, that people with disabilities are disadvantaged by S.B.1's Number-Matching Requirement because they may have difficulty "remembering and locating their ID number" or "understanding the relevant instructions and requirements"; older voters may not recall the number they used when registering to vote decades ago; and those who have moved to congregate settings such as nursing homes may have difficulty retrieving their ID number. ROA.40900 (D.Ct.Op.37) (citing ROA.45758-45759 (Kruse)); *see also, e.g.*, ROA.45655-45656 (Houston)).

Vast numbers of Texans who provide accurate information may also have their materials rejected, due to the Secretary's failure to maintain complete and correct records of all of Texas voters' state-issued identification numbers. ROA.40901 (D.Ct.Op.38). At trial, the Secretary conceded, and the District Court found, that "at least 667,685 Texas voters could put a valid DPS number or SSN4 on an [mail-ballot application] or [ballot envelope form] and not have it match their voter registration record in TEAM." ROA.40901 (D.Ct.Op.38) (citing ROA.43918 (Ingram)).

The District Court cited several defects in the TEAM system, whose use is mandated by the Number-Matching Requirement. First, Texas has collected identification numbers on voter-registration forms for inclusion in TEAM since 2004. But voters who registered before 2004 may not have *any* number in their TEAM record. ROA.40900 (D.Ct.Op.37).

Second, registrants since 2004 have been required to provide *either* a DPS number *or* an SSN4 when they register to vote. ROA.40900 (D.Ct.Op.37). Reflecting the text of S.B.1, the instructions on the Secretary's forms implementing the Number-Matching Requirement, reproduced *infra*, also require the voter to enter just one of those numbers—"*either* a DPS number *or* an SSN/4." The District Court found voters are thus forced to "gambl[e] that the number he or she enters will

be the one that is in TEAM." ROA.40902 (D.Ct.Op.39) (citing ROA.43031-43033 (Callanen)).[4]

Third, DPS issues a variety of permits and identification cards, all with different numbers, so a registered voter may have multiple DPS numbers; TEAM, however, may list only one DPS number per voter—and Texas has no plans to update its system to allow more. ROA.40901 (D.Ct.Op.38).

The District Court found that the result of these defects is that a mail-ballot application or ballot envelope with a valid DPS number may be rejected for failing to satisfy the Number-Matching Requirement because the voter's record in TEAM: (1) does not contain any ID number; (2) contains only the voter's SSN4; (3) contains a different DPS number; or (4) contains a typo. ROA.40901 (D.Ct.Op.38).

The District Court found that the Number-Matching Requirement poses significant barriers to voters with disabilities in particular. ROA.40899, 40903-40905 (D.Ct.Op.36, 40-42). Based on trial testimony and exhibits, it found that the Secretary's designs for the application and carrier envelope "do not draw enough attention to the identification number requirements," employing "tiny type," "hid[ing]" the mail ballot carrier envelope form under the envelope flap, and providing "spaces to

[4] S.B.1 and the Election Code also prohibit the Secretary from amending the forms to advise voters to include both numbers when filling them out. ROA.40902 (D.Ct.Op.39) (citing ROA.43836 (Adkins)).

enter the numbers [that] are easy to miss." ROA.40899-40900 (D.Ct.Op.36-37) (citing ROA.42208 (Wise), 79839).

The relevant part of the Secretary's mail-ballot application form is shown here, near actual size:

**Application for a Ballot by Mail**

If someone helps you complete this form or mails, emails or faxes this form for you, that person must complete the Witness/Assistant Box 6 below. If you email or fax this form to the Early Voting Clerk, you must also send the original hardcopy to the Early Voting Clerk. If you are faxing or emailing this form on or near the deadline to apply for a Ballot by Mail, you must send the original hardcopy so that the Clerk receives it no later than the fourth business day after the day the Clerk received your email or fax. Original signatures are required on both the fax or email image and the physical hard copy. Electronic signatures are not permitted. **THE HARDCOPY OF THIS APPLICATION MUST BE RECEIVED BY THE EARLY VOTING CLERK AND MEET ALL LEGALLY REQUIRED DEADLINES.** Please read the instructions on the back of this form completely. If you have any questions, please call the Early Voting Clerk in your county of registration or the office of the Texas Secretary of State at 1-800-252-8683 or log on to www.sos.texas.gov for a list of County Early Voting Clerks and their email and physical addresses.

**1. Voter Information:** Please print all information clearly and legibly

Name: _____ Last, _____ First, _____ Middle _____ Suffix (Jr, Sr)

Residence Address as shown on your Voter Registration Certificate

Address: _____ Street _____ Apt. # (if any) _____ City _____ State _____ Zip Code

Optional Information: Providing this information is helpful to the Early Voting Clerk, but not required.

Date of Birth: _____ / _____ / _____ VUID # _____ Pct #: _____

Email: _____ Tel. #: _____

**YOU MUST PROVIDE ONE of the following numbers**

Texas Driver's License, Texas Personal Identification Number or Election Identification Certificate Number issued by the Department of Public Safety (NOT your voter registration VUID#)

_ _ _ _ _ _ _ _ _ _ _

If you do not have a Texas Driver's License, Texas Personal Identification Number or Texas Election Identification Certificate Number, give the last 4 digits of your Social Security Number.

XXX-XX- _ _ _ _

☐ I have not been issued a Texas Driver's License/Texas Personal Identification Number/Texas Election Identification Certificate or Social Security Number

ROA.40880 (D.Ct.Op.17); ROA.66277; *see also* TEC §§84.011(a), (a)(3-a), 31.002.

The same instructions and space for ID numbers also appear under the flap of the mail-ballot carrier envelope, also designed by the Secretary (again, shown around actual size):

**REQUIRED INFORMATION: YOU MUST PROVIDE ONE OF THE FOLLOWING NUMBERS AND IT MUST BE ASSOCIATED WITH YOUR VOTER REGISTRATION RECORD**
**INFORMACIÓN REQUERIDA: DEBE PROPORCIONAR UNO DE LOS SIGUIENTES NÚMEROS Y DEBE ESTAR ASOCIADO CON SU REGISTRO DE VOTANTE**

Texas Driver's License or Texas Personal Identification Card or Election Identification Certificate Number issued by the Texas Department of Public Safety (NOT your voter registration VUID#)/Número de Licencia de Conducir de Texas o Número de Tarjeta de Identificación Personal de Texas o Certificado de Identificación Electoral expedida por el Departamento de Seguridad Pública de Texas) (NO ES el número de su Registro Electoral VUID#) _ _ _ _ _ _ _ _ _ _

OR / O

If you do not have a Texas Driver's License or Personal Identification Card or a Texas Election Identification Certificate Number, give the last 4 digits of your Social Security Number (Si no tiene una Licencia de Conducir de Texas o una Tarjeta de Identificación Personal de Texas o Certificado de Identificación Electoral de Texas, proporcione los 4 últimos dígitos de su número de Seguro Social)

XXX-XX- _ _ _ _

OR / O

☐ I have not been issued a Texas Driver's License or Texas Personal Identification Card or Texas Election Identification Certificate or a Social Security Number (No se me ha expedido una Licencia de Conducir de Texas o Tarjeta de Identificación Personal de Texas o un Certificado de Identificación Electoral de Texas ni un número de Seguro Social.)

ROA.40880 (D.Ct.Op.17) (citing ROA.65312); *see also* TEC §86.001-002, .012-.013.

The District Court credited the testimony of voters with vision impairments whose mail-ballot applications were rejected or whose mail-

ballots were not counted, including Yvonne Yvette Iglesias, a member of Plaintiffs The Arc and REVUP who has visual impairments. *See* ROA.40904-40905, 40907 (D.Ct.Op.42-43, 45); *see also* ROA.42964-42967, 42969-42970 (Guerrero Mata), ROA.63524-63525, 63528, 63538, 63542, 63544-63545, 63547-63550 (Iglesias Dep.).

S.B.1's Number-Matching Requirement, as the District Court found, produced a "dramatic increase" in rejections of applications and mail ballots. ROA.40899 (D.Ct.Op.36). In the March 2022 Primary election, the statewide rejection rate was "twenty times higher than in 2020," reflecting tens of thousands of rejected ballots; In the 2022 general election, another 11,000 were rejected. ROA.40899 (D.Ct.Op.36). The District Court found based on the trial record that the Number-Matching Requirement caused these rejections. ROA.40899 (D.Ct.Op.36).

The District Court found the barriers imposed on disabled voters by the Number-Matching Requirement are augmented by the failure of officials to provide accommodations or assistance in response to the "pervasive confusion and rejection" of mail-ballot applications and mail ballots; instead, officials' response to problems with the Number-Matching Requirement was generally to send *additional* paperwork to voters, increasing voters' confusion. ROA.40902 (D.Ct.Op.39).

The District Court also found that the barriers to disabled voters posed by the Number-Matching Requirement will likely persist in future elections. ROA.40940-40941 (D.Ct.Op.77-78, 78 n.49) (citing ROA.42437

(Scarpello), 43049-43050 (Callanen), 43159 (Harris County/Obakozuwa). The court explained that S.B.1's online curing process is utterly ineffective because it is inaccessible to blind and visually impaired voters and still requires voters to enter the same ID number they could not provide on their application or mail ballot. ROA.40903-40904 (D.Ct.Op.40-41). The Secretary has denied requests, moreover, for accommodations that would permit disabled voters to cure defective mail ballots by email. ROA.40904 (D.Ct.Op.41); *see* ROA.43298-43299 (Longoria).

Having determined that Defendants' implementation of the Challenged Provisions, "individually and cumulatively," violates the ADA, and that the pre-S.B.1 rules allowed Texans with disabilities to vote securely, the District Court enjoined those provisions on a statewide basis. ROA.40956, 40964-40965, 40970-40974 (D.Ct.Op.93, 101-102, 107-111). Defendants appealed.

## SUMMARY OF ARGUMENT

**I.** Plaintiffs have standing as to all the Challenged Provisions.

**A.** The Assistance Restrictions directly regulate Plaintiff organizations and criminalize their activities; Defendants do not contest Plaintiffs' Article III standing to challenge them. State Defendants suggest that Plaintiffs as organizations are outside the "zone of interest" of the ADA. That argument is foreclosed by statutory text authorizing

suit by "any person alleging discrimination on the basis of disability," 42 U.S.C. §12133, and is inconsistent with other Circuits' holdings.

**B.** The District Court found based on an extensive trial record that the Oath-and-Assistance Provisions harmed Plaintiffs' members, who were forced to endure pain, loss of privacy, and other harms to avoid exposing assistors to prosecution. Plaintiffs thus have associational standing. The court also found the Oath-and-Assistance provisions interfered with Plaintiffs' activities in providing assistance services to disabled voters. Plaintiffs thus have organizational standing. The District Court's jurisdictional factfinding contained no clear error.

**C.** The Number-Matching Requirement disenfranchised at least one of Plaintiffs' members and imposed barriers to the voting rights of many, as the District Court found. Plaintiffs thus have associational standing. The requirement also unleashed confusion and chaos for voters, interfering with Plaintiffs' existing election-related work and causing organizational harm. Again, the court's factfinding contained no clear error.

**D.** Plaintiffs' injuries are traceable to and redressable by the Secretary, who, among other things, designs and supplies the forms used by local officials to implement the Challenged Provisions. This Court has repeatedly rejected the suggestion that the Secretary is not a proper defendant in election-administration cases like this one.

**II.** The ADA requires that public entities make reasonable modifications to their programs whenever necessary to ensure that people with disabilities are not denied "meaningful access to the benefit" of the program. *E.g.*, *Cadena v. El Paso Cnty.*, 946 F.3d 717, 725 (5th Cir. 2020) (quoting *Alexander v. Choate*, 469 U.S. 287, 301 (1985)).

**A.** The District Court found that each of the Challenged Provisions, absent reasonable modifications, denied disabled Texans meaningful access to the State's voting programs. The court's findings, based on extensive record evidence, were not clearly erroneous.

**1.** Defendants assert that disabled Texans have meaningful access to voting because they can use other methods to vote, but that is inconsistent with the record and the District Court's factfinding. Simply offering multiple voting options does not satisfy the ADA's meaningful access or reasonable modifications requirements. *See Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494, 507 (4th Cir. 2016). Especially here. As to the Number-Matching Requirement, many voters were unable to vote in person as an alternative to mail-ballot voting, and unable to access the curing process. And the Oath-and-Assistance Provisions and the Assistance Restrictions generally apply to *both* mail-ballot and in-person voting, meaning there was *zero* alternative to speak of.

