**No. 25-50246**

# UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

LA UNIÓN DEL PUEBLO ENTERO, *et al.*,
*Plaintiffs-Appellees*,

*v.*

GREGORY W. ABBOTT, *et al.*,
*Defendants-Appellants*,

REPUBLICAN NATIONAL COMMITTEE,
*Movant-Appellant*.

On Appeal from the United States District Court
for the Western District of Texas, San Antonio Division,
No. 5:21-cv-00844, Judge Xavier Rodriguez

**BRIEF OF THE LONE STAR CHAPTER OF THE PARALYZED
VETERANS OF AMERICA AND THE NATIONAL FEDERATION OF
THE BLIND OF TEXAS AS AMICI CURIAE SUPPORTING
PLAINTIFFS-APPELLEES AND AFFIRMANCE**

MATT JONES
CLAY READE JACOB, JR.
KATE STRICKLAND
WILMER CUTLER PICKERING
   HALE AND DORR LLP
2100 Pennsylvania Avenue, NW
Washington, DC 20037
matt.jones@wilmerhale.com
reade.jacob@wilmerhale.com
kate.strickland@wilmerhale.com

WHITLEY HORNING
WILMER CUTLER PICKERING
   HALE AND DORR LLP
60 State Street
Boston, MA 02109
whitley.horning@wilmerhale.com

*Counsel for Amici Curiae*

November 26, 2025

## CERTIFICATE OF INTERESTED PARTIES

*La Unión Del Pueblo Entero, et al., v. Gregory W. Abbott, et al.,* No. 25-50246

Pursuant to Fifth Circuit Rule 29.2, the undersigned counsel of record certifies that, in addition to the persons and entities listed in Plaintiffs-Appellees' Certificate of Interested Persons, the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made so that the judges of this Court may evaluate possible disqualification or recusal.

### Amici Curiae

Lone Star Chapter of the Paralyzed Veterans of America

National Federation of the Blind of Texas

### Counsel for Amici Curiae

Matt Jones
Clay Reade Jacob, Jr.
Whitley Horning
Kate Strickland
WILMER CUTLER PICKERING HALE AND DORR LLP

Dated: November 26, 2025

/s/ Matt Jones_____
MATT JONES
*Attorney of Record for Amici Curiae*

i

# TABLE OF CONTENTS

Page

CERTIFICATE OF INTERESTED PARTIES........................................................i

TABLE OF AUTHORITIES........................................................................ iii

STATEMENT OF INTEREST......................................................................1

SUMMARY OF ARGUMENT......................................................................3

ARGUMENT ............................................................................................7

I. LONE STAR PVA AND NFBTX REPRESENT SIGNIFICANT GROUPS OF DISABLED TEXANS WHO VOTE AT SIGNIFICANTLY LOWER RATES ..................................................................................................7

II. FEDERAL LAW PROHIBITS DISCRIMINATION AGAINST DISABLED VOTERS....................................................................................10

III. S.B.1'S NUMBER-MATCHING REQUIREMENT, OATH-AND-ASSISTANCE PROVISIONS, AND ASSISTANCE RESTRICTIONS DISCRIMINATE AGAINST DISABLED TEXANS IN VIOLATION OF FEDERAL LAW .....................................................................12

    A. The Number-Matching Requirement Creates Significant Barriers for Texas' Disabled Voters......................................13

    B. The Assistance Restrictions and Oath-And-Assistance Provisions Restrict Access to the Ballot for Disabled Voters .........................................................................17

IV. DENYING DISABLED VOTERS EQUAL OPPORTUNITY TO VOTE UNDERMINES ELECTION INTEGRITY .........................................22

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Bennett-Nelson v. Louisiana Board of Regents*, 431 F.3d 448 (5th Cir. 2005) ...............................................................................................12

*Fry v. Napoleon Community Schools*, 137 S. Ct. 743 (2017)..................................10

*National Federation of the Blind v. Lamone*, 813 F.3d 494 (4th Cir. 2016) ...............................................................................................23

*People First of Alabama v. Merrill*, 491 F. Supp. 3d 1076 (N.D. Ala. 2020) ...............................................................................................21

*Smith v. Harris County, Texas*, 956 F.3d 311 (5th Cir. 2020)................................10

## STATUTES, RULES, AND REGULATIONS

28 C.F.R. §35.130 ...............................................................................................11, 12

29 U.S.C. §794 .......................................................................................................4, 11

42 U.S.C.
     §12101(a)...................................................................................................11
     §12132 ..................................................................................................4, 11

52 U.S.C. §21081(3) ...................................................................................................12

S.B.1
     §5.02 ......................................................................................................3, 13
     §5.03 ......................................................................................................3, 13
     §5.07 ......................................................................................................3, 13
     §6.03-6.05 ..............................................................................................3, 18
     §6.06 ...............................................................................................3, 17, 18
     §6.07 ......................................................................................................3, 18
     §7.04 ...............................................................................................3, 17, 18

