No. 25-50246

# In the United States Court of Appeals for the Fifth Circuit

LA UNIÓN DEL PUEBLO ENTERO, SOUTHWEST VOTER REGISTRATION EDUCATION PROJECT; MEXICAN AMERICAN BAR ASSOCIATION OF TEXAS; TEXAS HISPANICS ORGANIZED FOR POLITICAL EDUCATION; JOLT ACTION; WILLIAM C. VELASQUEZ INSTITUTE; FIEL HOUSTON, INCORPORATED; FRIENDSHIP-WEST BAPTIST CHURCH; TEXAS IMPACT; JAMES LEWIN,

*Plaintiffs-Appellees,*

*v.*

GREGORY W. ABBOTT, IN HIS OFFICIAL CAPACITY AS GOVERNOR OF TEXAS; JANE NELSON, IN HER OFFICIAL CAPACITY AS TEXAS SECRETARY OF STATE; STATE OF TEXAS; WARREN K. PAXTON, IN HIS OFFICIAL CAPACITY AS ATTORNEY GENERAL OF TEXAS; HARRIS COUNTY REPUBLICAN PARTY; DALLAS COUNTY REPUBLICAN PARTY; NATIONAL REPUBLICAN SENATORIAL COMMITTEE,

*Defendants-Appellants,*

REPUBLICAN NATIONAL COMMITTEE

*Movant-Appellant,*

REVUP-TEXAS,

*Plaintiffs-Appellee,*

*v.*

KEN PAXTON, TEXAS ATTORNEY GENERAL,

*Defendant-Appellant,*

DELTA SIGMA THETA SORORITY, INCORPORATED; THE ARC OF TEXAS,

*Plaintiffs-Appellees,*

*v.*

GREGORY WAYNE ABBOTT, IN HIS OFFICIAL CAPACITY AS GOVERNOR OF TEXAS; WARREN KENNETH PAXTON, JR., IN HIS OFFICIAL CAPACITY AS THE ATTORNEY GENERAL OF TEXAS,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the Western District of Texas, San Antonio Division

## REPLY BRIEF FOR STATE DEFENDANTS-APPELLANTS

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

WILLIAM R. PETERSON
Solicitor General

WILLIAM F. COLE
Principal Deputy Solicitor General

DANIEL ORTNER
Assistant Solicitor General
Daniel.Ortner@oag.texas.gov

*Counsel for State Defendants-Appellants*

# Table of Contents

Page

Table of Authorities ............................................................................. ii

Glossary of S.B.1 Provisions ............................................................... vi

Introduction .......................................................................................... 1

Argument .............................................................................................. 2

    I.   Plaintiffs Lack Standing ............................................................ 2

        A.  This Court's recent decision in *LUPE III* controls. ............................ 2

        B.  Neither Plaintiffs nor their members are injured by the Voter Identification Provisions. ......................................................... 4

        C.  Plaintiffs are not entitled to challenge the Paid Assistance and Vote Harvesting Provisions because they are not discriminated against based on a disability. .......................................... 6

        D.  Plaintiffs' ADA injuries are not traceable to the Secretary. ................. 6

    II.  Plaintiffs Cannot Prevail on their Title II Claims ........................................ 8

        A.  The district court erroneously relied on a disparate impact theory that Plaintiffs concede they did not request. ........................... 8

        B.  S.B.1 does not deny disabled voters "meaningful access" to voting. .................................................................................. 9

        C.  Plaintiffs' failure to request accommodations defeats their claims. .................................................................................. 12

        D.  Invalidating whole provisions of S.B.1 was not a reasonable accommodation and it fundamentally altered Texas's law. ................17

    III.  The District Court's Injunction Was Impermissibly Overbroad. ............. 23

Conclusion ......................................................................................... 24

Certificate of Compliance ................................................................. 26

# Table of Authorities

**Page(s)**

**Cases:**

*A Helping Hand, LLC v. Baltimore County,*
515 F.3d 356 (4th Cir. 2008) .................................................. 6

*Addiction Specialists, Inc. v. Twp. of Hampton,*
411 F.3d 399 (3d Cir. 2005) .................................................. 6

*Alexander v. Choate,*
469 U.S. 287 (1985) .............................................................9, 10

*Bd. of Trs. of Univ. of Alabama v. Garrett,*
531 U.S. 356 (2001) ...............................................................19

*Bennett-Nelson v. La. Bd. of Regents,*
431 F.3d 448 (5th Cir. 2005) ................................................ 18

*Biden v. Nebraska,*
600 U.S. 477 (2023) ...............................................................17

*Cadena v. El Paso County,*
946 F.3d 717 (5th Cir. 2020) ..........................................14, 18

*Cascino v. Nelson,*
No. 22-50748, 2023 WL 5769414 (5th Cir. Sept. 6, 2023) ................................. 3

*Clapper v. Amnesty Int'l USA,*
568 U.S. 398 (2013) ................................................................ 3

*Crawford v. Hinds Cnty. Bd. of Supervisors,*
1 F.4th 371 (5th Cir. 2021) ..................................................... 3

*Crawford v. Marion Cnty. Bd.,*
553 U.S. 181 (2008) ...................................................... 5, 10, 11

*Deep South Center for Environmental Justice v EPA,*
138 F.4th 310 (5th Cir. 2025) ................................................ 4

*Delano-Pyle v. Victoria County,*
302 F.3d 567 (5th Cir. 2002) .................................................19

*Disability Rights Wisconsin, Inc. v. Walworth Cnty. Bd. of Supervisors,*
522 F.3d 796 (7th Cir. 2008) .................................................13

*Disabled in Action v. Bd. of Elecs.,*
752 F.3d 189 (2d Cir. 2014) ................................................. 10

*Eu v. San Francisco Cnty. Democratic Cent. Comm.,*
489 U.S. 214 (1989) ............................................................... 20

*FDA v. Alliance for Hippocratic Medicine* (*Alliance*),
  602 U.S. 367 (2024) .................................................................1, 4

*Frame v. City of Arlington*,
  657 F.3d 215 (5th Cir. 2011) ............................................... 3

*Gustafson v. Bi-State Dev. Agency*,
  29 F.4th 406 (8th Cir. 2022) .............................................11

*J.W. v. Paley*,
  81 F.4th 440 (5th Cir. 2023) ..............................................15

