# In the United States Court of Appeals for the Fifth Circuit

La Unión del Pueblo Entero; Southwest Voter Registration Education Project; Mexican American Bar Association of Texas; Texas Hispanics Organized for Political Education; JOLT Action; William C. Velasquez Institute; Fiel Houston, Incorporated; Friendship-West Baptist Church; Texas Impact; James Lewin; Mi Familia Vota,

*Plaintiffs-Appellees,*

*v.*

Gregory W. Abbott, in his official capacity as Governor of Texas; Jane Nelson, in her official capacity as Texas Secretary of State; State of Texas; Warren K. Paxton, in his official capacity as Attorney General of Texas; Harris County Republican Party; Dallas County Republican Party; National Republican Senatorial Committee,

*Defendants-Appellants,*

Republican National Committee,

*Movant-Appellant.*

———————————

OCA-Greater Houston; League of Women Voters of Texas, REVUP-Texas,

*Plaintiffs-Appellees,*

*v.*

Ken Paxton, Texas Attorney General,

*Defendant-Appellant.*

———————————

LULAC Texas; Texas Alliance for Retired Americans; Texas AFT; Voto Latino,

<em>Plaintiffs-Appellees,</em>

v.

Ken Paxton, in his official capacity as the Texas Attorney General,

<em>Defendant-Appellant.</em>

_____

Delta Sigma Theta Sorority, Incorporated; The Arc of Texas,

<em>Plaintiffs-Appellees,</em>

v.

Gregory Wayne Abbott, in his official capacity as the Governor of Texas; Warren Kenneth Paxton, Jr., in his official capacity as the Attorney General of Texas,

<em>Defendants-Appellants,</em>

———

On Appeal from the United States District Court<br>for the Western District of Texas, San Antonio Division

———

<strong>INTERVENOR-APPELLANTS' REPLY BRIEF</strong>

———

John M. Gore
E. Stewart Crosland
Nathaniel C. Sutton
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
Phone: (202) 879-3939
Fax: (202) 626-1700
jmgore@jonesday.com
scrosland@jonesday.com
nsutton@jonesday.com

Counsel for Intervenor-Appellants

# TABLE OF CONTENTS

Page

INTRODUCTION ..................................................................................1

ARGUMENT......................................................................................... 5

I.     PLAINTIFFS LACK STANDING TO CHALLENGE THE OATH PROVISION, THE ASSISTOR DISCLOSURE PROVISIONS, AND THE IDENTIFICATION REQUIREMENT ....................................................................... 5

     A.    This Court Has Already Held That Plaintiffs Lack Standing To Challenge The Oath and Assistor Disclosure Provisions ................................................................ 6

     B.    Plaintiffs Lack Standing To Challenge The Identification Requirement.......................................................................... 10

II.    PLAINTIFFS' CLAIMS FAIL ON THE MERITS............................................14

     A.    S.B. 1 Does Not Meaningfully Exclude Disabled Individuals From Voting ........................................................15

     B.    Plaintiffs Failed To Request an Accommodation .....................21

     C.    Enjoining S.B. 1 Statewide Is Unreasonable And Violates Article III .................................................................. 30

CONCLUSION.............................................................................................31

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Alexander v. Choate,*
469 U.S. 287 (1985) ..................................................... 3, 14, 21

*Am. Council of Blind of N.Y. v. City of N.Y.,*
495 F. Supp. 3d 211 (S.D.N.Y. 2020) ........................................17

*Bennett-Nelson v. Louisiana Board of Regents,*
431 F.3d 448, 449 (5th Cir. 2005) ........................................... 29

*Cadena v. El Paso Cnty.,*
946 F.3d 717 (5th Cir. 2020)............................................. 19, 28

*Clapper v. Amnesty Int'l USA,*
568 U.S. 398 (2013)........................................................ 7, 11

*Crawford v. Hinds Cnty. Bd. of Supervisors,*
1 F.4th 371 (5th Cir. 2021) ..................................................... 9

*Delano-Pyle v. Victoria County,*
302 F.3d 567, 576 (5th Cir. 2002) ......................................... 29

*Disabled in Action v. Board of Elections,*
752 F.3d 189 (2d Cir. 2014) ..................................................17

*FDA v. All. for Hippocratic Med.,*
602 U.S. 367 (2024) ...................................................... 2, 5, 13

*Frame v. City of Arlington,*
616 F.3d 476 (5th Cir. 2010)..................................................15

*Frame v. City of Arlington,*
657 F.3d 215 (5th Cir. 2011) (en banc) .............................*passim*

*Funeral Consumers All., Inc. v. Service Corp. Int'l,*
    695 F.3d 330 (5th Cir. 2012) ..................................................12

*Gustafson v. Bi-State Dev. Agency of Mo.-Ill. Metro Dist.,*
    29 F.4th 406 (8th Cir. 2022) ........................................... 4, 18

*Husted v. A. Philip Randolph Inst.,*
    584 U.S. 756 (2018) ................................................................ 11

*Johnson v. Gambrinus Co./Spoetzl Brewery,*
    116 F.3d 1052 (5th Cir. 1997) ..............................................30

*La Unión Del Pueblo Entero v. Abbott,*
    151 F.4th 273 (5th Cir. 2025) ..........................................*passim*

*Luke v. Texas,*
    46 F.4th 301 (5th Cir. 2022) .................................................16

*National Federation of the Blind v. Lamone,*
    813 F.3d 494 (4th Cir. 2016)........................................... 16, 17

*Payan v. Los Angeles Community College District,*
    11 F.4th 729 (9th Cir. 2021) ................................................ 29

*People First of Ala. v. Merrill,*
    491 F. Supp. 3d 1076 (N.D. Ala. 2020)...........................*passim*

*Richardson v. Tex. Sec'y of State,*
    978 F.3d 220 (5th Cir. 2020).................................................. 10

*Smith v. Harris Cnty.,*
    956 F.3d 311 (5th Cir. 2020)..........................................*passim*