**2.** Defendants also claim that disabled Texans generally managed to vote despite the Challenged Provisions. That is factually wrong and legally irrelevant. When voters with disabilities must spend

significantly more time, exert more effort, or endure physical pain to vote, they are denied meaningful access, even if they are able to overcome those barriers to cast a ballot anyway. *See Luke v. Texas*, 46 F.4th 301, 305-07 (5th Cir. 2022).

**B.**     Despite the denial of meaningful access to voting, Defendants argue they did not need to make reasonable modifications to their voting programs absent individual requests. That is wrong.

**1.**     First, it is wrong on the facts. The District Court found, based on extensive testimony, that voters *did* seek modifications of the Challenged Provisions, but their requests were ignored or rejected.

**2.**     Second, it is wrong on the law. There is no requirement to make individualized modification requests in a statewide ADA case like this one. At a minimum, no such requests are required where the need for modifications is "open and obvious," *Cadena*, 946 F.3d at 724. Here, it was. The District Court detailed the "open and obvious" nature of that need in well-supported factual findings that are not challenged as clearly erroneous.

**3.**     Third, modification requests are not required when they would constitute only a futile gesture. *E.g.*, *Frame v. City of Arlington*, 657 F.3d 215, 235-36 (5th Cir. 2011) (en banc). The District Court found that was so, among other reasons because election officials repeatedly testified that they were not permitted under the terms of S.B.1 itself to

make any modifications to the Challenged Provisions. Again, these findings were not clearly erroneous.

**C.** Defendants argue that Plaintiffs' claims present a purportedly impermissible "disparate-impact" theory of ADA liability. That argument is forfeited, but in any case, Defendants effectively concede that this case was pleaded, litigated, tried, and decided as a failure-to-accommodate claim, not a disparate-impact claim.

**III.** Under the ADA, the defendant bears the burden of proving that a modification would be a "fundamental[] alter[ation]" of the program at issue. *Reickenbacker v. Foster*, 274 F.3d 974, 983 (5th Cir. 2001). This fact-dependent affirmative defense is difficult to prove. On appeal, Defendants point to no error in the District Court's extensive factfinding regarding this defense.

**A.** Defendants claim that the election-security purpose of S.B.1 makes *any* modification of the Challenged Provisions a fundamental alteration of their voting programs. Preventing fraud in voting is undisputedly an important goal, but the trial record demonstrated—and the District Court found—that the Challenged Provisions are neither essential nor particularly helpful to advancing that interest. By contrast, their enforcement caused real, concrete harm to voters with disabilities. That was not clear error.

**B.** Defendants also suggest that enjoining the Challenged Provisions amounts to a fundamental alteration, but the injunction

leaves most voters and the broad swath of election rules in Texas untouched. The District Court's factual finding that the essential purpose of Texas's voting programs is maintained absent the Challenged Provisions was not clearly erroneous.

**IV.** The District Court's statewide injunction was a proper remedy—simple and administrable relief that fully redresses injuries suffered by Plaintiffs and their thousands of members statewide. Any concerns regarding the scope of the injunction can be addressed by a remand for further remedial proceedings.

## STANDARD OF REVIEW

A district court's factual findings are reviewed for clear error. *E.g.*, *Veasey v. Abbott*, 830 F.3d 216, 249-50 (5th Cir. 2016) (en banc). They cannot be reversed if supported by any plausible view of the record, even if this Court might have weighed the evidence differently. *See Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 574 (1985). This deferential standard applies to findings of jurisdictional fact and findings relating to liability. *E.g.*, *In re S. Recycling, L.L.C.*, 982 F.3d 374, 379 (5th Cir. 2020); *accord Pederson v. La. State Univ.*, 213 F.3d 858, 869 (5th Cir. 2000).

Purely legal conclusions are reviewed *de novo*. *E.g.*, *Colony Ins. Co. v. Wright*, 16 F.4th 1186, 1191 (5th Cir. 2021). Determinations of mixed questions of law and fact may be reversed only for legal error or a clearly erroneous factual flaw. *Beech v. Hercules Drilling Co., LLC*, 691 F.3d 566,

569 (5th Cir. 2012); *Tokio Marine & Fire Ins. Co., Ltd. v. FLORA MV*, 235 F.3d 963, 966 (5th Cir. 2001).

A district court's decision to permanently enjoin a statute determined to be unlawful is reviewed for abuse of discretion, "a demanding standard." *Crown Castle Fiber, L.L.C. v. City of Pasadena*, 76 F.4th 425, 441 (5th Cir. 2023).

## ARGUMENT

## I. PLAINTIFFS HAVE STANDING.

Article III standing requires injury, traceability, and redressability. *Spokeo v. Robins*, 578 U.S. 330, 338 (2016). Injury-in-fact may be a past, concrete harm or a "substantial risk" of future harm. *E.g.*, *Stringer v. Whitley*, 942 F.3d 715, 721 (5th Cir. 2019). The harm "need not measure more than an identifiable trifle." *OCA-Greater Hou. v. Tex.* ("*OCA-GH*"), 867 F.3d 604, 612 (5th Cir. 2017) (quotations omitted). And if one plaintiff has standing on a given claim, Article III's case-or-controversy requirement is met. *See, e.g.*, *Rumsfeld v. F. for Acad. & Inst. Rts., Inc.*, 547 U.S. 47, 52 n.2 (2006); *accord La Unión del Pueblo Entero v. Abbott* ("*LUPE III*"), 151 F.4th 273, 285 (5th Cir. 2025).

Organizational plaintiffs may establish standing in two ways. They have *associational* standing when at least one member has standing, the suit is germane to the organization's purpose, and individual participation is unnecessary. *See, e.g.*, *Ass'n of Am. Physicians &*

*Surgeons, Inc. v. Tex. Med. Bd.*, 627 F.3d 547, 550 (5th Cir. 2010).[5] They may also have *organizational* standing when the organization itself suffers Article III injury—either because it is directly regulated or because its "core business activities" are "perceptibly impaired." *See OCA-GH*, 867 F.3d at 610; *see also FDA v. All. for Hippocratic Med.* ("*AHM*"), 602 U.S. 367, 395 (2024); *accord Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 & n.19 (1982).

Here, the District Court concluded that Plaintiffs have standing to challenge certain provisions of S.B.1—§§5.02-5.03, 5.07, 6.03-6.07, 7.04—but not others—*e.g.*, §§5.06, 5.10, and 5.12—based on detailed factual findings and claim-by-claim application of settled law. ROA.40940-40952 (D.Ct.Op.77-89); *see also* ROA.40888-40893 (D.Ct.Op.25-30). Defendants show no clear error in those findings and no legal error in the standing analysis.

## A. Plaintiffs have standing to challenge the Assistance Restrictions.

This Court concluded in *LUPE III* that some of the Plaintiffs had standing to challenge S.B.1's Assistance Restrictions because there is a credible threat that they will be prosecuted for violating them. *LUPE III*, 151 F.4th at 289-90. Here too, Plaintiffs LUPE and MABA provided their

---

[5] Defendants do not dispute that ensuring access for voters with disabilities is germane to Plaintiffs' missions. Nor do they argue that individual member participation is needed. *See Consumer Data Indus. Ass'n v. Texas*, No. 21-51038, 2023 WL 4744918, at *4 n.7 (5th Cir. July 25, 2023). The only live question for associational standing purposes is whether Plaintiffs' members satisfy Article III's three-part test.

staff or volunteers with "compensation," as broadly defined under Texas law, for assisting voters, including mail voters. ROA.40949-40950 (D.Ct.Op.86-87) (citing ROA.42073, 42122-42125 (LUPE), ROA.44537, 44540 (MABA)). The threat of criminal prosecution under the Assistance Restrictions caused these organizations to cease assisting voters. ROA.40949-40950 (D.Ct.Op.86-87) (citing ROA.42083-42085 (LUPE), ROA.44540-44542 (MABA)); *see also* ROA.40929 (D.Ct.Op.66). These injuries provide a clear basis for standing, and indeed, Defendants do not dispute Plaintiffs' Article III standing to challenge the Assistance Restrictions. *See, e.g.*, Intervenors' Br. 30.

Defendants suggest that Plaintiffs lack statutory standing to sue because as organizations "their alleged injuries are not within the zone of interest" of the ADA. State Br. 28-29. That argument is meritless.

Congress may "modify or even abrogate prudential standing requirements," *Ass'n of Cmty. Orgs. for Reform Now v. Fowler*, 178 F.3d 350, 363 (5th Cir. 1999), and did so in the ADA, which authorizes suit by "any person alleging discrimination on the basis of disability," 42 U.S.C. §12133. Consistent with that text, every court of appeals to address the issue has held that plaintiffs, including organizations, may bring suit to enforce the ADA subject only to Article III's limitations.[6] Courts in this

---

[6] *See Innovative Health Sys., Inc. v. City of White Plains*, 117 F.3d 37, 47-49 (2d Cir. 1997); *accord A Helping Hand, LLC v. Baltimore Cnty.*, 515 F.3d 356, 364 (4th Cir. 2008); *Addiction Specialists, Inc. v. Twp. of Hampton*, 411 F.3d 399, 407 (3d Cir. 2005); *MX Grp., Inc. v. City of Covington*, 293 F.3d 326, 334 (6th Cir. 2002); *Weber v. Cranston Sch. Comm.*, 212 F.3d 41, 47-49 (1st Cir. 2000); *see also McCullum v.*

Circuit have done the same.[7] Defendants offer no basis for this Court to break with its sister circuits and defy statutory text.[8]

## B. Plaintiffs have standing to challenge the Oath-And-Assistance Provisions.

REVUP and The Arc have associational standing to challenge the Oath-and-Assistance Provisions because their members suffered injuries from the oath's ambiguous and threatening terms and the new procedures added to the amended oath. ROA.40943-40946 (D.Ct.Op.80-83). The District Court found that multiple members were forced to vote without assistance—enduring "physical pain and the loss of their privacy"—because their assistors feared criminal exposure. ROA.40943 (D.Ct.Op.80). It likewise found that assistors ceased helping voters, including Plaintiffs' members, because they feared criminal exposure,

*Orlando Reg'l Healthcare Sys., Inc.*, 768 F.3d 1135, 1142 (11th Cir. 2014) ("It is widely accepted that under both the [Rehabilitation Act] and the ADA, non-disabled individuals have standing to bring claims when they are injured because of their association with a disabled person.").

[7] *E.g.*, *Swanson v. City of Plano*, No. 4:19-CV-412, 2020 WL 6799173, at *4 (E.D. Tex. Nov. 19, 2020); *accord Hooker v. Dall. Indep. Sch. Dist.*, No. 3:09-CV-1289-D, 2010 WL 4025877, at *3 n.6 (N.D. Tex. Oct. 13, 2010); *McCoy v. Tex. Dep't of Crim. Just.*, No. C.A.C 05 370, 2006 WL 2331055, at *6 (S.D. Tex. Aug. 9, 2006).

[8] The "zone-of-interests" test is "not especially demanding"; the plaintiff must be "arguably" within the interests the statute at issue protects. *FDA v. R.J. Reynolds Vapor Co.*, 145 S.Ct. 1984, 1991 (2025). Representative organizations readily meet this standard, including in ADA cases. *See, e.g.*, *Swanson*, 2020 WL 6799173, at *1, *4 (owner of residential living facility could bring ADA claim). Plaintiffs include disability-rights organizations whose core missions involve serving people with disabilities, and who were forced to alter their activities by the Challenged Provisions. *See infra* 41-42. They clearly fall within the ADA's zone of interests. *See generally Bank of Am. v. City of Miami*, 581 U.S. 189 (2017).

"specifically cit[ing] the 'penalty of perjury' and 'eligibility' language in the Oath as their reasons for declining to provide assistance." ROA.40945 (D.Ct.Op.82) (citing ROA.45289-45290 (Litzinger), ROA.45317 (Halvorson),).