## OTHER AUTHORITIES

The Americans with Disabilities Act of 1989: Hearings on S. 993
Before the Subcomm. on the Handicapped of the S. Comm. on
Labor and Human Resources, 101 Cong. 156 (1989) ...................................10

Betancourt, J.A., et al., *Exploring Health Outcomes for U.S. Veterans
Compared to Non-Veterans From 2003 to 2019,* 9 Healthcare
(Basel, Switzerland) 604 (2021) ......................................................................7

Dexheimer, Eric, *How Ken Paxton Cast a Social Worker Registering
Disabled Voters as Texas' Worst Election Criminal*, Houston
Chronicel (Nov. 28, 2022),
https://www.houstonchronicle.com/politics/texas/article/Texas-
AG-Paxton-raisedalarms-in-2021-with-four-17589784.php........................20

Dexheimer, Eric, *Paxton Made Her the State's Worst Election
Criminal. Now Texas is Coming for Her Teaching License*,
Houston Chronicle (Nov. 7, 2023) ................................................................21

Flamisch, Steve, *The Number of People With Disabilities Is Growing
and They Are Voting In Greater Numbers*, Rutgers (Oct. 15,
2024), https://www.rutgers.edu/news/number-people-
disabilities-growing-and-they-are-voting-greater-numbers ...........................8

National Conference of State Legislatures, *Voters with Disabilities*
(Oct. 21, 2024), https://www.ncsl.org/elections-and-
campaigns/voters-with-disabilities ...............................................................12

National Federation of the Blind, *2024 Blind Voter Experience* (May
2025), https://nfb.org/programs-services/center-excellence-
nonvisual-accessibility/national-center-nonvisual-election-0 ........................5

*Percentage of People in the U.S. with a Vision Disability as of 2023,
by State,* Statista, https://www.statista.com/statistics/794303/vision-
disabled-population-us-by-
state/#:~:text=Table_title:%20Percentage%20of%20people%20in%
20the%20U.S.,Texas%20%7C%20Percentage%20of%20populatio
n:%202.8%25%20%7C ...................................................................................9

Sherman, Amy, *Fact-Check: Was Texas Veteran Denied Mail-in Ballot Because of 1950s Registration Number?*, Austin American-Statesman (Feb. 5, 2022) ..............................................16

Span, Paula, *Wheelchair? Hearing Aids? Yes. 'Disabled'? No Way.*, New York Times (Nov. 15, 2025) ...............................................8

Statement by Representative Tony Coelho, *Legislative History of Public Law 101-336*, *The Americans with Disabilities Act of 1988*, Committee on Education and Labor (1991) ..........................................4

Statement of Sandra Parrino, *Legislative History of Public Law 101-336*, The Americans with Disabilities Act of 1988, Committee on Education and Labor (1991) ...................................................8

US Census Bureau, *Table S1810: Disability Characteristics* (2022), https://data.census.gov/table/ACSST5Y2022.S1810?q=disability&g=040XX00US48 ...............................................7

US Census Bureau, *Table S2101: Veteran Status* (2022), https://data.census.gov/table?q=2022+veterans&g=040XX00US48 ...............7, 8

Vespa, Jonathan & Caitlin Carter, *Trends in Veteran Disability Status and Service-Connected Disability: 2008-2022* (Nov. 2024), https://www2.census.gov/library/publications/2024/demo/acs-58.pdf ..................7

**STATEMENT OF INTEREST**[1]

The Paralyzed Veterans of America ("PVA") is a congressionally chartered veterans service organization representing nearly 16,000 members nationwide. Its members are veterans of the United States Armed Forces who have sustained spinal cord injuries or disorders. PVA is dedicated to advancing voting accessibility for people with disabilities and has played a pivotal role in securing federal protections for accessible polling places and voting systems, empowering veterans and others with physical disabilities to participate fully in the democratic process.

The Lone Star Chapter of the Paralyzed Veterans of America ("Lone Star PVA") is a regional chapter of PVA and headquartered in Garland, Texas. Lone Star PVA serves North Texas, focusing on the needs and experiences of Texas veterans with spinal cord injuries or disorders, including by providing peer support, benefits counseling, accessibility advocacy, and community reintegration services.

The National Federation of the Blind ("NFB") is a nonprofit membership organization comprised of blind individuals and their friends and families. NFB promotes the general welfare of the blind by advocating for equal integration into

---

[1] No party, party's counsel, or person other than the amici, their members, and counsel who authored this brief, in whole or in part, contributed money intended to fund preparing or submitting this brief.

1

society and the removal of barriers that deny opportunity. Its mission includes eliminating legal, economic, and social discrimination, and ensuring that blind Americans can participate in all aspects of life—including voting—on equal terms.

The NFB of Texas ("NFBTX"), the state affiliate of NFB, advances the rights of its 500 members to participate fully and equally in Texas civic life. NFBTX works to ensure that blind Texans can vote independently and on equal footing with every other voter, including by collaborating with developers of voting technology to promote accessibility.