*Johnson v. Gambrinus Co. Spoetzl Brewery*,
  116 F.3d 1052 (5th Cir. 1997)...........................................17

*La Union Del Pueblo Entero v. Abbott*,
  151 F.4th 273 (5th Cir. 2025) ..................................... *passim*

*Lightbourn v. County of El Paso*,
  118 F.3d 421 (5th Cir. 1997) ............................................... 7

*Luke v. Texas*,
  46 F.4th 301 (5th Cir. 2022) ............................................... 9

*McDonald v. Bd. of Comm'rs of Chi.*,
  394 U.S. 802 (1969) ........................................................... 22

*N.A.A.C.P. v. City of Kyle*,
  626 F.3d 233 (5th Cir. 2010) ............................................... 5

*National Federal of the Blind v. Lamone*,
  813 F.3d 494 (4th Cir. 2016) ............................... 10, 18, 19

*Oxford House, Inc. v. City of Baton Rouge*,
  932 F. Supp. 2d 683 (M.D. La. 2013).........................13, 14, 16

*Payan v. Los Angeles Cmty. Coll. Dist.*,
  11 F.4th 729 (9th Cir. 2021) ............................................... 8

*People First of Ala. v. Merrill*,
  491 F. Supp. 3d 1076 (N.D. Ala. 2020), *stay granted,* 141 S. Ct. 25
  (Oct. 21, 2020)................................................................... 18

*Pickett v Texas Tech Univ. Health Scis. Ctr.*,
  37 F.4th 1013 (5th Cir. 2022) ...........................................13

*Richardson v. Tex. Sec'y of State*,
  978 F.3d 220 (5th Cir. 2020)......................................4, 5, 10

*Riel v. Elec. Data Sys. Corp.*,
  99 F.3d 678 (5th Cir. 1996)...............................................13

*Smith v. Harris County*,
    956 F.3d 311 (5th Cir. 2020) ....................................................12, 13, 15

*Tex. Democratic Party v. Abbott*,
    978 F.3d 168 (5th Cir. 2020) .................................................... 10

*Tex. Democratic Party v. Abbott*,
    961 F.3d 389 (5th Cir. 2020) .................................................... 21

*Tex. League of United Latin Am. Citizens v. Hughs*,
    978 F.3d 136 (5th Cir. 2020) .................................................... 4, 10, 11

*Tex. State LULAC v. Elfant*,
    52 F.4th 248 (5th Cir. 2022) .................................................... 3

*Texas Democratic Party v. Hughs*,
    860 F. App'x 874 (5th Cir. 2021) ............................................ 7

*Trump v. CASA, Inc.*,
    606 U.S. 831 (2025) ................................................................ 23

*United States v. Paxton*,
    148 F.4th 335 (5th Cir. 2025) ................................................6-7, 21, 22

*United States v. Village of Palatine*,
    37 F.3d 1230 (7th Cir.1994) ....................................................16

*Veasey v. Abbott*,
    830 F.3d 216 (5th Cir. 2016) (en banc)................................... 21

*Wilkins v. United States*,
    598 U.S. 152 (2023)................................................................ 23

*Windham v. Harris County*,
    875 F.3d 229 (5th Cir. 2017) ....................................................15

**Constitutional Provisions, Statutes, and Rules:**

U.S. Const. amend. XIV ...................................................................19

42 U.S.C.:
    § 12112(b)(4)....................................................................... 6
    § 12133 ................................................................................ 6
    § 12182(b)(1)(E)................................................................. 6

Rehabilitation Act § 504 ................................................................ 1

Tex. Elec. Code:

§ 1.022 ............................................................................ 14, 16

§ 82.001-002 .................................................................... 22

§ 82.003 ........................................................................... 22

§ 84.007(c) ........................................................................17

§ 86.0105(f) ...................................................................... 12

# Glossary of S.B.1 Provisions

| Section | Enjoined? | Plaintiffs' Shorthand | State Defendants' Shorthand | Intervenors' Shorthand | District Court's Shorthand |
|---------|-----------|----------------------|----------------------------|------------------------|----------------------------|
| 5.02 | Yes | Number Matching Requirement | Voter Identification Provisions | Identification Requirement | Number-Matching Requirement |
| 5.03 | Yes | Number Matching Requirement | Voter Identification Provisions | Identification Requirement | Number-Matching Requirement |
| 5.06 | No | N/A | N/A | Curative Provisions | Number-Matching Requirement |
| 5.07 | Yes | Number Matching Requirement | Voter Identification Provisions | Identification Requirement | Number-Matching Requirement |
| 5.10 | No | N/A | Voter Identification Provisions | Identification Requirement | Cure Provisions |
| 5.12 | No | N/A | Cure Provisions | Curative Provisions | Cure Provisions |
| 5.13 | No | N/A | Cure Provisions | Curative Provisions | N/A |
| 5.14 | No | N/A | Cure Provisions | Curative Provisions | N/A |
| 6.03 | Yes | Oath-and-Assistance Provisions | Voter Assistance Provisions | Assistor Disclosure Provisions | Assistance Provisions |
| 6.04 | Yes | Oath-and-Assistance Provisions | Voter Assistance Provisions | Oath Provision | Assistance Provisions |
| 6.05 | Yes | Oath-and-Assistance Provisions | Voter Assistance Provisions | Assistor Disclosure Provisions | Assistance Provisions |
| 6.06 | Yes | Assistance Restrictions | Paid Assistance Provision | Offense Provisions | Assistance Provisions |
| 6.07 | Yes | Oath-and-Assistance Provisions | Voter Assistance Provisions | Assistor Disclosure Provisions | Assistance Provisions |
| 7.04 | Yes | Assistance Restrictions | Vote Harvesting Provision | Offense Provisions | Canvassing Restriction |

# Introduction

Plaintiffs continue to mischaracterize S.B.1— a law that maintains and expands Texas's robust slate of options for disabled voters and introduces modest election security measures protecting from the real threats of mail-in ballot fraud and high-pressure tactics from paid assistors and vote harvesters. In Plaintiffs' reading, these modest measures deprive disabled voters of reasonable access to the polls under Title II of the ADA and Section 504 of the Rehabilitation Act. But S.B.1 does no such thing.