*State v. Hollins,*
    620 S.W.3d 400 (Tex. 2020) (per curiam)........................... 26

*Sutton v. United Air Lines, Inc.,*
    527 U.S. 471 (1999) .............................................................. 27

*Tennessee v. Lane,*
    541 U.S. 509 (2004)....................................................................2, 3, 5, 14

*Trump v. CASA, Inc.,*
    606 U.S. 831 (2025)......................................................................5, 14, 31

*United States v. Paxton,*
    148 F.4th 335 (5th Cir. 2025) ............................................................4, 30

*Windham v. Harris Cnty.,*
    875 F.3d 229 (5th Cir. 2017)...........................................................*passim*

## STATUTES

Tex. Elec. Code § 1.022........................................................................*passim*

Tex. Elec. Code § 86.015....................................................................... 12, 15

Tex. Elec. Code § 87.041.............................................................................15

Tex. Elec. Code § 87.0271 .................................................................... 12, 15

Tex. Elec. Code § 87.0411 ...........................................................................15

## OTHER AUTHORITES

S.B. 1 § 7.04 .............................................................................................. 26

## INTRODUCTION

Plaintiffs' brief doubles down on the errors that led the District Court to enjoin in their entirety nine of S.B. 1's election-integrity provisions under the banner of the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act. It also confirms that accepting the District Court's legal conclusions would have radical and untenable implications.

At the threshold, Plaintiffs identify no detour around the Court's controlling holding that they lack standing to challenge the Oath and Assistor Disclosure Provisions. *La Unión Del Pueblo Entero v. Abbott*, 151 F.4th 273, 285-89 (5th Cir. 2025) ("*LUPE*"). Quite the contrary: Plaintiffs seek to travel the same road this Court foreclosed in *LUPE*. They rehash their argument that their subjective chill from the Oath and Assistor Disclosure Provisions constitutes an injury in fact—which *this Court already* rejected as "pure speculation," "fanciful," and an attempt to "manufacture" standing. *Id.* at 286, 288. And their argument that *LUPE* does not govern because they pressed Section 208 claims there but ADA claims here fails. What matters for Article III standing is not that Plaintiffs press *different claims* but that they allege the *same injury*.

For this same reason, Plaintiffs also lack standing to challenge the Identification Requirement. They attempt to base associational standing on

an alleged inconvenience to their members from complying with the Requirement's mandate to complete a field on a form, but filling out a form is a "usual burden[] of voting," not a cognizable injury. *Id.* at 287 (quotations omitted). And their attempt to ground organizational standing in their diversion of resources runs headlong into the Supreme Court's rejection of resource-diversion standing. *FDA v. All. for Hippocratic Med.*, 602 U.S. 367 (2024).

On the merits, Plaintiffs present a boundless view of the ADA and Section 504 that would convert state and local governments' reasonable-accommodation duty into a roving license for federal courts to rewrite state election codes. Plaintiffs posit that whenever a state law might dissuade an individual with a disability from voting, that individual can dispense with any prerequisites to suit and rush to federal court. Then, the court must enjoin the law in *all* applications, as to *all* individuals—even non-disabled individuals or individuals who suffered no actionable harm. That is wrong for three reasons.

*First*, the ADA "does not require [the State] to employ any and all means to make [voting] services accessible." *Tennessee v. Lane*, 541 U.S. 509, 531-32 (2004). Rather, the ADA's and Section 504's "limited . . . remedy" of meaningful access "require[s] the State[] to take reasonable measures to

remove . . . barriers to accessibility." *Id.* Even prior to S.B. 1, Texas law provided those measures, including options for disabled individuals to vote that are unavailable to the general electorate. S.B. 1 then *expanded* those options. Texas thus facilitates, not denies, "evenhanded treatment and the opportunity" of disabled individuals to vote. *Alexander v. Choate*, 469 U.S. 287, 304 (1985).

*Second*, even if Plaintiffs had made out a prima facie case, the ADA requires that their members request from the relevant officials a "direct and specific" reasonable accommodation before filing suit. *Smith v. Harris Cnty.*, 956 F.3d 311, 317 (5th Cir. 2020). They did no such thing. And their justifications for not doing so do not withstand scrutiny.

For example, Plaintiffs' contention that such a request would have been futile is belied by S.B. 1—and the District Court's own reasoning. S.B. 1 bars election officials from interpreting the Election Code "to prohibit or limit the right of a qualified individual with a disability from requesting a reasonable accommodation," Tex. Elec. Code § 1.022, and the District Court explained that disabled voters "could ask the presiding judge for a reasonable accommodation," ROA.40917. Plaintiffs' assertion that their members' needs for accommodation are open and obvious fails because any testimony before the Legislature during the S.B. 1 lawmaking process did not inform

the "relevant" election officials of those needs. *Smith*, 956 F.3d at 317 (quoting *Windham v. Harris Cnty.*, 875 F.3d 229, 237 (5th Cir. 2017)). And Plaintiffs' argument that the breadth of their challenge excuses their failure to request an accommodation is faulty. That reasoning would allow an ADA plaintiff to bypass the accommodation-request requirement simply by seeking invalidation of neutral state laws in their entirety.

*Third*, the ADA and Article III foreclose the District Court's sweeping injunction in all events—as Plaintiffs' own arguments confirm. Plaintiffs insist that the injunction is modest because it "reinstate[d]" the pre-S.B. 1 status quo, which they say was "secure." Answering Br. 77-78. But this Court has already disagreed: "Mail-in ballots are not secure" and S.B. 1 serves "the State's legitimate interests in preventing the scourge of mail-in ballot fraud." *United States v. Paxton*, 148 F.4th 335, 337, 341 (5th Cir. 2025). Reinstating a regime that the Legislature—and this Court—deemed insecure is not modest relief. It is perhaps the most sweeping relief conceivable: wholesale nullification of duly enacted law that displaces the Legislature's policy choice. Such relief constitutes a fundamental alteration and is entirely disproportionate in a case concerning, at most, a few "frustrating, but isolated" voting experiences. *Gustafson v. Bi-State Dev. Agency of Mo.-Ill. Metro Dist.*, 29 F.4th 406, 412 (8th Cir. 2022) (quotations omitted).