Defendants wrongly assert that Plaintiffs' members and assistors cannot credibly fear prosecution because no assistors have been prosecuted yet. Intervenors' Br. 34-38. But one can have a reasonable fear of enforcement before enforcement happens, and the District Court found that this fear was reasonable. For example, the District Court found, based on OAG officials' testimony, that prosecutors were conducting investigations of possible violations of S.B.1 §§6.05 and 7.04. ROA.40896 (D.Ct.Op.33) (citing ROA.45913 (White)); *see also* ROA.45947-45950 (White) (testifying that OAG publicizes election-related prosecutions).

It further found that Texas law allows OAG to "direct the county or district attorney ... to *conduct* or *assist* [OAG] in conducting" such investigations. ROA.40895 (D.Ct.Op.32); *see also* ROA.40946 (D.Ct.Op.83) (citing TEC §§273.001, 002(1)). Indeed, County DAs are independently charged with investigating and prosecuting violations of the TEC, including the Oath-and-Assistance Provisions, and are forbidden from disavowing such prosecutions. ROA.40898 (D.Ct.Op.35); *see also* ROA.40945 (D.Ct.Op.82) (citing Tex. Local. Gov't Code §813(B)).

These findings, showing that disabled voters and their assistors credibly fear prosecution, were not clearly erroneous. *See, e.g.*, *Speech First, Inc. v. Fenves*, 979 F.3d 319, 336 (5th Cir. 2020).

Defendants also disregard "practical realities" the District Court credited: Many voters with disabilities rely on their assistors for daily needs in all aspects of their lives, not just voting. ROA.40909-40912, 40914 (D.Ct.Op.46-49, 51); *see also* ROA.45310 (Halvorson), ROA.45231-45232, 45234 (Nunez Landry), ROA.45273-45279 (Litzinger), ROA.63400-63402 (Crowther). On this record, it is entirely reasonable to credit disabled voters' testimony that they would and did protect those critical relationships and avoid even asking their assistors to expose themselves to possible criminal liability. ROA.40909-40910 (D.Ct.Op.46-47) (citing ROA.45244-45245, 45254-45255, 45258 (Nunez Landry); ROA.63407-63408 (Crowther)).

Defendants' redressability argument (Intervenors' Br. 38-39) fails for the same reason. Although the oath was subject to a perjury penalty before S.B.1, the District Court found, based on the testimony of voters and assistors, that removing the new, express felony-prosecution threat, the ambiguous new terms "eligible," and "pressure or coerce," and the new attestation that "I understand that if assistance is provided to a voter who is not eligible for assistance, the voter's ballot may not be counted," would meaningfully reduce the barriers imposed by the Oath-and-Assistance Provisions. ROA.40946 (D.Ct.Op.83); *see also*

ROA.40971-40972 (D.Ct.Op.108-109). That finding is not clearly erroneous.

Plaintiffs, DST, MABA, LUPE, and FIEL, also have organizational standing to challenge the Oath-and-Assistance Provisions because they impair the organizations' ability to assist voters, a core part of their respective missions. ROA.40947-40949 (D.Ct.Op.84-86). An organization may sue in its own right where the challenged conduct "directly affect[s] and interfere[s] with [the organization's] core business activities." *AHM*, 602 U.S. at 381, 395. Spending resources "*in response to* a defendant's actions" is not enough; however, where the challenged law impairs the plaintiffs' *pre-existing* core activities, causing the organization to alter those activities, it suffers a concrete harm and has standing to sue. *Id.* at 394-95 (emphasis added).

Here, the District Court found that the Oath-and-Assistance Provisions severely hampered Plaintiff groups' ability to recruit volunteer assistors, who feared they could be investigated or prosecuted for assisting voters; as a result, they curtailed their voter-assistance programs, or shuttered them altogether, and their members are no longer willing to provide assistance because of fears about the oath. ROA.40947 (D.Ct.Op.84) (citing ROA.44108-44109, 44146-44147, 44200-44201 (DST), ROA.42078-42080, 69210-69211, 69214, 69228 (LUPE), ROA.44541 (MABA), 44427-44428, 44442-44443, 44467-44468 (FIEL)). That finding was not clear error.

Defendants' reliance on the standing analysis from *LUPE III* is misplaced. *See* Intervenors' Br. 34-40; *see also* State Br. 23. Standing "turns on the nature and source *of the claim asserted*" and the particular harms that the statute giving rise to the claim protects against. *E.g.*, *Warth v. Seldin*, 422 U.S. 490, 500 (1975) (emphasis added). The claims in *LUPE III* arose under Section 208 of the Voting Rights Act, which guarantees certain voters' right to assistance, preempting state regulations that interfere with the voter's choice of assistor. In a Section 208 case, therefore, courts must analyze standing by asking whether there is an imminent enforcement threat that interferes specifically with a voter's choice of assistor. *See LUPE III*, 151 F.4th at 288.[9]

The claims here arise under the ADA. The ADA imposes affirmative obligations on public entities to ensure voters with disabilities have meaningful access to their programs, and an ADA harm occurs where there is a denial of meaningful access. *See infra* 45-46. An ADA claim may thus be broader, and an ADA injury more manifold, than whether a voter gets to choose their assistor. "Lack of meaningful access is *itself* the harm under Title II [of the ADA], regardless of whether additional injury

---

[9] Because *LUPE III* postdated the District Court's ruling on Plaintiffs' ADA claims, the court had no opportunity to consider it. If this Court concludes that *LUPE III* controls, it can remand so the District Court may assess Plaintiffs' standing under *LUPE III*, based on the trial record and any other submissions. *See, e.g.*, *Apter v. Dep't of Health & Human Servs.*, 80 F.4th 579, 595 (5th Cir. 2023) (noting "wisdom in remanding for the district court to address standing and any other jurisdictional issues in the first instance"); *accord Janvey v. Alguire*, 539 F. App'x 478, 480-81 (5th Cir. 2013).

follows." *Luke v. Texas*, 46 F.4th 301, 305-07 (5th Cir. 2022). And because of the nature of the right at stake, imminent harm in the ADA context is a more "'elastic concept,'" *Frame v. City of Arlington*, 657 F.3d 215, 235 (5th Cir. 2011) (en banc), and "can accommodate [] uncertainty," *Crawford v. Hinds Cnty. Bd. of Supervisors*, 1 F.4th 371, 374-376 (5th Cir. 2021) (ADA plaintiff's injury from lack of wheelchair access to courthouse was not too speculative, even if plaintiff might never again be called for jury service).

*LUPE III*'s Section 208 standing analysis is thus inapposite. A governmental policy that impedes or degrades participation by disabled voters *itself* suffices to establish an ADA injury, even if that same policy might not impinge on voters' choice of assistor enough to constitute a cognizable harm under Section 208.[10]

### C. Plaintiffs have standing to challenge the Number-Matching Requirement.

REVUP and The Arc have associational standing to challenge the Number-Matching Provisions, among other reasons because at least one of their members, Ms. Iglesias, had her mail-ballot applications repeatedly rejected under the Number-Matching Requirement.

---

[10] Defendants briefly invoke the Court's rule of orderliness with respect to *LUPE III*. *See* State Br. 23. The rule applies only when the earlier panel has "already answer[ed] the issue before" the Court. *Cascino v. Nelson*, No. 22-50748, 2023 WL 5769414, at *3-4 (5th Cir. Sept. 6, 2023) (*per curiam*). Again, *LUPE III* did not involve ADA claims, which are analytically distinct from Section 208 claims.

ROA.63537-63538, 63542-63545, 63547-63550. That concrete injury—the loss of her right to vote—itself establishes standing.

Defendants do not dispute Ms. Iglesias' past injury but speculate it may not recur, claiming she testified her ballot would count in the future. State Br. 27; Intervenors' Br. 31-32. She did not. *See* ROA.33557-33558 (stating, when asked whether her vote would count in the future, "I don't know … I'm hoping and praying that it will count.").[11] The District Court rejected Defendants' speculation that the rejections would cease, finding—based on testimony from multiple election administrators—a "substantial risk" that they will continue as long as the Number-Matching Requirement remains in force. ROA.40940-40941 (D.Ct.Op.77-78 & n.49). That finding was well supported: The error-ridden TEAM database is not self-correcting, and a voter like Ms. Iglesias, whose applications have repeatedly failed to match TEAM, faces the same disenfranchisement risk due to a mismatch in every election. *E.g.*, ROA.40941 (D.Ct.Op.78 & n.49).

While Ms. Iglesias' injury alone satisfies Article III, the record shows that thousands of Texans have had ballots rejected each cycle under the Number-Matching Requirement—and, as the District Court

---

[11] *Funeral Consumers Alliance, Inc. v. Service Corp. International*, 695 F.3d 330 (5th Cir. 2012), on which Defendants rely (Intervenors' Br. 32), is inapposite. There, plaintiffs lacked standing against specific casket-makers because there was no evidence they bought or would buy caskets from them. *Id.* at 342-43. Here, the Number-Matching Requirement has *already* disenfranchised Ms. Iglesias, who also faces substantial risk of future disenfranchisement on the same basis.

found, additional voters, including first-time mail voters with disabilities, will continue to be disenfranchised absent relief. *See* ROA.40899, 40940-40941 (D.Ct.Op.36, 77-78 & n.49), ROA.44994 (McDaniel); *see also* ROA.43049 (Callanen), ROA.42269 (Wise). Other voters with disabilities, including members of REVUP and The Arc, were also injured by the denial of meaningful access to Texas's mail-ballot voting program because of the substantial additional work required to overcome the Number-Matching Requirement's barriers, ROA.40905, 40907 (D.Ct.Op.42, 44); *see also* ROA.42964-42967, 42969-42970 (Guerrero Mata). *See Luke*, 46 F.4th at 305-07; *see also supra* 19-25 & *infra* 49-50.

In the alternative, Plaintiffs LUPE, The Arc, REVUP, and DST also have organizational standing to challenge the Number-Matching Requirement. Before S.B.1, these groups conducted extensive voter-education and assistance efforts for voters with disabilities in the lead-up to each election. *See, e.g.*, ROA.42058-42060, 42068, 42069-42070, 42142-42143 (LUPE house meetings, fairs, and tabling); ROA.44084-44086 (DST voter education and assistance with mail-ballot requests and transportation); ROA.45498-45499, 45501 (The Arc training and outreach for voters with disabilities); ROA.45615-45616, 45623-45624 (REVUP voter education and outreach). These efforts are central to these groups' organizational purpose and consume substantial organizational resources and effort. ROA.40888-40892 (D.Ct.Op.25-29).

But the Number-Matching Requirement forced disabled mail-ballot voters into an error-prone process that confused even experienced voters and disenfranchised thousands. ROA.40899-40902 (D.Ct.Op.36-39). Plaintiffs were forced to scale back their pre-existing efforts to focus volunteers and resources on helping voters understand and attempt to comply with the new requirement—through podcasts, flyers, and volunteer training and deployment. *See, e.g.*, ROA.44084-44085, 44098-44101 (DST); ROA.45503-45504, 45508-45509 (The Arc); ROA.45615-45616, 45623-45624 (REVUP). Plaintiffs scrapped other, preexisting organizational plans to do so. *See, e.g.*, ROA.45504-45507 (The Arc forwent time-sensitive legislative advocacy for schoolchildren with disabilities due to need to focus on S.B.1); *see also* ROA.44100 (DST). The trial record amply demonstrates these direct, concrete organizational harms; the District Court's fact-finding supporting organizational standing was not clearly erroneous.

## D.    Plaintiffs' injuries are traceable to the Secretary.

Twice now, this Court has rejected the Secretary's claim that injuries caused by S.B.1 are not traceable to or redressable by her. State Br. 29-31. Harms from a facially unlawful Texas election law that the Secretary helps to implement are "without question, fairly traceable to and redressable by the State itself and its [Secretary], who serves as the 'chief election officer of the state.'" *OCA-GH*, 867 F.3d at 613-14 (quoting TEC §31.001(a)); *see also United States v. Paxton*, 148 F.4th 335, 340 (5th

Cir. 2025) (Secretary's arguments "foreclosed by circuit precedent"). Here too, the Secretary administers and implements the Challenged Provisions and is thus a proper defendant.