Lone Star PVA and NFBTX share a strong interest in ensuring that Texans with disabilities—including paralyzed veterans and blind individuals—have meaningful and equal access to the democratic process. Both organizations support election integrity and recognize that true integrity is achieved only when all eligible voters can participate fully. S.B.1's restrictive voting provisions undermine election integrity by systematically excluding disabled voters and veterans who have sacrificed for our country. Upholding the District Court's decision is essential not only to protect the rights of disabled Texans, but also to ensure that Texas elections remain worthy of public confidence.

For these reasons, Lone Star PVA and NFBTX respectfully submit this statement of interest to support the enforcement of the rights of people with

2

disabilities to participate fully and equally in the democratic process. The organizations offer this perspective to assist the Court in understanding the real-world consequences that election rules have on Texans who live with spinal cord injuries or blindness, as well as other Texans with physical and mental disabilities who depend on accessible procedures to exercise the most fundamental right they possess: the right to vote.

## SUMMARY OF ARGUMENT

Election integrity is a foundational value, but it cannot come at the expense of excluding those with disabilities—many of whom have sacrificed for our country. Texas S.B.1's restrictions—particularly its Number-Matching Requirement (S.B.1 §§5.02, 5.03, 5.07), Assistance Restrictions (S.B.1 §§6.06, 7.04), and Oath-And-Assistance Provisions (S.B.1 §§6.03-6.05, 6.07)—make it significantly harder for Texans with disabilities, including paralyzed veterans and blind individuals, to vote. These barriers are not theoretical: millions of Texans live with disabilities, and veterans are disproportionately affected due to service-related injuries and age. For many, tasks such as traveling to a polling place, remembering or locating required identification numbers, or curing ballot defects in person are insurmountable obstacles.

3

Congress enacted the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act of 1973 ("Section 504") to, among other things, guarantee equal access to voting for disabled Americans.  These laws impose an affirmative duty on states to make reasonable modifications and prohibit discriminatory practices that undermine disabled voters' ability to participate in elections.  42 U.S.C. §12132; 29 U.S.C. §794.  As former Representative Tony Coelho, the primary sponsor of the ADA, stated at the time, "[c]ountless numbers of our fellow citizens who are veterans of foreign conflicts, have acquired a disability while defending their country, only to come home to a society that subjects them to discrimination and injustice, a society that shuns them merely because they are disabled."[2]  The ADA was designed to address that discrimination in all aspects of American life, including voting.[3]

The District Court correctly held that S.B.1's Number-Matching Requirement, Assistance Restrictions, and Oath-and-Assistance Provisions violate the ADA and Section 504 by denying disabled Texans—including paralyzed veterans who have sacrificed for our nation—an equal opportunity to vote.  The record shows that disabled voters are three to four times more likely to vote by mail and, in 2020, made

---

[2] Statement by Rep. Tony Coelho, *Legislative History of Public Law 101-336, The Americans with Disabilities Act of 1988*, at 942, Committee on Education and Labor (1991).
[3] *Id.* at 941.

4

up nearly a third of all Texas mail voters.  ROA.40875(D.Ct.Op.¶25).  The record also shows that S.B.1's rigid identification mandates have led to a dramatic spike in mail ballot rejections—soaring to 20 times previous rates—primarily due to missing or mismatched identification numbers.  ROA.40899(D.Ct.Op.¶126).  These barriers fall hardest on those with visual, cognitive or mobility impairments, disenfranchising thousands of eligible veterans and other voters on procedural grounds alone.

Compounding these obstacles, S.B.1 criminalizes compensated voter assistance and severely limits who may help disabled voters, ignoring the realities faced by individuals living with significant disabilities.  Many disabled people live alone, have limited transportation, and confront social and economic isolation—factors that restrictive voting rules only worsen.  Blind people, in particular, face transportation barriers limiting their ability to go to the polls in person and then often battle accessibility barriers when voting in person.[4]  Others live in facilities or rehabilitation hospitals because they are unable to receive the care they require at home.  In these settings, individuals with disabilities often rely on paid caregivers for their needs, including the ability to exercise their right to vote.  The statute's

---

[4] National Federation of the Blind, *2024 Blind Voter Experience* (May 2025), https://nfb.org/programs-services/center-excellence-nonvisual-accessibility/national-center-nonvisual-election-0 (30% of blind voters reported that poll workers had problems setting up or activating accessible voting machines).

failure to provide accessible ways to cure ballot defects, or to implement accessible options to ensure meaningful access for disabled voters, underscores its discriminatory impact and the State's failure to provide reasonable modifications.

Upholding the District Court's decision is essential to protect the rights of disabled Texans, honor the service of paralyzed veterans, and maintain the integrity of our electoral system.