Plaintiffs' claims falter at the foundational level of standing. This Court already held in *LUPE III* that Plaintiffs lack standing to challenge the Voting Assistance Provisions because their purported injuries rest on a speculative misreading of the law. Plaintiffs' efforts to distinguish *LUPE III* fail because *LUPE III's* logic did not turn on the nature of the claim but the speculative nature of the purported injury.

Plaintiffs likewise lack standing to challenge the Voting Identification Provisions because they injure neither Plaintiffs nor their members. Plaintiffs' voluntary diversion of resources does not confer standing because Plaintiffs cannot "spend [their] way into standing," as the Supreme Court recently reaffirmed. *FDA v. Alliance for Hippocratic Medicine* (*Alliance*), 602 U.S. 367, 394-95 (2024). And requiring Plaintiffs' members to provide certain information to verify their identity is just an ordinary facet of voting.

While Plaintiffs may be impacted by the Paid Assistance and Vote Harvesting Provisions, any supposed injury does not entitle them to bring a Title II claim. Finally, any perceived failure by local officials to offer accommodations under these

provisions is not traceable to the Secretary who lacks oversight over how local election officials implement the ADA.

Turning to the merits, Plaintiffs dramatically overread the ADA, turning a law ensuring "reasonable access" through accommodations into a sledgehammer for dismantling democratically enacted voter security measures. Plaintiffs also disregard the law's key requirement that individuals request an accommodation from local officials. Indeed, they failed to request an accommodation altogether. Instead, the only remedy they sought was the complete elimination of the challenged provisions, an unreasonable alteration of the voting security measures Texas enacted. Plaintiffs' limitless reading of Title II must be rejected and the district court's decision reversed.

## ARGUMENT

### I.  Plaintiffs Lack Standing.

#### A.  This Court's recent decision in *LUPE III* controls.

In *La Union Del Pueblo Entero v. Abbott*, 151 F.4th 273, 286 (5th Cir. 2025) *(LUPE III)* this Court ruled that Plaintiffs lack standing to challenge S.B.1's Voter Assistance Provisions. Plaintiffs argue that *LUPE III* is not binding because *LUPE III* did not involve Plaintiffs' Title II claims. Appellees Br. at 39 n.10. That's irrelevant.

The Court's logic—that Plaintiffs' alleged injuries were rooted in "baseless speculation about future prosecutions," *LUPE III*, 151 F.4th at 286—does not depend on the nature of Plaintiffs' claims. Even if Title II claims are "broader" or Title

II injuries "more manifold" than Voting Rights Act injuries, Appellee's Br. at 38, that still does not change the fact that Plaintiffs' alleged injuries are caused by speculative and "fanciful" fears about how S.B.1 might be enforced, *LUPE III*, 151 F.4th at 286, and a "highly attenuated chain of possibilities." *Tex. State LULAC v. Elfant*, 52 F.4th 248, 251 (5th Cir. 2022).

Contrary to Plaintiffs' assertions, the Oath-and-Assistance-Provisions do not require Plaintiffs' members to suffer "significant physical pain, hardship, and losses of privacy," Appellees' Br. at 16. Those self-inflicted harms based on "fears of hypothetical future harm" cannot confer standing. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013). Neither of the cases Plaintiffs cite lead to a different conclusion: Neither involved a dispute over whether the challenged policy would actually burden the plaintiffs. *See Crawford v. Hinds Cnty. Bd. of Supervisors*, 1 F.4th 371, 376-77 (5th Cir. 2021) (not too speculative that plaintiff would be called for jury duty in an inaccessible courthouse). *Frame v. City of Arlington*, 657 F.3d 215, 235-36 (5th Cir. 2011) (plaintiff did not need to personally encounter inaccessible sidewalk before challenging it).

Plaintiffs quibble over whether the rule of orderliness requires applying *LUPE III*. Appellees' Br. at 39 n.10. It does. *LUPE III* "already answered the question that Plaintiffs attempt to relitigate now" and its analysis on this point in *LUPE III* did not "turn on" the distinctions that Plaintiffs attempt to draw. *Cascino v. Nelson*, No. 22-50748, 2023 WL 5769414, at *3 (5th Cir. Sept. 6, 2023) (per curiam). Regardless, this Court should follow the compelling reasoning of *LUPE III* and reverse.

### B. Neither Plaintiffs nor their members are injured by the Voter Identification Provisions.

Plaintiffs claim they have organizational standing to challenge the Voter Identification Provisions because they chose to "scale back their pre-existing efforts to focus volunteers and resources on helping voters understand and attempt to comply with the new requirement." Appellees' Br. at 42. But in *Alliance*, the Supreme Court rejected the proposition that "standing exists when an organization diverts its resources in response to a defendant's actions." 602 U.S. at 395. Plaintiffs cannot "spend [their] way into standing" or "manufacture [their] own standing" by diverting resources to oppose S.B.1. *Id.* at 394.

Plaintiffs argue that *Alliance* does not apply because S.B.1 impairs their "*pre-existing* core activities." Appellees' Br. at 37. But *Alliance* lacks a preexisting activities exception. In *Deep South Center for Environmental Justice v. EPA*, this Court rejected the claim that a group had standing because it changed its preexisting "programming or activities in response to the defendants' actions" and engaged in hundreds of hours of "education and advocacy." 138 F.4th 310, 319, 320 (5th Cir. 2025). Instead, an organization only has standing when a law itself "places . . . obstacles" that prevent the group from "engaging in its advocacy, education, and training activities." *Id.* The Voter Identification Provisions do not do this.

Plaintiffs also lack associational standing because the Voter Identification Provisions merely "make casting a ballot more inconvenient for some voters." *Richardson v. Tex. Sec'y of State*, 978 F.3d 220, 237 (5th Cir. 2020) (quoting *Tex. League of United Latin Am. Citizens v. Hughs*, 978 F.3d 136, 146 (5th Cir. 2020)). After weeks

of trial and the development of a record of tens of thousands of pages, Plaintiffs can only identify a *single* member who had her mail-in ballot rejected for not providing her identification number. Appellees' Br. at 40. And she admitted that she now knows what S.B.1 requires and due to her "new experience and new knowledge" is "better able to cast" a mail-in ballot in the future. ROA.33557-559. Accordingly, no "specific member," *N.A.A.C.P. v. City of Kyle*, 626 F.3d 233, 237 (5th Cir. 2010), has a cognizable injury traceable to the Voter Identification Provisions and remediable by an injunction.