Finally, Plaintiffs' alternative request for a remand actually gives their case away. Plaintiffs argue that an injunction would remedy their alleged injury if it "[d]irect[ed] State and local election officials that modifications to the Challenged Provisions are permissible and consistent with S.B. 1 and Texas law when required by the ADA." Answering Br. 80. But S.B. 1 and the ADA *already* so direct Texas's election officials. *See* Tex. Elec. Code § 1.022; Answering Br. 71 (acknowledging that conflicting "state law must yield" to the ADA). Plaintiffs therefore implicitly have confirmed that there is *nothing to remedy* in this case. And they thus have also confirmed that the injunction reverting to pre-S.B. 1 law for *all* Texas voters "fundamentally alter[s]" the State's voting program, *Lane*, 541 U.S. at 532, and not only extends far broader than necessary—but, in fact, is *unnecessary*—to grant them relief, *Trump v. CASA, Inc.*, 606 U.S. 831, 851-52 (2025). The Court should reverse.

## ARGUMENT

### I. PLAINTIFFS LACK STANDING TO CHALLENGE THE OATH PROVISION, THE ASSISTOR DISCLOSURE PROVISIONS, AND THE IDENTIFICATION REQUIREMENT.

This Court should dismiss Plaintiffs' challenges to the Oath Provision, the Assistor Disclosure Provisions, and the Identification Requirement because Plaintiffs lack standing. *See* Principal Br. 29-41.

### A. This Court Has Already Held That Plaintiffs Lack Standing To Challenge The Oath and Assistor Disclosure Provisions.

Plaintiffs have abandoned several theories of standing they pressed below—presumably because the Court rejected them on the very same record and involving the very same parties in *LUPE*. Plaintiffs concede that "[s]pending resources in response to a defendant's action is not enough" to establish standing, *see* Answering Br. 37, and no longer assert that the burden of waiting in line, filling out the Oath or Assistor Disclosure forms, or the alleged increased risk of an assistor's clerical error constitutes a cognizable injury, *see id.* 31-42; *compare LUPE*, 151 F.4th at 287 (rejecting these theories of standing); Principal Br. 29-41.

Plaintiffs' remaining theories of standing to challenge the Oath And Assistor Disclosure Provisions were likewise rejected in *LUPE*. On organizational standing, they say that those Provisions "severely hampered Plaintiff groups' ability to recruit volunteer assistors, who feared they could be investigated or prosecuted for assisting voters." Answering Br. 37. Thus, Plaintiffs stake their organizational standing on an alleged "credible threat that [their members] will be prosecuted for violating [the challenged] provisions." *Id.* 32.

This Court already rejected the exact same theory, involving the exact same parties and record, in *LUPE*. *See* LUPE Appellees' Br., No. 24-50826, Dkt. No. 213, at 42 (5th Cir. Mar. 26, 2025) ("Section 208 Br."); *LUPE*, 151 F.4th at 286. Thus, here, as in *LUPE*, Plaintiffs "identify no credible threat that any assistors will be prosecuted for violating the [challenged] provisions." *LUPE*, 151 F.4th at 286. "All they offer is the 'fanciful notion' that an assistor might run afoul of the provisions and be prosecuted." *Id.* (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013)). That speculative harm does not constitute an Article III injury. Plaintiffs, after all, "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Id.*

On associational standing, Plaintiffs again rehash the assertion of would-be assistors' subjective chill from a nonexistent threat of prosecution that this Court rejected in *LUPE*. In particular, Plaintiffs replay their argument that their members suffered cognizable harm because they "were forced to vote without assistance . . . because their assistors feared criminal exposure." Answering Br. 34; *compare* Section 208 Br. 38-39, 42. Here, as in *LUPE*, that argument fails because "[t]he members' alleged fears are not fairly traceable to the challenged action of the defendant[s], but instead to

baseless speculation about future prosecutions." *LUPE*, 151 F.4th at 287 (quotations omitted).

Plaintiffs do not dispute that they are now pressing the same theories that this Court rejected on this same record in this same litigation in *LUPE*. *See* Answering Br. 39. Instead, they assert *LUPE* does not control because the ADA claims in this appeal are "analytically distinct" from the Section 208 claims in *LUPE*. *Id.* 39 n.10. That rejoinder fails.

For its part, the District Court did not view the Article III analysis for Plaintiffs' Section 208 claims any differently than for their ADA and Section 504 claims. The District Court's standing analysis of both sets of claims was virtually identical—and in many instances, *word for word*. According to the District Court:

- Organizational standing exists because "[t]he chilling effect that the Assistor Disclosure and Oath requirements would have on individuals' willingness to provide voting assistance—and the downstream effects on organizations' ability to perform voter assistance services—was 'sufficiently predictable.'" ROA.40136 (Section 208 Op.); ROA.40947 (ADA Op.) (identical).

- Associational standing exists because "[a]s long as the amended Oath of Assistance remains in effect, these voters will be unwilling to expose their attendants to criminal liability by asking for their assistance." ROA.40132 (Section 208 Op.); ROA.40944 (ADA Op. 81) (identical).

- Traceability exists to the State Defendants and local DAs "based on the chilling effect that the 'credible threat' of criminal enforcement has on [assistors'] willingness to provide BBM assistance."

ROA.40137 (Section 208 D.Ct.Op. 73); ROA.40948 (ADA D.Ct.Op. 85) (identical).

Thus, not only are the same Plaintiffs, same standing arguments, and same record as in *LUPE* again before this Court—the District Court's same errors are, too.