To start, the Secretary has the "affirmative duty" under the ADA to adopt "policies or procedures to prevent discrimination based on disability." *Delano-Pyle v. Victoria Cnty.*, 302 F.3d 567, 575 (5th Cir. 2002). Her assertion that she does not "enforce" the ADA, State Br. 29, is another "unsettling" example of "unfamiliarity with disability rights." ROA.40871 (D.Ct.Op.8).[12]

In any case, the Secretary's susceptibility to suit here stems from her "broad duties to oversee administration of Texas's election laws," *Ostrewich v. Tatum*, 72 F.4th 94, 100 (5th Cir. 2023) (citation omitted), including implementing the Challenged Provisions. She administers TEAM, and designs and prepares the content of election forms that local officials must use, including the forms implementing the Oath-and-Assistance Provisions, and the mail-ballot forms used for the Number-Matching Requirement. TEC §§31.002(a), (d), 64.0322(b), 86.013 (d).

---

[12] *Lightbourn v. County of El Paso*, 118 F.3d 421 (5th Cir. 1997) is inapposite. State Br. 30. The issue in *Lightbourn* was whether, for purposes of certain state statutes, the ADA is an "election law." 118 F.3d at 429-30. Setting aside that irrelevant question, *Lightbourn* affirmed the Secretary's obligation to comply with the ADA and "evaluate his department" under ADA-implementing regulations. *Id.* at 432.

Plaintiffs' injuries are thus traceable to the Secretary. ROA.40941, 40944, 40948, 40966 (D.Ct.Op.78, 81, 85, 103).[13]

In addition, Texas counties follow the Secretary's orders and guidance on election procedures. *See* ROA.42117-42118, 42123 (Camacho), 42126-42127 (Valdez-Cox), 42141 (Rocha), 42157-42598 (Wise), 43829 (Adkins), 43873 (Ingram). Yet the record shows the Secretary has not acted on requests for reasonable accommodations under the Challenged Provisions; rather, she directs voters to address their requests to their counties and tells counties seeking clarification to "read the statute." ROA.43302-43304; *see also* 43905-42906 (Longoria), ROA.43925-43926 (Ingram), ROA.46591-46592 (Adkins). The Secretary has likewise refused to clarify vague terms in the Assistance Restrictions and the Oath-and-Assistance Provisions. ROA.43912, 43922 (Ingram).

Especially because S.B.1 bars local officials from modifying election procedures absent "express" authorization, TEC §276.019, the Secretary's willful inaction on these fronts prevents counties from meeting their own ADA obligations, compounding the harms S.B.1 inflicts on disabled Texas voters. ROA.40872, 40965 (D.Ct.Op.9, 102).

---

[13] The Secretary also must collaborate with the Attorney General to enforce election laws by evaluating allegations about possible election crimes and in appropriate cases make referrals. TEC §31.006; ROA.45911, 46052-46053 (White). The Secretary has referred mail ballot "vote harvesting" allegations to OAG, both before and after passage of S.B.1. ROA.43912 (Ingram).

## II. DEFENDANTS VIOLATED THE ADA BY FAILING TO PROVIDE REASONABLE MODIFICATIONS TO TEXAS'S VOTING PROGRAMS FOR VOTERS WITH DISABILITIES.

The ADA imposes an affirmative duty on public entities to make reasonable modifications to their policies, practices and procedures when necessary to avoid disability discrimination. *Frame*, 657 F.3d at 231; *see also* 28 C.F.R. §35.130(b)(7); *Bennett-Nelson v. La. Bd. of Regents*, 431 F.3d 448, 454 (5th Cir. 2005); *accord Delano-Pyle*, 302 F.3d at 575. Reasonable modifications *must* be made whenever necessary to ensure that people with disabilities are not denied "meaningful access to the benefit" of the program at issue. *E.g.*, *Cadena v. El Paso Cnty.*, 946 F.3d 717, 725 (5th Cir. 2020) (quoting *Alexander v. Choate*, 469 U.S. 287, 301 (1985)); *see also, e.g.*, *Frame*, 657 F.3d at 231-32 ("[W]hen a city decides to build or alter a sidewalk but makes that sidewalk inaccessible to individuals with disabilities without adequate justification, the city discriminates within the meaning of Title II.")

Here, a substantial trial record supports the District Court's finding that Defendants denied meaningful access to Texas's voting programs for voters with disabilities by failing to make needed modifications to the Challenged Provisions and making it harder for them to vote. ROA.40929-40931 (D.Ct.Op.66-68); *see supra* 9-25.

In particular, the District Court found that the Challenged Provisions created "great difficulties" for voters requiring assistance and imposed "significant barriers" to mail voting. *E.g.*, ROA.40956

(D.Ct.Op.93). The court relied on extensive testimony from voters, assistors, and election officials that the Assistance Restrictions and Oath-and-Assistance Provisions deter caregivers and other assistors from providing lawful assistance to disabled voters and force many disabled voters (like Ms. Nunez Landry and Ms. Litzinger) to forgo needed help, endure pain, and suffer loss of dignity and privacy in order to vote. *E.g.*, ROA.40874, 40915, 40927-40929 (D.Ct.Op.11, 52, 64-66); *see also supra* 13-19. It credited testimony and expert analysis showing that many disabled voters cannot provide the identification number linked to their TEAM record and thus cannot comply with the Number-Matching Requirement. It also found that the requirement's presentation on the mail-ballot application and ballot-envelope forms makes compliance difficult for voters with disabilities, like Stella Guerrero Mata, whose vision is impaired. *E.g.*, ROA.40874, 40899-40903 (D.Ct.Op.11, 36-40); *see also supra* 20-25.

Defendants' various attempts to evade this fact-bound, well-supported liability determination all fail.

## A.    The Challenged Provisions deprive disabled voters of meaningful access to Texas's voting programs.

The ADA requires that disabled voters have an equal opportunity to access the State's programs. 28 C.F.R. §§35.130(b)(1)(ii), (iii); *accord Lartigue v. Northside Indep. Sch. Dist.*, 100 F.4th 510, 520 (5th Cir. 2024); *see also, e.g.*, *Luke*, 46 F.4th at 306. As this Court has held, that

means people with disabilities must be afforded "meaningful access to the benefit" of the program at issue. *E.g.*, *Cadena*, 946 F.3d at 725. In other words, public entities "must afford [disabled] persons equal opportunity to ... gain the same benefit" as people without disabilities, by making reasonable modifications as necessary to do so. *E.g.*, *Gustafson v. Bi-State Dev. Agency of Mo.-Ill. Metro. Dist.*, 29 F.4th 406, 412 (8th Cir. 2022) (internal citations omitted); *accord Bailey v. Bd. of Comm'rs of La. Stadium & Exposition Dist.*, 484 F. Supp. 3d 346, 424 (E.D. La. 2020), *aff'd sub nom. Bailey v. France*, 852 F. App'x 852 (5th Cir. 2021).

Here, the District Court's extensive factual findings show that, individually and cumulatively, the Challenged Provisions, absent any reasonable modifications, denied disabled Texans equal opportunity to access voting. *See* ROA.40899-40931, 40956 (D.Ct.Op.36-68, 93); *see also supra* 12-25. Defendants cannot demonstrate any of those findings were clear error, and thus miss the mark in arguing that Texas's voting programs already provide meaningful access to disabled voters such that reasonable modifications to the Challenged Provisions were not required. *See* State Br. 32-34; Intervenors' Br. 44-49.

## 1. Alternative voting options do not provide meaningful access.

Where a policy makes access to a public program more onerous for people with disabilities, it may deny those people meaningful access to the program and thus violate the ADA. *See, e.g.*, *Luke*, 46 F.4th at 306-

07 (failure to provide court interpreter denied meaningful access to judicial services, even when mother was available to provide basic interpretation); *see also Frame*, 657 F.3d at 228, 231 (inaccessible public sidewalks denied disabled individuals "the benefits of safe transportation and a venerable public forum").

Voting rules deny meaningful access to voters with disabilities when they make a voting process less independent, less private, or more burdensome, *even if* available alternatives would enable a voter to cast a ballot. *See, e.g., Lamone*, 813 F.3d at 507 (forcing blind voters to vote with assistance instead of allowing for online ballot-marking denied meaningful access to mail voting program); *People First of Ala. v. Merrill*, 491 F. Supp. 3d 1076, 1161 (N.D. Ala. 2020) (same for curbside voting ban); *Democracy N.C. v. N.C. State Bd. of Elections*, 476 F. Supp. 3d 158, 231-32 (M.D.N.C. 2020) (same for ban on nursing home employees providing voting assistance). Courts have thus held that states must make all available means of voting accessible, instead of restricting disabled voters to one method.

*Lamone* illustrates the principle. There, the Fourth Circuit held that Maryland could not excuse inaccessible absentee voting on the ground that voters could vote in person instead. 813 F.3d at 503-04. The court explained that meaningful access requires equal access *within* each voting program; the existence of an alternative method did not compensate for barriers that denied absentee voters privacy and

independence. *Id.; see also Disabled in Action v. Bd. of Elections*, 752 F.3d 189, 199 (2d Cir. 2014) ("[T]o assume the benefit is ... merely the opportunity to vote at some time and in some way would render meaningless the mandate that public entities may not afford persons with disabilities services that are not equal to that afforded others.") (cleaned up). Indeed, access is not meaningful if Plaintiffs must rely on "workarounds and alternate means." *Am. Council of the Blind of N.Y., Inc. v. City of N.Y.*, 495 F. Supp. 3d 211, 235 (S.D.N.Y. 2020).

Here, the District Court credited robust evidence that disabled voters in Texas are in fact reduced to burdensome workarounds and ineffective alternate means in order to vote due to the Challenged Provisions, thus denying them meaningful access. ROA.40906-40916, 40965 (D.Ct.Op.43-53, 102).

The Number-Matching Requirement illustrates the problem. For some voters, like Ms. Guerrero Mata, who had difficulty seeing the text on the mail-ballot envelope, it was too late to even attempt to vote by other means or otherwise cure the defect when she learned her ballot had been rejected in November 2022. ROA.40907 (D.Ct.Op.44); *see* ROA.42963-42967, 42969-42970. For other voters, alternative means are simply not an option. Ms. Iglesias, whose mail ballot was also rejected in 2022, *must* vote by mail because the ambulance services that she requires for transportation cannot be used for voting. ROA.40905 (D.Ct.Op.42); *see* ROA.63521-63522, 63524-63525, 63528. For her, S.B.1's restrictions

make mail voting unreasonably difficult, while an in-person option provides *no* access, meaningful or otherwise.

And even where voters find out about a problem due to the Number-Matching Requirement in time, numerous election officials testified, and the District Court found, that S.B.1's cure procedures make correcting a mail-ballot application or mail ballot rejected due to the Number-Matching Requirement much more difficult for voters with disabilities. *See, e.g.*, ROA.42216 (Wise), ROA.42430-42431 (Scarpello), ROA.42745-42746 (Garza), ROA.43549 (Escobedo); *see also* ROA.43840 (Adkins). The online system for curing poses particular challenges for blind or visually impaired voters and is useless for those without internet access, ROA.40903 (D.Ct.Op.40), and in-person curing is not accessible to those who vote by mail because of mobility or transportation limitations. ROA.40904 (D.Ct.Op.41). *See* ROA.43298, 43300 (Longoria); *see also supra* 25. Texas cannot escape the ADA's mandate by pointing to voting options that are, for many of the voters with disabilities who testified at trial, illusory.

Meanwhile, Defendants never even try to claim that any alternate voting methods provide meaningful access for disabled Texans with respect to the other Challenged Provisions.

The Assistance Restrictions criminalize (in expansive and nebulous terms) various forms of voter assistance and engagement, inhibiting would-be assistors and the disabled voters who need their assistance.

ROA.40925-40929 (D.Ct.Op.62-66); *see also* ROA.40887 (D.Ct.Op.24). Defendants never claim that any alternative methods of voting obviate the need to modify these restrictions. And the District Court found that the Oath-and-Assistance Provisions, which apply both to in-person voting *and* voting by mail, deny meaningful access for voters who require assistance *regardless* of how they cast their ballots. ROA.40956-40957 (D.Ct.Op.93-94); *see also* ROA.40907-40927 (D.Ct.Op.44-64). Again, Defendants do not and cannot claim that this finding was clear error.

### 2. Meaningful access does not depend on whether Texans with disabilities successfully voted.

Rather than attack the District Court's well-supported factual findings that the Challenged Provisions impeded disabled Texans' ability to vote, Defendants attempt to move the goalposts, claiming that Plaintiffs "have identified no instance in which any disabled Texan could not cast a ballot because of S.B.1." Intervenors' Br. 45.