# ARGUMENT

## I.    Lone Star PVA and NFBTX Represent Significant Groups of Disabled Texans Who Vote at Significantly Lower Rates.

A substantial portion of the Texas voting age population has a disability. The U.S. Census Bureau reports that in 2022, over 3.35 million Texans reported a disability.[5]   Nearly one-third of Texas veterans have a disability: 426,602 of the state's 1.4 million veterans.[6]  And veterans are more likely to have a disability than those who have never served in the U.S. Armed Forces.[7]  While approximately 30% of Texas veterans have a disability, only 13% of the non-veteran population had a disability in 2022.[8]  The higher rate of disabilities among veterans stems, at least in part, from service-related injuries as well as "the physical and psychological demands of military service."[9]

The number of Texans with disabilities will increase over time as the population continues aging. In any population, disability correlates "[v]ery, very highly with age." ROA.40876(D.Ct.Op.¶26). And, the average age of the veteran

---

[5] US Census Bureau, *Table S1810: Disability Characteristics* (2022), https://data.census.gov/table/ACSST5Y2022.S1810?q=disability&g=040XX00US48.
[6] US Census Bureau, *Table S2101: Veteran Status* (2022), https://data.census.gov/table?q=2022+veterans&g=040XX00US48.
[7] Betancourt et al., *Exploring Health Outcomes for U.S. Veterans Compared to Non-Veterans From 2003 to 2019*, 9 Healthcare (Basel, Switzerland) 604 (2021).
[8] US Census Bureau, *Table S2101, supra,* note 6.
[9] Vespa & Carter, *Trends in Veteran Disability Status and Service-Connected Disability: 2008-2022* at 14 (Nov. 2024), https://www2.census.gov/library/publications/2024/demo/acs-58.pdf.

population in Texas and in the nation generally is already higher than that of the non-veteran population.[10]  Further, as the Texas veteran population ages—and medicine advances—more disabled veterans will be eligible to vote in state and national elections.[11]  As Sandra Parrino, then-chairperson of the National Council on Disability explained to Congress during the hearings on the ADA, "Advancing age, economic circumstances, illness, and accident will someday, according to reputable statistics, put most of us, in the category of a person with a disability."[12]  This is true even if many voters choose to not call themselves disabled because of persistent stigma,[13] meaning current statistics likely undercount the true number of disabled Texans.

Disabled Texans have diverse disabilities and face differing challenges.  Just over half of Texans with disabilities have a mobility impairment, defined as difficulty walking or climbing stairs.  ROA.40904(D.Ct.Op.¶148 n.25).  Members of Lone Star PVA, in particular, generally have some form of spinal cord injury or disorder that has a significant impact on mobility.  And approximately one-third of

---

[10] US Census Bureau, *Table S2101: Veteran Status*, *supra* note 6.

[11] Flamisch, *The Number of People With Disabilities Is Growing and They Are Voting In Greater Numbers*, Rutgers (Oct. 15, 2024), https://www.rutgers.edu/news/number-people-disabilities-growing-and-they-are-voting-greater-numbers.

[12]  Statement of Sandra Parrino, *Legislative History of Public Law 101-336*, The Americans with Disabilities Act of 1988, at 956, Committee on Education and Labor (1991).

[13] *See, e.g.*, Span, *Wheelchair? Hearing Aids? Yes. 'Disabled'? No Way.*, New York Times (Nov. 15, 2025), https://www.nytimes.com/2025/11/15/health/older-people-disability.html.

the voting-eligible Texans with disabilities have a cognitive impairment, defined as difficulty remembering, concentrating, or making decisions. ROA.40915-40916(D.Ct.Op.¶191). Approximately 3% of Texans have a vision disability, amounting to nearly 900,000 people.[14] The vast majority of NFBTX members are blind.

Historically, voters with disabilities have turned out to vote in lower percentages than non-disabled voters. This turnout gap was 5.15 percentage points in 2020. ROA.40929(D.Ct.Op.¶241). Likely, this gap is caused by several factors that limit the opportunity for individuals with disabilities to exercise their fundamental right to vote. Individuals with disabilities often have difficulty going outside of the home alone, lower education and income levels, higher levels of social isolation, and often experience difficulties with voting. *Id*. In Texas specifically, 10% of voting age Texans have a disability that limits travel *and* Texans with disabilities are four times more likely to live in a zero-vehicle household than Texans without disabilities. ROA.40904(D.Ct.Op.¶149). Given these limitations, disabled voters are much more likely to use mail-in voting, ROA.40876(D.Ct.Op.¶25),

---

[14] *Percentage of People in the U.S. with a Vision Disability as of 2023, by State,* Statista, https://www.statista.com/statistics/794303/vision-disabled-population-us-by-state/#:~:text=Table_title:%20Percentage%20of%20people%20in%20the%20U.S.,Texas%20%7C%20Percentage%20of%20population:%202.8%25%20%7C) (last visited Nov. 26, 2025).

though many still experience barriers with that manner of voting, as discussed in Section III.