Plaintiffs nevertheless allege that there is a "substantial risk" that their members will be disenfranchised. Appellees' Br. at 24. But their arguments are based primarily on the counties' flawed rollout of the new law in the March 2022 election where technological issues and inadequate time to educate voters led to high rejection rates. State Defs. Br. at 14-15. The rapid decline of ballot rejections in the November 2022 election demonstrates that when voters are informed about S.B.1's requirements, the risk of disenfranchisement is not substantial, *id.* at 15-16. Any "additional work" required to write an identification number on the carrier envelope does not differ significantly from "the usual burdens of voting" like providing proper identification. *Crawford v. Marion Cnty. Bd.*, 553 U.S. 181, 191, 198 (2008); *Richardson*, 978 F.3d at 237 (upholding Texas's signature match requirement as not imposing a "severe burden" on voting); *LUPE III*, 151 F.4th at 287 (requiring voters to "complete[] a simple form is not a cognizable injury"). Plaintiffs therefore lack standing to challenge the Voter Identification Provisions.

## C.   Plaintiffs are not entitled to challenge the Paid Assistance and Vote Harvesting Provisions because they are not discriminated against based on a disability.

While this Court's decision in *LUPE III* says that Plaintiffs are injured by the Paid Assistance and Vote Harvesting Provisions, this does not mean that their injury entitles them to bring a Title II claim. Plaintiffs argue that other circuits have allowed disability rights organizations to bring Title II claims and argue that there is "no basis for this Court to break with its sister circuits." Appellees' Br. at 34. But there *is* a compelling reason—the statutory text which provides relief only for a "person alleging discrimination on the basis of disability", 42 U.S.C. § 12133, and does not encompass discrimination due to a "relationship or association" with disabled individuals as Title I and III do. 42 U.S.C. § 12182(b)(1)(E) (Title III); 42 U.S.C. § 12112(b)(4) (Title I).

Even putting that aside, the plaintiffs in those cases were directly discriminated against *because* of their work with disabled individuals such as methadone treatment clinics subject to hostile zoning laws. *A Helping Hand, LLC v. Baltimore County*, 515 F.3d 356 (4th Cir. 2008); *Addiction Specialists, Inc. v. Twp. of Hampton*, 411 F.3d 399, 415 (3d Cir. 2005). By contrast, the Vote Harvesting Provision limits paid vote harvesting regardless of whether organizations assist voters with a disability or not. Plaintiffs' injuries are therefore removed from both the text and intent of Title II.

## D.   Plaintiffs' ADA injuries are not traceable to the Secretary.

While a panel of this Court recently concluded that the Secretary could be sued over the Voter Identification Provisions of S.B.1, *United States v. Paxton*, 148

F.4th 335, 340 (5th Cir. 2025), it did not decide whether the Secretary is responsible for any failure to accommodate Plaintiffs under the ADA. She isn't.

Plaintiffs wrongly suggest that the Secretary has a standalone duty "to advise or instruct" local election officials on ADA compliance. Appellees' Br. at 63. No such duty exists. As this Court explained, the Secretary "has no duty under either Texas law or the ADA to take steps to ensure that local election officials comply with the ADA." *Lightbourn v. County of El Paso*, 118 F.3d 421, 432 (5th Cir. 1997). Plaintiffs baldly assert that *Lightbourn* is inapposite with minimal explanation. Appellees' Br. at 43 n.12. But *Lightbourn* is directly on point. It rejected the argument that the Secretary was responsible for "the practices of every electoral subdivision in Texas." *Lightbourn*, 118 F.3d at 432. Instead, the Secretary is just required to "evaluate [her] department" to ensure ADA compliance. *Id.*

The only connections Plaintiffs make between their injuries and the practices of the Secretary's department are 1) designing mail-ballot applications that voters may use and carrier envelopes that counties use, and 2) maintaining the database used for verifying identity and correcting ballot deficiencies. Appellees' Br. at 11, 22. These are not "sufficient connection[s]" because local election officials "are the ones who review" applications and ballots, not the Secretary. *See Texas Democratic Party v. Hughs*, 860 F. App'x 874, 878 (5th Cir. 2021) (per curiam).

But even if that were sufficient, it would only give the Secretary a connection to the Voter Identification Provisions and the application of the Voter Assistance Provisions to mail-in ballots. It establishes nothing concerning Plaintiffs' other claims against the Secretary, which should have been dismissed.

## II. Plaintiffs Cannot Prevail on their Title II Claims.

### A. The district court erroneously relied on a disparate impact theory that Plaintiffs concede they did not request.

The district court erroneously relied on a disparate impact theory. ROA.40907 ¶ 161. Plaintiffs do not respond to State Defendants' substantive arguments regarding why Title II does not encompass disparate impact. State Defs. Br. at 35-37. Plaintiffs instead argue that the district court did not embrace a disparate impact theory at all. Appellees' Br. at 66. But the language the district court used, ROA.40907 ¶ 161, and its favorable citation to a Ninth Circuit decision that adopted disparate impact framework disprove Plaintiffs' claim. *Payan v. Los Angeles Cmty. Coll. Dist.*, 11 F.4th 729, 739 (9th Cir. 2021).

In *Payan,* the Ninth Circuit distinguished between "an accommodation based on an individualized request or need" which was the proper domain of a reasonable accommodation claim, and "modifying a policy or practice to improve systemic accessibility" which was the domain of disparate impact liability. *Id.* at 738. The district court cited *Payan* in support of its conclusion that S.B.1 failed to provide "systemic accessibility" without the need for "an individualized request or need," ROA.40907 ¶ 161, which corresponds precisely to what the Ninth Circuit held was the domain of a disparate impact claim rather than a failure to accommodate claim. So, the district court impermissibly applied the Ninth Circuit's disparate impact standard to invalidate S.B.1. At minimum, the district court's decision muddied the waters regarding the role disparate impact played, which will create confusion absent this Court's clarification.