In all events, Plaintiffs are wrong on the law. Article III's requirements of injury in fact, causation, and redressability apply with full and equal force to both Section 208 and ADA claims. Thus, even if Section 208 and ADA *claims* are "analytically distinct," Answering Br. 39 n.10, the Article III *standing* requirements applicable to both are the same—as even Plaintiffs' own cited cases confirm, *compare LUPE*, 151 F.4th at 285, *with Frame v. City of Arlington*, 657 F.3d 215, 235 (5th Cir. 2011) (en banc) (ADA plaintiffs must prove "actual or imminent" injury) (cited at Answering Br. 39); *Crawford v. Hinds Cnty. Bd. of Supervisors*, 1 F.4th 371, 375 (5th Cir. 2021) (ADA plaintiffs must prove traceability and redressability) (cited at Answering Br. 39).

Plaintiffs also insist that "imminent harm in the ADA context is a more 'elastic concept.'" Answering Br. 39 (quoting *Frame*, 657 F.3d at 235). But it is Plaintiffs, not this Court in *Frame*, who insert the word "more." *Frame* actually proves that ADA plaintiffs are *not* entitled to an exemption from or a relaxation of Article III's bedrock standing requirements. *See, e.g.*, *Frame*,

657 F.3d at 235. Here, as in *LUPE*, Plaintiffs fatally fail to show "imminent harm" from the Oath and Assistor Disclosure Provisions caused by and traceable to Defendants. *Id.*; *LUPE*, 151 F.4th at 286-88. The Court should dismiss Plaintiffs' challenges to those Provisions.

## B. Plaintiffs Lack Standing To Challenge The Identification Requirement.

Plaintiffs likewise lack standing to challenge the Identification Requirement. Plaintiffs assert three bases of associational standing. All fail. *First*, Plaintiffs point to two of their members' alleged "additional work required to overcome the [ ] Requirement's barriers." Answering Br. 41. But, of course, any rule that imposes a "usual burden[]" of voting, even if "additional" compared to some other voters or prior practice, does not give rise to Article III standing. *LUPE*, 151 F.4th at 287; *Richardson v. Tex. Sec'y of State*, 978 F.3d 220, 237 (5th Cir. 2020).

Plaintiffs, moreover, do not explain what they mean by "additional work." Answering Br. 41. To the extent Plaintiffs are referring to the Identification Requirement's mandate to fill in lines on a form, any such "work" is a "usual burden[] of voting," not a cognizable injury. *LUPE*, 151 F.4th at 287. To the extent Plaintiffs are referring to S.B. 1's new cure process for mail ballots, that process *alleviates*, rather than *causes*, any alleged harm from the Requirement. And to the extent Plaintiffs are referring to errors in

the Texas Election Administrative Management System ("TEAM"), there is no dispute that TEAM is complete and accurate for the vast majority of Texas voters, or that the State is constantly and actively working to fix remaining errors. *See* Answering Br. 19-25. In all events, database errors are certainly not unique to Texas, *see, e.g., Husted v. A. Philip Randolph Inst.*, 584 U.S. 756, 760 (2018), and Appellees point to zero authority suggesting that such inevitable errors violate the ADA or Section 504.

*Second*, Plaintiffs point to a single member, Ms. Iglesias, who allegedly had her mail-ballot application rejected because she failed to include the required identification number. *See* Answering Br. 39-40. Plaintiffs contend that this single member's experience "alone" secures standing for them to seek the blanket injunction. *See id.* They are mistaken. Ms. Iglesias's experience does not establish "certainly impending" future injury *even for herself*, let alone for all voters with disabilities or all Texas mail voters covered by the injunction. *Clapper*, 568 U.S. at 409; Principal Br. 31-32.

Even for her part, Ms. Iglesias could not testify that her application or ballot would be rejected in the future due to noncompliance with the Identification Requirement. Election officials offered curing to Ms. Iglesias, but she still failed to include an ID number. *See* ROA.33535-33540. Moreover, as she testified, she now has "more knowledge about how to vote

by mail in future elections" and agrees that "having that additional information will make it easier for voters just like [her] to vote more effectively." ROA.33548. Accordingly, she acknowledged that she would be "better able to cast an Application for Ballot by Mail or mail-in ballot in [the 2023] election." ROA.33559. She does not face certainly impending injury.

Nor does her experience establish certainly impending injury for anyone else. S.B. 1's cure process is available to all Texas voters who apply for or cast a mail ballot. *See* Tex. Elec. Code §§ 86.015(c), 87.0271. That process provides voters notice and multiple opportunities to comply with the Identification Requirement before election officials decline to process their application or ballot. It therefore makes any threat of future or "repeated injury" remote and "speculative," as opposed to "real and immediate." *Funeral Consumers All., Inc. v. Service Corp. Int'l*, 695 F.3d 330, 342 (5th Cir. 2012) (quotations omitted).

*Third*, Plaintiffs suggest they have standing because a small percentage of mail voters have failed to comply with the Identification Requirement in the past and "additional voters . . . will" fail to comply and choose not to use the cure process in future elections. Answering Br. 40-41. Even if the Court could credit Plaintiffs' prognostication, it does not establish associational standing. To show associational standing, Plaintiffs must prove their own

"*members* . . . have standing," not that some voters might be affected by the Requirement. *LUPE*, 151 F.4th at 285 (emphasis added). Plaintiffs' failure to do so after years of sprawling discovery and a multi-week trial dooms their associational standing argument.

Plaintiffs' organizational standing theory likewise runs headlong into governing law: Once again, Plaintiffs argue that the Identification Requirement forced them to divert resources from one form of voter education to another. *See* Answering Br. 41-42. That theory, however, is no longer good law—if it ever was. *See, e.g.*, *All. for Hippocratic Med.*, 602 U.S. at 395; *LUPE*, 151 F.4th at 286-88. And with good reason: That theory would permit every "organization[] in America [to] have standing to challenge almost every [ ] policy that they dislike." *All. for Hippocratic Med.*, 602 U.S. at 395.