For one, that is simply wrong. Ms. Iglesias was twice disenfranchised by S.B.1's Number-Matching Requirement. ROA.40905 (D.Ct.Op.42); *see* ROA.63524-63525, 63532, 63544-63545, 63547-63550.

But even if they were right, it would not matter.

When voters with disabilities like Ms. Litzinger must spend significantly more time, exert more effort, or endure physical pain to vote—barriers not faced by voters who have no disabilities—they are denied meaningful access, even if they ultimately succeed in voting. *See,*

*e.g.*, *Am. Council of the Blind v. Paulson*, 525 F.3d 1256, 1269 (D.C. Cir. 2008) (use of "coping mechanisms" did not give visually impaired individuals meaningful access). The ADA forbids more than just absolute exclusion from a program. *See Lamone*, 813 F.3d at 503; *accord Shotz v. Cates*, 256 F.3d 1077, 1080 (11th Cir. 2001); *Disabled in Action*, 752 F.3d at 198-99; *Brooks v. Colo. Dep't of Corr.*, 12 F.4th 1160, 1167 (10th Cir. 2021). "Lack of meaningful access is *itself* the harm ... regardless of whether [] additional injury follows." *Luke*, 46 F.4th at 306. A voter who faces unreasonable difficulty in voting because of a disability may still prevail under the ADA even if they manage to cast a ballot, as the District Court correctly held. ROA.40955 (D.Ct.Op.92) (citing *Gustafson,* 29 F.4th at 412).

Defendants' arguments otherwise misread both the law and the record. They cite *People First*, *see* State Br. 33, which supports the District Court's conclusion and held that challenged curbside-voting restrictions and absentee-ID rules denied meaningful access because they "may dissuade" disabled voters from using those methods. 491 F. Supp. 3d at 1160, 1165. And Intervenors' conjecture that every election rule might deter someone, somewhere, from voting, Intervenors' Br. 46, is specious. The District Court found based on an extensive record that the Challenged Provisions in fact *do* deter, restrict, and even prevent

eligible Texas voters with disabilities from voting. *E.g.*, ROA.40956 (D.Ct.Op.93); *see also supra* 12-25.[14]

Intervenors are also wrong to claim that the District Court deemed evidence about whether Plaintiffs' members actually voted "legally irrelevant." Intervenors' Br. 46-47. The District Court simply declined to give that evidence dispositive weight, and instead considered all evidence bearing upon meaningful access, including the fact that many of Plaintiffs' members ultimately voted, in concluding that Defendants nevertheless denied voters meaningful access. *E.g.*, ROA.40954-40956 (D.Ct.Op.91-93).

That is precisely what this Court contemplated in *Luke*, another case involving access to public programs, where the Court recognized that a disabled person who overcomes difficulty to obtain a public program's benefit may still have been denied meaningful access. 46 F.4th at 305-07. Indeed, *Luke*, which involved access to the criminal legal process, is directly analogous. A criminal defendant who cannot understand court proceedings has been denied meaningful access even though he might nonetheless have charges dismissed or otherwise manage to comply with conditions of supervision or obtain some positive

---

[14] The District Court's extensive factfinding regarding concrete, ongoing, actual barriers and harms to disabled voters from the Challenged Provisions undermines Defendants' reliance (State Br. 34) on *United States v. Mississippi*, 82 F.4th 387 (5th Cir. 2023). *Mississippi* involved individuals solely at risk of *future* institutionalization; voters in Texas have already experienced harms from S.B.1. 82 F.4th at 394.

outcome. 46 F.4th at 305-07. So too here: A disabled voter who manages to vote despite S.B.1's barriers still experiences discrimination if those barriers make participation unreasonably difficult and thus unequal.

Defendants fail to distinguish *Luke*, and identify no clear error in the District Court's well-supported factual findings regarding the barriers imposed on disabled Texans by the Challenged Provisions.[15]

## B. Defendants cannot evade their duty to make reasonable modifications by claiming none were requested.

The Challenged Provisions deny disabled Texans meaningful access to the State's voting programs, and the ADA therefore requires Defendants to make reasonable modifications to those programs. *E.g.*, *Frame*, 657 F.3d at 232-33. But Defendants argue they had no duty to make reasonable modifications to their voting programs because disabled voters made no individual requests. State Br. 37-42; Intervenors' Br. 49-55. That is wrong on both the facts and the law.

---

[15] Intervenors cite *Cadena*, but there this Court found that evidence the plaintiff fell and experienced pain *supported* her claim for denial of meaningful access, even if she successfully completed her time at the jail. 946 F.3d at 725 (cited in Intervenors' Br. 47). And the facts of *Gustafson*, which Intervenors also cite, bear little resemblance to this case. The court there found no denial of meaningful access where a blind plaintiff successfully rode defendants' buses dozens of times each year. 29 F.4th at 409. But the individuals S.B.1 harms will face barriers every time they try to exercise their fundamental right to vote.

**1. Voters made requests that Defendants ignored.**

Voters in fact made numerous requests for reasonable modifications of the Challenged Provisions, as the District Court found. *E.g.*, ROA.40873, 40906, 40960 (D.Ct.Op.10, 43, 97) (citing ROA.45320-45321, 45328 (Halvorson), ROA.45265-45266 (Nunez Landry)).

A disabled individual requesting an ADA accommodation "does not have to mention the ADA or use the phrase 'reasonable accommodation.' Plain English will suffice." *E.E.O.C. v. Chevron Phillips Chem. Co., LP*, 570 F.3d 606, 621 (5th Cir. 2009). Nor are "magic words" required. *United States v. Hialeah Hous. Auth.*, 418 F. App'x 872, 876 (11th Cir. 2011) (internal citation omitted) (unpublished) (collecting cases). Voters needed only to put election officials "on notice" that they were disabled. *E.g.*, *Pierce v. Dist. of Columbia*, 128 F. Supp. 3d 250, 270 (D.D.C. 2015) (Jackson, J.).

Voters did that here. The District Court found, based on the extensive testimony of disabled voters and election officials, that voters made numerous modification requests with respect to the Challenged Provisions that were either ignored or denied because officials believed S.B.1 prohibited them from making the modifications. *See, e.g.*, ROA.40959-40960 (D.Ct.Op.96-97). Defendants identify no clear error in those amply supported findings.

Voters testified that they made requests for modifications that were either ignored or denied. ROA.40960 (D.Ct.Op.97); *see also, e.g.*,

ROA.45320-45321 (Halvorson), ROA.45360-45361 (Saltzman). For example, Ms. Nunez Landry repeatedly contacted Harris County for guidance about S.B.1's requirements and concerning problems she and other voters encountered, without success. ROA.45247, 45252-45253 (Nunez Landry). Neither the State nor Harris County provided any clarity on the meaning of the word "eligibility" in the text of the oath or made any modification to it. ROA.45249-45250 (Nunez Landry).

County election officials confirmed this testimony, describing reasonable modification requests from disabled voters concerning the Challenged Provisions. ROA.40959-40960 (D.Ct.Op.96-97 & n.71); *see* ROA.43040-43043 (Callanen), ROA.43169 (Obakozuwa), ROA.43286-43288 (Longoria). They testified that they either denied these requests outright or were unable to and did not implement them in practice. ROA.42442 (Scarpello), ROA.42540 (Dallas County/T. Phillips), ROA.43298-43299 (Longoria); *see also infra* 61-65. State officials also testified that they received and denied reasonable modification requests from disabled voters, including modification requests regarding mail ballot applications. *E.g.*, ROA.46593-46594 (Adkins).

## 2. The ADA required reasonable modifications here regardless of individual requests.

Defendants are also wrong on the law: Individual requests were not required to prove an ADA violation here, because Defendants have an affirmative duty to make reasonable modifications and they had ample

notice that the Challenged Provisions denied voters with disabilities meaningful access to their voting programs.

In the context of an ADA challenge to a policy's broad application, a public entity's affirmative duty to make reasonable modifications to its programs does not turn on specific individual requests. *Cf. Frame*, 657 F.3d at 239 ("The City may avoid liability … simply by building sidewalks right the first time, or by fixing its original unlawful construction … the City is not liable forever; it is responsible only for correcting its own mistakes.").

This is no less true in voting cases. In *Lamone*, for example, voters with vision impairments sought modification of Maryland's mail-ballot program. The case did not turn on the consideration or denial of individual accommodation requests. Rather, the Fourth Circuit upheld the trial court's finding that voters with disabilities were denied meaningful access to absentee voting based on Defendants' failure to meet their affirmative obligation of public entities to accommodate voters. *Lamone*, 813 F.3d at 501-02; *see also Cadena*, 946 F.3d at 724; *accord Bennett-Nelson*, 431 F.3d at 454; *Delano-Pyle*, 302 F.3d at 575 ("A plain reading of the ADA evidences that Congress intended to impose an affirmative duty on public entities to create policies or procedures to prevent discrimination based on disability.").[16]

---

[16] The District Court cited Fifth Circuit cases in concluding that individualized requests for accommodations are unnecessary in policy-level claims. ROA.40958 (D.Ct.Op.95). *Payan v. Los Angeles Community College District*, 11 F.4th 729 (9th

Defendants rely on inapposite cases involving individual accommodations, such as Title I employment claims by individuals. *See, e.g.*, Intervenors' Br. 42, 50, 53 & State Br. 37-38, 42 (citing Title I employment cases such as *Soledad v. U.S. Dep't of Treasury*, 304 F.3d 500, 504 (5th Cir. 2002), *Riel v. Elec. Data Sys. Corp.*, 99 F.3d 678, 682 (5th Cir. 1996), and *Taylor v. Principal Fin. Grp., Inc.*, 93 F.3d 155, 165 (5th Cir. 1996)). Cases involving individuals seeking accommodations specifically for themselves are irrelevant in this challenge to statewide election rules affecting voters with disabilities throughout Texas. ROA.40869 (D.Ct.Op.6).[17]

Moreover, and at a minimum, when an individual's disabilities and the need for accommodations are "open and obvious," public entities must make reasonable modifications even without affirmative requests. *Cadena*, 946 F.3d at 724; *accord Smith v. Harris Cnty.*, 956 F.3d 311, 318 (5th Cir. 2020); *Windham v. Harris Cnty.*, 875 F.3d 229, 237 (5th Cir.

---

Cir. 2021), thus was not, as Defendants claim, the "only authority" cited in support of that conclusion. Intervenors' Br. 54-55.

[17] Defendants also cite inapposite Title I cases to support their argument that the ADA mandates an individualized "interactive process" pursuant to individual accommodation requests. *See* State Br. 42; Intervenors' Br. 53 (citing *Hohider v. United Parcel Serv., Inc.*, 574 F.3d 169, 187 (3d Cir. 2009) and *Griffin v. United Parcel Serv., Inc.*, 661 F.3d 216, 225 (5th Cir. 2011)). They are wrong to invoke those authorities, and in any case, even under Title I standards, Plaintiffs are not required to make reasonable modification requests where (as here) the need for modification is open and obvious or such requests would be futile. *Davoll v. Webb*, 194 F.3d 1116, 1132 (10th Cir. 1999); *Bultemeyer v. Fort Wayne Cmty. Schs.*, 100 F.3d 1281, 1285 (7th Cir. 1996). *See infra* 60-65.

2017). Here, the District Court found that State Defendants, as well as local election officials, were on notice of widespread concerns that S.B.1 would deny meaningful access absent modifications. ROA.40960-40961 (D.Ct.Op.97-98).

The District Court credited extensive record evidence concerning "the modification requests and complaints regarding the mail-ballot and assistance provisions that Defendants received," like requests made by Laura Halvorson and Teri Saltzman, that were either denied or ignored. *See, e.g.*, ROA.40906, 40961 (D.Ct.Op.43, 98); ROA.45320-45321, 45328 (Halvorson), ROA.45360-45361 (Saltzman); *see also supra* 55-56. It also relied on disabled voters' testimony before the Texas Legislature about S.B.1's anticipated harms and on data showing "relevant correlations between age and disability, between disability and voting assistance, and between disability and voting by mail." ROA.40961 (D.Ct.Op.98); *see also* ROA.40876 (D.Ct.Op.13); ROA.45769 (Kruse). The court's finding that Defendants were on notice of the "large-scale harm" of S.B.1 was not clear error. ROA.40961 (D.Ct.Op.98).