## II.     Federal Law Prohibits Discrimination Against Disabled Voters.

The ADA and Section 504 are vital safeguards for the integrity and inclusivity of democratic participation for voters with disabilities.[15]  Testifying before the Senate Committee on Labor and Human Resources regarding the ADA in May 1989, then-PVA National Vice President Perry Tillman—who was paralyzed in a helicopter crash in Vietnam—explained the inequity that the ADA was designed to address:

> Myself and other veterans before me fought for freedom for all Americans. But when I came home and I found out that what I fought for applied to everyone but me and other handicapped people, I couldn't stop fighting. I have fought since my injury in Vietnam to regain my rightful place in society.[16]

According to Tillman, the ADA would finally "allow all Americans, disabled or not, to take part equally in American life."[17]  And he was right.

The ADA was enacted by Congress as a "clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities"

---

[15] These statutes impose nearly identical substantive requirements, so courts have interpreted them in tandem. *Fry v. Napoleon Community Schools*, 137 S. Ct. 743, 749 (2017); *Smith v. Harris County, Texas*, 956 F.3d 311, 317 (5th Cir. 2020).

[16] The Americans with Disabilities Act of 1989: Hearings on S. 993 Before the Subcomm. on the Handicapped of the S. Comm. on Labor and Human Resources, 101 Cong. 156 (1989).

[17] *Id.*

10

and provides "clear, strong, consistent, enforceable standards" to address disability-based discrimination.  42 U.S.C. §12101(b)(1).  The ADA's text acknowledges that "physical or mental disabilities in no way diminish a person's right to fully participate in all aspects of society," yet discrimination against individuals with disabilities persisted in several critical areas, including voting.  42 U.S.C. §12101(a).

To ensure more inclusive elections, Title II of the ADA prohibits the state from denying disabled voters meaningful access to voting or otherwise discriminating on the basis of disability.  42 U.S.C. §12132.  Section 504 similarly prohibits discrimination against people with disabilities by any program or activity that receives federal financial assistance.  29 U.S.C. §794.

Under Title II, it is unlawful discrimination on the basis of disability if Texas: (i) provides voters with disabilities an opportunity to vote unequal to that afforded to non-disabled voters; (ii) administers voting in a way that is not as effective in affording equal opportunity as that provided to non-disabled voters; (iii) uses criteria or methods of administering voting that defeats or substantially impairs the objectives of voting with respect to individuals with disabilities; or (iv) imposes eligibility criteria that tends to screen out disabled voters.  28 C.F.R. §35.130.  Instead, the ADA imposes an affirmative duty on Texas to make reasonable modifications "when the modifications are necessary to avoid discrimination,"

11

unless those modifications would fundamentally alter the nature of the program.  28 C.F.R. §35.130(b)(7).[18]

The federal government protects the right to vote for disabled Americans in other laws as well.[19]  Most recently, Congress passed the Help America Vote Act in 2002, which strengthened protections for disabled voters.  In particular, the statute affirmed that voting systems must be accessible to individuals with disabilities.  52 U.S.C. §21081(3).  Taken together, federal law intentionally provides several safeguards to ensure voters with disabilities have meaningful access to participate in our democracy, free from disability-based discrimination.

## III. S.B.1's Number-Matching Requirement, Oath-And-Assistance Provisions, and Assistance Restrictions Discriminate Against Disabled Texans in Violation of Federal Law.

Despite the protections of federal law, the Texas Legislature introduced three new sets of obstacles within S.B.1, collectively referred to as the Challenged Provisions, that affect disabled voters—including veterans and blind Texans—who

---

[18] *Bennett-Nelson v. Louisiana Board of Regents*, 431 F.3d 448, 454 (5th Cir. 2005) ("In addition to their respective prohibitions of disability-based discrimination, both the ADA and the Rehabilitation Act impose upon public entities an affirmative obligation to make reasonable accommodations for disabled individuals.").

[19] *See, e.g.*, National Conference of State Legislatures, *Voters with Disabilities* (Oct. 21, 2024), https://www.ncsl.org/elections-and-campaigns/voters-with-disabilities (discussing the Voting Rights Act of 1965, the Voting Accessibility for the Elderly and Handicap Act of 1984, and the National Voter Registration Act of 1993).

often rely on mail-in ballots or voting assistance because of mobility or health limitations.[20]  By mandating that voters remember and accurately enter multiple identification numbers, and by restricting access to ballot assistance, S.B.1 creates barriers that are not only burdensome but, for many disabled veterans, frequently insurmountable.

The District Court's findings of fact confirm that these provisions subject disabled Texans—including blind people and veterans who have sacrificed for our nation's freedoms—to repeated ballot rejections, longer voting times, physical hardship, and a loss of privacy and dignity in the voting process. ROA40956(D.Ct.Op.¶93).  The District Court rightfully found that these provisions undermine disabled Texans' participation in the democratic process and violate the ADA.  ROA.40931(D.Ct.Op.¶249).