Plaintiffs also argue that this issue is waived because Defendants "could have raised their contention … below." Appellees' Br. at 66. But Plaintiffs agree that they "did not plead" and "have never pressed" a disparate-impact theory. *Id.* Plaintiffs cannot explain how Defendants could have raised their objections to a theory that Plaintiffs did not advance and was raised *sua sponte* by the district court. This Court should therefore at a minimum hold that the district court erred in embracing a theory that Plaintiffs did not advance, State Defs. Br. at 34-35, or rule that the district court erred because Title II does not encompass disparate impact liability.

## B.  S.B.1 does not deny disabled voters "meaningful access" to voting.

The district court mistakenly concluded that S.B.1's provisions deprive disabled voters of "meaningful access" to voting. Title II requires only "evenhanded treatment and the opportunity for handicapped individuals to participate in and benefit from programs," not "equal results." *Alexander v. Choate*, 469 U.S. 287, 304 (1985). Texas's voting system is accessible to disabled voters through a wide variety of methods—some exclusively for those with disabilities (like curbside voting). State Defs. Br. at 6-18. The challenged provisions, which impose modest limits on these methods do not deprive Plaintiffs' members of "meaningful access" to voting. *Cf. Luke v. Texas*, 46 F.4th 301, 304-05 (5th Cir. 2022) (refusing to provide an interpreter denied disabled individual "meaningful access" to judicial proceedings).

Plaintiffs assert that *any* change that makes the "voting process less independent, less private, or more burdensome" qualifies as a denial of "meaningful access." Appellees' Br. at 48. But this expansive reading would dramatically broaden Title II's scope by requiring invasive scrutiny of every election security measure

that a state enacts and would "frustrate[] the intent of the elected representatives of the people." *Crawford*, 553 U.S. at 203. Indeed, it would require Texas's voting laws to pose "*no risk* of uncorrectable rejection" and to provide every disabled voter with "infallible ways to vote," something this Court emphasized is not required. *Richardson*, 978 F.3d 220 at 237-38 (equal protection). That goes far beyond Title II's call for "evenhanded treatment" and an opportunity for participation. *Alexander*, 469 U.S. at 304.30.

Plaintiffs also argue that *each method* of voting and each provision of S.B.1 must be separately scrutinized. Appellees' Br. at 48. But looking at each provision and method separately is "myopic" at best. *Hughs*, 978 F.3d at 145.

*National Federal of the Blind v. Lamone*, 813 F.3d 494, 504 (4th Cir. 2016), a case Plaintiffs rely on supports the opposite approach here. The fact that Maryland allowed *any* voter to request an absentee ballot was a "significant" factor in the Fourth Circuit's "analysis of the proper scope of review". *Id.*; *see also Disabled in Action v. Bd. of Elecs.*, 752 F.3d 189 (2d Cir. 2014). By contrast, Texas does not allow all voters to request an mail-in ballot; only a limited subset. *See Tex. Democratic Party v. Abbott*, 978 F.3d 168, 174 (5th Cir. 2020) (noting that "[e]arly voting by mail is the exception" in Texas). As a result, Plaintiffs' demand that the Court scrutinize each method of voting separately is illogical. How can the Court evaluate whether there is "evenhanded treatment" for an accommodation unavailable to the general population? Instead, the Court must look holistically at whether Texas election law, including its many existing accommodations that S.B.1 preserved and expanded, provides "meaningful access" to the voting process.

But even if the Court were to "focus[] myopically," *Hughes*, 978 F.3d at 145, on each provision, none of them deprive voters of "meaningful access" to voting:

**<u>Voter Identification Provisions</u>**—Requiring voters to verify their identity is one of "the usual burdens of voting," *Crawford*, 553 U.S. at 191, 198. Texas also offers numerous options to help voters correct defects. State Defs. Br. at 12-13. As a result, once this requirement was fully implemented the overwhelming majority of mail-in ballot voters were able to successfully vote. *See id.* at 33 n.14. And "frustrating, but isolated, instances" of failure to comply do not result in a denial of meaningful access for all. *Gustafson v. Bi-State Dev. Agency*, 29 F.4th 406, 412 (8th Cir. 2022).

**<u>Voter Assistance Provisions</u>**— Requiring assistors to identify themselves or take an oath that they will faithfully help the person they are assisting does not eliminate "meaningful access" to the polls—quite the contrary. *Accord LUPE III*, 151 F.4th at 288 ("We cannot fathom how the Oath Provision harmed [P]laintiffs' members by making the existing consequences of the law more explicit."). Plaintiffs claim some of their members were harmed because they could not get assistance from aids of their choice. Appellees' Br. at 16. But as this Court concluded in *LUPE III*, the Voter Assistance Provisions were not the cause of these injuries, just Plaintiffs' "baseless speculation" and "fanciful" fears. *LUPE III*, 151 F.4th at 286.[1] And election officials were aware of few (if any) voters unable to get assistance

---

[1] Because the district court erroneously concluded that these injuries were caused by S.B.1, no deference is owed to the district court's factual findings. Appellees' Br. at 51.

from a person of their choice. ROA.45857-58 (Denton County); ROA.42304 (El Paso County); ROA.42491 (Dallas County).

**Paid Assistance and Vote Harvesting Provisions**— While these provisions may impact Plaintiffs' organizational activities, they do not deprive disabled voters of "meaningful access" to voting. At most, some of Plaintiffs' members may be unable to get assistance filling out their ballot from one of Plaintiffs' paid employees. But disabled voters who receive assistance usually receive it from a family member or an "attendant" or "caregiver" that is "previously known to the voter," which are not covered by the Paid Assistance Provision at all. Tex. Elec. Code § 86.0105(f).[2] ROA.45985. Given that Plaintiffs can get assistance from any number of other individuals (including Plaintiffs' volunteers), these modest measures do not eliminate meaningful access for disabled voters.[3] None of S.B.1's provisions therefore eliminate meaningful access for disabled Texans.

## C. Plaintiffs' failure to request accommodations defeats their claims.

Before a plaintiff can bring a failure to accommodate claim, they must request an accommodation in "direct and specific terms." *Smith v. Harris County*, 956 F.3d 311, 317, 319 (5th Cir. 2020). Plaintiffs' failure to do so "is fatal to [their] reasonable

---

[2] Amici claims that the term "previously known to the voter" is "not sufficiently defined," Amicus Br. at 18-19, but this is a common sense phrase and any fear that a caregiver will be prosecuted for not being "known to the voter" is exactly the kind of baseless speculation this Court rejected in *LUPE III*.