Finally, Plaintiffs suggest in passing that "the District Court's fact-finding supporting organizational standing is not clearly erroneous." Answering Br. 42. That standard of review provides Plaintiffs no cover in any event. Standing is a "legal issue[] reviewed *de novo*," and Plaintiffs' standing theories fail as a matter of law. *LUPE*, 151 F.4th at 285. Moreover, the District Court never found that Plaintiffs have organizational standing to

challenge the Identification Requirement; instead, it rested solely on associational standing.  *See* ROA.40940-40941.

This Court should dismiss Plaintiffs' challenge to the Identification Requirement.

## II.    PLAINTIFFS' CLAIMS FAIL ON THE MERITS.

While the Court has no jurisdiction to reach them, Plaintiffs' various ADA and Section 504 challenges to S.B. 1 also fail on the merits.  *First*, Texas law and S.B. 1 facilitate, rather than deprive disabled voters of, "meaningful access" to voting.  *Alexander*, 469 U.S. at 301; *see* Principal Br. 42-49. *Second*, Plaintiffs and their members failed to request a reasonable accommodation from, and to engage in the accommodation process with, relevant election officials before filing suit.  *See Smith*, 956 F.3d at 317; *Windham*, 875 F.3d at 236-37; *see also* Principal Br. 49-56.  *Third*, the District Court's sweeping statewide injunction invalidating the challenged provisions in their entirety and reverting all Texas voters to pre-S.B. 1 law is not "reasonable," "fundamentally alter[s]" the State's voting program, *Lane*, 541 U.S. at 532, and sweeps far broader than necessary to provide complete relief, *see Trump*, 606 U.S. at 851; Principal Br. 56-62.  The Court should reverse.

## A. S.B. 1 Does Not Meaningfully Exclude Disabled Individuals From Voting.

Plaintiffs' ADA and Section 504 challenges fail because Texas's voting regime is not "being administered in a way that 'effectively denies' individuals with qualifying disabilities 'meaningful access' to the benefits for which they are qualified." *Frame v. City of Arlington*, 616 F.3d 476, 484 (5th Cir. 2010), *on reh'g en banc*, 657 F.3d 215 (5th Cir. 2011); *see* Principal Br. 42-49. Texas law provides voters with disabilities more than meaningful access to casting a ballot, including various voting options, such as curbside voting and mail voting, unavailable to the general electorate. *See* Principal Br. 44. Far from restricting these avenues for voting, S.B. 1 preserved—and even *expanded*—them. For example, S.B. 1 codified an express anti-discrimination mandate that facilitates disabled individuals' accommodation requests, *see* Tex. Elec. Code § 1.022, created a new cure process for mail ballots and applications, *see id.* §§ 86.015(c), 87.0271, 87.0411, and deemphasized signature comparison as a means of verifying voters' identities, *see id.* § 87.041; *see also* Principal Br. 44-45.

The record demonstrates that these accommodations are working. No Plaintiff or Plaintiff group member testified that they were unable to vote, by reason of their disability, because of any challenged S.B. 1 provision. Instead, voters with disabilities, including Plaintiff group members, availed

themselves of accommodations such as curbside voting, accessible machines, mail voting, and even S.B. 1's cure process. *See, e.g.*, ROA.35412-13, 35415, 35416, 35420, 35422, 35454; Principal Br. 45.

Plaintiffs' various arguments that the challenged S.B. 1 provisions deny disabled voters meaningful access uniformly fail.

*First*, Plaintiffs point to two of this Court's prior cases, *Luke v. Texas* and *Frame*, *see* Answering Br. 47-48, but both undercut, rather than buttress, Plaintiffs' claims. In those cases, the defendant denied the disabled individual *any and all* access to its program or service. *See Luke v. Texas*, 46 F.4th 301, 305 (5th Cir. 2022) (failure to provide interpreter denied opportunity to participate in judicial proceedings); *Frame*, 657 F.3d at 228, 231 (inaccessible public sidewalks denied use of the sidewalks). They therefore underscore that there is no denial of meaningful access here, where the vast majority of voters with disabilities who attempt to vote (by mail or otherwise) successfully do so and, thus, *do* have access to voting.

*Second*, Plaintiffs suggest that the relevant "program" is mail voting, not voting generally, and principally point to the Fourth Circuit's decision in *National Federation of the Blind v. Lamone*, 813 F.3d 494 (4th Cir. 2016). *See* Answering Br. 47-48. However, a "significant" premise in the Fourth Circuit's analysis was "the fact that Maryland allows *any* voter to vote by

absentee ballot." 813 F.3d at 504; *see also id.* at 510 ("Maryland's decision to provide 'no excuse' absentee voting to all its citizens provides a benefit that is far from universal across the United States."). A State's obligation to provide voters with disabilities meaningful access to a universally available method of voting is obvious. But *Lamone* is not probative of Texas's voting regime, which strictly limits the privilege of mail voting to select categories of voters. In fact, if anything, Texas's extension of mail voting to voters with disabilities provides them *more* access to voting than the general electorate, who are not eligible for that privilege.

For this same reason, the Second Circuit's decision in *Disabled in Action v. Board of Elections*, 752 F.3d 189 (2d Cir. 2014) (cited at Answering Br. 49), which involved universally available in-person voting, is unilluminating. So, too, do other of Plaintiffs' cited cases involve universally available programs or services. *See, e.g.*, *Am. Council of Blind of N.Y. v. City of N.Y.*, 495 F. Supp. 3d 211, 235 (S.D.N.Y. 2020) (public crosswalks). And Plaintiffs neglect to mention that the Supreme Court stayed one of their other cited decisions. *See People First of Ala. v. Merrill*, 491 F. Supp. 3d 1076 (N.D. Ala. 2020), *stayed* 141 S. Ct. 25 (Oct. 21, 2020) (cited at Answering Br. 48).

In all events, even if Plaintiffs were correct, Texas *does* provide voters with disabilities meaningful access to mail voting. Texas includes such voters

with disabilities in the narrow categories of voters who are eligible to vote by mail. There is no dispute that the vast majority of voters with disabilities who attempt to vote by mail do so successfully. And S.B. 1 makes mail voting easier for voters with disabilities by codifying the anti-discrimination mandate, creating a new cure process, and deemphasizing signature comparison. *See* Principal Br. 44-45.