Defendants simply ignore the basis for these findings. They argue that a disability must be open and obvious "to [an] entity's relevant agents, not the State Legislature," claiming Plaintiffs' legislative testimony failed to give local officials sufficient notice. Intervenors' Br. 26; *see also* State Br. 39-40. But the District Court's finding that the need for modifications was open and obvious rested on multiple grounds, not

just testimony to the Legislature. *See supra* 59. And in any case, the Secretary of State has an independent obligation to provide reasonable modifications, and Defendants do not claim that the Secretary was not aware of public testimony before the Legislature regarding a high-profile law that she is charged with implementing.

### 3. Requests for modifications would have been futile.

Even if individual accommodation requests generally were required in a case like this (and had not in fact been made), here such requests would have been futile.

The ADA does not require individual requests where they would be "futile gestures." *Frame*, 657 F.3d at 235-36. "[I]f making a request would be clearly futile or 'foredoomed,' then the plaintiff is not required to make [it]." *Oxford House, Inc. v. City of Baton Rouge, La.*, 932 F. Supp. 2d 683, 690-91 (M.D. La. 2013) (citations omitted).[18]

The District Court found that modification requests to the Challenged Provisions would have been (and indeed were) futile because State and county officials believed that S.B.1 forbade them from

---

[18] *Frame*, a Title II case, refutes Defendants' argument that the futile-gesture doctrine is limited to Title III. State Br. 40. *See* 657 F.3d at 236; *see also Doe v. Rowe*, 156 F. Supp. 2d 35, 58 (D. Me. 2001) (applying doctrine in Title II voting case); *Schwarz v. Vills. Charter Sch., Inc.*, No. 5:12-CV-177-OC-34PRL, 2014 WL 12623013, at *5-6 (M.D. Fla. May 23, 2014) (applying doctrine in Title II case where Plaintiffs did not request modifications for auxiliary aids and services because they were told by other deaf residents that the Defendant would deny any request).

modifying the Challenged Provisions. *See* ROA.40959 (D.Ct.Op.96). That finding was well-supported by the trial record and was not clear error.

Numerous county officials testified that they believed that the law prohibited them from modifying the Challenged Provisions such as Oath-and-Assistance Provisions or the Number-Matching Requirement, that the Secretary reinforced this belief, and that they acted on that understanding to deny requests when they received them. *See* ROA.42268, 42356 (Wise), ROA.42537 (T. Phillips), ROA.42769-42770 (Garza), ROA.43043 (Callanen), ROA.43298-43299, ROA.43302-43304, ROA.43309-43315 (Longoria), ROA.43468 (Travis County/Hayes), ROA.44334-44335 (Hidalgo County/Ramon). For example, an official in Harris County, which received a "huge" number of modification requests, described how disabled voters requested to scan and email their cured ballot forms or send someone else to cure their ballots because they could not access the online system. ROA.43287 (Longoria); *see* ROA.43298-43299, 43302-43304 (Longoria). But when the official asked the Secretary's office if this modification was possible, she was told to "read the statute," leading her to conclude that it was impermissible and to deny the request—a frustrating, unjust, "excruciating" outcome. ROA.40873 (D.Ct.Op.10). Another county official, commenting on the denial of a disabled voter's request regarding the mail-ballot application, stated that "Sometimes there's the right thing to do and S.B.1 has really tied our hands on that." ROA.43040 (Callanen).

Defendants effectively concede the point, agreeing that officials were barred from making any modifications for disabled voters "directly contrary to the design of Texas's election laws," such as curing a ballot by email. State Br.16-17. Under these circumstances—where officials understood that they were *prohibited* from modifying the Challenged Provisions—any requests would necessarily have been futile. ROA.40959-40960 (D.Ct.Op.96-97); *see Smith v. Dunn*, 568 F. Supp. 3d 1244, 1264 (M.D. Ala. 2021), *aff'd sub nom. Smith v. Comm'r, Ala. Dep't of Corrs.*, No. 21-13581, 2021 WL 4916001 (11th Cir. Oct. 21, 2021) (defendant's intention not to comply with ADA supports futility determination).

Defendants nevertheless now insist that "S.B.1 did not restrict election officials' ability to make ADA accommodations" because §1.08 of S.B.1 provides that the Election Code should not be read to bar disabled voters "from requesting a reasonable accommodation or modification to any election standard, practice, or procedure … that the individual is entitled to request under federal or state law." State Br. 16, 41 (quoting TEC §1.022); *see also* Intervenors' Br. 44.

This argument does not hold water. First, as a factual matter, officials *believed* they could not make modifications to enable meaningful access and *communicated* that to voters by failing to offer modifications and indeed denying voters' modification requests, *see supra* 55-56, 61-62; *accord* ROA.40959 (D.Ct.Op.96). Requests for modifications are futile

where, as here, voters understand that the "offending policy" represented by the Challenged Provisions "remain[ed] firmly in place." *Dudley v. Hannaford Bros. Co.*, 333 F.3d 299, 306 (1st Cir. 2003); *accord Steger v. Franco, Inc.*, 228 F.3d 889, 892 (8th Cir. 2000); *accord Frame*, 657 F.3d at 235-36.

Second, S.B.1 §1.08 does not actually do what Defendants now claim. By its plain text, S.B.1 §1.08 "protects voters' right to *request* reasonable accommodations," but "does not require any election entity or administrator to actually *make*" the requested changes—or even to consider them. ROA.40872 (D.Ct.Op.9) (emphasis in original). Meanwhile, other S.B.1 provisions affirmatively *bar* election officials from making modifications not expressly authorized (*see, e.g.*, TEC §276.019 (S.B.1 §7.04)) and impose penalties—including termination and loss of benefits—on election officials who do so. *See* TEC §31.129(b) (S.B.1 §8.01). The District Court thus found, consistent with numerous officials' testimony, that "any election official in Texas who makes an affirmative accommodation for disabled voters risks her job and benefits." ROA.40872, 40893 (D.Ct.Op.9, 30).

S.B.1 §1.08 is doubly irrelevant to the futility analysis because local election officials were also unable as a practical matter to modify the Challenged Provisions in the first place, due to the Secretary's failure to advise or instruct them. ROA.40870-40871, 40873 (D.Ct.Op.7-8, 10 & n.9); *see also* ROA.42442 (Scarpello). State witnesses conceded that they

had no policies or training on their ADA obligations and were "not ADA experts."[19] ROA.40871 (D.Ct.Op.8); ROA.46591-46592 (Adkins); *see also* ROA.43924-43925 (Ingram). *See supra* 9-10. Election officials' practical inability to respond to modification requests regarding the Challenged Provisions further supports the District Court's finding that such requests were futile.

The experience of disabled voters, also illustrated in detail in the trial record, further corroborates the District Court's futile-gesture finding.

Voters Ms. Litzinger and Ms. Saltzman testified that they were deterred from requesting modifications to S.B.1 because neither the State nor the counties provided legally-required information on how to even make such requests. ROA.45298 (Litzinger), 45360-45361 (Saltzman). Meanwhile, when voters sought guidance, they often received no response. ROA.36126-36127. Ms. Halvorson, for example, could get no answer from Bexar County to her inquiry about accessible voting equipment. She was forced to research the machines herself to determine whether they would be accessible to her and ultimately asked her father to go in person to see if they had remote controls. ROA.45320-45321.

---

[19] Defendants now claim that the Secretary lacks authority to approve voters' accommodation requests. State Br. 5, 31. That is inconsistent with their trial position, where they questioned Plaintiffs' witnesses about contacting the Secretary for such requests. *E.g.*, ROA.45264-45266 (Nunez Landry). In any event, they cite no factual or legal authority suggesting the State cannot modify its own election rules to comply with federal law.

Given evidence that counties often failed to respond to modification requests promptly—or at all—there is no guarantee that Plaintiffs would receive requested modifications in time for their votes to count even if counties had been willing and able to grant them. Indeed, mail voters, such as Ms. Guerrero Mata, may not know that a reasonable modification is needed, or be able to request one, until after their ballot has been rejected and the deadline to cure it has run. *E.g.*, ROA.40907 (D.Ct.Op.44) (citing ROA.42964-42967, 42969-42970).

Defendants' proposed approach would require disabled Texas voters to request individual modifications each and every time they vote (*see* Intervenors' Br. 54), even though they will likely be denied or ignored. But forcing voters to ask for something that counties cannot and will not give them is the definition of futility. Here, individualized modification requests, even when made, were futile and could not ensure meaningful access for disabled voters. Under these circumstances, requiring disabled voters to make such requests anyway as a prerequisite for ADA liability would only impose another unworkable and pointless burden on both voters and election administrators.

## C.   **Defendants' belated disparate-impact argument fails.**

Defendants reenvision Plaintiffs' claims as ADA disparate-impact claims—a theory Plaintiffs neither pleaded nor tried—and now insist the

District Court erred by endorsing their imagined disparate-impact theory. State Br. 34-37. That argument is both forfeited and meritless.

As to forfeiture, Defendants concede that Plaintiffs "did not plead" and "have never pressed" a disparate-impact theory of ADA liability. State Br. 34-35; Intervenors' Br. 55. And they do not point to any aspect of the District Court's decision where the court considered whether ADA disparate-impact claims are available, relied on a disparate-impact analysis to support its legal conclusions, or otherwise characterized Plaintiffs' claims as disparate-impact claims—because the District Court never did or said any of that. *See, e.g.*, ROA.40952-40956 (D.Ct.Op.89-93); *see also infra* 68-69 & n.22. Rather, the court decided this case the same way that Plaintiffs pleaded, framed, and tried it, as one about reasonable modifications. *See* ROA.40874, 40952-40961 (D.Ct.Op.11, 89-98); *see also* ROA.6433-6445, 6447-6449 (Pls.' 2d.Am.Compl.); ROA.36116-36127, 36146-36177 (Pls.' Proposed Findings).

Defendants could have raised their contention that Plaintiffs advanced an impermissible ADA disparate-impact claim at any time during years of litigation below. If they had, Plaintiffs and the District Court could have addressed it.[20] But they never did. They have now

---

[20] Intervenors point to *Kamps v. Baylor University,* to support their claim that "[t]he ADA does not prohibit policies that have a disparate impact." 592 F. App'x 282, 285 (5th Cir. 2014) (cited in Intervenors' Br. 56). *Kamps* involved the Age Discrimination Act of 1975—not the ADA—and says literally nothing about ADA disparate-impact claims. *Id.*

forfeited this stratagem by deploying it "for the first time on appeal." *E.g.*, *Rollins v. Home Depot U.S.A*, 8 F.4th 393, 397 (5th Cir. 2021).

Further, Defendants' arguments about whether the ADA allows disparate-impact claims are irrelevant because—again—Plaintiffs never alleged, and the District Court never decided, such a claim in the first place. To the contrary, Plaintiffs have consistently asserted that Defendants are liable because they failed to make reasonable modifications to Texas's voting program as the ADA requires. *See supra* 66. The District Court accordingly analyzed Plaintiffs' claims on that basis, considering whether Defendants had failed to provide reasonable modifications to the Challenged Provisions, resulting in a denial of meaningful access. ROA.40954-40961 (D.Ct.Op.91-98).