### A.     The Number-Matching Requirement Creates Significant Barriers for Texas' Disabled Voters.

For many disabled Texans, the Number-Matching Requirement imposed by S.B.1 §§5.02, 5.03, and 5.07 has made voting more difficult and, in some cases, nearly impossible.  For those with cognitive impairments—including veterans who

---

[20] Voters with disabilities are four times more likely to vote by mail based on 2020 numbers. ROA.40876(D.Ct.Op.¶25).  For some disabled voters, voting by mail is the only way to fulfill their civic duty.   ROA.40900(D.Ct.Op.¶130).

13

suffered traumatic brain injuries during their service—memory loss makes recalling which of several identification numbers they used on their registration or ballot request form difficult. These individuals and those who live in congregate settings may also have difficulty retrieving their ID number because they do not know where to find that information or where it is stored. ROA.40900(D.Ct.Op.¶130). Additionally, voters with disabilities are often older, meaning they likely registered to vote some time ago and now have trouble remembering what number they used. *Id*. In fact, some may have registered before Texas began requiring identification numbers to register, so they may not even have an acceptable identification number in the voter database to match against a ballot request, creating further hurdles.

When disabled voters need to fix an error—such as inputting the wrong identification number—they are forced to navigate a complicated process to ensure their vote is counted. This often means traveling long distances to a local clerk's office, which can be especially burdensome and inaccessible for the blind and those with disabilities that limit driving. And for those who attempt to fix problems via the state's error-ridden online ballot tracker, its inaccessibility may make it impossible to use.

These are not theoretical concerns; they are a reality confirmed by the District Court's record. The experience of Teri Saltzman, a legally blind voter and member

of The Arc of Texas, exemplifies the systemic problems caused by these requirements. Ms. Saltzman testified that her mail ballot application was rejected multiple times due to ID-related issues. ROA.40906(D.Ct.Op.¶155). When Travis County instructed her to use the ballot tracker to cure her application, she discovered the system was inaccessible for blind users. ROA.40906(D.Ct.Op.¶¶155-158). Even after using assistive technology at work to check her ID numbers, her mail ballot was ultimately rejected because the instructions were not accessible, preventing her from understanding the required steps. *Id*. Despite reaching out to the county for help over three elections and explaining her disability and inability to cure the ballot in person or online, she was not offered any modifications or waivers of S.B.1's requirements. *Id.* In the November 2022 general election, the application form's smaller print made it even less accessible, further excluding her from the voting process. ROA.40906(D.Ct.Op.¶158).

The experience of World War II veteran Kenneth Thompson further illustrates how the Number-Matching Requirement disenfranchises or, at minimum, places additional burdens on older veterans. In February 2022, Texas rejected two mail ballot applications sent by the 95-year-old veteran who has voted in every election

15

since the 1940s.[21]  Why?  Because Thompson registered to vote before Texas voter registration rules required ID numbers, so his mail ballot application had nothing to match in his voter record.  And the issue was only discovered when Thompson's daughter proactively called the county multiple times to check on her father's application.  Thompson ultimately had to re-register, placing an additional burden on the elderly veteran.  Though Thompson and his daughter discovered and overcame this added obstacle in time to receive a mail ballot, both expressed concern that other senior citizens might not be so lucky, losing their ability to vote by mail.

Moreover, the process of correcting a rejected ballot poses significant challenges for disabled voters.  Anne Robinson, a quadriplegic Army veteran and PVA National Vice President, wrote to the Texas Legislature about the significant challenges S.B.1 creates for voters with severe disabilities who must cure ballots.  D.Ct.Dkt.642-2, Ex.8 (Robinson testimony).  Ms. Robinson explained that she relies on a caregiver or family member to drive her everywhere, that a trip to her local clerk's office in San Antonio would require approximately one hour each way, and

---

[21] Sherman, *Fact-Check: Was Texas Veteran Denied Mail-in Ballot Because of 1950s Registration Number?*, Austin American-Statesman (Feb. 5, 2022), https://www.statesman.com/story/news/politics/politifact/2022/02/05/texan-denied-mail-ballot-because-1950-s-registration-number/6665193001/.

that her local clerk's office—as well as the entire downtown area of San Antonio—"is not very wheelchair friendly." *Id.* at 2.

Ms. Robinson's difficulties are not isolated incidents. Indeed, she notes that many disabled voters are homebound or lack reliable transportation, making in-person cures inaccessible. D.Ct.Dkt.642-2, Ex.8 at 2. Members of The Arc of Texas and REV UP Texas testified that traveling to an elections office presents a major barrier due to transportation and mobility limitations—the very circumstances that require them to vote by mail in the first place. ROA.40904(D.Ct.Op.¶148).

The experiences of these disabled voters and advocates make clear that the Number-Matching Requirement, as implemented by S.B.1, does not provide equal access to voting as required by the ADA and Section 504. Instead, these provisions subject disabled individuals to repeated ballot rejections, unnecessary physical and emotional hardship, and a loss of independence and dignity in the voting process.