[3] S.B.1 targets the kind of "frequent flyer" assistors who assist dozens or hundreds of voters or are specifically working for political candidates, not ordinary caregivers. ROA.37248, 37250.

accommodation claim[s]." *Oxford House, Inc. v. City of Baton Rouge*, 932 F. Supp. 2d 683, 690–91 (M.D. La. 2013).[4]

Plaintiffs argue this requirement arises only in the Title I context or they are exempt because they are not seeking "individual accommodations." Appellees' Br. at 58. Both assertions are wrong. Title II cases like *Smith* require plaintiffs to request an accommodation. *Smith*, 956 F.3d at 317; *Pickett v. Texas Tech Univ. Health Scis. Ctr.*, 37 F.4th 1013, 1033 (5th Cir. 2022). And just because Plaintiffs are associations representing multiple disabled individuals does not excuse their members from Title II's requirement to ask for accommodations. *See Disability Rights Wisconsin, Inc. v. Walworth Cnty. Bd. of Supervisors,* 522 F.3d 796, 802 (7th Cir. 2008) (disability rights group lacked standing when a member could not "present, in his or her own right, the claim (or the type of claim) pleaded by the association").

This requirement is far from an "unworkable and pointless burden" as Plaintiffs characterize, Appellees' Br. at 65. To the contrary, this requirement "places the burdens where they comfortably fit," *Riel v. Elec. Data Sys. Corp.*, 99 F.3d 678, 682 (5th Cir. 1996), giving government entities opportunity to consider a specific accommodation request and alternatives. Plaintiffs' broad exception would swallow the rule

---

[4] Plaintiffs claim that some of their members asked for some accommodations from local election officials. Appellees' Br. at 64-65. But if they asked for more specific accommodations, then the failure to grant those accommodations should have been the subject of this lawsuit, not a broad request for the complete elimination of the challenged provisions.

by allowing plaintiffs to run to the courthouse and short circuit this vital interactive process.

Plaintiffs claim that Defendants had an affirmative duty even if Plaintiffs did not request an accommodation, citing *Cadena v. El Paso County*, 946 F.3d 717, 726 (5th Cir. 2020). But that case undermines their point. In *Cadena*, a county jail refused to provide a detainee with a wheelchair despite repeated requests claiming that crutches were adequate. This Court explained that while providing crutches "may reasonably accommodate most individuals with this disability," the county had significant evidence that *this* detainee needed a wheelchair. *Id.* at 725. Likewise, the plaintiffs in *Oxford House,* 932 F. Supp. 2d at 690–91, made "multiple reasonable accommodation requests" for a zoning classification. Nothing of the sort happened here.

Texas's Election Code provides numerous options that can "reasonably accommodate most" voters "with a disability." S.B.1 did not change this and even expanded options for disabled voters. Most disabled voters could successfully comply with S.B.1's modest requirements as demonstrated by the low mail-ballot rejection rates in the November 2022 election and the fact that county and state election officials received very few complaints about the inability to receive needed voting assistance. State Defs. Br. at 15-16.

When the legislature enacted S.B.1, it assumed that voters would be able to request accommodations. Indeed, it expressly forbade local election officials from reading S.B.1 to "to prohibit or limit the right of a qualified individual with a disability from requesting a reasonable accommodation." Tex. Elec. Code § 1.022.

Many of the injuries that Plaintiffs' members allegedly suffered would be remediable through reasonable accommodations if Plaintiffs' members simply requested them. One example is that of Ms. Guerrero Mata, who Plaintiffs claim "had difficulty seeing the text on the mail-ballot envelope." Appellees' Br. at 49. But Plaintiffs provide no evidence that she asked for either a large font version of the material on the mail in-ballot or any other accommodation to help her better see the ballot. Some of Plaintiffs' other members conceded that they never asked local election officials for an accommodation. ROA.45328–45329, ROA.45247, 45252-45253.

Plaintiffs rely on the district court's conclusion that Defendants were on notice regarding the need for accommodations because disability rights groups testified before the Texas legislature. ROA.40961. But neither the district court nor Plaintiffs cite precedent suggesting that a public advocacy organization's testimony to the legislature obviates an individual's specific need to request an accommodation from the "relevant agents" who implement a law. *Windham v. Harris County*, 875 F.3d 229, 237 (5th Cir. 2017). Instead, this Court in *Smith* explained that the "entity's relevant agents" must be aware not only of "the disability" and the "resulting limitation" but also the "necessary reasonable accommodation." 956 F.3d. at 318; *accord J.W. v. Paley*, 81 F.4th 440, 450 (5th Cir. 2023). Generalized legislative testimony in Austin cannot provide particular knowledge of an individual's needs to local election officials. Plaintiffs' theory would open the floodgates for Title II lawsuits whenever the legislature passes a law that disability rights groups criticize and should be rejected.

Plaintiffs then claim that it would be "futile" to ask for an accommodation either because (1) S.B.1 only guarantees the right of voters to ask for modifications

but does not allow local officials to grant these requests, Appellees' Br. at 63, or (2) some election officials testified that they could not waive S.B. 1's requirements. Appellees' Br. at 55-56. Even if Title II had a futility exception, *see* State Defs. Br. at 41, the facts simply do not support its application here.

The ADA *requires* local officials to grant reasonable accommodations and S.B.1 does not interfere with that process. Indeed S.B.1 expressly recognizes and protects it. Tex. Elec. Code § 1.022. While local election officials testified that they could not completely ignore the requirements of the law, they also repeatedly testified they could make reasonable modifications for disabled voters if asked: And the record shows that local election officials did so. State Defs. Br. at 17-18; ROA.37212. Therefore, it is far from futile or "foredoomed," *Oxford House*, 932 F. Supp. 2d at 691 (quoting *United States v. Village of Palatine*, 37 F.3d 1230, 1234 (7th Cir.1994)), to ask for an accommodation under S.B.1.

Plaintiffs' next claim—that *some* local election officials failed to post instructions about how to request an accommodation—cannot justify Plaintiffs' wholesale refusal to request an accommodation. Appellees' Br. at 61-62. And were there some local election officials that erroneously believed that they could not offer any accommodations at all, the district court could have corrected that misapprehension and directed those officials to consider Plaintiffs' requests for an accommodation.