*Third*, after years of sprawling discovery, Plaintiffs point to only two individuals who had their mail ballot or application rejected under the Identification Requirement. *See* Answering Br. 49. Of course, those instances say nothing about any of the other challenged provisions. Moreover, "those frustrating, but isolated, instances" do not even establish that the Identification Requirement has resulted—much less in the future will result—in a denial of meaningful access to those two individuals. *Gustafson*, 29 F.4th at 412 ("three" or "four" instances of alleged discrimination did not "establish a violation of the ADA") (quotations omitted). And they provide no basis to conclude that the Requirement will result in a denial of meaningful access for all (disabled) voters covered by the District Court's injunction, when the vast majority of (disabled) voters who have attempted to comply with the Requirement have done so.

In any event, Plaintiffs also misstate the facts. Election officials rejected Ms. Iglesias's applications because she did not include an identification number and did not cure. ROA.33535-33540. That is not a disability-based exclusion; it is noncompliance with a neutral, generally applicable requirement, including the cure procedures the Legislature created precisely to help avoid erroneous rejections. *See Smith*, 956 F.3d at 317 (the ADA requires exclusion "by reason of . . . disability"); *Cadena v. El Paso Cnty.*, 946 F.3d 717, 723 n.1 (5th Cir. 2020) (the Rehabilitation Act requires exclusion "solely by reason" of disability). In fact, Ms. Iglesias herself acknowledged that her difficulty stemmed from a lack of "knowledge about how to vote by mail," not her disability. ROA.33548.

*Fourth*, Plaintiffs suggest that "the District Court credited robust evidence that disabled voters in Texas are" denied meaningful access "due to the Challenged Provisions." Answering Br. 49. What they cite are the District Court's findings that disabled voters voted without assistance because they or their assistors were deterred by the subjective chill of a (unproven) threat of prosecution. *See* ROA.40906-40916, 40965 (cited at Answering Br. 49). But just as that evidence fails to establish standing, *see supra* Part I, it also fails to show a denial of meaningful access or an ADA violation *by the State*. *See, e.g.*, *Smith*, 956 F.3d at 317 ("public entity" must

be "responsible" for the denial of access).  If the rule were otherwise, a voter's subjective fears—untethered to any State-imposed barrier—could morph into an ADA violation, effectively imposing strict liability whenever an individual has misconceptions about the law.  *See LUPE*, 151 F.4th at 287 (explaining that it is impossible to "fathom how the Oath Provision harmed plaintiffs' members by making the existing consequences of violating the law more explicit").

*Fifth*, Plaintiffs suggest that a State violates the ADA whenever it adopts a rule that makes voting "more onerous" or "more difficult for voters with disabilities."  Answering Br. 47, 50; *see also id.* 51.  Plaintiffs, however, never address the obvious question:  "more onerous" or "more difficult" *compared to what*?  S.B. 1's new cure process makes voting *easier* for all mail voters, including disabled voters.  Thus, to the extent Plaintiffs suggest that process makes voting "more difficult for voters with disabilities," *id.* at 50, they cannot be drawing a comparison to pre-S.B. 1 law.  Instead, they are complaining that using the cure process may be more difficult for some voters with disabilities than for some voters without disabilities. *See id.*  But the ADA does not—and, indeed, *cannot*—require States to eliminate an individual's disability or the unfortunate difficulties attendant to having a disability.  Accordingly, the meaningful access standard does not require

States "to produce the identical result or level of achievement for [disabled] and [nondisabled] persons." *Alexander*, 469 U.S. at 305 (quotations omitted).

To the extent Plaintiffs intend to draw a comparison to pre-S.B. 1 law, the ADA does not freeze state law in place or prohibit States from innovating in their programs and services. The only question is whether the State currently provides disabled individuals "meaningful access" compared to other individuals. *Id.* at 306-07. Because Texas's voting regime—even its mail voting rules—do so, the Court should reverse.

### B. Plaintiffs Failed To Request An Accommodation.

Even if Plaintiffs made out a prima facie case, their members' failure to "specifically identify the disability and resulting limitations, and [ ] request an accommodation in direct and specific terms" from the relevant election official forecloses their claims. *Windham*, 875 F.3d at 236-37 (quotations omitted); *Smith*, 956 F.3d at 317; *see also* Principal Br. 49-56.

Plaintiffs' attempts to evade their accommodation-request obligation all fail.

1. Plaintiffs insist that the District Court found their members in fact sought accommodations. *See, e.g.*, Answering Br. 55. The District Court

made no such finding, concluding instead that such requests were unnecessary. *See* ROA.40959-61.

At any rate, the record establishes that Plaintiffs' members did not request accommodations. Plaintiffs cite the testimony of Ms. Halvorson, *see* Answering Br. 55-56, but she testified she *never* requested an accommodation, *see* ROA.45328–45329 ("Q. Did you ever consider requesting an accommodation for your disability that would involve modifying or waiving one of the requirements of SB 1? A. I didn't know that was a thing you could do."). Ms. Halvorson instead was concerned that her polling place would not have "remote controls for people with limited mobility," but it did. ROA.45320.

Ms. Nunez Landry, *see* Answering Br. 55-56, also did not request an accommodation. She sought legal advice about S.B. 1's requirements from Texas election officials and the United States Department of Justice. ROA.45247, 45252-45253.

Ms. Saltzman, *see* Answering Br. 56, did not identify her disability or limitations, or request an accommodation, in "direct and specific terms," *Windham*, 875 F.3d at 236-37. She merely told officials she needed "help with her ballot." ROA.45360-61. And those officials *did* provide help, guiding her through S.B. 1's cure process by phone. ROA.45356.