This type of systemic failure-to-accommodate ADA claim against a governmental policy is well established. *See, e.g.*, *Frame*, 657 F.3d at 222-33 (failure-to-accommodate case involving accessibility of city sidewalks); *accord Disabled in Action*, 752 F.3d at 196, 200-02; *Oconomowoc Residential Programs v. City of Milwaukee*, 300 F.3d 775, 783 (7th Cir. 2002). Such claims stand on their own, "distinct from a claim of discrimination based on disparate impact." *Henrietta D. v. Bloomberg*, 331 F.3d 261, 276-277 (2d Cir. 2003); *accord Lamone*, 813 F.3d at 503 n.5 (fact that "some sort of disparity will necessarily be present in cases of discrimination [] does not mean that all discrimination cases are … 'disparate impact' cases"); *Wis. Cmty. Servs., Inc. v. City of Milwaukee,*

465 F.3d 737, 753 (7th Cir. 2006) (en banc); *id.* at 756 (Easterbrook, J., concurring).[21]

State Defendants' wishful statement that "even though Plaintiffs did not bring disparate-impact claims, the district court nevertheless invalidated S.B.1 under this theory," State Br. 32, is sharply at odds with reality. The phrase "disparate impact" appears only *once* in the District Court's entire 112-page opinion, where the court used it colloquially to describe the general effect of the Oath-and-Assistance Provisions on disabled voters. *See* ROA.40907 (D.Ct.Op.44). It appears *zero* times in the court's extended legal analysis, which was focused on meaningful access and failure to make reasonable modifications, *i.e.*, Plaintiffs' failure-to-accommodate claim.[22] ROA.40954-40961 (D.Ct.Op.91-98). Defendants'

---

[21] Disparate-impact analysis examines whether a facially-neutral policy disproportionately harms one group compared to others—for example, by comparing "the percentage of minorities in the workforce and the percentage of qualified minorities in the relevant candidate pool" to show that a facially-neutral hiring rule disparately impacts a racial group. *E.g.*, *Scales v. Slater*, 181 F.3d 703, 708 n.5 (5th Cir. 1999). By contrast, a meaningful-access claim based on a failure to make reasonable modifications asks whether "individuals with disabilities [can] access public benefits to which both they and those without disabilities are legally entitled, and to which they would have difficulty obtaining access due to disabilities" without regard to how their experience compares to that of people without disabilities. *E.g.*, *Henrietta D.*, 331 F.3d at 274.

[22] Defendants' claim that the District Court "relied on" the Ninth Circuit's *Payan* decision is not to the contrary. State Br. 37. The court referenced *Payan* in a section of its decision entitled, "*Failure to Accommodate*." ROA. 40958-40961 (D.Ct.Op.95-98) (emphasis added); *see also supra* n.16. At no point did the court use *Payan* to apply a disparate-impact analysis to Plaintiffs' claims.

belated attempt to inject an irrelevant issue into this case must be rejected out of hand.

## III. ENJOINING S.B.1 DOES NOT FUNDAMENTALLY ALTER TEXAS'S VOTING PROGRAM.

Defendants concede that "fundamental alter[ation]" is an affirmative defense and it was their burden to raise and prove it at trial. State Br. 46 (citing ROA.40963); Intervenors' Br. 56-57. *See also Olmstead v. L.C.*, 527 U.S. 581, 607 (1999) (Stevens, J., concurring); *Reickenbacker v. Foster*, 274 F.3d 974, 983 (5th Cir. 2001).

That burden is demanding. To meet it, Defendants had to come forward with evidence on "the specifics" of how the modifications sought by the Plaintiffs will fundamentally alter Defendants' voting program— not generalized claims about the nature of the modification. *Johnson v. Gambrinus Co. Spoetzl Brewery*, 116 F.3d 1052, 1059-60 (5th Cir. 1997). Bare assertions do not suffice; "a public entity has the burden *of proving* that compliance" will result in a fundamental alteration. *See, e.g.*, *Hindel v. Husted*, 875 F.3d. 344, 348 (6th Cir. 2017) (citing 28 C.F.R. §35.164).

Defendants did not do that. The District Court found that Defendants had not "offered any evidence" that modifying the Challenged Provisions would fundamentally alter their voting program—instead, they offered only the "conclusory assertion[]" that *any* change to State law is, by definition, a fundamental alteration. ROA.40963

69

(D.Ct.Op.100). The court's factfinding was well supported by the record and is nowhere near clear error.

## A. Modifying State law to avoid discrimination is not a fundamental alteration to Texas's voting program.

Nobody disputes the importance of secure elections. But Defendants miss the mark by suggesting that merely invoking "election security" immunizes state laws or policies that discriminate against voters with disabilities from any modification under the ADA. Intervenors' Br. 58-60; State Br. 45-46.

The fundamental-alteration inquiry is fact-intensive and does not pit accessibility against security: It asks whether a requested modification would eliminate an "essential aspect" of the program and impair its basic purpose. *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 682-83 (2001); *see also Johnson*, 116 F.3d at 1064 (allowing support dog on a brewery tour was not a fundamental alteration because it preserved safe operation); *see also Hindel*, 875 F.3d. at 348 (court must determine whether the change would be "so at odds with the purposes behind the [law]" as to be unreasonable (citation omitted)).[23]

---

[23] *Block v. Texas Bd. of L. Exam'rs*, 952 F.3d 613 (5th Cir. 2020), on which Defendants rely, is off point. State Br. 46. *Block* involved the failure of the plaintiff to prove a prima facie case, not any issue of fundamental alteration. 952 F.3d at 618. And *Block*, in which a *pro se* plaintiff sought admission to the Texas Bar without "the necessary knowledge and skill to practice law," could not be more different on the facts. *Id.* at 618-19. No one disputes that the numerous disabled Texans who are denied meaningful access to Texas's voting programs are qualified to vote.

A defendant's existing rules and practices are not "sacrosanct"; indeed, treating them as untouchable would negate the ADA's reasonable-modification requirements and render the fundamental-alteration analysis a foregone conclusion. *Martin*, 532 U.S. at 689. The "simple fact" that a modification would excuse a disabled person from a rule "cannot … automatically show that the accommodation is not 'reasonable.'" *U.S. Airways v. Barnett*, 535 U.S. 391, 398 (2002).

Those principles apply when the defendant is a governmental body and the rules sought to be modified are state and local laws. When a state or local law conflicts with the ADA's "comprehensive national mandate," state law must yield. *Mary Jo C. v. N.Y. State & Local Ret. Sys.*, 707 F.3d 144, 163 (2d Cir. 2013) (citation omitted); *accord Barber ex rel. Barber v. Colo. Dep't of Rev.*, 562 F.3d 1222, 1233 (10th Cir. 2009); *Johnson v. Callanen*, 610 F. Supp. 3d 907, 916 (W.D. Tex. 2022).

Title II thus can and often does require states to alter their voting laws and practices to avoid disability discrimination. Indeed, requiring states to change their voting laws and practices to avoid discrimination is "exactly what the ADA does." *Lamone*, 813 F.3d at 508-09 (state statutory requirement regarding ballot marking did not "insulate[] public entities from making otherwise reasonable modifications to prevent disability discrimination") (collecting cases); *see also, e.g.*, *Hindel*, 875 F.3d. at 349 (modification of Ohio's rules to permit blind voters to use an online ballot-marking tool safely in use in other States was not

unreasonable; explaining that "a state procedural requirement may not excuse a substantive ADA violation"); *People First*, 491 F. Supp. 3d. at 1163 (suspending a photo-ID requirement for absentee voting was not a fundamental alteration because it was unnecessary, under Alabama law, to verify the identity of voters with disabilities—many of whom were exempted from that requirement).

Trial evidence overwhelmingly showed the concrete barriers the Challenged Provisions impose on voters with disabilities. *E.g.*, ROA.40899-40931 (D.Ct.Op.36-68); *supra* 12-25. But Defendants did not identify or substantiate any "essential" feature of their voting program that would be lost if the Challenged Provisions were modified to cure these barriers. *Martin*, 532 U.S. at 689. The District Court accordingly found that Defendants had "not offered any evidence" to support their fundamental-alteration defense. ROA.40963 (D.Ct.Op.100).

The District Court properly found that Defendants failed to meet their burden. Based on the trial record, it found that voter fraud was exceedingly rare before S.B.1 and that the Challenged Provisions were not tailored to any concrete or identifiable fraud problem that the pre-existing law could not already address. *See* ROA.40926 (D.Ct.Op.63). For example, the OAG's tracker of resolved election-crime prosecutions did "not identify a single case of voter assistance fraud relating to assistance provided in the polling place." ROA.40922 (D.Ct.Op.59). Accordingly, Defendants did not prove that modifying the Challenged Provisions

would undermine any essential aspect of their voting programs. ROA.40963 (D.Ct.Op.100).

The District Court made extensive findings that, pre-S.B.1, Texas law already contained robust and effective safeguards against voter fraud, including pre-existing voter and assistor identity and address verification provisions, and processes for investigating election irregularities. *See* ROA.40874-79, 40883-40884, 40895-40897, 40921 (D.Ct.Op.11-16, 20-21, 32-34, 58). Defendants highlight one official's testimony about a mayoral candidate who was prosecuted for voter-impersonation fraud as proof that the Challenged Provisions are essential. State Br. 9-10. That evidence undermines their argument: The wayward official's potential fraud was detected and prosecuted under the rules in place prior to the Challenged Provisions' enactment.

The evidence also showed that the Challenged Provisions sweep far beyond any justifiable fraud-prevention needs the State might have. The District Court found, for example, that section 6.06 "criminalizes compensation for assistance," not fraud, because a person may be convicted under TEC §86.0105 even absent any fraud or coercion and even when the ballot is marked as the voter wishes. ROA.40926 (D.Ct.Op.63) (citing 45993-45994 (White)).

Evidence regarding the Number-Matching Requirement was similar. The District Court found that Texas already had—and used—other means to confirm voters' identity. ROA.40875-40878, 40899-40903,

40964 (D.Ct.Op.12-15, 36-40, 101 & n.74). But S.B.1's "byzantine number-matching framework"—requiring voters to guess which number TEAM contains and then reproduce it exactly on their absentee ballot application, and then again on a small-print form hidden under the ballot-envelope flap—was neither essential nor effective to establish voters' identity. ROA.40964 (D.Ct.Op.101 & n.74). In practice, the District Court found, the Number-Matching Requirement turns mail voting into a test of memory and luck, one that can screen out otherwise eligible voters and "unduly burden Texas voters with disabilities." ROA.40964 (D.Ct.Op.101 n.74). That fact-bound determination was not clear error. ROA.40964-40965 (D.Ct.Op.101-102).[24]

Defendants' singular focus on potential fraud cannot override their concrete ADA obligation to protect disabled voters' access to the franchise in the face of actual, documented harm caused by the Challenged Provisions. Texas law itself makes clear that the Election Code's "legislative intent" is not only to "reduce the likelihood of fraud" but also to "promote voter access" and "ensure that all legally cast ballots are counted." TEC §§1.0015, 1.003(a-1). Defendants cannot ignore those core purposes of Texas's voting programs and justify denying meaningful

---

[24] As the District Court noted, the State may be able to *request* ID numbers from voters in the mail-voting process; the denial of meaningful access under the ADA crystalizes when the ID number is required for acceptance of the voter's mail-ballot application or ballot, thus denying voters access to the ballot. ROA.40964 (D.Ct.Op.101 n.74).

access to disabled voters by invoking generalized fraud concerns. *See, e.g.*, *Hindel*, 875 F.3d. at 348 (allowing blind voters to use ballot-marking tools did not eliminate certification rule's essential purpose of "correctly, accurately, and continuously register[ing] and record[ing] every vote cast"); *Lamone*, 813 F.3d at 508-10 (allowing some voters with disabilities to use non-certified online ballot-marking tool did not defeat election integrity and was not a fundamental alteration); *People First*, 476 F. Supp. 3d at 1164 (suspending absentee-voter ID requirement for disabled voters did not fundamentally alter Alabama's absentee voting program because State had other means of verifying identity); *accord Democracy N.C.*, 476 F. Supp. 3d at 233.

Defendants were required to present evidence of "the specifics" of how modifications of the Challenged Provisions would undermine election security in Texas. *Johnson*, 116 F.3d at 1059-60. Because they did not do so, the District Court correctly found, based on the evidence before it, that election integrity would be maintained even if the Challenged Provisions were modified to accommodate Texans with disabilities and provide them with meaningful access. ROA.40963-40965 (D.Ct.Op.100-102). The District Court's fact-based rejection of the fundamental-alteration defense here was not clear error.

**B.    Enjoining the Challenged Provisions would not fundamentally alter Texas's voting program.**

Nor does the nature of the specific modification ordered—simply enjoining the Challenged Provisions—make it a fundamental alteration. Intervenors' Br. 57-58, 60-62; *see also* State Br. 42-44.