### B. The Assistance Restrictions and Oath-And-Assistance Provisions Restrict Access to the Ballot for Disabled Voters.

The Assistance Restrictions and the Oath-And-Assistance Provisions impose significant and immediate barriers for disabled voters, compounding the challenges they already face in accessing the ballot. The Assistance Restrictions criminalize voter assistance, making it an offense to offer or accept even modest compensation, such as a meal, for helping with mail ballots. S.B.1 §§6.06 and 7.04. The Oath-

And-Assistance Provisions place further burdens on voters with disabilities and assistors by requiring additional written disclosures from the assistor and a sworn oath under penalty of perjury that the voter is eligible for assistance and was not coerced. S.B.1 §§6.03-6.05, 6.07. And failure to include the new disclosures or to administer the sworn oath results in felony-level offenses. *See* S.B.1 §§6.06(c), 7.04(f); ROA.40874(D.Ct.Op.¶19).

These additional burdens have limited disabled voters' access to voting using the assistors of their choice. Ms. Robinson explained in her letter to Texas legislators that "[i]f the disabled person requires 'voter assistance,' as I do, putting extra requirements on the person helping them could potentially discourage voting." D.Ct.Dkt.642-2, Ex.8 at 2. Quadriplegic Texas attorney and voter Toby Cole agrees: "every time you put even one little road bump or one little barrier in front, it just makes it that much harder" for people with disabilities to vote. ROA.40930-40931(D.Ct.Op.¶247).

Certainly, the record provides ample evidence that these restrictions on voter assistance discourage assistors and/or caregivers from providing assistance to disabled voters by fostering fear and uncertainty among them. Despite the small carveout in S.B.1 §6.06 creating an exception for caregivers or attendants "previously known to the voter," the terms are not sufficiently defined, leaving

18

voters and their caregivers confused about what constitutes criminal activity. ROA.40925-40926(D.Ct.Op.¶226).  Jennifer Martinez, Chief Executive Officer of The Arc of Texas, and Robert Kafka, a disability advocate and organizer for REV UP Texas, testified that the criminalization of assisting disabled voters is an additional burden on caregivers who are already challenging to find and asked to do labor-intensive tasks for very low wages.  ROA.45623 (10/11 Tr. 3625:5-22 (Kafka)).  The severity of these restrictions force many caregivers to withdraw help, leaving disabled voters with the untenable choice of risking legal jeopardy or attempting to vote without necessary care—often at the cost of pain, frustration, and loss of privacy and dignity.

And the stakes are high: for some disabled voters like REV UP Texas regional representative Jodi Lydia Nunez Landry, the loss of her caregiver could mean the loss of her independence and relegation into a nursing home. ROA.40908(D.Ct.Op.¶166 n.27).  Similarly, Nancy Crowther, a member of The Arc of Texas with a progressive neuromuscular disease, testified that "as meaningful as voting is to me . . . it's just not worth it when your life is dependent on your attendant or your caregiver."  ROA.40930(D.Ct.Op.¶245).  Mr. Cole summed up the choice facing disabled voters in simple terms: if voting requires asking caregivers to risk

19

deportation or criminal charges, they will choose not to exercise their fundamental right to vote.  ROA.40916(D.Ct.Op.¶193).

The Assistance Restrictions additionally limit the opportunity to vote for disabled Texans living in congregate settings such as nursing facilities.  For these individuals, voting requires assistance from facility staff who are paid to help residents in various activities, including voting during elections.  But, without sufficient clarity, these staff members are equally likely to fear criminal prosecution and choose not to help disabled voters apply for or fill out their mail ballots.

This fear is particularly well justified because Texas has shown that it can and will prosecute individuals for even unintentional errors when assisting voters in supported care facilities.  Kelly Brunner, a former social worker at a supported living facility, was indicted for 134 election fraud crimes after the 2020 election for mistakenly signing the applications of residents she was assisting as an "agent," which has a narrow definition under Texas law.[22]  These charges meant Ms. Brunner faced years in prison and expensive legal bills, forcing her to eventually agree to a

---

[22] Dexheimer, *How Ken Paxton Cast a Social Worker Registering Disabled Voters as Texas' Worst Election Criminal*, Hous. Chron. (Nov. 28, 2022), https://www.houstonchronicle.com/politics/texas/article/Texas-AG-Paxton-raisedalarms-in-2021-with-four-17589784.php.

20

deal for probation.[23]  Such a well-publicized cautionary tale chills the willingness of well-meaning assistors who may now choose not to assist those who have no other way of voting for fear of severe criminal penalties.