Nor does the concern that Plaintiffs' members "would [not] receive requested modifications in time for their votes to count," Appellees' Br. at 65, excuse unwillingness to request those accommodations. Plaintiffs' members need not wait until the eve of an election to request accommodations. For instance, voters can submit

an application for ballot by mail anytime in the year of an election. Tex. Elec. Code § 84.007(c). And if local election officials failed to respond to a request in a timely manner, then Plaintiffs' members could seek a TRO asking the court to direct those officials to comply with their request. Plaintiffs' failure to seek accommodations thus defeats their claims.

### D. Invalidating whole provisions of S.B.1 was not a reasonable accommodation and it fundamentally altered Texas's law.

Even if Plaintiffs were somehow exempt from the requirements to ask *Defendants* for an accommodation, that does not excuse Plaintiffs' failure to satisfy their burden of proposing a reasonable accommodation to the district court. *Johnson v. Gambrinus Co. Spoetzl Brewery*, 116 F.3d 1052, 1059 (5th Cir. 1997) (noting that "plaintiff bears the ultimate burden of proof on the issue"). Plaintiffs do not deny that the proposed "modification" they sought was the total elimination of S.B.1's challenged provisions for all voters. But completely eliminating a law is neither an "accommodation" nor "modification" at all. *See* State Defs. Br. at 42-43 (quoting *Biden v. Nebraska*, 600 U.S. 477, 494-95 (2023) (defining a modification as a "modest adjustment[] and addition[]" rather than a "basic and fundamental change[]")).

Plaintiffs' attempt to shift the burden to Defendants to prove that invalidating provisions of S.B.1 would represent a "fundamental alteration" of the law. Appellees' Br. at 69. The Court should reject this gambit. Plaintiffs never proposed a reasonable modification in the first place, so the burden never shifted to Defendants to justify denying that modification.

Plaintiffs mischaracterize Defendants' argument as "immuniz[ing] state laws or policies that discriminate against voters with disabilities from any modification under the ADA." Appellees' Br. at 70. Not so. The point is that Plaintiffs had to propose a modification that will accommodate disabled voters, not a complete elimination of provisions that they disapprove of for *all* voters.

It is similarly incorrect to claim that Defendants have argued "that *any* modifications to their election rules would be unreasonable" Appellees' Br. at 3. State Defendants' position is that complete nullification of the election security measures that the legislature enacted is unreasonable. But the record is replete with examples of local election officials offering reasonable accommodations including coming to voters' homes to correct deficiencies and giving assurances about the scope of the oath requirement. State Defs. Br. at 15-16.

The cases that Plaintiffs rely on do not help them. Appellees' Br. at 57. In each instance the plaintiffs in those cases requested a *specific* accommodation for their *specific* disability under a challenged policy, not the wholesale elimination of the challenged policy. For instance, in *Lamone*, the plaintiffs requested the state give disabled voters access to an already existing online ballot marking tool. *Lamone*, 813 F.3d at 509. As already discussed, the demand in *Cadena* was for a wheelchair. 946 F.3d at 724. In *Bennett-Nelson v. La. Bd. of Regents*, 431 F.3d 448, 450 (5th Cir. 2005), the plaintiffs "requested sign language interpreters and note takers for the classes in which they were enrolled, as well as certain study aids." And in *People First of Ala. v. Merrill*, 491 F. Supp. 3d 1076, 1166 (N.D. Ala. 2020), *stay granted*, 141 S. Ct. 25 (Oct. 21, 2020), the plaintiffs sought an expansion of an existing exemption to the state's

photo ID requirement for those "with conditions that place them at risk of severe complications from [COVID-19]." *See also Delano-Pyle v. Victoria County*, 302 F.3d 567, 571 (5th Cir. 2002) (failure to ensure that a deaf individual had accommodations to understand police interrogation). None of these cases involved a demand to invalidate a policy wholesale.

Plaintiffs' demand that Defendants prove that enjoining S.B.1 will "fundamentally alter Defendants' voting program" also misses the mark. 69. Defendants only have the burden to show "that *the requested modification* would be a fundamental alteration to the program," *Lamone*, 813 F.3d at 508 (emphasis added). Since Plaintiffs never requested a modification, the burden never shifted back to Defendants.

Had Plaintiffs bothered to ask the district court to grant a specific remedy, such as allowing Plaintiffs "to scan and email their cured ballot forms" or to "send someone else to cure their ballots," Appellees' Br. at 61; Amicus Br. at 23, then Defendants could have explained why those requests were unduly burdensome or agreed to grant those requests. But Plaintiffs never did so.

Plaintiffs' demand that Defendants bear the burden of justifying their election security measures without reference to any concrete alternative proposal improperly turns the ADA from a law granting reasonable accommodations into a form of heightened scrutiny that far exceeds what the Constitution requires. *See Bd. of Trs. of Univ. of Alabama v. Garrett*, 531 U.S. 356, 367–68 (2001) (noting that "States are not required by the Fourteenth Amendment to make special accommodations for the disabled, so long as their actions toward such individuals are rational"). Plaintiffs' standard would require the government to either prove that each policy that burdens

disabled citizens is indispensable to the overall statutory scheme or face invalidation. That burden would make it exceedingly difficult for states to defend even modest election security measures. Indeed, the more modest the measure the more difficult it might be to defend under Plaintiffs' skewed analysis.

Consider the Voter Identification Requirement. The legislature enacted this requirement to close a loophole allowing unscrupulous individuals to request absentee ballots without a voters' consent. At trial, Defendants identified at least one fraudulent scheme in the November 2020 election where an individual requested a large number of absentee ballots for voters. State Defs. Br. at 10. This scheme was possible because the law allowed absentee ballots to be requested using only publicly available information. It was only detected because the requestor had all of the ballots sent to a single address. *Id.* The Voter Identification Requirement addressed this vulnerability in furtherance of the State's compelling interest "in preserving the integrity of its election process" and preventing voter fraud. *Eu v. San Francisco Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 231 (1989). Eliminating this requirement would undermine the protections that the legislature enacted for disabled voters, a "fundamental alteration" of the law.[5]

---

[5] Plaintiffs and the district court offer Texans concerned about voter fraud cold comfort by suggesting that Texas could *request* but not demand ID numbers from mail-in voters. Appellees' Br. at 74 n.24. But turning a mandatory election security requirement into an optional submission would effectively eliminate the protections that the Texas legislature enacted to protect disabled voters because individuals could once again request a ballot using only publicly available information.