2. Plaintiffs suggest that "the District Court found" that "[v]oters in fact made numerous requests for reasonable modifications of the Challenged Provisions." Answering Br. 55. As just explained, however, neither Plaintiffs nor the District Court identified any of Plaintiffs' *members* who made such a request, and any requests by *nonmembers* cannot form the basis of Plaintiffs' claims. *See, e.g.*, *supra* Part I.

In any event, the portion of the opinion Plaintiffs cite recited that "[c]ounty election officials stated that they did receive some requests for accommodation (i.e., curing number-matching requirements by email) and were told by the [Secretary of State] to 'read the statute.'" ROA.40873. That recitation misstates the testimony.

One election official (Longoria) testified only that her office received inquiries from voters asking whether they "could" cure noncompliance with the Identification Provision by "email" or by sending "an assistant in their place." ROA.43302. The official, however, did not testify that any such inquiring voter identified herself as disabled or requested these approaches as accommodations, as opposed to simply asking what Texas law permits. *See* ROA.43302-43304. And the official's testimony about an increase in "call volume" to her office said nothing about voters with disabilities or any requests for accommodation. ROA.43286-43288 (cited at Answering Br. 56).

Another official (Callanen) testified that her office received requests for "assistance" from voters with disabilities, but did not identify any specific requests for accommodation.  ROA.43042-43043.  She further testified that her office "does not track [ ] request[s] . . . for reasonable modifications [or] assistance."  ROA.43042.  Yet another official testified as to what he believed S.B. 1 required, not whether he received any accommodation requests from disabled voters.  *See* ROA.42442 (Scarpello).

The only election official's testimony regarding accommodation requests that Plaintiffs cite came from Tacoma Phillips.  Ms. Phillips testified that voters sought a particular accommodation from the Identification Requirement:  election officials "com[ing] and assist[ing]" them in their homes or picking them up at home and taking them "to the polls to vote."  ROA.42540 (cited at Answering Br. 56).  Ms. Phillips testified that those requests were denied, *see id.*, and Plaintiffs nowhere explain how these proposed accommodations were "reasonable," Answering Br. 56.  Ms. Phillips further testified that other accommodation requests were granted, such as "help[ing] [voters] to get on the Secretary of State's Ballot Tracker to help them to try to cure" noncompliance with the Identification Provision.  ROA.42450.

Finally, Plaintiffs' suggestion that "[s]tate officials also testified that they received and denied reasonable modification requests from disabled voters," Answering Br. 56 (citing ROA.46593–46594 (Adkins)), is simply baffling. The cited testimony says nothing of the sort. Instead, Ms. Adkins testified that "the entity that is conducting the election," not the Secretary of State, is the correct entity for voters to direct their accommodation requests. ROA.46593. She further confirmed that S.B. 1's anti-discrimination mandate preserves the right to request an accommodation and that election officials can and should grant "reasonable" accommodations on request. ROA.46593–46594.

3. Plaintiffs, like the District Court, nonetheless maintain that it would have been "futile" for their members to request accommodations because election officials purportedly read the Election Code to prohibit them from granting accommodations. Answering Br. 60. S.B. 1 says the opposite. Principal Br. 51-53; Tex. Elec. Code § 1.022. Plaintiffs respond that S.B. 1's anti-discrimination mandate is somehow "irrelevant to the futility analysis." Answering Br. 63. That is multiply erroneous.

To begin, Plaintiffs say the mandate does not go far enough because it grants only the right to *request* an accommodation, not the right to *receive* one. ROA.40917 n.34. Of course it does not. *See* Principal Br. 53. The ADA,

not state law, supplies the right to *receive* a reasonable accommodation and preempts any contrary state laws—as Plaintiffs elsewhere recognize. *See* Answering Br. 71 (conflicting "state law must yield" to the ADA).

Next, Plaintiffs insist that S.B. 1 "bar[s] election officials from making modifications not expressly authorized." *Id.* 63 (citing S.B. 1 § 7.04). They are wrong. Section 7.04 simply provides that public officials may not "create, alter, modify, waive, or suspend any election standard, practice, or procedure mandated by law." In other words, election officials cannot flout the requirements of Texas law. This might seem obvious, but after flagrant violations by some Texas counties during the 2020 election, a reminder was warranted. *See State v. Hollins*, 620 S.W.3d 400, 410 (Tex. 2020) (per curiam). Section 7.04 nowhere says or ever hints that officials cannot grant accommodations.

Plaintiffs, moreover, misrepresent the record when they say that election officials testified they were prohibited from granting accommodations. The cited testimony reflects only that election officials cannot *eliminate* the mandatory requirements to vote under Texas law. *See* Principal Br. 52; *see also* S.B. 1 § 7.04. But that does not mean they cannot *accommodate* disabled voters. In fact, election officials answered

"[a]bsolutely" when asked whether they tried to make such accommodations. ROA.43042:20-23; *see also* ROA.46593–46594.

4. Plaintiffs suggest that they did not have to request accommodations because their members' disabilities were "open and obvious" to election officials. Answering Br. 58-59. The record belies that conclusion. Principal Br. 53-54. Plaintiffs' voicing of concerns about S.B. 1 to the State Legislature did not (and could not) put the "relevant agents"—local election officials—on notice of specific members' disabilities. *See Windham*, 875 F.3d at 237. Nor could Plaintiffs' conjecture that the Secretary of State listened to their testimony, Answering Br. 60, because "the entity that is conducting the election," not the Secretary, is the relevant agent for accommodation requests, ROA.46593.

5. Plaintiffs try to sidestep their accommodation-request obligation by invoking the breadth of their challenge. Answering Br. 56-58. The District Court echoed this view, deeming it "impractical" in a systemic challenge for "each voter with a disability" to "request a separate accommodation." ROA. 40960. Precedent holds otherwise.

Title II does not authorize wholesale suspension of generally applicable election rules simply because plaintiffs mount a program-wide suit. After all, the ADA mandates "an individualized approach." *Sutton v. United Air Lines,*

*Inc.*, 527 U.S. 471, 484 (1999). This Court thus requires discrete accommodations tied to known, individual limitations. *Windham*, 875 F.3d at 236. That is the whole reason why the accommodation-request burden "falls on the plaintiff" in the first instance. *Id.* at 237.