Enjoining the Challenged Provisions would not fundamentally alter Texas's voting program because the modifications apply only to the "limited categories of voters" eligible to vote by absentee ballot or to receive in-person voting assistance in the first place. *See* ROA.40964 (D.Ct.Op.101). Demonstrating a fundamental alteration is a difficult burden where the proposed modification concerns a narrowly defined subset of persons. *See, e.g.*, *Doe v. Rowe*, 156 F. Supp. 2d 35 (D. Me. 2001) (enjoining disenfranchisement of individuals under guardianship) (cited approvingly in *Tennessee v. Lane*, 541 U.S. 509, 524 (2004)). *Cf. People First*, 467 F. Supp. 3d at 1221-22 (no fundamental alteration when enjoining voting law as to circumscribed set of voters). That is the case here: Enjoining the Challenged Provisions alters Texas's voting programs only as to a particular group of voters who come within the law's scope, chiefly voters with disabilities. ROA.40964 (D.Ct.Op.101).

Defendants' citation to the fundamental-alteration analysis in *League of Women Voters of Fla., Inc. v. Lee*, 595 F. Supp. 3d 1042 (N.D. Fla. 2022), is thus unavailing. State Br. 43, Intervenors' Br. 58-59. The mail-ballot statute there was open to "all voters" (not limited categories,

as in Texas) so enjoining it *in toto* swept far more broadly than here. 595 F. Supp. 3d at 1158. Indeed, the court in *Lee* specifically contrasted that case with *People First*, where, as here, enjoining a mail-ballot rule as to "a larger, yet still circumscribed, subset of older, disabled, and compromised voters" was *not* a fundamental alteration. *Lee*, 595 F. Supp. 3d at 1158 (citing *People First*, 467 F. Supp. 3d at 1212-13).[25]

Furthermore, the effect of the injunction here is to reinstate well-established procedures for assistance and mail-ballot voting that election officials had "effectively administer[ed]" for years before S.B.1. ROA.40964 (D.Ct.Op.101); *see supra* 8-9. Reverting from the Challenged Provisions to rules that had enabled the voting process to function securely through 2020 was not a fundamental alteration. *See Lamone*, 813 F.3d at 508 (use of a previously implemented, incident-free tool for blind voters supported finding that the modification was not a fundamental alteration).[26]

It is no answer to say Defendants may choose among reasonable, ADA-compliant modifications. *See* State Br. 42; Intervenors' Br. 53. That discretion exists only when a defendant actually proposes equally effective alternatives that ensure meaningful access. *See E.T. v. Paxton*,

[25] Moreover, in *Lee*, Plaintiffs did not offer alternative, narrower proposed forms of relief. 595 F.Supp. 3d at 1158. Plaintiffs did that here. *See infra* 81.

[26] Defendants claim that enjoining the Challenged Provisions would impose "obvious" financial and administrative burdens but never describe those burdens or indicate any record evidence to support their existence. Intervenors' Br. 59. The District Court found there was no such evidence. ROA.40963(D.Ct.Op.100).

41 F.4th 709, 717 (5th Cir. 2022). Defendants offered none here—at trial or now. Especially in the absence of any effective alternatives, the District Court did not err in concluding that a return to the secure, workable pre-S.B.1 framework with respect to the Challenged Provisions was not unreasonable.

## IV.   THE DISTRICT COURT'S REMEDY IS PROPER.

Defendants lastly suggest that the District Court's injunction was overbroad and beyond its authority. Their arguments are unavailing.

### A. The District Court did not abuse its discretion in granting a statewide injunction.

Defendants misplace reliance on *United States v. Mississippi*, 82 F.4th 387 (5th Cir. 2023), to argue that the District Court's remedy was overbroad. State Br. 44-45. *Mississippi* involved a remedy that this Court held would have "rework[ed] the entire Mississippi mental health system" and imposed detailed plans that would "radically modif[y]" statewide programs. 82 F.4th 398-99. But simply enjoining the Challenged Provisions does nothing like that: As the District Court found, it would not "impose any new requirements on Defendants" or require "a new, costly program for administering election[s] or monitoring ADA-compliance"; it merely reverts to the pre-S.B.1 rules. ROA.40962 (D.Ct.Op.99).[27]

---

[27] Defendants similarly misplace reliance on *LA Alliance for Human Rights v. County of Los Angeles*, in which the Ninth Circuit reversed a preliminary injunction that

Defendants also wrongly argue that the remedy ordered by the District Court is inconsistent with *Trump v. CASA, Inc.*, 606 U.S. 831 (2025), suggesting the court lacked "equitable authority" to enjoin the Challenged Provisions on a statewide basis. State Br. 45; Intervenors' Br. 61-62. But *CASA* did not alter district courts' equitable authority to craft remedies that provide necessary and complete relief to the parties involved in the suit. 606 U.S. at 852. Indeed, *CASA* specifically acknowledged that voting and election cases tend to require uniform rules as a matter of course and effective administration. *See* 606 U.S. at 852 n.12 (citing *Shaw v. Hunt*, 517 U.S. 899 (1996)).

If Defendants now suggest relief should have been limited to Plaintiffs' members, they waived that argument by failing to raise it below, and they have not even begun to explain how such a remedy would be administrable. There is reason to think it would not be. Plaintiff organizations have tens of thousands of members across Texas. ROA.40889-40893 (D.Ct.Op.26-30). Limiting modifications of the Challenged Provisions to only these individuals would require local officials to keep and update running lists of members in their jurisdictions, and to vary the applicable election procedures on a voter-by-voter basis. And any gaps or lapses in this needlessly complex system

---

swept far beyond plaintiffs' evidence, ordering citywide relief despite evidence focused only in the City's Skid Row area. 14 F.4th 947, 960-61 (9th Cir. 2021). Here, the opposite is true: the District Court issued a permanent injunction only after extensive factfinding, and it tailored relief precisely to the burdens the Challenged Provisions impose on disabled voters. ROA.40964 (D.Ct.Op.101).

would deny complete relief to Plaintiffs' members. *See, e.g.*, *Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486, 1501-02 (9th Cir. 1996) (statewide injunction appropriate because it was "unlikely" that highway officers would determine whether person was a plaintiff before impermissibly issuing citation).

### B. The Court can remand for a narrower remedy.

If this Court nevertheless determines for any reason that the injunction is overbroad, it should remand to the District Court to narrow the remedy. *See U.S. v. Lierman*, 151 F.4th 530 (4th Cir. 2025); *accord Ortega v. Grisham*, 148 F.4th 1134, 1155-56 (10th Cir. 2025) (same); *Doe v. Trump*, 142 F.4th 109, 112 (1st Cir. 2025) (same); *Reporters Comm. for Freedom of the Press v. Rokita*, 147 F.4th 720, 734 (7th Cir. 2025) (same).

Examples of alternative remedies that the District Court could consider, individually and together, to address ADA violations found here include:

1) Narrowing the injunction to provide exceptions to the Challenged Provisions only for voters with disabilities;

2) Directing State and local election officials that modifications to the Challenged Provisions are permissible and consistent with S.B.1 and Texas law when required by the ADA;

3) Waiving or modifying any or all of the Challenged Provisions;

4) Directing the use of alternative or additional methods of curing mail-ballot applications and ballots;

5) Implementing a statewide system for providing guidance to counties on reasonable modifications under S.B.1 to ensure that counties can review and respond to reasonable modification requests in a timely and effective way;

6) Narrowing and clarifying the terms in the Challenged Provisions, such as "vote-harvesting," so that they clearly apply only to fraudulent activity.

Plaintiffs suggested a number of these alternatives below in their post-trial submissions. *See* ROA.36177-36179. Defendants never engaged or offered any alternatives.

To the extent this Court finds the injunction overly broad, it can affirm on the merits and then remand to the District Court to craft a remedy that affords complete relief for the violations of the ADA proven at trial.

## CONCLUSION

The District Court's judgment should be affirmed.

Dated: November 21, 2025          Respectfully submitted,

*/s/ Brian Dimmick*
Brian Dimmick

*/s/ Victor Genecin*
Victor Genecin

/s/ *Leah Tulin*
Leah Tulin

/s/ *Nina Perales*
Nina Perales

Victor Genecin
Kathryn Sadasivan
Breanna Williams
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
40 Rector Street, 5th Floor
New York, NY 10006
(212) 965-2200
vgenecin@naacpldf.org
ksadasivan@naacpldf.org
bwilliams@naacpldf.org

Kelly Gardner
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
260 Peachtree Street NW,
Suite 2300
Atlanta, GA 30303
(404) 590-0885
kgardner@naacpldf.org

Shira Wakschlag
Evan Monod
THE ARC OF THE UNITED
STATES, INC.
2000 Pennsylvania Ave NW,
Suite 500
Washington, DC 20006
(202) 534-3708
wakschlag@thearc.org
monod@thearc.org

Brian Dimmick
Adriel I. Cepeda Derieux
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
915 15th Street NW
Washington, DC 20005
(202) 457-0800
bdimmick@aclu.org
acepedaderieux@aclu.org

Ari Savitzky
Dayton Campbell-Harris
Sophia Lin Lakin
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 284-7334
asavitzky@aclu.org
dcampbell-harris@aclu.org
slakin@aclu.org

Thomas Paul Buser-Clancy
Ashley Alcantara Harris
AMERICAN CIVIL LIBERTIES
UNION OF TEXAS
P.O. Box 8306
Houston, TX 77288
(713) 942-8146
tbuser-clancy@aclutx.org
aharris@aclutx.org

J. Michael Showalter
Duncan Weinstein
ARENTFOX SCHIFF LLP
233 South Wacker Drive,
Suite 7100
Chicago, IL 60606
(312) 258-5561
j.michael.showalter@afslaw.com
duncan.weinstein@afslaw.com

Derek Ha
ARENTFOX SCHIFF LLP
44 Montgomery Street, 38th Floor
San Francisco, CA 94104
(415) 757-5500
derek.ha@afslaw.com

Elissa Gershon
Megan A. Rusciano
CENTER FOR PUBLIC
REPRESENTATION
5 Ferry Street #314
Easthampton, MA 01027
(413) 586-6024
egershon@cpr-ma.org
mrusciano@cpr-ma.org

Leah J. Tulin
BRENNAN CENTER FOR
JUSTICE AT NYU SCHOOL OF
LAW
777 6th Street NW, Suite 1100
Washington, DC 20001
(202) 650-6397
tulinl@brennan.law.nyu.edu

Zachary Dolling
TEXAS CIVIL RIGHTS PROJECT
1405 Montopolis Drive
Austin, Texas 78741
(512) 474-5073
zachary@texascivilrightsproject.org

Peter Thomas Hofer
Christopher McGreal
DISABILITY RIGHTS TEXAS
2222 W. Braker Lane
Austin, TX 78758
(512) 454-4816
phofer@drtx.org
cmcgreal@drtx.org

Nina Perales
MEXICAN AMERICAN LEGAL
DEFENSE AND EDUCATION
FUND
110 Broadway, Suite 300
San Antonio, Texas 78205
(210) 224-5476
nperales@maldef.org

Zachary Tripp
Aaron J. Curtis
WEIL, GOTSHAL &
MANGES, L.L.P.
767 5th Avenue
New York, NY 10153
(212) 310-8901
zack.tripp@weil.com
aaron.curtis@weil.com

Sean Morales-Doyle
Jasleen K. Singh
Patrick A. Berry
BRENNAN CENTER FOR
JUSTICE AT NYU SCHOOL OF
LAW
120 Broadway, Suite 1750
New York, NY 10271
(646) 292-8310
morales-
doyles@brennan.law.nyu.edu
singhj@brennan.law.nyu.edu
berryp@brennan.law.nyu.edu

*Counsel for Plaintiffs-Appellees*

**CERTIFICATE OF COMPLIANCE**

This document complies with the type-volume limits of Fed. R. App. P. 32(a)(7)(B) and 28(b) because it contains 17,970 words, excluding parts exempted by Fed. R. App. P. 32(f).

This document complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(5) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

*/s/ Brian Dimmick*
Brian Dimmick

*/s/ Victor Genecin*
Victor Genecin

*/s/ Leah Tulin*
Leah Tulin

*/s/ Nina Perales*
Nina Perales

## CERTIFICATE OF SERVICE

I hereby certify that on November 21, 2025, a true and correct copy of the foregoing document was served on all counsel of record by filing with the Court's CM/ECF system.

*/s/ Brian Dimmick*
Brian Dimmick

*/s/ Victor Genecin*
Victor Genecin

*/s/ Leah Tulin*
Leah Tulin

*/s/ Nina Perales*
Nina Perales