Lone Star PVA and NFBTX agree with the District Court's finding that the threat of criminal penalties, coupled with ambiguous guidance regarding permissible assistance and relationships, has deterred trusted friends, volunteers, and professional caregivers from providing essential support.  ROA.40955(D.Ct.Op.,p. 92 (citing *People First of Alabama v. Merrill*, 491 F. Supp. 3d 1076, 1160, 1165 (N.D. Ala. 2020) (holding that restrictions on curbside voting and photo ID requirements for absentee voting rendered in-person voting and absentee voting, respectively, inaccessible for at least some disabled voters because those restrictions "may dissuade" them from using those methods of voting).  The court's findings underscore that the presence of trusted assistors is vital to preserving disabled voters' independence and equal opportunity, and that S.B.1's restrictive measures undermine these fundamental rights by impeding full participation in the democratic process.

---

[23] Dexheimer, *Paxton Made Her the State's Worst Election Criminal.  Now Texas is Coming for Her Teaching License*, Houston Chronicle (Nov. 7, 2023), https://www.houstonchronicle.com/news/investigations/article/brunner-paxton-voter-fraud-license-18459837.php.

Taken together, the detailed record in the trial court demonstrates that, rather than ensuring equal opportunity, the Challenged Provisions subject disabled individuals to repeated rejections, unnecessary physical and emotional hardship or pain, and a loss of independence and dignity at the ballot box.

## IV.   Denying Disabled Voters Equal Opportunity to Vote Undermines Election Integrity.

Election integrity is a valid and important goal, but it is not achieved by excluding blind people and veterans who have sacrificed for our country. When disabled voters are denied reasonable modifications that would afford them meaningful access to the voting process, the result is not only individual disenfranchisement, but a systemic failure that undermines the legitimacy and fairness of Texas elections. The ADA and Section 504 were enacted to safeguard the integrity of democratic participation by making our elections free from disability-based discrimination, and Texas's refusal to make reasonable modifications to its voting procedures for disabled veterans is precisely the exclusionary, discriminatory behavior these laws were designed to prevent.

The failure to make reasonable modifications to the Challenged Provisions of S.B.1—such as remote ballot return, accessible formats, or trusted assistance— creates a system in which disabled voters face disproportionate barriers to voting due to their disabilities. ROA.40929-40931(D.Ct.Op.¶¶241-249). This exclusion is

not only a violation of federal law, but also a breach of the public trust. When a significant segment of the electorate is systematically disenfranchised, the outcome of the election no longer reflects the will of the people. Instead, it reflects the limitations imposed by arbitrary and discriminatory procedures.

Moreover, denying disabled veterans a means of accessing the vote that is offered to other military members, such as overseas and active-duty military voters who are permitted to return ballots electronically, highlights the arbitrary nature of these restrictions. Texas's refusal to extend proven, secure voting modifications to disabled voters—while making them available to others—undermines the principle of reasonable modification and equal access, signaling to the public that the Texas voting system is not truly devoted to meaningful access for all voters. This kind of exclusion erodes confidence in the electoral process and diminishes the perceived legitimacy of election outcomes.

Federal statutes like the ADA and Section 504 were enacted not only to protect individual rights, but to safeguard the integrity of public programs—including elections—by ensuring that no eligible voter is excluded. *See, e.g.*, *National Federation of the Blind v. Lamone*, 813 F.3d 494, 507 (4th Cir. 2016) ("Ensuring that disabled individuals are afforded an opportunity to participate in voting that is equal to that afforded others, 28 C.F.R. §35.130, helps ensure that those individuals are

23

never relegated to a position of political powerlessness."). The failure to provide reasonable modifications for disabled veterans and blind Texans is precisely the kind of systemic flaw these laws were designed to prevent. By ignoring the needs of disabled voters, Texas risks transforming election integrity from a principle of inclusion into a tool of exclusion.

Ultimately, the integrity of an election depends on the participation of *all* eligible citizens. When disabled voters are denied meaningful access, the democratic process is diminished. And when those voters are veterans who acquired their disabilities during their service, then the values for which they served are betrayed. Ensuring reasonable modifications is not a matter of convenience—it is a constitutional and moral imperative that preserves the legitimacy of our elections and honors the service of those who have defended our democracy.

Respectfully submitted.

/s/ Matt Jones ___

MATT JONES
CLAY READE JACOB, JR.
KATE STRICKLAND
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2100 Pennsylvania Avenue, NW
Washington, DC 20037
matt.jones@wilmerhale.com
reade.jacob@wilmerhale.com
kate.strickland@wilmerhale.com

WHITLEY HORNING
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street
Boston, MA 02109
whitley.horning@wilmerhale.com

## CERTIFICATE OF COMPLIANCE

This amici brief supporting Plaintiffs-Appellees contains 4,868 words, excluding the parts of the brief exempted by rule.  This filing complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Times New Roman) using Microsoft Word.

/s/ Matt Jones ___
MATT JONES

November 26, 2025

## CERTIFICATE OF SERVICE

I hereby certify that on this 26th day of November 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit using the appellate CM/ECF system. Counsel for all parties to the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

/s/ Matt Jones

MATT JONES

November 26, 2025