Plaintiffs discount this incident saying that it was just a solitary example of fraud and, because it was detected, the Voter Identification Provisions were unnecessary. Appellees' Br. at 73. But this incident highlighted a vulnerability that the Texas legislature rightly moved to close. The fact that only one blatant scheme was detected does not mean that this type of fraud that is "difficult to detect and prosecute," *Tex. Democratic Party v. Abbott*, 961 F.3d 389, 396 (5th Cir. 2020), was not occurring under the radar.

Plaintiffs would effectively require Defendants to establish that this change would eliminate an "essential aspect" of Texas's voting scheme. Appellees' Br. at 72-73. Effectively, Defendants would have to *prove* that this kind of fraud was widespread, existing protections were inadequate, Texas could not stop this kind of fraud without the challenged provisions, and more. Title II does not and was never meant to impose such an unwieldy burden on the states.

This type of heightened scrutiny is particularly inappropriate in the context of election security measures, especially measures concerning mail-in voting. As this Court explained, "the potential and reality of fraud [are] much greater" with mail-ballots "than with in-person voting" and are "a significant threat." *Veasey v. Abbott*, 830 F.3d 216, 239, 256 (5th Cir. 2016) (en banc). This Court recently described such fraud as a "scourge" that "trigger[ed] significant election security concerns." *Paxton*, 148 F.4th at 339, 341. And evidence at trial showed that voters have been disenfranchised by such fraudulent schemes and that they have even swayed election outcomes. ROA.45822; ROA.45942; ROA.44871. The same is true for the state's

interest in preventing voter assistance fraud which contrary to Plaintiffs' mischaracterization is a serious issue. ROA.37251; ROA.45931-32; ROA.45933-34; ROA.46034.

States can enact prophylactic measures to protect against such fraud even if those requirements are not strictly "essential" or a type of fraud isn't common so long as those measures "meaningfully correspond[] to the State's legitimate interests in preventing the scourge of mail-in-ballot fraud." *Paxton*, 148 F.4th at 341. *See McDonald v. Bd. of Comm'rs of Chi.*, 394 U.S. 802, 809 (1969) (applying rational basis review to a state's law limiting access to absentee ballots). Plaintiffs' proposed approach would invalidate these kinds of prophylactic election security measures and therefore harm Texas voters including the vulnerable disabled voters Plaintiffs claim to protect. ROA.46107.

Plaintiffs also argue that enjoining the challenged provisions did not fundamentally alter Texas's voting program because these provisions only applied to a limited subset of voters. Appellees' Br. at 76. But there are still a significant number of voters who are not disabled who can vote absentee or with assistance. For instance, anyone 65 years of age or older is entitled to request an absentee ballot whether or not they suffer from a disability. Tex. Elec. Code § 82.003. So are women expected to give birth within three weeks of election day or individuals traveling out of the county during the election period. Tex. Elec. Code § 82.001-002. And even among voters who have a qualifying disability under the ADA, many have no difficulty complying and do not need an accommodation. The district court's decision to invalidate whole

provisions of Texas's democratically enacted election security laws was unreasonable and a fundamental alteration that must be reversed.

## III. The District Court's Injunction Was Impermissibly Overbroad.

The remedy that the district court adopted—an injunction barring enforcement of the challenged provisions against anyone in Texas—is overbroad and exceeded the court's equitable authority. *Trump v. CASA, Inc.*, 606 U.S. 831 (2025) ("*CASA*").

Plaintiffs claim this argument is waived. Appellees' Br. at 79. But *CASA*, which ended the practice of courts issuing universal injunctions, came out after this case was already on appeal. This argument also concerns the district court's jurisdiction to issue its injunction and therefore "may be raised at any time." *Wilkins v. United States*, 598 U.S. 152, 157 (2023).

Plaintiffs mischaracterize State Defendants' argument by suggesting that local election officials would need to keep a running list of Plaintiffs' members. Appellees' Br. at 79. State Defendants demand nothing of the sort. Narrowly tailored injunctive relief was possible without these absurd consequences. For instance, the court could have ordered Defendants to offer an opt-out for voters indicating they cannot comply with the identification requirement due to a qualifying disability. And the injunction against the Paid Assistance and Vote Harvesting Provisions could apply only to Plaintiffs' staff, not to organizations not before the Court.

Plaintiffs themselves acknowledge that narrower remedies were possible, like providing exceptions "only for voters with disabilities." Appellees' Br. at 80. But they mischaracterize the record by stating that they "suggested a number of these

alternatives below in their posttrial submissions." Appellees' Br. at 81. Plaintiffs' post-trial submission sought an order "enjoining the Challenged Provisions." ROA.36178. Their sole reference to alternative remedies is a single paragraph noting "[o]ther forms of relief may be appropriate in addition to or in the alternative" and mentioning only the possibility of waiving the provisions for voters with disabilities. ROA.36179. A single paragraph slipped into a post-trial filing does not negate the fact that the primary relief that Plaintiffs *sought* and that the district court *granted* far exceeded the court's equitable jurisdiction.

Therefore, this Court should at minimum direct the district court to narrow the relief it granted to be limited to Plaintiffs and disabled voters similarly situated to Plaintiffs' members.

## Conclusion

This Court should hold that the district court lacked jurisdiction or alternatively, hold that it erred in ruling in favor of Plaintiffs and direct entry of judgment for Defendants.

Respectfully submitted.

Ken Paxton
Attorney General of Texas

William R. Peterson
Solicitor General

Brent Webster
First Assistant Attorney General

William F. Cole
Principal Deputy Solicitor General

<table>
<tr><td>

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

</td><td>

/s/ Daniel M. Ortner

DANIEL M. ORTNER
Assistant Solicitor General
Daniel.Ortner@oag.texas.gov

*Counsel for State Defendants-Appellants*

</td></tr>
</table>

## Certificate of Compliance

This brief complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,335 words, excluding the parts of the brief exempted by Rule 32(f); and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Equity) using Microsoft Word (the same program used to calculate the word count).

/s/ Daniel M. Ortner
Daniel M. Ortner