This requirement of an individualized approach would be swallowed whole if, as Plaintiffs claim, ADA plaintiffs could avoid it simply by seeking program-wide relief. Nor, as Plaintiffs contend, has this Court limited the accommodation-request obligation to "inapposite cases involving individual accommodations, such as Title I employment claims." Answering Br. 58. The Court has routinely applied it in Title II cases. *See, e.g.*, *Windham*, 875 F.3d at 236; *Smith*, 956 F.3d at 317.

Thus, it is unsurprising that Plaintiffs identify no decision from this Court relaxing that requirement for program-wide Title II challenges. In fact, *Cadena*, *see* Answering Br. 57, expressly states that "a plaintiff must show that the entity knew of the disability and its consequential limitations, either because the plaintiff requested an accommodation or because the nature of the limitation was open and obvious," 946 F.3d at 724.

Plaintiffs' other citations are inapposite. *Frame* merely held that plaintiffs have a private right of action to enforce Title II. *See* 657 F.3d at 240. *Delano-Pyle v. Victoria County* did not involve a failure-to-

accommodate claim.  302 F.3d 567, 576 (5th Cir. 2002).  And *Bennett-Nelson v. Louisiana Board of Regents* concerned whether a university waived its Eleventh Amendment immunity from suit under the Rehabilitation Act.  431 F.3d 448, 449 (5th Cir. 2005).

The District Court relied on *Payan v. Los Angeles Community College District*, 11 F.4th 729 (9th Cir. 2021), to reject individualized accommodation requests as "impractical."  ROA. 40960.  But *Payan* involved a disparate-impact claim, which "focuse[s] on modifying a policy or practice to improve systemic accessibility" as opposed to "an accommodation based on an individualized request or need."  *Payan*, 11 F.4th at 738.

Plaintiffs make the baffling argument that *Defendants* have somehow forfeited a disparate-impact argument.  *See* Answering Br. 65-69. Intervenor-Appellants *agree* with Plaintiffs that there is no disparate-impact claim in this case, which Plaintiffs again unequivocally disavow.  *See id.* Moreover, Plaintiffs cannot bypass this Court's foreclosure of disparate-impact claims and such claims' exemption from the accommodation-request obligation by seeking overbroad relief.  In any event, their disavowal of a disparate-impact claim forecloses Plaintiffs from invoking other circuits' disparate-impact caselaw to avoid the accommodation-request obligation. Principal Br. 54-56.

## C. Enjoining S.B. 1 Statewide Is Unreasonable And Violates Article III.

Finally, in all events, the Court should reverse because the District Court's blanket injunction is unreasonable, fundamentally alters Texas's voting program, and violates Article III. *See* Principal Br. 56-62.

Plaintiffs do not even argue that the injunction constitutes a "reasonable" modification under Title II, Answering Br. 69, so the Court should reverse on this basis alone, *Johnson v. Gambrinus Co./Spoetzl Brewery*, 116 F.3d 1052, 1059-60 (5th Cir. 1997).

Plaintiffs instead hang their hat on the argument that blanket invalidation of nine separate S.B. 1 provisions does not constitute a fundamental alteration. That is so, Plaintiffs say, because the injunction "reinstate[s]" a voting process that—according to Plaintiffs and the District Court—"function[ed] *securely* through" the 2020 elections. Answering Br. 77 (emphasis added). But this Court has already disagreed: "Mail-in ballots are *not secure*" and S.B. 1 serves "the State's legitimate interests in preventing the scourge of mail-in ballot fraud." *Paxton*, 148 F.4th at 337, 341 (emphasis added). By definition, reinstating a regime that the Legislature—and this Court—deemed insecure *is* a fundamental alteration. *See* Principal Br. 58-61.

If more were somehow needed, the injunction sweeps far more broadly than necessary to grant Plaintiffs complete relief. *Trump*, 606 U.S. at 851; *see* Principal Br. 61-62. Plaintiffs' alternative request for a remand proves as much. Plaintiffs suggest that an injunction "[d]irecting State and local election officials that modifications to the Challenged Provisions are permissible and consistent with S.B. 1 and Texas law when required by the ADA" would remedy their injury. Answering Br. 80. Such accommodations, however, are individualized, belying Plaintiffs' contention that "relief . . . limited to Plaintiffs' members . . . would" not "be administrable." *Id.* 79. And Plaintiffs' suggestion also underscores there is no basis or need for a remedy here, since S.B. 1's anti-discrimination mandate and the ADA already require relevant election officials to grant reasonable accommodations upon appropriate requests. *See, e.g.*, Tex. Elec. Code § 1.022.

## CONCLUSION

This Court should reverse and dismiss Plaintiffs' ADA and Rehabilitation Act challenges to those provisions.

December 19, 2025                    Respectfully submitted,


    *s/John M. Gore*

John M. Gore
  *Counsel of Record*
E. Stewart Crosland
Nathaniel C. Sutton
JONES DAY
51 Louisiana Ave., N.W.
Washington, DC 20001
(202) 879-3939
jmgore@jonesday.com
scrosland@jonesday.com
nsutton@jonesday.com


*Counsel for Intervenor-Appellants*

## CERTIFICATES OF COMPLIANCE AND SERVICE

I certify that this brief complies with Federal Rule of Appellate Procedure 32(a)(5)-(a)(6), (a)(7)(B), (c)(1), and Fifth Circuit Rule 32.1-32.2. Excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Fifth Circuit Rule 32.2, the brief contains 6,474 words and has been prepared using Microsoft Word in Georgia 14-point font.

I certify that on December 19, 2025, I caused a copy of the foregoing to be served on all counsel of record via CM/ECF.

December 19, 2025

*s/John M. Gore*
John Gore
*Counsel for Intervenor-Appellants*